1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND

2                   NORTHERN DIVISION

3

4

    LUISA PEREZ, ET AL.

5

        v.                       CIVIL CASE NO.

6                           AMD-06-121

    MOUNTAIRE FARMS, INC., ET AL.

7

        Defendants

8    _____/

9

10                 (Bench Trial)
              Tuesday, March 24, 2009

11            Baltimore, Maryland

12

    Before:  Honorable Andre M. Davis, Judge

13

14

15    Appearances:

16          On Behalf of the Plaintiffs:
          C. Christopher Brown, Esquire

17          Jane R. Flanagan, Esquire

18          On Behalf of the Defendants:
          J. Larry Stine, Esquire

19          Paul Oliver, Esquire

20

21

22    Reported by:
    Mary M. Zajac, RPR

23    Room 5515, U.S. Courthouse
    101 West Lombard Street

24    Baltimore, Maryland 21201

25

1           (Proceedings at 3:05 p.m.)

2           THE COURT:  Counsel, thank you for your indulgence.  I

3    was detained this morning, but we're ready to proceed, I think.

4           MS. FLANAGAN:  We are, Your Honor.  We have a short

5    Mountaire training video, it's approximately ten minutes, that we

6    could show now if you'd like.  Or if you'd rather proceed to the

7    witness.

8           THE COURT:  Whichever you'd like.

9           MR. STINE:  Either one is fine by us, Your Honor.

10          THE COURT:  Okay.  Why don't you show the movie?  Yes.

11   I thank counsel for the listing of the exhibits.  I got that.

12   Thank you.  It's very helpful.

13          I think -- just one moment.  Just to be sure.  Can you

14   put those speakers closer to a microphone?

15          MS. FLANAGAN:  Yes.

16          THE COURT:  Okay.  I suppose that one will do.  Yes.

17   Thank you, Ms. Flanagan.

18          MS. FLANAGAN:  Sure.

19          MR. BROWN:  Just for introduction, this is a training

20   film, I think it is, that is produced by the defendants.

21          MS. FLANAGAN:  It's a food safety video.

22          THE COURT:  This is both a defense and plaintiff

23   exhibit, I believe, correct?  Well, no.

24          MR. STINE:  Been listed by the plaintiff.

25          THE COURT:  Okay.  So it's a plaintiffs' exhibit.

1          MR. BROWN:  Our purpose primarily is to let you see

2     what it's like to be donned.  We're not --

3          MS. FLANAGAN:  There's some discussion of food safety

4     that will be irrelevant.

5          THE COURT:  I think I watched this yesterday.  It's

6     marked as an exhibit, is it not?

7          MS. FLANAGAN:  It is.

8          THE COURT:  Yeah.  Yeah.  I actually had it on

9     yesterday.  But go ahead.  Go ahead.

10          (Video played.)

11          THE COURT:  Yeah.  I had watched this but this is fine.

12     This is fine.

13          (Tape playing.)

14          MR. BROWN:  Your Honor, we're going take out of turn

15     Mr. Tirrell.

16          THE COURT:  Very well.

17          MR. STINE:  Ready, Your Honor?  Mr. Tirrell.  Come up

18     to the witness stand, please.  I can do it from right here just

19     as easy as I can do it from the desk.

20           MICHAEL TIRRELL, DEFENDANT'S WITNESS, SWORN

21          THE WITNESS:  Yes.

22          THE CLERK:  Thank you.  You may be seated.  Please

23     begin by stating your name for the record and spelling your last

24     name, please.

25          THE WITNESS:  Michael Tirrell.  T-I-R-R-E-L-L.

1              THE CLERK:  Thank you.

2              THE COURT:  Mr. Tirrell, that may look like a jury but

3    it's not.

4              THE WITNESS:  Okay.

5              THE COURT:  But we're pleased to have them with us.

6              DIRECT EXAMINATION

7    BY MR. STINE:

8    Q    Would you please state your address for the record?

9    A    Home address?

10   Q    Yes, please.

11   A    ███  Radish Road, Millsboro, Delaware.

12   Q    And where are you currently employed?

13   A    Mountaire Farms.

14   Q    And how long have you been employed by Mountaire?

15   A    25 and a half years.

16   Q    And what is your current position?

17   A    Vice President of Processing Operations.

18   Q    Could you tell us a little bit about your history with,

19   employment history with Mountaire, please?

20   A    Yes.  I was hired in January, 1984.  Started in the

21   Eviscerating Department.  And I was promoted to supervisor there.

22             THE COURT:  Excuse me one second.  Gail, is the system

23   actually on?

24             THE CLERK:  Yes.

25             THE COURT:  I guess it is.  Okay.  Sorry, Mr. Stine.

1          THE WITNESS:  I was promoted to supervisor there.  And

2    I worked various supervisory jobs in, first processing, which is

3    the Eviscerating Department, second processing, Deboning,

4    Shipping, Tray Pack.  Then was promoted to superintendant, which

5    is in charge of various departments, multiple departments.

6          I worked there for about a year, two.  Then was

7    promoted to night shift manager.  And I worked for a couple of

8    years there.  And then in 1989 or '90 I was promoted to Vice

9    President of Process and Operations.  We only had one plant at

10   that time but that was the title.

11   BY MR. STINE:

12   Q    Okay.  And in this position as the Vice President, have you

13   had any involvement from a corporate point with the issue related

14   to donning and doffing of gear?

15   A    Yes.  I was the company contact person.  I stayed on top of

16   the issue.  Started around 1998 when the Department of Labor

17   started what they called a poultry initiative, which was

18   compliance survey with the laws and regulations.

19         And there's a trade organization that multiple

20   companies belong to called National Chicken Council.  And they

21   send out the equivalent of flash reports, which is basically to

22   keep everybody updated on what's, what's happening with those.

23   So I kept in touch with that, starting around 1998.

24         That survey, if I remember, found about 50% of the

25   companies in compliance and about 50 out of compliance.

1          Then there was another one that was done by the

2    Department of Labor in 2000.  And if I remember right, I think

3    that the Department of Labor found 100% of the companies out of

4    compliance at that point.  But I kept in touch with that.  We got

5    regular updates to keep us all informed.

6    Q    Okay.  Were you able to ascertain what was the difference

7    between the '98 surveys, where about 50% of the companies were in

8    compliance, and the 2000 survey, when the Wage Hour reported that

9    none of the companies were in compliance.

10   A    To the best of our knowledge and our ability, what it looked

11   like to us was that the Department of Labor had changed and

12   reversed their position on donning and doffing, the

13   compensability of donning and doffing.

14   Q    And at that time, was Mountaire following industry practice

15   on donning and doffing?

16   A    Yes.

17   Q    And what was that industry practice at that time?

18   A    Industry practice, you provide gloves and aprons, bump caps

19   to your employees.  And they put them on whenever they wanted to

20   put them on.  And they knew what time to report to the line.

21   Same practice we've been using for as long as I've been there,

22   over 25 years, and beyond that.

23          But people know what time to be on, at their work

24   station.  And it's pretty much free discretion when they put it

25   on.

1    Q    Now, did the National Chicken Council disagree with the

2    Department of Labor's position?

3    A    Yes.

4    Q    And did you receive information from the National Chicken

5    Council as to the disagreement, the reasons for it?

6    A    Yes.  Multiple updates from National Chicken Council and

7    attorneys that represented the Chicken Council, informing us that

8    the Department of Labor had erred in their interpretation.  And

9    it was obviously a departure from past practice and from past

10   court cases.

11          And they more or less advised companies to continue

12   doing what we're doing.  And that's what we decided to do.  We

13   felt strongly that we were doing the right thing.  So we didn't

14   see that we needed to change it.

15   Q    Okay.  Your Honor, I believe we have a binder for the

16   witness to use.  May I?

17          THE CLERK:  Defendant's binder?

18   Q    Yes, ma'am.  I would like to draw your attention to what has

19   been previously marked as Defendant's Exhibit 30.  Could you

20   briefly review that and identify it for us?

21          THE COURT:  By the way, I'm sorry to interrupt.

22   Counsel, I don't know that we specifically addressed this

23   question.  But may I take it that all of the exhibits that have

24   been premarked and included in the respective binders are

25   admitted?

1          MR. STINE:  We would have objection to three of them

2    were out of context.  They need to be introduced in a more proper

3    manner.  But we have no fundamental objections, Your Honor.

4          THE COURT:  Okay.

5          MR. STINE:  I think 9, 10 and 11 of the plaintiffs'

6    exhibits need to be introduced properly.  But other than wanting

7    that in context, we have no objections.

8          MR. BROWN:  We have no objections to the defendant's

9    exhibits, Your Honor.

10          THE COURT:  All right.  Mr. Stine, you want an

11    affidavit from the agency regarding -- 9, 10 and 11 are --

12          MR. STINE:  No, Your Honor.  I don't want an affidavit

13    from the agency.  I'm not asking Mr. Brown to do that.

14          THE COURT:  Okay.

15          MR. STINE:  He fundamentally has gotten that from this

16    particular witness on the stand.  And it just needed to be in

17    context.

18          THE COURT:  So he can authenticate them through Mr.

19    Tirrell?

20          MR. STINE:  Yes, Your Honor.  We have no problem.  I

21    was just saying we didn't really object to it.  We just wanted

22    them put in context.

23          THE COURT:  Okay.  All right.

24          MR. STINE:  And in fact, I'm trying to do that right

25    now.

1          THE COURT:  Okay.

2    BY MR. STINE:

3    Q    Okay.  Are you familiar with the Defendant's Exhibit 30?

4    A    If I can look at for a minute.

5    Q    Yes.  Please do.

6    A    Yes, I've seen this.

7    Q    And was this provided to you in your position as Vice

8    President?

9    A    Yes.

10   Q    Okay.  I would like to draw your attention in particular to

11   what's in this exhibit, which is Attachment One, which is Bates

12   stamped Mount 0057.  That's about the fourth page.

13   A    Um-hum.

14   Q    And do you see this particular document?

15   A    Yes.

16   Q    And what was, what did this document inform you of after the

17   Wage Hour poultry surveys?

18   A    This document told me particularly that the Pilgrim's Pride

19   Company, chicken company, and Sanderson Farms Chicken Company,

20   both were sued on donning and doffing issues, and they both were

21   decided in favor of the company.

22   Q    Okay.  And were you aware that they'd been affirmed by the

23   Fifth Circuit?

24   A    Yes.

25   Q    Okay.  So you were provided this information after the Wage

1    Hour surveys?

2    A    Yes.

3    Q    Okay.  This was in -- what year was this provided to you?

4    A    This is in 2002.

5    Q    2002?

6    A    Yes.

7    Q    Now, were you subsequently, did you subsequently learn of

8    the Supreme Court decision, IBP v. Alvarez?

9    A    Yes.

10   Q    And can you tell me how you were informed about this case?

11   A    This information circulated from various law firms, at least

12   three that I can think of, and National Chicken Council,

13   informing us that the Supreme Court had, in fact, heard some of

14   the issues but they didn't really decide the issue of donning and

15   doffing.

16   Q    And what was your understanding as to what the Supreme Court

17   had decided in relation to donning and doffing?

18   A    Specifically, the Supreme Court decided that waiting in line

19   to receive personal protective equipment was not compensable, and

20   that once the principal activity took place, that under the

21   continuous work day rule that the time would start,

22   compensability would start at that point.  And those were the two

23   things that the Supreme Court decided that I remember.

24   Q    Okay.  And were you informed by these letters that your

25   current practice was in compliance or illegal?

1    A    In compliance.

2    Q    In compliance.  And did you continue to look at materials on

3    donning and doffing after that point, also?

4    A    Yes.

5    Q    I'd like to draw your attention to what's been previously

6    marked as Plaintiffs' Exhibit Nine.  I want to know if I could

7    ask where the exhibit book for the plaintiffs is.  Now, I'm

8    handing you what's been now marked as Plaintiffs' Exhibit Nine.

9    Do you recognize this document?

10   A    Yes, I do.

11   Q    Have you, did you previously review this document in your

12   position as Vice President?

13   A    Yes, I did.

14   Q    And did you make any decisions as to what you would do in

15   relation to this memorandum from Wage and Hour?

16   A    Yes.  We always allowed our employees to take their bump

17   caps, hair nets, ear plugs, gloves, aprons, boots with them, put

18   them on any time they wanted to put them on.  Took them home.

19        This memorandum from the Acting Administrator told us

20   that it was the Department of Labor's long-standing position that

21   as long as an employee had the option and the ability to don

22   personally protective equipment at home, then it would be

23   non-compensable even if that activity took place at work.  And

24   based on that information, we decided to also allow employees to

25   take home.  Previous to that, we restricted those to just the

1   plant.  But at that point we decided if that's the DOL's

2   position, that we would make a change to try to make sure that we

3   lined up with that position.

4   Q    And so when did you make that change?

5   A    We made that change, I think it was July of 2006.  And this

6   memo was May 31st, 2006.

7   Q    And how did you communicate this change in policy?

8   A    We posted policies on a bulletin board and made sure that we

9   put it into the orientation videos for new hires.  Made sure

10  everybody knew.  We also told them at the coat room, because

11  that's where they dropped off their coat.

12          It basically was pretty widespread change, that people

13  knew why.

14  Q    And did you change anything about how smocks could be

15  handled in the afternoon?

16  A    I think people, yes, people could take, drop the coat off

17  and you could pick up a coat, take it home, a cleaned up coat and

18  take it home, where before you couldn't do that.

19  Q    So you did make the changes in that procedure in relation to

20  this?

21  A    Oh, yes.

22  Q    And have you continued to keep up with the donning and

23  doffing issues with the poultry industry?

24  A    Yes.

25  Q    And have you been aware of any decisions since the Supreme

1    Court's decision in IBP v. Alvarez?

2    A    Yes.  Harrison Poultry and Claxton Poultry both were also

3    sued for donning and doffing issues.  And both of those cases

4    were found in favor of the company.

5    Q    So from all this information, what have you drawn from the

6    material that you've been studying since 1998 concerning how

7    Mountaire is handling the donning and doffing issue?

8    A    Well, based on everything that we kept in touch with, you

9    know, we basically drew the conclusion that what we were doing

10   was right and the Department of Labor had made an error in their,

11   in changing the way they interpreted the law, and that that was

12   most likely going to have to be litigated or changed another way.

13         But what we were doing was right.  So we stayed with

14   what we were doing.

15   Q    And your change in 2006, how did you perceive that in

16   relation to the compliance with donning and doffing?

17   A    Well, you know, just from a practical standpoint, being in

18   business, nobody likes to be sued.  You know, you just don't.

19   It's a hassle and it's time consuming.  It takes people away from

20   what they do.

21         So what we tried to do is if we could come into

22   agreement with what the DOL position was, then we thought that it

23   was just a prudent business practice to do it.  So that's what we

24   did.  We tried to make adjustments to what we were doing to see

25   if we could live with the decisions that they were making.

1   Q    Now, if you had to figure out some way to practically

2   measure the way to time donning and doffing, could you?

3   A    Honestly, I don't see how.

4   Q    Tell me why.

5   A    People -- not without being very, very restrictive on

6   adults, which, you know, you don't want to do that to people.

7   They have some dignity.  They have self-respect.  To bring people

8   in the front door, what they do is they come in, they come in,

9   some of them with their boots on.  As a matter of fact, almost

10  all of the people come in with their boots on.  Hair nets, ear

11  plugs hanging on their bump cap.  They might have their coat in

12  their hand.  They might have it on.

13       They go, they punch in.  They go to the cafeteria.

14  They get a sandwich or a cup of coffee.  When it's time for them

15  to go to work, they get up and they go on into the line.

16       If we had people trying to track that time, you're not

17  going to allow anybody to put anything on.  Don't touch any,

18  don't put your gloves on, don't put your hair net on, your hat

19  on.  You can't put anything on.  And then everybody would have to

20  line up in the hall, you know, almost like a race.  A race, set,

21  go.  Everybody clock in and put on your stuff.  Then parade them

22  on out to the line.

23       Just, just, you know, from a practical standpoint, it's

24  just not a feasible thing.  You're talking about, you know, a

25  thousand people.

1   Q    So you have almost a thousand people coming through, donning

2   and doffing at Millsboro?

3   A    About 900 per shift.

4   Q    Per shift.  So you got more than 1000?  You got to regulate?

5   A    Oh, yes.

6   Q    Now, if you can't record it, how do you figure out how to

7   pay them for the time if donning and doffing was found to be

8   compensable?

9   A    The only way to do that would be to just add some arbitrary

10  number to everybody's paycheck.  There's no practical way to

11  measure it.  You just have to, you'd have to make an estimate.

12  And that, that just doesn't make any business sense to us.

13  Q    Are you aware that other companies have been trying that and

14  are still having difficulties with donning and doffing issues?

15  A    Yes.

16  Q    Are you aware of who they are or you just heard in general?

17  A    In general.

18  Q    In general?  Okay.  Just one moment.

19       (Pause in proceedings.)

20  Q    No further questions, Your Honor.

21       MR. BROWN:  Your Honor, do you mind if I stay seated or

22  would you --

23       THE COURT:  No.  Not at all.

24       CROSS EXAMINATION

25  BY MR. BROWN:

1    Q    Mr. Tirrell, let me see if I understand what you just said.

2    From at least 1999 to the present, it's been your understanding

3    that the Department of Labor requires employers to pay for

4    donning and doffing time?

5    A    I think the first poultry initiative was 1998.  And the

6    Department of Labor found 50% of the companies in compliance.  So

7    I don't know that that's, what you just said was right.

8    Q    No.  Not a finding of compliance or non-compliance.  Has it

9    been the case that ever since late 1990s, the Department of Labor

10   has said that people such as, companies such as yours must pay

11   workers for donning and doffing time, washing time, and also for

12   lunch time?  Has that been your understanding of the department?

13   A    No.  Pay people for lunch time?

14   Q    Pay people for donning and doffing down time when they could

15   be at lunch?

16   A    I don't know exactly when the Department of Labor changed

17   their mind on that issue.  But it was some time between the first

18   and the second poultry initiative.  I think that that's accurate.

19   But I don't know exactly when that occurred.

20   Q    But you've chosen not to follow the Department of Labor's

21   rule in that respect?

22   A    We chose to follow the policies that were accepted by the

23   Department of Labor prior to that because we thought that was

24   right.

25   Q    So you thought you knew more than the Department of Labor?

1   A    I didn't say that.  Anybody can make a mistake, including

2   the Department of Labor.  They had a long-standing position

3   opposite to their new position.  Those things can change with

4   administrators or politicians.  They can change with lots of

5   things.  But we had court-decided cases that were appealed and

6   then upheld that said that what we were doing is right.  And I

7   think that was, that's good enough for us.

8   Q    Now, your plant, sir, two of your plants are in Delaware, is

9   that correct?

10  A    Yes.

11  Q    And you have a third plant in North Carolina?

12  A    Yes.

13  Q    You talk about these cases that were decided, saying what

14  you were doing was correct.  Were any of these cases from this

15  area, from the Maryland area, the Delaware area, or the Federal

16  Third Circuit or Fourth Circuits?

17  A    I'm not sure if they were, they weren't.  But since we're

18  talking about a federal law, it seemed like a federal court case

19  would apply no matter where you are.

20  Q    Well, so you didn't know at the time the status of the Third

21  Circuit and Fourth Circuit, of this doffing and donning rule?

22  A    I didn't know that there were any cases in that district.  I

23  don't know.  I know that Sanderson had one and Pilgrim's had one,

24  and both of those cases were found by the company, for the

25  company.

1    Q    Right.  And that was down South, is that correct?

2    A    I believe so.

3    Q    Yes.  So you continued to rely, you continued to reject the

4    Department of Labor standard despite the fact that you had no

5    Third Circuit or Fourth Circuit law in your favor?

6    A    I suppose that's one way to say it.  We continued to rely on

7    the federal court cases.

8    Q    And did you rely on any other North Carolina state cases

9    that upheld the duty of an employer to pay for doffing and

10   donning?

11   A    I don't know that there were any in North Carolina.

12   Q    Now, you did say the case named Alvarez came along, is that

13   correct?

14   A    What was the question?

15   Q    You did recently testify, just testify that a case in the

16   Supreme Court named Alvarez?

17   A    Yes.

18   Q    And your reaction to Alvarez was not to change your

19   compensability of donning and doffing, correct?

20   A    Correct.

21   Q    And why is that, again?

22   A    Because we didn't see that the Supreme Court decided the

23   donning and doffing issue.  They decided continuous work day and

24   they decided waiting time for supplies was not compensable.

25   Those two.

1    Q    Let me, we just talked about Exhibit Number Nine, which I

2    guess is entered into evidence, or almost will be.  And the

3    Department of Labor in this statement, advisory memorandum of May

4    31, 2006, says as follows:

5              Alvarez thus clearly stands for the proposition of

6    where the active time spent donning, walking and waiting and

7    doffing exceeds the de minimis standard it is compensable.

8    A    Where are you reading that from, sir?

9    Q    This is from the Department of Labor, May, 2006, advisory

10   memorandum.  And it's Exhibit Number Nine.

11   A    Okay.  I think I have that in front of me.  Where did you

12   read that?

13   Q    It's the last, last paragraph, first sentence.  The question

14   to you is, doesn't this come right down on all fours and say that

15   Alvarez requires you to start paying workers for donning and

16   doffing?

17   A    No.  Not to us it didn't.  We had, like I said, the

18   continuous work day rule, we thought that was, in fact, decided

19   by the Supreme Court.  And then the waiting time was decided by

20   the Supreme Court.  But not the donning and doffing.

21   Q    You disagree with the Department of Labor's analysis in this

22   instance?

23   A    Absolutely.

24   Q    Now, you explained to us in brief, but I didn't get the full

25   gist of it, you decided in July of 2006 to find a way to get

1   around Alvarez?

2   A    Pardon me?

3   Q    Isn't that what you, in essence, testified?

4   A    I'm sorry.  I'm having a little hard time hearing you.

5   Q    I'm sorry.  I've got a -- it's a fact, is it not, Mr.

6   Tirrell, that in July of 2006 you changed your policies with

7   respect to donning and doffing?

8   A    With respect to lab coats.

9   Q    And lab coats now for the first time were able to be taken

10  home?

11  A    Yes.

12  Q    Whereas they were not before?

13  A    Correct.

14  Q    And your reason to do this was to get around the Alvarez

15  opinion?

16  A    Absolutely not.  The memorandum from the Acting

17  Administrator of DOL said that if employees have the option and

18  ability to take their equipment home, then it's not compensable.

19  We thought that was an easy change to make.

20  Q    Let me show you Exhibit Number 15, please.  Exhibit 15.

21  A    15?

22  Q    Could you turn to 15, please?  Mr. Tirrell, can you identify

23  this document?

24  A    Yes.  This is an e-mail from me.

25  Q    And the e-mail, in the middle of the page, that's from Mr.

1    Everett Brown?

2    A    Yes.

3    Q    Who is Mr. Brown?

4    A    Mr. Brown is the Director of Operations for the Selbyville,

5    Delaware plant.

6    Q    So he is saying to you, quote, in the middle of this page,

7    "At this point we have talked with each employee and they are

8    signing their name saying they understand that they have the

9    option to take the coat or not take the coat."  Is that accurate

10   so far?

11   A    Yes.

12   Q    He then goes on to say, Most are not taking the coat and

13   don't want it the night before.  Is that accurate?

14   A    That's what it says.

15   Q    Then it goes on to say, however, As with all other

16   equipment, they have the option.  Do you agree with that?

17   A    Yes.  That's what it says.

18   Q    Do you have any idea what that erased part was, the redacted

19   part?

20   A    No.

21   Q    You don't recall from having -- you read this at one point

22   in time in the past, I trust?

23   A    Yes.

24   Q    Now --

25   A    2006.

1   Q     Pardon?

2   A     In 2006.

3   Q     That was just yesterday, wasn't it?

4   A     Yeah.

5   Q     Could you, Mr. Tirrell, look at the fourth page of that

6   Exhibit 15?  And is this your writing or is this Mr. Brown

7   writing to you?

8   A     I believe that's me writing.

9   Q     Okay.  And you say, do you not, a few weeks ago we decided

10  to give the employees the option of taking the lab coat home with

11  them and therefore making it possible for the employee to put the

12  lab coat on at their discretion.  This should have effectively

13  eliminated the donning and doffing issue.

14          Doesn't that read as if you know you're on the ropes

15  and this is an attempt to get around the donning and doffing

16  issue?

17  A     No.  Not at all.  That is, that is what I just told you.

18  That was a change that we made, even though it has some expense

19  to it, it was a change that we made in order to come into

20  agreement with what the Department of Labor had issued, saying

21  that was their longstanding position.

22  Q     But then you --

23  A     Like I said before, nobody likes to be sued.  If we can make

24  a change like this, we were willing to do it.

25  Q     Well, let's go back to that first page of Exhibit 15.  It

1   says the workers don't want to take the smock home.  Why would

2   you change the rule for something that the workers don't want,

3   anyway?

4   A    Well, I think what the policy, the memo said from the acting

5   administrator was, if the employees have the option and the

6   ability.  The desire wasn't listed.  Option and ability was, that

7   was what we provided.

8   Q    Okay.  So it didn't matter to you that nobody wanted this

9   new right?

10  A    I didn't say that.  I had, my job was to provide them with

11  the option and the ability.  The people have the choice what they

12  want to do.  And I think that's what the policy was all about,

13  choice.

14  Q    What was the benefit to the employee of this new option?

15  A    The employee?

16  Q    What was the benefit to your employees?

17  A    I don't know that there was a benefit.

18  Q    So it would be fair to say this was an illusory gift that

19  you gave them?

20  A    No.  This is, you either get it in the morning or you get it

21  the night before.  It doesn't make any difference.

22  Q    Isn't it totally impractical to put all your, to dress at

23  home and then drive to the plant, perform you jobs at the plant?

24  A    I don't think so.

25  Q    We just saw the film, the brief film with everybody in

1    their, in their plant regalia?

2    A    Um-hum.

3    Q    Are you seeing anybody diving down the highway dressed like

4    that?

5    A    Yes, I have.

6    Q    Really?

7    A    Yes, I have.  It's very easy to spot.  The bump cap on their

8    head in the car.

9    Q    And --

10   A    Lab coat.

11   Q    You wouldn't -- lab coat, too?  And apron over the lab coat?

12   A    I don't know if I've ever seen that.

13   Q    How about gloves?  Were they wearing, the people you saw,

14   were they wearing gloves?

15   A    I don't know if I've seen that.

16   Q    How about the shield that go on the arms?

17   A    I can't tell you I've seen that.  Well, yes, I have.  I

18   have.  I have seen sleeves.  It's really about personal choices.

19   They can do it if they want to.  They cannot do it if they want

20   to.

21   Q    But very few people seem to want to?

22   A    Well, that's what this says at this time.

23   Q    Well, something has changed?  Is that what you're

24   suggesting?

25   A    All I'm telling you is that is what that sentence says.  I

1    have to agree with you.

2    Q    Why was it that earlier, before July of '06, you forbad

3    employees from taking home with them their smock?

4    A    Well, we thought that it was a way to keep better control on

5    an expensive piece of equipment.  That smocks at the time were

6    between 8 and $12 apiece.  And that when we let people take them,

7    they were strewn all over the place.

8    Q    So there was no fear of contamination being an issue?

9    A    No.

10   Q    Do you see, have you seen anybody in the summer, the hot

11   southern Delaware summer driving to work or from work, all in

12   full personal protection gear or regalia?

13   A    I can tell you that I've seen them driving.  I can't tell

14   you what season it was.  I don't remember.

15   Q    It would be pretty hot under all that stuff to drive that

16   way to work, wouldn't it?

17   A    If you're wearing a coat in the summer, it would be hot,

18   yes, if that's the question.

19   Q    And in the winter, I guess you need an overcoat over your

20   smock and your apron and your sleeves and so forth?  Is that a

21   yes or a no?

22   A    Well, I don't know.  You know, in the summer it's hot and in

23   the winter it's cold.  I've seen people driving, I've seen them

24   driving with the lab coats on and the bump caps, too.  What

25   season it was, I can't remember.

1   Q    Now, how does it work?  You have racks inside the plant and

2   lab coats or smocks.  The lab coats and smocks are the same

3   thing, right?

4   A    Yes.

5   Q    And there are these racks inside in the hallway.  How does

6   an employee get a lab coat from the rack?

7   A    They get, go to their, they're marked by size.  They go and

8   get whatever size they wear and take it.

9   Q    And does that make it easier for them to pick the lab coat,

10  more easier to change there in the plant?

11  A    Does what make it easier?

12  Q    Does putting the lab coat rack out in the hallway, does that

13  make it easier for an employee to grab a coat and, or smock, and

14  then dress in the plant?

15  A    As compared to what?

16  Q    As compared to not having a, not having a, not having a

17  smock rail right out at your leisure?

18  A    I'm not sure I understand.  Easier or not easier, there

19  would have to be two things to compare it to, not just one.  I

20  don't know what you're asking me.

21  Q    What if there were no rack at all?

22  A    If there was no coat to get, then having a rack there is

23  easier.  I'm not sure, I'm really not sure what you're asking me.

24  Q    I guess what I'm thinking of, is another way to get a lab

25  coat to go to a store, people are given a lab coat at the store?

1    A    Go to the store?

2    Q    Supply store.

3    A    That's possible.  There's lab coats there, also.

4    Q    How about, does everybody have access to a locker if he or

5    she wants it?

6    A    I'm not sure.

7    Q    Let me turn, if we could, back to that Exhibit 15.  And let

8    me read to you this Number 2 on Page 4.  And this is you, again,

9    telling some of your people in your chain of command.

10        It says, quote:  "Each of you should have begun moving

11   the hand wash sinks out to the department areas to delay the

12   first principal activity until the line started."  What's that

13   mean?

14   A    That means that whatever people have to, whenever they have

15   to wash their hands, we move the sinks to the line instead of

16   having it at the front door.

17   Q    And the purpose for that was to get around the doffing and

18   donning --

19   A    No.

20   Q    -- requirements?

21   A    The purpose for that was to make the hand wash sinks right

22   next to the departments.

23   Q    Well, then, what's this reference to first principal

24   activity?  What does that mean?

25   A    That was, those are my words that I used because this is my

1  e-mail. Like I said before, what we're doing was everything we

2  could do to come into agreement with the Department of Labor

3  change in position. That's what that is. The lab coats were

4  that and so was this.

5  Q    And it's just coincidental that those words, "first

6  principal activity", happen to have legal significance?

7  A    Yeah. I'm not a lawyer. Neither are the guys I wrote this

8  to, but they understood what that meant.

9  Q    So someone advised you, I take it, that this was one way in

10 which you could reduce your need to pay compensation for donning

11 and doffing; namely, if you moved these washing sinks inside?

12 A    No. What the Department of Labor has, I told you before, a

13 couple of court cases found in favor of companies. What I'm

14 doing here, as we're keeping track of all these activities that

15 are going on with all these different poultry companies and all

16 this survey the Department of Labor was doing, I'm trying to make

17 changes to come into agreement with the Department of Labor's

18 position change. And that's what I was doing.

19           I still thought what we were doing was right. But if I

20 could make a change, modification, I did it.

21 Q    And I take it your lawyer suggested these options?

22           MR. STINE: Objection, Your Honor.

23           THE COURT: Sustained.

24 BY MR. BROWN:

25 Q    If I'm an employee at your plant and I decide I don't want

1    to wear a bump cap or I don't want to wear shoes, I don't want to

2    wear an apron, what would happen to me?

3    A    If you didn't want to wear something that was required?

4    Q    Right.

5    A    You couldn't enter the work area.  You couldn't work there.

6    Q    And if I did it, I trust I would be punished in some way or

7    another, if I continued that?

8    A    Yes.  You couldn't work there.  That's punishment.  You have

9    to wear it.

10   Q    In what, in what ways does the personal protective equipment

11   help the employer?  In what ways does the use, the use of wearing

12   personal protective equipment, how does that help them out there?

13   A    It's really for two purposes.  It helps, mostly it helps the

14   employee, you know, because there's water, that they can get wet.

15   So we have non-slip boots so people don't slip on the floor, and

16   aprons so they don't get the front of them wet.  Bump caps so

17   they don't bump their head on any, anything that might be, a

18   little hanging conveyor belt or a drip pan.  Ear plugs to protect

19   their hearing.

20   Q    So there's no benefit to the employer, really, by the

21   personal protective equipment?

22   A    Might protect the product.  If the person has some, you

23   know, some, something on their clothes.  You know, if they wear

24   something over top, it will protect the product.  But it's mostly

25   to protect the employee.

1   Q    And isn't it in the employer's interest to have healthy

2   employees?

3   A    Absolutely.

4   Q    And isn't it in the interest of the employer to keep Workers

5   Comp payments down by people not getting injured on the job?

6   A    Safety's always important, not only for Workmen's

7   Compensation costs, but also pain and suffering, employees

8   missing time from work.  There's lots of reasons to be safe.

9   Q    Have there been any occasions in which Mountaire has faced

10  problems as a consequence of contaminated, selling contaminated

11  chicken?

12  A    Selling contaminated chicken?  Can you be more specific?  We

13  have to insure that the chicken is safe to the best of our

14  ability to put it in commerce.

15  Q    But in the past, has there ever been an occasion in which an

16  accident took place, or whatever happened, the chicken was

17  contaminated, got out into the market, and had to be withdrawn?

18  A    There may have.  I can't recall a specific incident.  But

19  there may have.

20  Q    And that's something, is it not, that personal protective

21  equipment guarantees or helps guarantee against?

22  A    Not necessarily.  Contaminated poultry might be for lots of

23  reasons.  Could be a chemical that doesn't have anything to do

24  with personal protective equipment.

25  Q    If somebody's using, if somebody's handling your chicken

1   without gloves on, clean gloves on, that could contaminate the

2   chicken, right?

3   A    People can, can and do handle chicken without gloves on.

4   Q    I have no further questions.

5              REDIRECT EXAMINATION

6   BY MR. STINE:

7   Q    Just one or two, Your Honor.  Mr. Brown was asking you about

8   observations of employees.  Could you elaborate a little bit more

9   what you've seen with employees and what gear they've been

10  wearing into the plant or driving around?

11  A    I specifically see people routinely with a bump cap on, lab

12  coat on, a hair net on, and ear plugs.  They're usually not in

13  but they're hanging from the back strap on the back of the

14  helmet.

15  Q    And --

16  A    See it a lot.  Particularly when you get closer to the plant

17  because people live in various radius from the plant.  As they

18  come to the parking lot, you know, as I drive in, you can clearly

19  see people with their stuff on in the car.

20  Q    So how would you respond to the claim that, you know, this

21  change about the smock was illusory and employees don't, can't do

22  it and don't do it?

23  A    That's not accurate.  That's not true.  Whether you pick up

24  a coat on your way out or pick up a coat on your way in, there's

25  no difference.

1    Q    Now, Mr. Brown also raised something about aprons and gloves

2    and arm guards.  In the process at the plant, when would new

3    employees typically put on the apron, the plastic gloves, that

4    sort of thing?

5    A    What or when?

6    Q    When, in sequence of events?

7    A    Generally, the gloves go on right at the line.

8    Q    What about the aprons?

9    A    Apron, a lot of times what they're doing is they're putting

10   it on as they're walking.

11   Q    Where?  In the production area or --

12   A    In the production area.

13   Q    Nothing further, Your Honor.

14            MR. BROWN:  Nothing further, Your Honor.

15            THE COURT:  Mr. Tirrell, I can't pass up this

16   opportunity.  My questions, I suspect, are of marginal relevance.

17   But how many competitors do you have?  Nationwide.

18            THE WITNESS:  Companies?

19            THE COURT:  Yes, companies.

20            THE WITNESS:  Or plants?

21            THE COURT:  Companies.  Round figure.

22            THE WITNESS:  Fifty.

23            THE COURT:  Fifty.  And I presume that fresh chicken is

24   one of those products that retailers, and wholesalers, for that

25   matter, are going to want a nearby or local market?  In other

1    words, if I'm a Giant supermarket in Baltimore, I'm not going to

2    want a chicken from California or from Texas, am I?

3              THE WITNESS:  No.

4              THE COURT:  So it's like bread.  The bread you buy was

5    probably baked somewhere pretty close by?

6              THE WITNESS:  Yes.  If it's fresh.  There's also

7    frozen.

8              THE COURT:  Yeah.

9              THE WITNESS:  Frozen can go around the world.

10             THE COURT:  Right.  Exactly.  Now, I'm really going to

11   test you now.  What is the, what is the domestic market in

12   consumed chicken in round numbers?  And is it a B or a T?

13             THE WITNESS:  Per person, I think --

14             THE COURT:  No.  Not per person.

15             THE WITNESS:  Oh, total.

16             THE COURT:  In the aggregate.

17             THE WITNESS:  I tell you, I don't know.  I don't know.

18             THE COURT:  It's way up there?

19             THE WITNESS:  It's way up there.

20             THE COURT:  Americans love our chicken.

21             THE WITNESS:  Yes.  We do.  Fried chicken, baked

22   chicken, barbequed chicken.  Yes.  It's number one over beef and

23   pork.

24             THE COURT:  Number one.  By, I suspect, quite a margin.

25             THE WITNESS:  Yes.  And turkey, which tastes bad.  They

1   try to make turkey taste good but it just doesn't taste good.

2           THE COURT:  Well, my grandmother could make a turkey

3   taste pretty good.

4           THE WITNESS:  Some people can.

5           THE COURT:  Now, I can't help but ask this practical

6   question.  I'd like to think I have sort of a pragmatic bent.

7   And I've alluded to this, I think, with counsel at earlier

8   hearings.

9           But I think I understand full well competitive

10  advantage and the need to, notwithstanding local markets but, in

11  fact, in respect to local markets, you've got to be competitive.

12  And I can't help but, since I've become very educated now about

13  the chicken industry as a result of this case -- well, let me ask

14  this first, which really will help clarify a couple things.

15          You have the time clock that, as I read the record on

16  the various motions, really has no meaning except to tell you

17  that an employee has showed up, has shown up.  The time clock has

18  nothing to do with people getting paid, right?

19          THE WITNESS:  Correct.

20          THE COURT:  Why do you have the time clock?

21          THE WITNESS:  Attendance.

22          THE COURT:  Attendance.  Okay.  So it's attendance.

23  All right.  So a person clocks in.  And I guess, I mean, in my

24  past I had jobs where I clocked in as a younger man.  And as I

25  recall, there would be sometimes rules that you couldn't clock in

1    before a certain time and you had to clock out by a certain time.

2         Does that kind of consideration come into play where

3    you have a time clock that only checks for attendance?  In other

4    words, you mentioned employees showing up and having coffee.  Can

5    an employee come to work any time she wants, sit in the

6    cafeteria, read the paper, read a magazine, have a coffee, have

7    breakfast, have lunch?

8         THE WITNESS:  Generally --

9         THE COURT:  Not that they'd want to now.  I understand

10   that.

11        THE WITNESS:  Well, our cafeteria's pretty good.  So a

12   lot of people come there to have their meals.

13        THE COURT:  By the way, do you offer free breakfast or

14   something?  No?

15        THE WITNESS:  No.

16        THE COURT:  Of course not.

17        THE WITNESS:  But we do subsidize it.

18        THE COURT:  You subsidize it.  You don't go --

19        THE WITNESS:  Don't go all the way.

20        THE COURT:  Okay.  All right.  So a guy can show up two

21   hours before a shift, hour and a half before a shift?

22        THE WITNESS:  Yes.

23        THE COURT:  Hour before his shift?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.

1          THE WITNESS:  And they do.

2          THE COURT:  And they do.

3          THE WITNESS:  Because a lot of people ride together.

4          THE COURT:  Right.  Of course.

5          THE WITNESS:  One works in one part of the plant, one

6    works at another part of the plant.  So they come in and clock

7    in.

8          THE COURT:  And the shifts don't all start at the same

9    time?

10         THE WITNESS:  No.  Because as the chicken moves through

11   the process, you know, you have the back dock forklift drivers

12   start at six in the morning but Deboning Department won't start

13   until 8:30.

14         THE COURT:  Okay.  Got it.  And by the way, is it two

15   or three shifts?

16         THE WITNESS:  There are three shifts.  Two production

17   shifts and one sanitation.

18         THE COURT:  I see.  So the third shift, they clean up.

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  Got it.  Now, back to my practical

21   bent.  A person could look at this situation, I think, and say,

22   why don't they just pay these people for 20 minutes extra or 15

23   minutes extra and just charge everybody a nickel more for a piece

24   of chicken when they go to KFC, or 12 cents a pound when they go

25   to Giant and buy chicken for the summer barbecue.

1            THE WITNESS:  Why don't they?

2            THE COURT:  Would that solve the problem?

3            THE WITNESS:  Well --

4            THE COURT:  Not that there is a problem.  But is that

5    one sort of --

6            THE WITNESS:  Well, if you --

7            THE COURT:  I guess it would violate antitrust laws,

8    wouldn't it?  If all the chicken companies got together and said,

9    look --

10           THE WITNESS:  If we got together and did it, it would.

11           THE COURT:  Okay.

12           THE WITNESS:  If you did that, you would trade hundreds

13   for millions.

14           THE COURT:  Meaning what?

15           THE WITNESS:  Meaning 15 minutes a day is millions of

16   dollars.

17           THE COURT:  Okay.  I just pulled out of the air five

18   cents on a piece of chicken.  Would seven cents cover it?

19           THE WITNESS:  No.

20           THE COURT:  No?

21           THE WITNESS:  And what happens is you really are

22   charging just a few people.  Somebody might buy hamburger.

23           THE COURT:  You mean, in other words, you'd lose some

24   market?

25           THE WITNESS:  Honestly, what we, what I said, we

1    believe we're right.  And to just pay some more and then take it

2    back some place else, just not the way we do things.

3          THE COURT:  Well, when you say you believe you're

4    right, you mean you believe you're complying with the law?

5          THE WITNESS:  Absolutely.

6          THE COURT:  I mean, right depends on what Congress says

7    you have to do.

8          THE WITNESS:  Complying with the law.

9          THE COURT:  Right.  Okay.

10          THE WITNESS:  We comply with lots of laws.

11          THE COURT:  Okay.  Now, so nobody's ever, or maybe you

12    don't know this.  But nobody's ever, you know, run the algorithms

13    or done the analyses to see the comparative cost.  As you said,

14    you don't want to be sued.  You don't want to be sitting here in

15    Baltimore, as much as you love being in Baltimore.

16          THE WITNESS:  I love the Inner Harbor but --

17          THE COURT:  You didn't want to be sitting here

18    testifying to this fake jury.  You want to be back in Delaware,

19    managing a chicken plant.

20          THE WITNESS:  That's right.

21          THE COURT:  Has anybody ever done the analysis to see

22    what it's cost the industry to insist that it's right and the

23    Department of Labor or the plaintiff class or whoever it is are

24    wrong, instead of my admittedly simple-minded idea of just adding

25    eight cents to the cost of a unit of chicken and avoiding all the

1    costs associated with the litigation?

2              THE WITNESS:  Well, you have a good point.  Here's the

3    problem with that point.  You mentioned earlier, this is a very

4    competitive business.  We make very little per pound.

5              THE COURT:  Okay.

6              THE WITNESS:  You make your --

7              THE COURT:  Good point.

8              THE WITNESS:  You make your money on lots of pounds.

9    And we compete for customers.  We compete for employees.  So if,

10   if I charge more in my cafeteria or something else, for some

11   other thing, then the competition ten miles up the street doesn't

12   do it.  Now I'm at a competitive disadvantage.  Not only are my

13   products going to cost more, because I can't get it all back,

14   it's millions.  But I'm going to charge people more than they

15   charge people for the same thing.  So now I'm not competitive.

16             If you're not competitive --

17             THE COURT:  You're not competitive.

18             THE WITNESS:  I mean, we measure to ten-thousandths of

19   a dollar, four decimal points.

20             THE COURT:  In your production cost?

21             THE WITNESS:  In our production.  And we have to be

22   very competitive with everybody.  So when we look at these cases

23   and we see there are people prevailing, they're not doing it.

24   They're not going to do it.  They won their court case.  If I do

25   it, they now have a competitive advantage.  We will not survive

1    doing it.

2              THE COURT:  I see.

3              THE WITNESS:  You can't stay in business because

4    they'll go right to Giant and right to Food Lion and right to

5    somebody else, and they'll take your customer because they can

6    charge them less.  And you know, we can't run our business and

7    make no money.  Break even or lose.  You can't survive.

8              THE COURT:  Since we've gone down this path at my

9    request, I seem to recall, and I believe Mr. Brown's firm was

10   involved in some of these cases, or maybe Mr. Brown was, there

11   was some chicken catcher cases a few years ago.  Does that ring a

12   bell?

13             THE WITNESS:  Yes.

14             MR. BROWN:  Yes.

15             THE COURT:  Did that have an impact on your costs?

16   Again, I didn't have any of those cases and, frankly, I didn't

17   pay a whole lot of attention to it except to sort of notice that

18   there were positive outcomes either by settlement or by

19   litigation all the way through, whereby a number of those workers

20   benefitted from the litigation in the process.

21             THE WITNESS:  Yes.

22             THE COURT:  And I just infer from that that the costs

23   of those firms increased, and I presume that those costs were

24   passed on to you in the prices you pay for your chickens.  I

25   mean, am I right or wrong or --

1          THE WITNESS:  You're right.

2          THE COURT:  I'm right.  So you had to pass those costs

3     on.

4          THE WITNESS:  Well --

5          THE COURT:  And I guess that contributes -- or if you

6     could, you could pass them on.  But I guess what your point is,

7     that if chicken catchers in Maryland and Delaware prevailed and,

8     therefore, those costs went up, and those costs are passed on to

9     you, but some, in a neighboring area those costs didn't go up,

10    then you were at a competitive disadvantage.

11         THE WITNESS:  Right.

12         THE COURT:  Kind of what you were talking about when

13    you were talking about the thing.

14         THE WITNESS:  That's exactly right.

15         THE COURT:  That's very helpful.  I understand.  I

16    thought I --

17         THE WITNESS:  And that's is what is what's going on

18    right now with these cases.

19         THE COURT:  Okay.

20         THE WITNESS:  This is a huge issue.

21         THE COURT:  Well, you know, this isn't the first time,

22    of course.  You know that.  I mean, we could talk about seat

23    belts.  We could talk about warnings on ladders.

24         THE WITNESS:  Yes, we can.

25         THE COURT:  Okay.  Well, thank you very much.

1          I guess I still don't quite understand why the time

2     clock can't be moved very close to the parking, to the production

3     floor and employees can't be given -- in other words, you can't

4     punch in more than ten minutes before your shift.  And the line

5     time starts at a certain time and you punch in no sooner than ten

6     minutes before.

7          Would that not create a system where an employee would

8     know, for example, at the beginning of the shift, at least, all

9     right, company's giving me, making it available to me ten minutes

10    to don what I need to don?  Now, if I could only, if I can do it

11    in only two and a half minutes, then I don't have to punch in

12    until three minute before my shift starts, but I know I got to be

13    on the line at a certain time.

14         And so you would be paying some employees ten extra

15    minutes, those who got there right at the ten minute mark and

16    punch in and had their coffee.  But there would be other

17    employees that might not get there until one minute before and

18    they'd be quickly donning.  Super donning.

19              THE WITNESS:  I can tell you --

20              THE COURT:  So what's your reaction to that?

21              THE WITNESS:  My reaction is if employees knew that the

22    company would pay them ten minutes early if they could get there,

23    the whole plant would try to get there ten minutes early.

24              THE COURT:  Now, the truth is not everybody could punch

25    in at ten minutes.

1          THE WITNESS:  That's right.

2          THE COURT:  Right?  You got 900 employees.  And not all

3    of them, as you say, go to the same department.  But if you have,

4    I don't know, two hundred employees in Department A, Deboning or

5    whatever it is, and they all line up at 12 of, they're not all

6    going to get to punch in at, right at that ten minute mark.  You

7    may have a percentage of them who will punch in at ten.  But

8    clearly, some of them are going to have to stand in line for two

9    or three minutes.  So you're not going to pay them ten minutes,

10   you're going to pay them seven minutes or six minutes, right?

11         THE WITNESS:  And what happens, the way the line works,

12   the people at the front start earlier and they get off earlier.

13   People at the back start later and they get off later.

14         THE COURT:  Wait a minute.  Why would they get off

15   earlier?  You mean on the line?

16         THE WITNESS:  Down the line.  Because the bird starts,

17   let's just say at 7 a.m.  Start at 7 and it moves down an

18   assembly line.

19         THE COURT:  By the way, what's the late -- I'm sorry to

20   interrupt you.  But I was curious about that.  The line time

21   starts when the first chicken reaches the first worker?

22         THE WITNESS:  Yes.

23         THE COURT:  Right?  How long will it take that first

24   chicken to get to the last worker on that shift in that

25   department?

1          THE WITNESS:  It depends on which department it is.

2          THE COURT:  Okay.  Pick one.  I mean, what's the

3    minimum and maximum?

4          THE WITNESS:  You could pick deboning.  It might be,

5    might be two minutes.

6          THE COURT:  Two minutes.  And then that would be the --

7          THE WITNESS:  Eviscerating might be ten minutes.

8          THE COURT:  Ten minutes.  Okay.

9          THE WITNESS:  But if you were going to use a method to

10   allow people to punch in early or they had to punch in as close

11   to the start as possible, which it sounds like what your scenario

12   is, you'll have, I can tell you people will try to take advantage

13   of that situation.

14          And somebody that starts in the beginning of the line

15   can't get, because they come in a minute early, not ten minutes

16   early, people at the end of the line are crowding the time clock.

17   So I'm sorry, Mike, I couldn't get to my work station because

18   there was a line.  So we eliminated that problem.

19          THE COURT:  I see your point.

20          THE WITNESS:  It's a real, it's a real big deal.

21   Especially with, you know, labor intensive industries have lots

22   of humans.  If you don't, you know, if you just have mechanics

23   and machines, it's not a big deal.

24          THE COURT:  I see.  Well, thank you very much for

25   answering my questions.

1          I told you they would only be of marginal relevance.

2     But it taught me something.  Any further questions in light of

3     the Court's question?

4          MR. BROWN:  No further questions, Your Honor.

5          MR. STINE:  Yes, Your Honor.  Your question raised one

6     or two questions.

7          THE COURT:  Certainly.

8     BY MR. STINE:

9     Q    I just want to make sure I get the record real clear.  If

10    you move the time clock to the production area, where is the

11    donning and doffing occurring?  Before or after the time clock?

12    If you had it right by the line?

13    A    Well --

14         THE COURT:  Well, let me help you out because,

15    obviously, what I meant, and I didn't say this and I appreciate

16    your clarifying.  What I meant was to have the time clock near

17    the production area, the person would punch the clock, go into

18    the locker room or whatever area was set aside, then don and doff

19    and so on.

20         So you can go ahead.  But I just wanted to clarify

21    that.  You're right.  Obviously, you couldn't go through the time

22    clock and then go straight to the line.

23         MR. STINE:  That's all I was trying to clarify on that

24    one.

25         THE COURT:  Okay.

1    BY MR STINE:

2    Q    And the way that your line time works is you start the lines

3    at a set time, don't you?

4    A    Yes.

5    Q    It's not when the -- if chicken's not there to be hung at a

6    set time, you're going to pay them, anyway?

7    A    That's right.

8    Q    I just want to make certain.

9    A    Every department has a start time.  Pay starts at that time

10   whether the chickens are there or not.

11   Q    And some departments have a set stop time?

12   A    Yes.

13   Q    And some don't?

14   A    Some don't.

15   Q    And some are based on what shift they're on?

16   A    That's right.

17   Q    So it's not a set system for every department --

18   A    That' right.

19   Q    -- for every group as to how that ends, the times?

20   A    That's right.

21   Q    I just want to make sure I got those clear.

22        THE COURT:  I appreciate that.  And one other thing.

23   The employee shows up late, just to clarify.  He punches in, you

24   know, 15 minutes after the line has started.  Does he or she go

25   and report directly to a supervisor?  How is that handled?

Case 1:06-cv-00121-BEL   Document 157   Filed 10/19/09   Page 47 of 83

1          THE WITNESS:  I'm not sure.  It's handled one of two

2     ways.  Number one, they would go to Human Resources and get

3     what's called a line pass.

4          THE COURT:  I see.

5          THE WITNESS:  Which, you know, I'm checking in.  I

6     wasn't here on time.  They get a pass to go out to the line,

7     report to the supervisor.  And the supervisor notes the time and

8     makes the adjustment.

9          THE COURT:  Okay.  And what's the alternative?

10          THE WITNESS:  Those are the two.

11          THE COURT:  I see.

12          THE WITNESS:  In either case, they go to the

13     supervisor.

14          THE COURT:  I see.  Either go directly to the

15     supervisor, who records the time, or to Human Resources, who then

16     sends him or her to the supervisor.

17          THE WITNESS:  Yes.

18          THE COURT:  Report to your supervisor.

19          THE WITNESS:  But in both cases, the supervisor,

20     because otherwise the employee won't know where to go on the

21     line.  If they come after the line started, somebody's in that

22     spot.

23          THE COURT:  I see.  Okay.  Actually, I was going to ask

24     that as well.  From looking at the video, I guess we were only

25     watching hangers, but it looks like, what, on a typical shift you

1    have -- well, I guess -- how many hangers are there on a typical

2    line?

3              THE WITNESS:  Well, there's a couple kind of hangers.

4              THE COURT:  Okay.  A couple kinds of hangers.

5              THE WITNESS:  People --

6              THE COURT:  There's a fry hanger and a roasting hanger.

7              THE WITNESS:  There's a live hanger that hangs a live

8    chicken.  And there's hangers that hang the --

9              THE COURT:  I hope they get more money, by the way.

10             THE WITNESS:  They do.  Yes, they do.

11             THE COURT:  Okay.  All right.  And so my point is, you

12   have several of every job category.

13             THE WITNESS:  Yes.

14             THE COURT:  So if, if Joe and John, on their way to

15   work, have a flat tire and one's a hanger, or one's a live hanger

16   and one's not a life hanger and they show up 40 minutes late,

17   that doesn't stop the line, obviously?  It reduces production

18   with fewer people, but somebody will be there to cover the

19   function that they cover.

20             THE WITNESS:  That's correct.

21             THE COURT:  I see.

22             THE WITNESS:  There are some exceptions, when there

23   aren't enough people to pull from.

24             THE COURT:  I see.

25             THE WITNESS:  But in those cases, production will be

1    reduced.

2           THE COURT:  And some people do more than one job, I

3    guess?

4           THE WITNESS:  Yes.

5           THE COURT:  They can be pulled from this function and

6    put over here, if people call in sick or something?

7           THE WITNESS:  Yes.

8           THE COURT:  I see.  Okay.  Thank you.

9           THE WITNESS:  We rotate people as a general rule.

10          THE COURT:  To increase the skill set.

11          THE WITNESS:  Yeah.  And you rest muscle groups.

12          THE COURT:  I wish they'd do that for judges.  Thank

13   you.  Thank you very much, Mr. Tirrell.  You're excused.  And

14   thank you for coming up early.  I don't think it was planned for

15   you to be here today.

16          THE WITNESS:  No, it wasn't.

17          THE COURT:  I appreciate your coming up early.  Mr.

18   Brown?

19          MR. BROWN:  Your Honor, our next witness is an expert

20   from Wisconsin.

21          THE COURT:  I thought he wasn't coming until Wednesday.

22          MR. BROWN:  He'll be on, he's coming in tonight.

23          THE COURT:  Okay.  So he's not --

24          MR. BROWN:  He'll be here in court.

25          THE COURT:  Okay.  All right.  And then that will, that

1    will conclude your presentation, I believe?

2              MR. BROWN:  That will.

3              THE COURT:  Okay.  Very good.  Again, counsel, thank

4    you for indulging my tardiness this afternoon.

5              Mr. Stine, you will be ready to go tomorrow?  Mr.

6    Brown, you gave us an estimate yesterday.  How long do you think

7    Dr. Radwin will be on if we start at 10:00?

8              MR. BROWN:  Two hours --

9              THE COURT:  Two hours?

10             MR. BROWN:  -- for me and an hour for you?

11             MR. STINE:  Between one and two, I'm afraid.  And we

12   will have Amanda Irwin and Humberto -- I can't master his name.

13   We have them coming in at 10:00 just so they'll be ready to go

14   whenever.

15             THE COURT:  Okay.  Excellent.  So we'll start tomorrow

16   morning at 10:00.  Thank you very much, counsel.

17             (Conclusion of Proceedings at 4:30 p.m.)

18

19

20

21

22

23

24

25

1                            INDEX

2

3                                                    PAGE

4    WITNESS: MICHAEL TIRRELL.

5    DIRECT EXAMINATION BY MR. STINE                  4

6    CROSS EXAMINATION BY MR. BROWN                  15

7    REDIRECT EXAMINATION BY MR. STINE              31

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of Luisa Perez, et

5    al, v. Mountaire Farms, Inc., et al., Case Number(s) AMD-06-121,

6    on March 24, 2009.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                            _____

                             Mary M. Zajac,
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

$12 [1] - 25:6

**'**

'06 [1] - 25:2
'90 [1] - 5:8
'98 [1] - 6:7

**0**

0057 [1] - 9:12

**1**

10 [2] - 8:5, 8:11
100% [1] - 6:3
1000 [1] - 15:4
101 [1] - 1:23
10:00 [3] - 50:7, 50:13, 50:16
11 [2] - 8:5, 8:11
12 [2] - 36:24, 43:5
15 [11] - 20:20, 20:21, 20:22, 22:6, 22:25, 27:7, 36:22, 37:15, 46:24, 51:6
1984 [1] - 4:20
1989 [1] - 5:8
1990s [1] - 16:9
1998 [4] - 5:16, 5:23, 13:6, 16:5
1999 [1] - 16:2

**2**

2 [1] - 27:8
20 [1] - 36:22
2000 [2] - 6:2, 6:8
2002 [2] - 10:4, 10:5
2006 [9] - 12:5, 12:6, 13:15, 19:4, 19:9, 19:25, 20:6, 21:25, 22:2
2009 [3] - 1:10, 52:6, 52:11
21201 [1] - 1:24
24 [2] - 1:10, 52:6
25 [2] - 4:15, 6:22

**3**

30 [2] - 7:19, 9:3
31 [2] - 19:4, 51:7
31st [1] - 12:6
3:05 [1] - 2:1

1

2

**4**

4 [2] - 27:8, 51:5
40 [1] - 48:16
4:30 [1] - 50:17

**5**

50 [1] - 5:25
50% [3] - 5:24, 6:7, 16:6
5515 [1] - 1:23

**7**

7 [2] - 43:17

**8**

8 [1] - 25:6
8:30 [1] - 36:13

**9**

9 [2] - 8:5, 8:11
900 [2] - 15:3, 43:2

**A**

a.m [1] - 43:17
ability [7] - 6:10, 11:21, 20:18, 23:6, 23:11, 30:14
able [2] - 6:6, 20:9
Absolutely [4] - 19:23, 20:16, 30:3, 38:5
accepted [1] - 16:22
access [1] - 27:4
accident [1] - 30:16
accurate [5] - 16:18, 21:9, 21:13, 31:23, 52:9
Acting [2] - 11:19, 20:16
acting [1] - 23:4
active [1] - 19:6
activities [1] - 28:14
activity [5] - 10:20, 11:23, 27:12, 27:24, 28:6
add [1] - 15:9
adding [1] - 38:24
address [2] - 4:8, 4:9
addressed [1] - 7:22
adjustment [1] - 47:8
adjustments [1] - 13:24
Administrator [2] - 11:19, 20:17
administrator [1] - 23:5

1    administrators [1] - 17:4
     admitted [1] - 7:25
2    admittedly [1] - 38:24
     adults [1] - 14:6
3    advantage [3] - 34:10, 39:25, 44:12
     advised [2] - 7:11, 28:9
4    advisory [2] - 19:3, 19:9
     affidavit [2] - 8:11, 8:12
5    affirmed [1] - 9:22
     affixed [1] - 52:10
6    afraid [1] - 50:11
     afternoon [2] - 12:15, 50:4
7    agency [2] - 8:11, 8:13
     aggregate [1] - 33:16
8    ago [2] - 22:9, 40:11
     agree [2] - 21:16, 25:1
9    agreement [4] - 13:22, 22:20, 28:2, 28:17
     ahead [3] - 3:9, 45:20
10   air [1] - 37:17
     al [2] - 52:5
11   AL [2] - 1:4, 1:6
     algorithms [1] - 38:12
12   allow [3] - 11:24, 14:17, 44:10
     allowed [1] - 11:16
13   alluded [1] - 34:7
     almost [4] - 14:9, 14:20, 15:1, 19:2
14   alternative [1] - 47:9
     Alvarez [9] - 10:8, 13:1, 18:12, 18:16, 18:18, 19:5, 19:15, 20:1,
15   20:14
     Amanda [1] - 50:12
16   AMD-06-121 [2] - 1:6, 52:5
     Americans [1] - 33:20
17   analyses [1] - 38:13
     analysis [2] - 19:21, 38:21
18   Andre [1] - 1:12
     answering [1] - 44:25
19   antitrust [1] - 37:7
     anyway [2] - 23:3, 46:6
20   apiece [1] - 25:6
     appealed [1] - 17:5
21   Appearances [1] - 1:15
     apply [1] - 17:19
22   appreciate [3] - 45:15, 46:22, 49:17
     Apron [1] - 32:9
23   apron [4] - 24:11, 25:20, 29:2, 32:3
     aprons [5] - 6:18, 11:17, 29:16, 32:1, 32:8
24   arbitrary [1] - 15:9
     area [10] - 17:15, 29:5, 32:11, 32:12, 41:9, 45:10, 45:17, 45:18
25   areas [1] - 27:11
     arm [1] - 32:2

4

1   arms [1] - 24:16
    ascertain [1] - 6:6
2   aside [1] - 45:18
    assembly [1] - 43:18
3   associated [1] - 39:1
    Attachment [1] - 9:11
4   attempt [1] - 22:15
    Attendance [2] - 34:21, 34:22
5   attendance [2] - 34:22, 35:3
    attention [4] - 7:18, 9:10, 11:5, 40:17
6   attorneys [1] - 7:7
    authenticate [1] - 8:18
7   available [1] - 42:9
    avoiding [1] - 38:25
8   aware [4] - 9:22, 12:25, 15:13, 15:16

9                              B

10  bad [1] - 33:25
    baked [2] - 33:5, 33:21
11  Baltimore [5] - 1:11, 1:24, 33:1, 38:15
    barbecue [1] - 36:25
12  barbequed [1] - 33:22
    based [3] - 11:24, 13:8, 46:15
13  Bates [1] - 9:11
    become [1] - 34:12
14  beef [1] - 33:22
    begin [1] - 3:23
15  beginning [2] - 42:8, 44:14
    begun [1] - 27:10
16  Behalf [2] - 1:16, 1:18
    bell [1] - 40:12
17  belong [1] - 5:20
    belt [1] - 29:18
18  belts [1] - 41:23
    Bench [1] - 1:10
19  benefit [4] - 23:14, 23:16, 23:17, 29:20
    benefitted [1] - 40:20
20  bent [2] - 34:6, 36:21
    best [2] - 6:10, 30:13
21  better [1] - 25:4
    Between [1] - 50:11
22  between [3] - 6:7, 16:17, 25:6
    beyond [1] - 6:22
23  big [2] - 44:20, 44:23
    binder [2] - 7:15, 7:17
24  binders [1] - 7:24
    bird [1] - 43:16
25  bit [2] - 4:18, 31:8
    board [1] - 12:8

book [1] - 11:7
boots [4] - 11:17, 14:9, 14:10, 29:15
bread [2] - 33:4
Break [1] - 40:7
breakfast [2] - 35:7, 35:13
brief [2] - 19:24, 23:25
briefly [1] - 7:20
bring [1] - 14:7
BROWN [17] - 2:19, 3:1, 3:14, 8:8, 15:21, 15:25, 28:24, 32:14, 40:14, 45:4, 49:19, 49:22, 49:24, 50:2, 50:8, 50:10, 51:6
Brown [11] - 1:16, 8:13, 21:1, 21:3, 21:4, 22:6, 31:7, 32:1, 40:10, 49:18, 50:6
Brown's [1] - 40:9
bulletin [1] - 12:8
Bump [1] - 29:16
bump [8] - 6:18, 11:16, 14:11, 24:7, 25:24, 29:1, 29:17, 31:11
business [6] - 13:18, 13:23, 15:12, 39:4, 40:3, 40:6
buy [3] - 33:4, 36:25, 37:22
BY [11] - 4:7, 5:11, 9:2, 15:25, 28:24, 31:6, 45:8, 46:1, 51:5, 51:6, 51:7

# C

cafeteria [3] - 14:13, 35:6, 39:10
cafeteria's [1] - 35:11
California [1] - 33:2
cannot [1] - 24:19
cap [4] - 14:11, 24:7, 29:1, 31:11
caps [4] - 6:18, 11:17, 25:24, 29:16
car [2] - 24:8, 31:19
Carolina [3] - 17:11, 18:8, 18:11
Case [1] - 52:5
CASE [1] - 1:5
case [8] - 10:10, 16:9, 17:18, 18:12, 18:15, 34:13, 39:24, 47:12
cases [17] - 7:10, 13:3, 17:5, 17:13, 17:14, 17:22, 17:24, 18:7, 18:8, 28:13, 39:22, 40:10, 40:11, 40:16, 41:18, 47:19, 48:25
catcher [1] - 40:11
catchers [1] - 41:7
category [1] - 48:12
cents [4] - 36:24, 37:18, 38:25
certain [5] - 35:1, 42:5, 42:13, 46:8
Certainly [1] - 45:7
CERTIFICATE [1] - 52:1
certify [2] - 52:3, 52:7
chain [1] - 27:9
change [21] - 7:14, 12:2, 12:4, 12:5, 12:7, 12:12, 12:14, 13:15, 17:3, 17:4, 18:18, 20:19, 22:18, 22:19, 22:24, 23:2, 26:10, 28:3, 28:18, 28:20, 31:21
changed [5] - 6:11, 13:12, 16:16, 20:6, 24:23
changes [2] - 12:19, 28:17

changing [1] - 13:11
charge [6] - 5:5, 36:23, 39:10, 39:14, 39:15, 40:6
charging [1] - 37:22
checking [1] - 47:5
checks [1] - 35:3
chemical [1] - 30:23
chicken [28] - 9:19, 30:11, 30:12, 30:13, 30:16, 30:25, 31:2, 31:3, 32:23, 33:2, 33:12, 33:20, 33:21, 33:22, 34:13, 36:10, 36:24, 36:25, 37:8, 37:18, 38:19, 38:25, 40:11, 41:7, 43:21, 43:24, 48:8
Chicken [7] - 5:20, 7:1, 7:4, 7:6, 7:7, 9:19, 10:12
chicken's [1] - 46:5
chickens [2] - 40:24, 46:10
choice [2] - 23:11, 23:13
choices [1] - 24:18
chose [1] - 16:22
chosen [1] - 16:20
Christopher [1] - 1:16
Circuit [6] - 9:23, 17:16, 17:21, 18:5
Circuits [1] - 17:16
circulated [1] - 10:11
CIVIL [1] - 1:5
claim [1] - 31:20
clarify [4] - 34:14, 45:20, 45:23, 46:23
clarifying [1] - 45:16
class [1] - 38:23
Claxton [1] - 13:2
clean [2] - 31:1, 36:18
cleaned [1] - 12:17
clear [2] - 45:9, 46:21
clearly [3] - 19:5, 31:18, 43:8
CLERK [4] - 3:22, 4:1, 4:24, 7:17
clock [15] - 14:21, 34:15, 34:17, 34:20, 34:25, 35:1, 35:3, 36:6, 42:2, 44:16, 45:10, 45:11, 45:16, 45:17, 45:22
clocked [1] - 34:24
clocks [1] - 34:23
close [3] - 33:5, 42:2, 44:10
closer [2] - 2:14, 31:16
clothes [1] - 29:23
coat [25] - 12:10, 12:11, 12:16, 12:17, 14:11, 21:9, 21:12, 22:10, 22:12, 24:10, 24:11, 25:17, 26:6, 26:9, 26:12, 26:13, 26:22, 26:25, 31:12, 31:24
coats [7] - 20:8, 20:9, 25:24, 26:2, 27:3, 28:3
coffee [4] - 14:14, 35:4, 35:6, 42:16
coincidental [1] - 28:5
cold [1] - 25:23
coming [6] - 15:1, 49:14, 49:17, 49:21, 49:22, 50:13
command [1] - 27:9
commerce [1] - 30:14
communicate [1] - 12:7

**Comp** [1] - 30:5

**Companies** [2] - 32:18, 32:21

**companies** [13] - 5:20, 5:25, 6:3, 6:7, 6:9, 7:11, 15:13, 16:6, 16:10, 28:13, 28:15, 32:19, 37:8

**Company** [2] - 9:19

**company** [7] - 5:15, 9:19, 9:21, 13:4, 17:24, 17:25, 42:22

**company's** [1] - 42:9

**comparative** [1] - 38:13

**compare** [1] - 26:19

**compared** [2] - 26:15, 26:16

**compensability** [3] - 6:13, 10:22, 18:19

**compensable** [6] - 10:19, 11:23, 15:8, 18:24, 19:7, 20:18

**Compensation** [1] - 30:7

**compensation** [1] - 28:10

**compete** [2] - 39:9

**competition** [1] - 39:11

**competitive** [10] - 34:9, 34:11, 39:4, 39:12, 39:15, 39:16, 39:17, 39:22, 39:25, 41:10

**competitors** [1] - 32:17

**complete** [1] - 52:9

**compliance** [13] - 5:18, 5:25, 6:4, 6:8, 6:9, 10:25, 11:1, 11:2, 13:16, 16:6, 16:8

**comply** [1] - 38:10

**complying** [1] - 38:4

**Complying** [1] - 38:8

**concerning** [1] - 13:6

**conclude** [1] - 50:1

**conclusion** [1] - 13:9

**Conclusion** [1] - 50:17

**Congress** [1] - 38:6

**consequence** [1] - 30:10

**consideration** [1] - 35:2

**constitute** [1] - 52:7

**consumed** [1] - 33:12

**consuming** [1] - 13:19

**contact** [1] - 5:15

**contaminate** [1] - 31:1

**contaminated** [4] - 30:10, 30:12, 30:17

**Contaminated** [1] - 30:22

**contamination** [1] - 25:8

**context** [4] - 8:2, 8:7, 8:17, 8:22

**continue** [2] - 7:11, 11:2

**continued** [5] - 12:22, 18:3, 18:6, 29:7

**continuous** [3] - 10:21, 18:23, 19:18

**contributes** [1] - 41:5

**control** [1] - 25:4

**conveyor** [1] - 29:18

**corporate** [1] - 5:13

**Correct** [3] - 18:20, 20:13, 34:19

**correct** [7] - 2:23, 17:9, 17:14, 18:1, 18:13, 18:19, 48:20

**cost** [5] - 38:13, 38:22, 38:25, 39:13, 39:20
**costs** [9] - 30:7, 39:1, 40:15, 40:22, 40:23, 41:2, 41:8, 41:9
**Council** [6] - 5:20, 7:1, 7:5, 7:6, 7:7, 10:12
**Counsel** [2] - 2:2, 7:22
**counsel** [4] - 2:11, 34:7, 50:3, 50:16
**couple** [5] - 5:7, 28:13, 34:14, 48:3, 48:4
**course** [3] - 35:16, 36:4, 41:22
**court** [7] - 7:10, 17:5, 17:18, 18:7, 28:13, 39:24, 49:24
**Court** [10] - 10:8, 10:13, 10:16, 10:18, 10:23, 18:16, 18:22, 19:19, 19:20, 52:16
**COURT** [122] - 1:1, 2:2, 2:8, 2:10, 2:16, 2:22, 2:25, 3:5, 3:8, 3:11, 3:16, 4:2, 4:5, 4:22, 4:25, 7:21, 8:4, 8:10, 8:14, 8:18, 8:23, 9:1, 15:23, 28:23, 32:15, 32:19, 32:21, 32:23, 33:4, 33:8, 33:10, 33:14, 33:16, 33:18, 33:20, 33:24, 34:2, 34:5, 34:20, 34:22, 35:9, 35:13, 35:16, 35:18, 35:20, 35:23, 35:25, 36:2, 36:4, 36:8, 36:14, 36:18, 36:20, 37:2, 37:4, 37:7, 37:11, 37:14, 37:17, 37:20, 37:23, 38:3, 38:6, 38:9, 38:11, 38:17, 38:21, 39:5, 39:7, 39:17, 39:20, 40:2, 40:8, 40:15, 40:22, 41:2, 41:5, 41:12, 41:15, 41:19, 41:21, 41:25, 42:20, 42:24, 43:2, 43:14, 43:19, 43:23, 44:2, 44:6, 44:8, 44:19, 44:24, 45:7, 45:14, 45:25, 46:22, 47:4, 47:9, 47:11, 47:14, 47:18, 47:23, 48:4, 48:6, 48:9, 48:11, 48:14, 48:21, 48:24, 49:2, 49:5, 49:8, 49:10, 49:12, 49:17, 49:21, 49:23, 49:25, 50:3, 50:9, 50:15
**Court's** [2] - 13:1, 45:3
**court-decided** [1] - 17:5
**Courthouse** [1] - 1:23
**cover** [3] - 37:18, 48:18, 48:19
**create** [1] - 42:7
**CROSS** [2] - 15:24, 51:6
**crowding** [1] - 44:16
**cup** [1] - 14:14
**curious** [1] - 43:20
**current** [2] - 4:16, 10:25
**customer** [1] - 40:5
**customers** [1] - 39:9

**D**

**Davis** [1] - 1:12
**de** [1] - 19:7
**deal** [2] - 44:20, 44:23
**Deboning** [3] - 5:3, 36:12, 43:4
**deboning** [1] - 44:4
**decide** [2] - 10:14, 28:25
**decided** [16] - 7:12, 9:21, 10:17, 10:18, 10:23, 11:24, 12:1, 17:5, 17:13, 18:22, 18:23, 18:24, 19:18, 19:19, 19:25, 22:9
**decimal** [1] - 39:19
**decision** [2] - 10:8, 13:1
**decisions** [3] - 11:14, 12:25, 13:25
**Defendant's** [3] - 7:17, 7:19, 9:3

1    DEFENDANT'S [1] - 3:20
     defendant's [1] - 8:8
2    defendants [1] - 2:20
     Defendants [2] - 1:7, 1:18
3    defense [1] - 2:22
     Delaware [7] - 4:11, 17:8, 17:15, 21:5, 25:11, 38:18, 41:7
4    delay [1] - 27:11
     department [7] - 16:12, 27:11, 43:3, 43:25, 44:1, 46:9, 46:17
5    Department [30] - 4:21, 5:3, 5:16, 6:2, 6:3, 6:11, 7:2, 7:8,
     11:20, 13:10, 16:3, 16:6, 16:9, 16:16, 16:20, 16:23, 16:25, 17:2,
6    18:4, 19:3, 19:9, 19:21, 22:20, 28:2, 28:12, 28:16, 28:17, 36:12,
     38:23, 43:4
7    departments [4] - 5:5, 27:22, 46:11
     departure [1] - 7:9
8    desire [1] - 23:6
     desk [1] - 3:19
9    despite [1] - 18:4
     detained [1] - 2:3
10   difference [3] - 6:6, 23:21, 31:25
     different [1] - 28:15
11   difficulties [1] - 15:14
     dignity [1] - 14:7
12   DIRECT [2] - 4:6, 51:5
     directly [2] - 46:25, 47:14
13   Director [1] - 21:4
     disadvantage [2] - 39:12, 41:10
14   disagree [2] - 7:1, 19:21
     disagreement [1] - 7:5
15   discretion [2] - 6:24, 22:12
     discussion [1] - 3:3
16   DISTRICT [2] - 1:1, 1:1
     district [1] - 17:22
17   diving [1] - 24:3
     DIVISION [1] - 1:2
18   dock [1] - 36:11
     document [6] - 9:14, 9:16, 9:18, 11:9, 11:11, 20:23
19   doff [1] - 45:18
     doffing [32] - 5:14, 6:12, 6:13, 6:15, 9:20, 10:15, 10:17, 11:3,
20   12:23, 13:3, 13:7, 13:16, 14:2, 15:2, 15:7, 15:14, 16:4, 16:11,
     16:14, 17:21, 18:9, 18:19, 18:23, 19:7, 19:16, 19:20, 20:7,
21   22:13, 22:15, 27:17, 28:11, 45:11
     DOL [2] - 13:22, 20:17
22   DOL's [1] - 12:1
     dollar [1] - 39:19
23   dollars [1] - 37:16
     domestic [1] - 33:11
24   don [4] - 11:21, 42:10, 45:18
     done [3] - 6:1, 38:13, 38:21
25   donned [1] - 3:2
     donning [34] - 5:14, 6:12, 6:13, 6:15, 9:20, 10:14, 10:17, 11:3,

1    12:22, 13:3, 13:7, 13:16, 14:2, 15:1, 15:7, 15:14, 16:4, 16:11,
     16:14, 17:21, 18:10, 18:19, 18:23, 19:6, 19:15, 19:20, 20:7,
2    22:13, 22:15, 27:18, 28:10, 42:18, 45:11
     **door** [2] - 14:8, 27:16
3    **down** [7] - 16:14, 18:1, 19:14, 24:3, 30:5, 40:8, 43:17
     **Down** [1] - 43:16
4    **Dr** [1] - 50:7
     **draw** [3] - 7:18, 9:10, 11:5
5    **drawn** [1] - 13:5
     **dress** [2] - 23:22, 26:14
6    **dressed** [1] - 24:3
     **drew** [1] - 13:9
7    **drip** [1] - 29:18
     **drive** [3] - 23:23, 25:15, 31:18
8    **drivers** [1] - 36:11
     **driving** [5] - 25:11, 25:13, 25:23, 25:24, 31:10
9    **drop** [1] - 12:16
     **dropped** [1] - 12:11
10   **duty** [1] - 18:9

11                              **E**

12   **e-mail** [3] - 20:24, 20:25, 28:1
     **ear** [3] - 11:17, 14:10, 31:12
13   **Ear** [1] - 29:18
     **early** [7] - 42:22, 42:23, 44:10, 44:15, 44:16, 49:14, 49:17
14   **Easier** [1] - 26:18
     **easier** [6] - 26:9, 26:10, 26:11, 26:13, 26:18, 26:23
15   **easy** [3] - 3:19, 20:19, 24:7
     **educated** [1] - 34:12
16   **effectively** [1] - 22:12
     **eight** [1] - 38:25
17   **Either** [2] - 2:9, 47:14
     **either** [3] - 23:20, 40:18, 47:12
18   **elaborate** [1] - 31:8
     **eliminated** [2] - 22:13, 44:18
19   **employed** [2] - 4:12, 4:14
     **employee** [15] - 11:21, 21:7, 22:11, 23:14, 23:15, 26:6, 26:13,
20   28:25, 29:14, 29:25, 34:17, 35:5, 42:7, 46:23, 47:20
     **employees** [22] - 6:19, 11:16, 11:24, 20:17, 22:10, 23:5, 23:16,
21   25:3, 30:2, 30:7, 31:8, 31:9, 31:21, 32:3, 35:4, 39:9, 42:3,
     42:14, 42:17, 42:21, 43:2, 43:4
22   **employer** [4] - 18:9, 29:11, 29:20, 30:4
     **employer's** [1] - 30:1
23   **employers** [1] - 16:3
     **employment** [1] - 4:19
24   **end** [1] - 44:16
     **ends** [1] - 46:19
25   **enter** [1] - 29:5
     **entered** [1] - 19:2

11

**equipment** [10] - 10:19, 11:22, 20:18, 21:16, 25:5, 29:10, 29:12, 29:21, 30:21, 30:24

**equivalent** [1] - 5:21

**erased** [1] - 21:18

**erred** [1] - 7:8

**error** [1] - 13:10

**Especially** [1] - 44:21

**Esquire** [4] - 1:16, 1:17, 1:18, 1:19

**essence** [1] - 20:3

**estimate** [2] - 15:11, 50:6

**ET** [2] - 1:4, 1:6

**et** [2] - 52:4, 52:5

**events** [1] - 32:6

**Everett** [1] - 21:1

**evidence** [1] - 19:2

**Eviscerating** [3] - 4:21, 5:3, 44:7

**Exactly** [1] - 33:10

**exactly** [3] - 16:16, 16:19, 41:14

**EXAMINATION** [6] - 4:6, 15:24, 31:5, 51:5, 51:6, 51:7

**example** [1] - 42:8

**exceeds** [1] - 19:7

**Excellent** [1] - 50:15

**except** [2] - 34:16, 40:17

**exceptions** [1] - 48:22

**Excuse** [1] - 4:22

**excused** [1] - 49:13

**Exhibit** [11] - 7:19, 9:3, 11:6, 11:8, 19:1, 19:10, 20:20, 22:6, 22:25, 27:7

**exhibit** [5] - 2:23, 2:25, 3:6, 9:11, 11:7

**exhibits** [4] - 2:11, 7:23, 8:6, 8:9

**expense** [1] - 22:18

**expensive** [1] - 25:5

**expert** [1] - 49:19

**explained** [1] - 19:24

**extra** [3] - 36:22, 36:23, 42:14

## F

**faced** [1] - 30:9

**fact** [7] - 8:24, 10:13, 14:9, 18:4, 19:18, 20:5, 34:11

**fair** [1] - 23:18

**fake** [1] - 38:18

**familiar** [1] - 9:3

**far** [1] - 21:10

**Farms** [3] - 4:13, 9:19, 52:5

**FARMS** [1] - 1:6

**favor** [4] - 9:21, 13:4, 18:5, 28:13

**fear** [1] - 25:8

**feasible** [1] - 14:24

**Federal** [1] - 17:15

1    **federal** [3] - 17:18, 18:7
**felt** [1] - 7:13
2    **few** [4] - 22:9, 24:21, 37:22, 40:11
**fewer** [1] - 48:18
3    **Fifth** [1] - 9:23
**Fifty** [2] - 32:22, 32:23
4    **figure** [3] - 14:1, 15:6, 32:21
**film** [3] - 2:20, 23:25
5    **fine** [3] - 2:9, 3:11, 3:12
**firm** [1] - 40:9
6    **firms** [2] - 10:11, 40:23
**first** [14] - 5:2, 16:5, 16:17, 19:13, 20:9, 22:25, 27:12, 27:23,
7    28:5, 34:14, 41:21, 43:21, 43:23
**five** [1] - 37:17
8    **FLANAGAN** [6] - 2:4, 2:15, 2:18, 2:21, 3:3, 3:7
**Flanagan** [2] - 1:17, 2:17
9    **flash** [1] - 5:21
**flat** [1] - 48:15
10   **floor** [2] - 29:15, 42:3
**follow** [2] - 16:20, 16:22
11   **following** [1] - 6:14
**follows** [1] - 19:4
12   **Food** [1] - 40:4
**food** [2] - 2:21, 3:3
13   **FOR** [1] - 1:1
**forbad** [1] - 25:2
14   **foregoing** [1] - 52:7
**forklift** [1] - 36:11
15   **forth** [1] - 25:20
**four** [1] - 39:19
16   **fours** [1] - 19:14
**fourth** [2] - 9:12, 22:5
17   **Fourth** [3] - 17:16, 17:21, 18:5
**frankly** [1] - 40:16
18   **free** [2] - 6:24, 35:13
**fresh** [2] - 32:23, 33:6
19   **Fried** [1] - 33:21
**front** [5] - 14:8, 19:11, 27:16, 29:16, 43:12
20   **frozen** [1] - 33:7
**Frozen** [1] - 33:9
21   **fry** [1] - 48:6
**full** [3] - 19:24, 25:12, 34:9
22   **function** [2] - 48:19, 49:5
**fundamental** [1] - 8:3
23   **fundamentally** [1] - 8:15

24                       **G**

25   **Gail** [1] - 4:22
**gear** [3] - 5:14, 25:12, 31:9

general [4] - 15:16, 15:17, 15:18, 49:9
Generally [2] - 32:7, 35:8
Giant [3] - 33:1, 36:25, 40:4
gift [1] - 23:18
gist [1] - 19:25
given [2] - 26:25, 42:3
gloves [11] - 6:18, 11:17, 14:18, 24:13, 24:14, 31:1, 31:3, 32:1, 32:3, 32:7
grab [1] - 26:13
grandmother [1] - 34:2
group [1] - 46:19
groups [1] - 49:11
guarantee [1] - 30:21
guarantees [1] - 30:21
guards [1] - 32:2
guess [12] - 4:25, 19:2, 25:19, 26:24, 34:23, 37:7, 41:5, 41:6, 42:1, 47:24, 48:1, 49:3
guy [1] - 35:20
guys [1] - 28:7

# H

Hair [1] - 14:10
hair [3] - 11:17, 14:18, 31:12
half [3] - 4:15, 35:21, 42:11
hall [1] - 14:20
hallway [2] - 26:5, 26:12
hamburger [1] - 37:22
hand [3] - 14:12, 27:11, 27:21
handing [1] - 11:8
handle [1] - 31:3
handled [3] - 12:15, 46:25, 47:1
handling [2] - 13:7, 30:25
hands [1] - 27:15
hang [1] - 48:8
hanger [6] - 48:6, 48:7, 48:15, 48:16
hangers [5] - 47:25, 48:1, 48:3, 48:4, 48:8
hanging [3] - 14:11, 29:18, 31:13
hangs [1] - 48:7
Harbor [1] - 38:16
hard [1] - 20:4
Harrison [1] - 13:2
hassle [1] - 13:19
hat [1] - 14:18
head [2] - 24:8, 29:17
healthy [1] - 30:1
heard [2] - 10:13, 15:16
hearing [2] - 20:4, 29:19
hearings [1] - 34:8
helmet [1] - 31:14

1   **help** [6] - 29:11, 29:12, 34:5, 34:12, 34:14, 45:14
    **helpful** [2] - 2:12, 41:15
2   **helps** [3] - 29:13, 30:21
    **hereby** [1] - 52:3
3   **hereunto** [1] - 52:10
    **highway** [1] - 24:3
4   **hired** [1] - 4:20
    **hires** [1] - 12:9
5   **history** [2] - 4:18, 4:19
    **home** [11] - 11:18, 11:22, 11:25, 12:17, 12:18, 20:10, 20:18,
6   22:10, 23:1, 23:23, 25:3
    **Home** [1] - 4:9
7   **Honestly** [2] - 14:3, 37:25
    **Honor** [18] - 2:4, 2:9, 3:14, 3:17, 7:15, 8:3, 8:9, 8:12, 8:20,
8   15:20, 15:21, 28:22, 31:7, 32:13, 32:14, 45:4, 45:5, 49:19
    **Honorable** [1] - 1:12
9   **hope** [1] - 48:9
    **hot** [4] - 25:10, 25:15, 25:17, 25:22
10  **Hour** [5] - 6:8, 9:17, 10:1, 11:15, 35:23
    **hour** [2] - 35:21, 50:10
11  **hours** [3] - 35:21, 50:8, 50:9
    **huge** [1] - 41:20
12  **hum** [2] - 9:13, 24:2
    **Human** [2] - 47:2, 47:15
13  **humans** [1] - 44:22
    **Humberto** [1] - 50:12
14  **hundred** [1] - 43:4
    **hundreds** [1] - 37:12
15  **hung** [1] - 46:5

16                                  **I**

17  **IBP** [2] - 10:8, 13:1
    **idea** [2] - 21:18, 38:24
18  **identify** [2] - 7:20, 20:22
    **illegal** [1] - 10:25
19  **illusory** [2] - 23:18, 31:21
    **impact** [1] - 40:15
20  **important** [1] - 30:6
    **impractical** [1] - 23:22
21  **IN** [1] - 1:1
    **Inc** [1] - 52:5
22  **INC** [1] - 1:6
    **incident** [1] - 30:18
23  **included** [1] - 7:24
    **including** [1] - 17:1
24  **increase** [1] - 49:10
    **increased** [1] - 40:23
25  **INDEX** [1] - 51:1
    **indulgence** [1] - 2:2

**indulging** [1] - 50:4
**industries** [1] - 44:21
**industry** [5] - 6:14, 6:17, 12:23, 34:13, 38:22
**Industry** [1] - 6:18
**infer** [1] - 40:22
**inform** [1] - 9:16
**information** [5] - 7:4, 9:25, 10:11, 11:24, 13:5
**informed** [3] - 6:5, 10:10, 10:24
**informing** [2] - 7:7, 10:13
**initiative** [3] - 5:17, 16:5, 16:18
**injured** [1] - 30:5
**Inner** [1] - 38:16
**inside** [3] - 26:1, 26:5, 28:11
**insist** [1] - 38:22
**instance** [1] - 19:22
**instead** [2] - 27:15, 38:24
**insure** [1] - 30:13
**intensive** [1] - 44:21
**interest** [2] - 30:1, 30:4
**interpretation** [1] - 7:8
**interpreted** [1] - 13:11
**interrupt** [2] - 7:21, 43:20
**introduced** [2] - 8:2, 8:6
**introduction** [1] - 2:19
**involved** [1] - 40:10
**involvement** [1] - 5:13
**irrelevant** [1] - 3:4
**Irwin** [1] - 50:12
**issue** [10] - 5:13, 5:16, 10:14, 13:7, 16:17, 18:23, 22:13, 22:16, 25:8, 41:20
**issued** [1] - 22:20
**issues** [5] - 9:20, 10:14, 12:23, 13:3, 15:14

**J**

**Jane** [1] - 1:17
**January** [1] - 4:20
**job** [4] - 23:10, 30:5, 48:12, 49:2
**jobs** [3] - 5:2, 23:23, 34:24
**Joe** [1] - 48:14
**John** [1] - 48:14
**Judge** [1] - 1:12
**judges** [1] - 49:12
**July** [4] - 12:5, 19:25, 20:6, 25:2
**jury** [2] - 4:2, 38:18

**K**

**keep** [5] - 5:22, 6:5, 12:22, 25:4, 30:4
**keeping** [1] - 28:14

```
1    kept [3]  -  5:23,  6:4,  13:8
     KFC [1]  -  36:24
2    kind [2]  -  35:2,  48:3
     Kind [1]  -  41:12
3    kinds [1]  -  48:4
     knowledge [1]  -  6:10
4
```

## L

```
5
6    Lab [1]  -  24:10
     lab [17]  -  20:8,  20:9,  22:10,  22:12,  24:11,  25:24,  26:2,  26:6,
     26:9,  26:12,  26:24,  26:25,  27:3,  28:3,  31:11
7    labor [1]  -  44:21
     Labor [21]  -  5:16,  6:2,  6:3,  6:11,  7:8,  13:10,  16:3,  16:6,  16:9,
8    16:16,  16:23,  16:25,  17:2,  18:4,  19:3,  19:9,  22:20,  28:2,  28:12,
     28:16,  38:23
9    Labor's [5]  -  7:2,  11:20,  16:20,  19:21,  28:17
     ladders [1]  -  41:23
10   Larry [1]  -  1:18
     last [4]  -  3:23,  19:13,  43:24
11   late [4]  -  16:9,  43:19,  46:23,  48:16
     law [6]  -  10:11,  13:11,  17:18,  18:5,  38:4,  38:8
12   laws [3]  -  5:18,  37:7,  38:10
     lawyer [2]  -  28:7,  28:21
13   learn [1]  -  10:7
     least [3]  -  10:11,  16:2,  42:8
14   legal [1]  -  28:6
     leisure [1]  -  26:17
15   less [2]  -  7:11,  40:6
     letters [1]  -  10:24
16   life [1]  -  48:16
     light [1]  -  45:2
17   likely [1]  -  13:12
     line [30]  -  6:20,  10:18,  14:15,  14:20,  14:22,  27:12,  27:15,  32:7,
18   42:4,  42:13,  43:5,  43:8,  43:11,  43:15,  43:16,  43:18,  43:20,
     44:14,  44:16,  44:18,  45:12,  45:22,  46:2,  46:24,  47:3,  47:6,
19   47:21,  48:2,  48:17
     lined [1]  -  12:3
20   lines [1]  -  46:2
     Lion [1]  -  40:4
21   listed [2]  -  2:24,  23:6
     listing [1]  -  2:11
22   litigated [1]  -  13:12
     litigation [3]  -  39:1,  40:19,  40:20
23   live [5]  -  13:25,  31:17,  48:7,  48:15
     local [3]  -  32:25,  34:10,  34:11
24   locker [2]  -  27:4,  45:18
     Lombard [1]  -  1:23
25   long-standing [2]  -  11:20,  17:2
     longstanding [1]  -  22:21
```

1  look [7] - 4:2, 9:4, 11:2, 22:5, 36:21, 37:9, 39:22
   looked [1] - 6:10
2  looking [1] - 47:24
   looks [1] - 47:25
3  lose [2] - 37:23, 40:7
   love [3] - 33:20, 38:15, 38:16
4  Luisa [1] - 52:4
   LUISA [1] - 1:4
5  lunch [4] - 16:12, 16:13, 16:15, 35:7

6  **M**

7  ma'am [1] - 7:18
   machines [1] - 44:23
8  magazine [1] - 35:6
   mail [3] - 20:24, 20:25, 28:1
9  man [1] - 34:24
   manager [1] - 5:7
10 managing [1] - 38:19
   manner [2] - 8:3, 52:9
11 March [2] - 1:10, 52:6
   margin [1] - 33:24
12 marginal [2] - 32:16, 45:1
   mark [2] - 42:15, 43:6
13 marked [5] - 3:6, 7:19, 11:6, 11:8, 26:7
   market [4] - 30:17, 32:25, 33:11, 37:24
14 markets [2] - 34:10, 34:11
   Mary [3] - 1:22, 52:3, 52:15
15 MARYLAND [1] - 1:1
   Maryland [4] - 1:11, 1:24, 17:15, 41:7
16 master [1] - 50:12
   material [1] - 13:6
17 materials [1] - 11:2
   matter [6] - 14:9, 17:19, 23:8, 32:25, 52:4, 52:9
18 maximum [1] - 44:3
   meals [1] - 35:12
19 mean [11] - 27:13, 27:24, 34:23, 37:23, 38:4, 38:6, 39:18, 40:25,
   41:22, 43:15, 44:2
20 Meaning [2] - 37:14, 37:15
   meaning [1] - 34:16
21 means [1] - 27:14
   meant [3] - 28:8, 45:15, 45:16
22 measure [3] - 14:2, 15:11, 39:18
   mechanics [1] - 44:22
23 memo [2] - 12:6, 23:4
   memorandum [5] - 11:15, 11:19, 19:3, 19:10, 20:16
24 mentioned [2] - 35:4, 39:3
   method [1] - 44:9
25 MICHAEL [2] - 3:20, 51:4
   Michael [1] - 3:25

microphone [1] - 2:14
middle [2] - 20:25, 21:6
Might [1] - 29:22
might [9] - 14:11, 14:12, 29:17, 30:22, 37:22, 42:17, 44:4, 44:5, 44:7
Mike [1] - 44:17
miles [1] - 39:11
millions [3] - 37:13, 37:15, 39:14
Millsboro [2] - 4:11, 15:2
mind [2] - 15:21, 16:17
minded [1] - 38:24
minimis [1] - 19:7
minimum [1] - 44:3
minute [7] - 9:4, 42:12, 42:15, 42:17, 43:6, 43:14, 44:15
minutes [23] - 2:5, 36:22, 36:23, 37:15, 42:4, 42:6, 42:9, 42:11, 42:15, 42:22, 42:23, 42:25, 43:9, 43:10, 44:5, 44:6, 44:7, 44:8, 44:15, 46:24, 48:16
missing [1] - 30:8
mistake [1] - 17:1
modification [1] - 28:20
moment [2] - 2:13, 15:18
money [3] - 39:8, 40:7, 48:9
morning [4] - 2:3, 23:20, 36:12, 50:16
most [1] - 13:12
Most [1] - 21:12
mostly [2] - 29:13, 29:24
motions [1] - 34:16
Mount [1] - 9:12
Mountaire [8] - 2:5, 4:13, 4:14, 4:19, 6:14, 13:7, 30:9, 52:5
MOUNTAIRE [1] - 1:6
move [2] - 27:15, 45:10
moved [2] - 28:11, 42:2
moves [2] - 36:10, 43:17
movie [1] - 2:10
moving [1] - 27:10
MR [38] - 2:9, 2:19, 2:24, 3:1, 3:14, 3:17, 4:7, 5:11, 8:1, 8:5, 8:8, 8:12, 8:15, 8:20, 8:24, 9:2, 15:21, 15:25, 28:22, 28:24, 31:6, 32:14, 40:14, 45:4, 45:5, 45:8, 45:23, 46:1, 49:19, 49:22, 49:24, 50:2, 50:8, 50:10, 50:11, 51:5, 51:6, 51:7
MS [6] - 2:4, 2:15, 2:18, 2:21, 3:3, 3:7
Multiple [1] - 7:6
multiple [2] - 5:5, 5:19
muscle [1] - 49:11
must [1] - 16:10

# N

name [4] - 3:23, 3:24, 21:8, 50:12
named [2] - 18:12, 18:16
namely [1] - 28:11

National [5] - 5:20, 7:1, 7:4, 7:6, 10:12
Nationwide [1] - 32:17
near [1] - 45:16
nearby [1] - 32:25
necessarily [1] - 30:22
need [6] - 8:2, 8:6, 25:19, 28:10, 34:10, 42:10
needed [2] - 7:14, 8:16
neighboring [1] - 41:9
net [2] - 14:18, 31:12
nets [2] - 11:17, 14:10
new [5] - 12:9, 17:3, 23:9, 23:14, 32:2
next [2] - 27:22, 49:19
nickel [1] - 36:23
night [3] - 5:7, 21:13, 23:21
Nine [4] - 11:6, 11:8, 19:1, 19:10
NO [1] - 1:5
nobody [3] - 13:18, 22:23, 23:8
nobody's [2] - 38:11, 38:12
non [3] - 11:23, 16:8, 29:15
non-compensable [1] - 11:23
non-compliance [1] - 16:8
non-slip [1] - 29:15
none [1] - 6:9
North [3] - 17:11, 18:8, 18:11
NORTHERN [1] - 1:2
notes [1] - 47:7
Nothing [2] - 32:13, 32:14
nothing [1] - 34:18
notice [1] - 40:17
notwithstanding [1] - 34:10
Number [6] - 19:1, 19:10, 20:20, 27:8, 33:24, 47:2
number [3] - 15:10, 33:22, 40:19
Number(s [1] - 52:5
numbers [1] - 33:12

## O

object [1] - 8:21
Objection [1] - 28:22
objection [1] - 8:1
objections [3] - 8:3, 8:7, 8:8
observations [1] - 31:8
obviously [3] - 7:9, 45:15, 48:17
Obviously [1] - 45:21
occasion [1] - 30:15
occasions [1] - 30:9
occurred [1] - 16:19
occurring [1] - 45:11
OF [1] - 1:1
offer [1] - 35:13

1  official [1] - 52:8
   Official [1] - 52:16
2  Oliver [1] - 1:19
   once [1] - 10:20
3  one [30] - 2:9, 2:13, 2:16, 4:22, 5:9, 6:1, 15:18, 17:23, 18:6,
   21:21, 26:19, 28:9, 31:7, 32:24, 33:22, 33:24, 36:5, 36:17, 37:5,
4  42:17, 44:2, 45:5, 45:24, 46:22, 47:1, 47:2, 49:2, 50:11
   One [2] - 9:11, 36:5
5  one's [3] - 48:15, 48:16
   Operations [3] - 4:17, 5:9, 21:4
6  opinion [1] - 20:15
   opportunity [1] - 32:16
7  opposite [1] - 17:3
   Option [1] - 23:6
8  option [8] - 11:21, 20:17, 21:9, 21:16, 22:10, 23:5, 23:11, 23:14
   options [1] - 28:21
9  order [1] - 22:19
   organization [1] - 5:19
10 orientation [1] - 12:9
   otherwise [1] - 47:20
11 outcomes [1] - 40:18
   overcoat [1] - 25:19
12

---

**P**

---

13
   p.m [2] - 2:1, 50:17
14 Pack [1] - 5:4
   PAGE [1] - 51:3
15 Page [1] - 27:8
   page [5] - 9:12, 20:25, 21:6, 22:5, 22:25
16 pages [1] - 52:7
   paid [1] - 34:18
17 pain [1] - 30:7
   pan [1] - 29:18
18 paper [1] - 35:6
   parade [1] - 14:21
19 paragraph [1] - 19:13
   Pardon [2] - 20:2, 22:1
20 parking [2] - 31:18, 42:2
   part [4] - 21:18, 21:19, 36:5, 36:6
21 particular [3] - 8:16, 9:10, 9:14
   Particularly [1] - 31:16
22 particularly [1] - 9:18
   pass [5] - 32:15, 41:2, 41:6, 47:3, 47:6
23 passed [2] - 40:24, 41:8
   past [5] - 7:9, 21:22, 30:15, 34:24
24 path [1] - 40:8
   Paul [1] - 1:19
25 Pause [1] - 15:19
   Pay [3] - 16:13, 16:14, 46:9

1  **pay** [13] - 15:7, 16:3, 16:10, 18:9, 28:10, 36:22, 38:1, 40:17, 40:24, 42:22, 43:9, 43:10, 46:6

2  **paycheck** [1] - 15:10

   **paying** [2] - 19:15, 42:14

3  **payments** [1] - 30:5

   **People** [4] - 14:5, 31:3, 43:13, 48:5

4  **people** [45] - 6:23, 12:12, 12:16, 13:19, 14:6, 14:7, 14:10, 14:16, 14:25, 15:1, 16:10, 16:13, 16:14, 23:11, 24:13, 24:21,

5  25:6, 25:23, 26:25, 27:9, 27:14, 29:15, 30:5, 31:11, 31:17, 31:19, 34:4, 34:18, 35:12, 36:3, 36:22, 37:22, 39:14, 39:15,

6  39:23, 43:12, 44:10, 44:12, 44:16, 48:18, 48:23, 49:2, 49:6, 49:9

   **per** [3] - 15:3, 33:14, 39:4

7  **Per** [2] - 15:4, 33:13

   **perceive** [1] - 13:15

8  **percentage** [1] - 43:7

   **Perez** [1] - 52:4

9  **PEREZ** [1] - 1:4

   **perform** [1] - 23:23

10 **person** [7] - 5:15, 29:22, 33:13, 33:14, 34:23, 36:21, 45:17

   **personal** [8] - 10:19, 24:18, 25:12, 29:10, 29:12, 29:21, 30:20,

11 30:24

   **personally** [1] - 11:22

12 **Pick** [1] - 44:2

   **pick** [5] - 12:17, 26:9, 31:23, 31:24, 44:4

13 **piece** [3] - 25:5, 36:23, 37:18

   **Pilgrim's** [2] - 9:18, 17:23

14 **place** [5] - 10:20, 11:23, 25:7, 30:16, 38:2

   **plaintiff** [3] - 2:22, 2:24, 38:23

15 **Plaintiffs** [1] - 1:16

   **plaintiffs** [1] - 11:7

16 **plaintiffs'** [2] - 2:25, 8:5

   **Plaintiffs'** [2] - 11:6, 11:8

17 **planned** [1] - 49:14

   **plant** [20] - 5:9, 12:1, 17:8, 17:11, 21:5, 23:23, 24:1, 26:1,

18 26:10, 26:14, 28:25, 31:10, 31:16, 31:17, 32:2, 36:5, 36:6, 38:19, 42:23

19 **plants** [2] - 17:8, 32:20

   **plastic** [1] - 32:3

20 **play** [1] - 35:2

   **played** [1] - 3:10

21 **playing** [1] - 3:13

   **pleased** [1] - 4:5

22 **plugs** [4] - 11:17, 14:11, 29:18, 31:12

   **point** [13] - 5:13, 6:4, 10:22, 11:3, 12:1, 21:7, 21:21, 39:2,

23 39:3, 39:7, 41:6, 44:19, 48:11

   **points** [1] - 39:19

24 **policies** [3] - 12:8, 16:22, 20:6

   **policy** [3] - 12:7, 23:4, 23:12

25 **politicians** [1] - 17:4

   **pork** [1] - 33:23

1  **position** [15] - 4:16, 5:12, 6:12, 7:2, 9:7, 11:12, 11:20, 12:2, 12:3, 13:22, 17:2, 17:3, 22:21, 28:3, 28:18
2  **positive** [1] - 40:18
   **possible** [3] - 22:11, 27:3, 44:11
3  **posted** [1] - 12:8
   **poultry** [7] - 5:17, 9:17, 12:23, 16:5, 16:18, 28:15, 30:22
4  **Poultry** [2] - 13:2
   **pound** [2] - 36:24, 39:4
5  **pounds** [1] - 39:8
   **practical** [5] - 13:17, 14:23, 15:10, 34:5, 36:20
6  **practically** [1] - 14:1
   **practice** [7] - 6:14, 6:17, 6:18, 6:21, 7:9, 10:25, 13:23
7  **pragmatic** [1] - 34:6
   **premarked** [1] - 7:24
8  **present** [1] - 16:2
   **presentation** [1] - 50:1
9  **President** [5] - 4:17, 5:9, 5:12, 9:8, 11:12
   **presume** [2] - 32:23, 40:23
10 **pretty** [6] - 6:24, 12:12, 25:15, 33:5, 34:3, 35:11
   **prevailed** [1] - 41:7
11 **prevailing** [1] - 39:23
   **Previous** [1] - 11:25
12 **previously** [3] - 7:19, 11:5, 11:11
   **prices** [1] - 40:24
13 **Pride** [1] - 9:18
   **primarily** [1] - 3:1
14 **principal** [4] - 10:20, 27:12, 27:23, 28:6
   **problem** [5] - 8:20, 37:2, 37:4, 39:3, 44:18
15 **problems** [1] - 30:10
   **procedure** [1] - 12:19
16 **proceed** [2] - 2:3, 2:6
   **proceedings** [3] - 15:19, 52:4, 52:8
17 **Proceedings** [2] - 2:1, 50:17
   **Process** [1] - 5:9
18 **process** [3] - 32:2, 36:11, 40:20
   **Processing** [1] - 4:17
19 **processing** [2] - 5:2, 5:3
   **produced** [1] - 2:20
20 **product** [2] - 29:22, 29:24
   **production** [10] - 32:11, 32:12, 36:16, 39:20, 39:21, 42:2, 45:10, 45:17, 48:17, 48:25
21
   **products** [2] - 32:24, 39:13
22 **promoted** [5] - 4:21, 5:1, 5:4, 5:7, 5:8
   **proper** [1] - 8:2
23 **properly** [1] - 8:6
   **proposition** [1] - 19:5
24 **protect** [4] - 29:18, 29:22, 29:24, 29:25
   **protection** [1] - 25:12
25 **protective** [7] - 10:19, 11:22, 29:10, 29:12, 29:21, 30:20, 30:24
   **provide** [2] - 6:18, 23:10

**provided** [4] - 9:7, 9:25, 10:3, 23:7
**prudent** [1] - 13:23
**pull** [1] - 48:23
**pulled** [2] - 37:17, 49:5
**punch** [11] - 14:13, 42:4, 42:5, 42:11, 42:16, 42:24, 43:6, 43:7, 44:10, 45:17
**punches** [1] - 46:23
**punished** [1] - 29:6
**punishment** [1] - 29:8
**purpose** [3] - 3:1, 27:17, 27:21
**purposes** [1] - 29:13
**put** [18] - 2:14, 6:19, 6:20, 6:24, 8:22, 11:17, 11:18, 12:9, 14:17, 14:18, 14:19, 14:21, 22:11, 23:22, 30:14, 32:3, 49:6
**putting** [2] - 26:12, 32:9

## Q

**questions** [7] - 15:20, 31:4, 32:16, 44:25, 45:2, 45:4, 45:6
**quickly** [1] - 42:18
**quite** [2] - 33:24, 42:1
**quote** [2] - 21:6, 27:10

## R

**race** [2] - 14:20
**rack** [4] - 26:6, 26:12, 26:21, 26:22
**racks** [2] - 26:1, 26:5
**Radish** [1] - 4:11
**radius** [1] - 31:17
**Radwin** [1] - 50:7
**rail** [1] - 26:17
**raised** [2] - 32:1, 45:5
**rather** [1] - 2:6
**reaches** [1] - 43:21
**reaction** [3] - 18:18, 42:20, 42:21
**read** [7] - 19:12, 21:21, 22:14, 27:8, 34:15, 35:6
**reading** [1] - 19:8
**ready** [3] - 2:3, 50:5, 50:13
**Ready** [1] - 3:17
**real** [3] - 44:20, 45:9
**Really** [1] - 24:6
**really** [10] - 8:21, 10:14, 24:18, 26:23, 29:13, 29:20, 33:10, 34:14, 34:16, 37:21
**reason** [1] - 20:14
**reasons** [3] - 7:5, 30:8, 30:23
**receive** [2] - 7:4, 10:19
**recently** [1] - 18:15
**recognize** [1] - 11:9
**record** [5] - 3:23, 4:8, 15:6, 34:15, 45:9
**recorded** [1] - 52:3

1    records [1] - 47:15
     redacted [1] - 21:18
2    REDIRECT [2] - 31:5, 51:7
     reduce [1] - 28:10
3    reduced [1] - 49:1
     reduces [1] - 48:17
4    reference [1] - 27:23
     regalia [2] - 24:1, 25:12
5    regarding [1] - 8:11
     regular [1] - 6:5
6    regulate [1] - 15:4
     regulations [1] - 5:18
7    reject [1] - 18:3
     related [1] - 5:13
8    relation [4] - 10:17, 11:15, 12:19, 13:16
     relevance [2] - 32:16, 45:1
9    rely [3] - 18:3, 18:6, 18:8
     remember [5] - 5:24, 6:2, 10:23, 25:14, 25:25
10   report [3] - 6:20, 46:25, 47:7
     Report [1] - 47:18
11   Reported [1] - 1:22
     reported [1] - 6:8
12   Reporter [1] - 52:16
     REPORTER'S [1] - 52:1
13   reports [1] - 5:21
     represented [1] - 7:7
14   request [1] - 40:9
     required [1] - 29:3
15   requirements [1] - 27:20
     requires [2] - 16:3, 19:15
16   Resources [2] - 47:2, 47:15
     respect [5] - 14:7, 16:21, 20:7, 20:8, 34:11
17   respective [1] - 7:24
     respond [1] - 31:20
18   rest [1] - 49:11
     restricted [1] - 11:25
19   restrictive [1] - 14:5
     result [1] - 34:13
20   retailers [1] - 32:24
     reversed [1] - 6:12
21   review [2] - 7:20, 11:11
     ride [1] - 36:3
22   ring [1] - 40:11
     Road [1] - 4:11
23   roasting [1] - 48:6
     room [2] - 12:10, 45:18
24   Room [1] - 1:23
     ropes [1] - 22:14
25   rotate [1] - 49:9
     Round [1] - 32:21

round [1] - 33:12
routinely [1] - 31:11
RPR [1] - 1:22
rule [6] - 10:21, 16:21, 17:21, 19:18, 23:2, 49:9
rules [1] - 34:25
run [2] - 38:12, 40:6

## S

safe [2] - 30:8, 30:13
safety [2] - 2:21, 3:3
Safety's [1] - 30:6
Sanderson [2] - 9:19, 17:23
sandwich [1] - 14:14
sanitation [1] - 36:17
saw [2] - 23:25, 24:13
scenario [1] - 44:11
season [2] - 25:14, 25:25
seat [1] - 41:22
seated [2] - 3:22, 15:21
second [3] - 4:22, 5:3, 16:18
see [24] - 3:1, 7:14, 9:14, 13:24, 14:3, 16:1, 18:22, 25:10,
31:11, 31:19, 36:18, 38:13, 38:21, 39:23, 40:2, 44:19, 44:24,
47:4, 47:11, 47:14, 47:23, 48:21, 48:24, 49:8
See [1] - 31:16
seeing [1] - 24:3
seem [2] - 24:21, 40:9
Selbyville [1] - 21:4
self [1] - 14:7
self-respect [1] - 14:7
selling [1] - 30:10
Selling [1] - 30:12
send [1] - 5:21
sends [1] - 47:16
sense [1] - 15:12
sentence [2] - 19:13, 24:25
sequence [1] - 32:6
set [7] - 14:20, 45:18, 46:3, 46:6, 46:11, 46:17, 49:10
settlement [1] - 40:18
seven [2] - 37:18, 43:10
several [1] - 48:12
shield [1] - 24:16
shift [13] - 5:7, 15:3, 15:4, 35:21, 35:23, 36:18, 42:4, 42:8,
42:12, 43:24, 46:15, 47:25
shifts [4] - 36:8, 36:15, 36:16, 36:17
Shipping [1] - 5:4
shoes [1] - 29:1
short [1] - 2:4
show [5] - 2:6, 2:10, 20:20, 35:20, 48:16
showed [1] - 34:17

**showing** [1] - 35:4
**shown** [1] - 34:17
**shows** [1] - 46:23
**sick** [1] - 49:6
**signature** [1] - 52:11
**significance** [1] - 28:6
**signing** [1] - 21:8
**simple** [1] - 38:24
**simple-minded** [1] - 38:24
**sinks** [4] - 27:11, 27:15, 27:21, 28:11
**sit** [1] - 35:5
**sitting** [2] - 38:14, 38:17
**situation** [2] - 36:21, 44:13
**six** [2] - 36:12, 43:10
**size** [2] - 26:7, 26:8
**skill** [1] - 49:10
**sleeves** [2] - 24:18, 25:20
**slip** [2] - 29:15
**smock** [6] - 23:1, 25:3, 25:20, 26:13, 26:17, 31:21
**smocks** [4] - 12:14, 25:5, 26:2
**solve** [1] - 37:2
**someone** [1] - 28:9
**sometimes** [1] - 34:25
**somewhere** [1] - 33:5
**sooner** [1] - 42:5
**sorry** [5] - 7:21, 20:4, 20:5, 43:19, 44:17
**Sorry** [1] - 4:25
**sort** [4] - 32:4, 34:6, 37:5, 40:17
**sounds** [1] - 44:11
**South** [1] - 18:1
**southern** [1] - 25:11
**speakers** [1] - 2:14
**specific** [2] - 30:12, 30:18
**Specifically** [1] - 10:18
**specifically** [2] - 7:22, 31:11
**spelling** [1] - 3:23
**spent** [1] - 19:6
**spot** [2] - 24:7, 47:22
**stamped** [1] - 9:12
**stand** [3] - 3:18, 8:16, 43:8
**standard** [2] - 18:4, 19:7
**standing** [2] - 11:20, 17:2
**standpoint** [2] - 13:17, 14:23
**stands** [1] - 19:5
**Start** [1] - 43:17
**start** [13] - 10:21, 10:22, 19:15, 36:8, 36:12, 43:12, 43:13, 44:11, 46:2, 46:9, 50:7, 50:15
**Started** [2] - 4:20, 5:16
**started** [4] - 5:17, 27:12, 46:24, 47:21
**starting** [1] - 5:23

| | |
|---|---|
| 1 | **starts** [6] - 42:5, 42:12, 43:16, 43:21, 44:14, 46:9 |
| | **state** [2] - 4:8, 18:8 |
| 2 | **statement** [1] - 19:3 |
| | **STATES** [1] - 1:1 |
| 3 | **stating** [1] - 3:23 |
| | **station** [2] - 6:24, 44:17 |
| 4 | **status** [1] - 17:20 |
| | **stay** [2] - 15:21, 40:3 |
| 5 | **stayed** [2] - 5:15, 13:13 |
| | **stenographically** [1] - 52:4 |
| 6 | **still** [3] - 15:14, 28:19, 42:1 |
| | **Stine** [4] - 1:18, 4:25, 8:10, 50:5 |
| 7 | **STINE** [21] - 2:9, 2:24, 3:17, 4:7, 5:11, 8:1, 8:5, 8:12, 8:15, 8:20, 8:24, 9:2, 28:22, 31:6, 45:5, 45:8, 45:23, 46:1, 50:11, |
| 8 | 51:5, 51:7 |
| | **stop** [2] - 46:11, 48:17 |
| 9 | **store** [4] - 26:25, 27:1, 27:2 |
| | **straight** [1] - 45:22 |
| 10 | **strap** [1] - 31:13 |
| | **street** [1] - 39:11 |
| 11 | **Street** [1] - 1:23 |
| | **strewn** [1] - 25:7 |
| 12 | **strongly** [1] - 7:13 |
| | **studying** [1] - 13:6 |
| 13 | **stuff** [3] - 14:21, 25:15, 31:19 |
| | **subsequently** [2] - 10:7 |
| 14 | **subsidize** [2] - 35:17, 35:18 |
| | **sued** [5] - 9:20, 13:3, 13:18, 22:23, 38:14 |
| 15 | **suffering** [1] - 30:7 |
| | **suggested** [1] - 28:21 |
| 16 | **suggesting** [1] - 24:24 |
| | **summer** [5] - 25:10, 25:11, 25:17, 25:22, 36:25 |
| 17 | **Super** [1] - 42:18 |
| | **superintendant** [1] - 5:4 |
| 18 | **supermarket** [1] - 33:1 |
| | **supervisor** [10] - 4:21, 5:1, 46:25, 47:7, 47:13, 47:15, 47:16, |
| 19 | 47:18, 47:19 |
| | **supervisory** [1] - 5:2 |
| 20 | **supplies** [1] - 18:24 |
| | **Supply** [1] - 27:2 |
| 21 | **suppose** [2] - 2:16, 18:6 |
| | **Supreme** [10] - 10:8, 10:13, 10:16, 10:18, 10:23, 12:25, 18:16, |
| 22 | 18:22, 19:19, 19:20 |
| | **survey** [4] - 5:18, 5:24, 6:8, 28:16 |
| 23 | **surveys** [3] - 6:7, 9:17, 10:1 |
| | **survive** [2] - 39:25, 40:7 |
| 24 | **suspect** [2] - 32:16, 33:24 |
| | **Sustained** [1] - 28:23 |
| 25 | **SWORN** [1] - 3:20 |
| | **system** [3] - 4:22, 42:7, 46:17 |

**T**

**T-I-R-R-E-L-L** [1] - 3:25
**Tape** [1] - 3:13
**tardiness** [1] - 50:4
**taste** [3] - 34:1, 34:3
**tastes** [1] - 33:25
**taught** [1] - 45:2
**ten** [16] - 2:5, 39:11, 39:18, 42:4, 42:5, 42:9, 42:14, 42:15, 42:22, 42:23, 42:25, 43:6, 43:7, 43:9, 44:7, 44:15
**Ten** [1] - 44:8
**ten-thousandths** [1] - 39:18
**test** [1] - 33:11
**testified** [1] - 20:3
**testify** [2] - 18:15
**testifying** [1] - 38:18
**Texas** [1] - 33:2
**That'** [1] - 46:18
**THE** [218] - 1:1, 1:1, 2:2, 2:8, 2:10, 2:16, 2:22, 2:25, 3:5, 3:8, 3:11, 3:16, 3:21, 3:22, 3:25, 4:1, 4:2, 4:4, 4:5, 4:22, 4:24, 4:25, 5:1, 7:17, 7:21, 8:4, 8:10, 8:14, 8:18, 8:23, 9:1, 15:23, 28:23, 32:15, 32:18, 32:19, 32:20, 32:21, 32:22, 32:23, 33:3, 33:4, 33:6, 33:8, 33:9, 33:10, 33:13, 33:14, 33:15, 33:16, 33:17, 33:18, 33:19, 33:20, 33:21, 33:24, 33:25, 34:2, 34:4, 34:5, 34:19, 34:20, 34:21, 34:22, 35:8, 35:9, 35:11, 35:13, 35:15, 35:16, 35:17, 35:18, 35:19, 35:20, 35:22, 35:23, 35:24, 35:25, 36:1, 36:2, 36:3, 36:4, 36:5, 36:8, 36:10, 36:14, 36:16, 36:18, 36:19, 36:20, 37:1, 37:2, 37:3, 37:4, 37:6, 37:7, 37:10, 37:11, 37:12, 37:14, 37:15, 37:17, 37:19, 37:20, 37:21, 37:23, 37:25, 38:3, 38:5, 38:6, 38:8, 38:9, 38:10, 38:11, 38:16, 38:17, 38:20, 38:21, 39:2, 39:5, 39:6, 39:7, 39:8, 39:17, 39:18, 39:20, 39:21, 40:2, 40:3, 40:8, 40:13, 40:15, 40:21, 40:22, 41:1, 41:2, 41:4, 41:5, 41:11, 41:12, 41:14, 41:15, 41:17, 41:19, 41:20, 41:21, 41:24, 41:25, 42:19, 42:20, 42:21, 42:24, 43:1, 43:2, 43:11, 43:14, 43:16, 43:19, 43:22, 43:23, 44:1, 44:2, 44:4, 44:6, 44:7, 44:8, 44:9, 44:19, 44:20, 44:24, 45:7, 45:14, 45:25, 46:22, 47:1, 47:4, 47:5, 47:9, 47:10, 47:11, 47:12, 47:14, 47:17, 47:18, 47:19, 47:23, 48:3, 48:4, 48:5, 48:6, 48:7, 48:9, 48:10, 48:11, 48:13, 48:14, 48:20, 48:21, 48:22, 48:24, 48:25, 49:2, 49:4, 49:5, 49:7, 49:8, 49:9, 49:10, 49:11, 49:12, 49:16, 49:17, 49:21, 49:23, 49:25, 50:3, 50:9, 50:15
**therefore** [2] - 22:11, 41:8
**they've** [1] - 31:9
**thinking** [1] - 26:24
**third** [2] - 17:11, 36:18
**Third** [3] - 17:16, 17:20, 18:5
**thousand** [2] - 14:25, 15:1
**thousandths** [1] - 39:18
**three** [6] - 8:1, 10:12, 36:15, 36:16, 42:12, 43:9

tire [1] - 48:15
Tirrell [11] - 3:15, 3:17, 3:25, 4:2, 8:19, 16:1, 20:6, 20:22, 22:5, 32:15, 49:13
TIRRELL [2] - 3:20, 51:4
title [1] - 5:10
today [1] - 49:15
together [3] - 36:3, 37:8, 37:10
tomorrow [2] - 50:5, 50:15
tonight [1] - 49:22
took [3] - 10:20, 11:23, 30:16
Took [1] - 11:18
top [2] - 5:15, 29:24
total [1] - 33:15
totally [1] - 23:22
touch [4] - 5:23, 6:4, 13:8, 14:17
track [2] - 14:16, 28:14
trade [2] - 5:19, 37:12
training [2] - 2:5, 2:19
transcribed [1] - 52:8
transcript [1] - 52:8
Tray [1] - 5:4
Trial [1] - 1:10
tried [2] - 13:21, 13:24
true [1] - 31:23
trust [2] - 21:22, 29:6
truth [1] - 42:24
try [4] - 12:2, 34:1, 42:23, 44:12
trying [5] - 8:24, 14:16, 15:13, 28:16, 45:23
Tuesday [1] - 1:10
turkey [3] - 33:25, 34:1, 34:2
turn [3] - 3:14, 20:22, 27:7
Two [4] - 36:16, 44:6, 50:8, 50:9
two [17] - 5:6, 10:22, 17:8, 18:25, 26:19, 29:13, 31:7, 35:20, 36:14, 42:11, 43:4, 43:8, 44:5, 45:6, 47:1, 47:10, 50:11
typical [2] - 47:25, 48:1
typically [1] - 32:3

## U

U.S [1] - 1:23
Um-hum [2] - 9:13, 24:2
under [2] - 10:20, 25:15
understood [1] - 28:8
unit [1] - 38:25
UNITED [1] - 1:1
up [25] - 3:17, 12:3, 12:17, 12:22, 14:15, 14:20, 31:23, 31:24, 32:15, 33:18, 33:19, 34:17, 35:4, 35:20, 36:18, 39:11, 41:8, 41:9, 43:5, 46:23, 48:16, 49:14, 49:17
updated [1] - 5:22
updates [2] - 6:5, 7:6

1    **upheld** [2] - 17:6, 18:9

2                                    **V**

3    **various** [5] - 5:2, 5:5, 10:11, 31:17, 34:16
     **Vice** [5] - 4:17, 5:8, 5:12, 9:7, 11:12
4    **video** [3] - 2:5, 2:21, 47:24
     **Video** [1] - 3:10
5    **videos** [1] - 12:9
     **violate** [1] - 37:7
6
                                    **W**
7
     **Wage** [4] - 6:8, 9:17, 9:25, 11:15
8    **Wait** [1] - 43:14
     **waiting** [4] - 10:18, 18:24, 19:6, 19:19
9    **walking** [2] - 19:6, 32:10
     **wants** [2] - 27:5, 35:5
10   **warnings** [1] - 41:23
     **wash** [3] - 27:11, 27:15, 27:21
11   **washing** [2] - 16:11, 28:11
     **watched** [2] - 3:5, 3:11
12   **watching** [1] - 47:25
     **water** [1] - 29:14
13   **ways** [3] - 29:10, 29:11, 47:2
     **wear** [7] - 26:8, 29:1, 29:2, 29:3, 29:9, 29:23
14   **wearing** [5] - 24:13, 24:14, 25:17, 29:11, 31:10
     **Wednesday** [1] - 49:21
15   **weeks** [1] - 22:9
     **West** [1] - 1:23
16   **wet** [2] - 29:14, 29:16
     **Whereas** [1] - 20:12
17   **whereby** [1] - 40:19
     **Whereof** [1] - 52:10
18   **Whichever** [1] - 2:8
     **whole** [2] - 40:17, 42:23
19   **wholesalers** [1] - 32:24
     **widespread** [1] - 12:12
20   **willing** [1] - 22:24
     **winter** [2] - 25:19, 25:23
21   **Wisconsin** [1] - 49:20
     **wish** [1] - 49:12
22   **withdrawn** [1] - 30:17
     **witness** [5] - 2:7, 3:18, 7:16, 8:16, 49:19
23   **Witness** [1] - 52:10
     **WITNESS** [93] - 3:20, 3:21, 3:25, 4:4, 5:1, 32:18, 32:20, 32:22,
24   33:3, 33:6, 33:9, 33:13, 33:15, 33:17, 33:19, 33:21, 33:25, 34:4,
     34:19, 34:21, 35:8, 35:11, 35:15, 35:17, 35:19, 35:22, 35:24,
25   36:1, 36:3, 36:5, 36:10, 36:16, 36:19, 37:1, 37:3, 37:6, 37:10,
     37:12, 37:15, 37:19, 37:21, 37:25, 38:5, 38:8, 38:10, 38:16,

31

1    38:20, 39:2, 39:6, 39:8, 39:18, 39:21, 40:3, 40:13, 40:21, 41:1,
     41:4, 41:11, 41:14, 41:17, 41:20, 41:24, 42:19, 42:21, 43:1,
2    43:11, 43:16, 43:22, 44:1, 44:4, 44:7, 44:9, 44:20, 47:1, 47:5,
     47:10, 47:12, 47:17, 47:19, 48:3, 48:5, 48:7, 48:10, 48:13,
3    48:20, 48:22, 48:25, 49:4, 49:7, 49:9, 49:11, 49:16, 51:4
     **won** [1] - 39:24
4    **words** [6] - 27:25, 28:5, 33:1, 35:4, 37:23, 42:3
     **worker** [2] - 43:21, 43:24
5    **workers** [5] - 16:11, 19:15, 23:1, 23:2, 40:19
     **Workers** [1] - 30:4
6    **Workmen's** [1] - 30:6
     **works** [4] - 36:5, 36:6, 43:11, 46:2
7    **world** [1] - 33:9
     **writing** [3] - 22:6, 22:7, 22:8
8    **wrote** [1] - 28:7

9                          **Y**

10   **year** [2] - 5:6, 10:3
     **years** [4] - 4:15, 5:8, 6:22, 40:11
11   **yesterday** [4] - 3:5, 3:9, 22:3, 50:6
     **younger** [1] - 34:24
12
                           **Z**
13
     **Zajac** [3] - 1:22, 52:3, 52:15
14

15

16

17

18

19

20

21

22

23

24

25