```
1                    IN THE UNITED STATES DISTRICT COURT
2                      FOR THE DISTRICT OF MARYLAND
                             NORTHERN DIVISION
3

4

5        LUISA PEREZ, ET AL.

6             v.                              CIVIL CASE NO.
                                                AMD-06-121
7        MOUNTAIRE FARMS, INC., ET AL.

8             Defendants
         _____/
9

10
                            (Bench Trial)
11                     Thursday, March 26, 2009
                        Baltimore, Maryland
12

13       Before:  Honorable Andre M. Davis, Judge

14

15
         Appearances:
16
                On Behalf of the Plaintiffs:
17                 C. Christopher Brown, Esquire
                   Jane R. Flanagan, Esquire
18
                On Behalf of the Defendants:
19                 J. Larry Stine, Esquire
                   Paul Oliver, Esquire
20

21

22
         Reported by:
23       Mary M. Zajac, RPR
         Room 5515, U.S. Courthouse
24       101 West Lombard Street
         Baltimore, Maryland 21201
25
```

```
1              (Proceedings at 11:10 a.m.)
2              THE COURT: Counsel, you may proceed when you're ready.
3              MR. STINE:  Call Dr. Gerry Davis, Your Honor.
4              DR. GERARD DAVIS, DEFENDANT'S WITNESS, SWORN
5              THE WITNESS:  I will.
6              THE CLERK:  Thank you.  You may be seated.
7              THE WITNESS:  Thank you.
8              THE CLERK:  Please begin by stating your name for the
9       record and spelling your last name.
10             THE WITNESS:  My name is Gerard, G-E-R-A-R-D, Albert,
11      Davis.
12             DIRECT EXAMINATION
13      BY MR. STINE:
14      Q    And would you please state your home and office address for
15      the record, please?
16             THE COURT:  You know, I've sorry to interrupt.  I
17      should have done it before.  We really don't require home
18      addresses, particularly for experts.
19      Q    Okay.  Your office address, please?
20      A    3883 Falcon Crest Court, Auburn, Alabama, 36830.
21      Q    And what is your current position?
22      A    I'm an Assistant Professor of Industrial and Systems
23      Engineering in the Samuel Ginn College of Engineering, Auburn
24      University.
25      Q    And could you give us some of your credentials, your
```

1    background?

2    A    Yes, sir.  I have a Bachelor of Science in Mechanical

3    Engineering from the University of South Carolina.  I have a

4    Masters of Science in Industrial and Systems Engineering, with a

5    focus in ergonomics and work measurement from Auburn University.

6    And I have a Ph.D. and Industrial and Systems Engineering with a

7    focus in ergonomics and work measurement from Auburn University.

8    Q    And are you a tenured professor?

9    A    Presently I'm not.  But I was recently notified that I was

10   selected for advancement to Associate Professor and the awarding

11   of tenure.

12   Q    Congratulations.

13   A    Thank you.

14        MR. BROWN:  Congratulations.

15        THE WITNESS:  Thank you, sir.

16   BY MR. STINE:

17   Q    Now, have you had an opportunity to visit the Millsboro

18   plant of Mountaire?

19   A    Yes, sir.  I visited Millsboro on two different time

20   periods to conduct the two studies that I submitted to this

21   Court.

22   Q    And how long did you spend, roughly, in the facility doing

23   these studies?

24   A    Approximately one week each time.

25   Q    Okay.  And what studies did you conduct at the facility?

A     I conducted a study of the employees' donning and doffing,

required personal protective equipment and sanitation items, and

then a second study which dealt with the amount of time it would

take for various employees to walk various paths back and

between their job and the break room, and assorted events such

as these.

Q     Okay.  For the time being, I would like to start off with

the walking study, if that's okay with you, Dr. Davis.

A     Yes, sir.

Q     Could you kind of give us an overview of your, of the

study, what you did?

A     Yes, sir.  Well, essentially, in a situation such like,

such as this, you have to determine what type of methodology

would be appropriate.  And I feel that it's my position to

collect the data, interpret that data, and then give options to

those folks that are making the decisions, whether that's the

company, the attorneys involved in this matter, or the Court and

the judge.

     And so when you look back on peer-reviewed science,

textbooks, literature, in this particular case you want to look

at what we call a standard data system.  And a standard data

system is essentially a compilation of individual elements that

we would go ahead and measure and categorize those using sound

statistical principles, archive those in a database, and then be

able to retrieve various combinations to be able to address any

1    number of questions that might be asked today.

2    Q    Okay.  How long have these methods been used in time

3    studies?

4    A    Well, originally, this would originally go back, this

5    concept of standard data and predetermined time and motion,

6    would actually go back to the Gilbraiths, who you might be

7    familiar with, famous as Cheaper By the Dozen.  And classically,

8    this is the time and motion efficiency expert type approach.

9    Q    Okay.  And so once you did that, what was the first step

10   you took once you begin this study?

11   A    Well, the first step I would always take in any facility is

12   I would ask for a thorough tour and walk-through of the entire

13   facility.  First time through just looking for generalities.

14   You know, where the walls are, the different departments.

15        When you go to facilities such as these, they are, though

16   they're very similar in some aspects, they're also very

17   different in other aspects.  And so you want to feel comfortable

18   that you understand where the various departments are, what

19   those walking routes might be, and these kind of things.

20        So I would get that initial tour.  I would then go back and

21   request a layout.  And I actually have one with me today that

22   I'll be referring to.  Familiarize myself with that.  And then I

23   would work with either their computer aid drawing folks or

24   their, their resident engineer to be able to pull from the

25   system and then generate blow-ups from that main layout for each

1     of the various departments.  Sometimes the departments are small

2     enough that we can fit multiple departments on each blow-up.  I

3     also have one of those.

4         The whole purpose here is once we get to this point, we now

5     have to look at the jobs that are involved in the plant.  As is

6     the case in this particular matter, there is a significant

7     number of job titles spread throughout the various departments.

8         So the goal initially is to take the layout, the blown-up

9     layout, go with a knowledgeable person the second time through,

10    such as a plant manager, a department manager, usually

11    supervisors, because they're most familiar with what's going on,

12    and actually stop and locate every single job that Mountaire has

13    that's associated with this matter.  Mark those job locations on

14    that blown-up schematic.  And then complete that for all the

15    departments that are involved.

16    Q    Okay.  And you said you have some blow-ups of this, I

17    believe it's Defendant's Exhibit 35.  Would this be a good time

18    for you to kind of go through those and show us those?

19    A    Sure.

20    Q    All right.

21    A    Can I grab them, sir?

22         THE COURT:  You may.

23    A    Thank you.

24         THE COURT:  Perhaps you can, is this a miniature

25    version of it in the exhibit book?  Do you have a miniature

1    version?  No?  That's quite all right.  That's quite all right.

2    A    Sir, I'll try to knock these out at one time with these

3    exhibit here.

4    Q    So we're looking.  We got the first page of Defendant's

5    Exhibit 35.

6         Are we ready?  Got the mike on?  This is the first page of

7    Defendant's Exhibit 35.  Would you explain what this layout's

8    about, please?

9    A    Yes, sir.  As I was alluding to, this is an overall

10   facility layout.  This is just an overall facility layout of the

11   Mountaire Farms Millsboro plant.  And as you can see, in the

12   context of other plants that I've been to, this plant is a

13   little above average inside, meaning that it's a fairly larger

14   plant.

15        Essentially, I won't go over everything that has, that I've

16   heard repeated before unless you specifically want me to, but

17   employees park across the street, come through an elevated

18   tunnel, and then come past security.  Come down the main

19   corridor, and then would retrieve required items that they

20   weren't carrying or would wear in.

21        They would go through a donning and doffing process.  And

22   then they would essentially go out to their jobs.

23   Q    So let me stop you just for a second.  This area in the,

24   marked in the red on the lower right-hand side is the area in

25   which the employees are coming in and the locker rooms are, is

1    that correct?

2    A    Yes, sir.  The locker room's right here.  And I actually

3    have a blow-up of that.

4    Q    We'll get to that in just a second.  Let's finish the

5    overview first.  And then we'll go to the blow-ups and the

6    individual areas.  Go ahead and tell me what else.

7    A    And then depending on, essentially, from my observations,

8    there's three primary groups of employees.  One group of

9    employees will be at what we call the back dock area.  And those

10   folks will be the folks that work in receiving and pinning,

11   which will be, if you go clean versus dirty, that the dirtier

12   part of the plant with regards to being kill area.  And you have

13   the dust and all these kind of feathers and these kind of

14   things.

15   Q    Dr. Davis, can you, for the record, explain where on this

16   map and what color you have marked that area or areas?

17   A    Yes, sir, I will.  The area that I'm alluding to is this

18   area right here, with live hang.  And then this would be the

19   receiving live hang area.  And then the kill room is right here.

20   Q    So you're referring to the bottom left-hand side of the

21   overview map as to the area where the lives are received in the

22   kill room and the pinning rooms, correct?

23   A    Yes, sir, I am.

24   Q    Okay.

25   A    And so the thing that is -- this is just about walking.

1    The thing that is distinguishing from the walking perspective

2    is, besides the fact that they already start tremendously early,

3    is these folks will enter, they will come down the main

4    corridor, they will punch in at the time clock, and they will go

5    ahead and exit.  This is going to be easier off the large one,

6    so I'll just talk through it right now and show you on specific

7    detail on that.  They will exit and then they will walk outside

8    the plant, come around the back, and come into their own

9    separate don/doff locker room, break room area.

10        And so that distinguishes them in a, in a different matter

11   from a walking perspective.  And what I mean by distinguishes

12   is, they will walk this distance.  They will done/doff, go to

13   lunch, and then -- excuse me -- go out to work.  Then when they

14   come bag on breaks and lunch, they primarily stay in that break

15   room that the company has provided with them.

16        So the only time they would make that repeat walk would be

17   at the end of their shift.

18   Q    Okay.  And did you determine where they obtained their

19   supplies, these people in the back lot?

20   A    I did.  The supervisor picks up a bag of all supplies that

21   they would need -- supplies meaning sanitation equipment and

22   personal protective equipment -- every day on his or her way in

23   and provides that to the employees in that area.

24   Q    What do you mean "in that area?"

25   A    Back in the don/doff area in the receiving live hang break

1    room.  And the mechanism for that is, the reason for that is

2    because the Supply Room is closed that, I believe it was 5:33 or

3    whatever that time was.  So they actually leave it at the

4    security gate and the supervisor picks it up on the way in.

5    Q    All right.  And what about the other overview?  What are

6    the other departments that we've talked about?

7    A    The brunt of the departments, there's 20 departments in the

8    plant that pertain to this matter.  The brunt of those

9    departments, we've already identified that previously through

10   other people's testimony and exhibits; that those folks walk in,

11   punch the clock, drop their lunch off, go through a don/doff

12   routine, and then be at their associated place of work at a

13   predetermined time, ready to process product.

14   Q    So on this map, though we've talk about evisceration, for

15   example, so on the overview of this map, where is the

16   Evisceration Department?

17   A    Evisceration is right here.  This is the Evisceration

18   Department right here.

19   Q    So this is, it's in the middle of the drawing and it's got

20   green and yellow lines on it?

21   A    If you have the color version.  If you do not, they're all

22   going to be in the absence of color.

23   Q    It's very rectangular, elongated in the center left of the

24   drawing?

25   A    Yes, sir.

1    Q     What about the debone areas?

2    A     Debone, there's three primary areas for debone.  One is

3    Cone/Debone.  And then there's Leg and Thigh Debone, which is

4    right over here, three different fundamental debone lines.

5    Q     So the Leg Debone is, if we looked at the map, in the

6    center of the map to the right of the building?

7    A     Right over here.  Leg and thigh.

8    Q     And then the Cone/Debone is in between Evisceration and Leg

9    Debone?

10   A     Cone are the big lines right here that you see.

11   Q     Right.  And in between Evisceration and the Leg Debone,

12   correct?

13   A     Yes, sir.  In this, in this particular schematic, they're

14   located almost directly in the middle.

15   Q     And where do the bulk of the employees work?

16   A     The employees, for the most part, the employees are located

17   in this central core area of the plant.  That would be, they'll

18   be, definitely be my estimation.  Usually, you are see the vast

19   number of people, employees on the debone type lines.  Very high

20   density, high concentration of folks.  Small amount of area.

21   Facilitated by the process of basically disassembling the

22   chicken.

23         Peripheral type people, employees working out in, this is

24   an area called Tray Pack and Roasters out here.  This is fairly

25   highly populated, too.  And when we look at the models later,

1    we'll be able to see the exact proportion of employees that work

2    in each of these departments.

3    Q    And that's located on this map on the upper right-hand

4    corner?

5    A    Top right-hand corner, yes, sir.  And then we have a series

6    of wet and dry coolers that are geographically dispersed

7    throughout the plant, mostly right here.  And they have a fair

8    amount of employees, but certainly not anything like Debone or

9    the other highly populated areas.

10   Q    So coolers are basically on the top half, the top third, to

11   the left?

12   A    Yes, sir.  Coolers are right here.  These are the coolers

13   in this area.

14   Q    So they're above the Evisceration or the Debone lines, to

15   the left on the schematic?

16   A    Yes, sir.  So the thing that's important here is, if we're

17   going to characterize this walking, how are we going to do it?

18   There is certainly a high level look, which we're looking at

19   right here.  And again, in my estimation, you could not

20   ascertain much from this type of layout looking at things from

21   this perspective.

22       Conversely, there's probably the minutiae level where we

23   get down and start measuring very small, tiny distances.

24       So part of the study design is going to be to determine

25   what's equitable not only from a data collection and

1    interpretation perspective, but also trying to rationalize this

2    and produce the numbers that are most representative.

3    Q    So then you said you got a breakdown.  I believe we've got,

4    or we don't -- what else?

5    A    The last thing I want to say is that there, it would be

6    very hard to look at this drawing, even if you went to a number

7    of plants, by an organization and determine what would be

8    geographic boundaries or natural divisions.  And so I refer to a

9    document that these facilities have, which is a document that

10   pulls out required personal protective equipment and sanitation

11   items.  In every plant that I've been to so far they have had

12   these type of documents.

13       And if you look at a document such as this, which was

14   submitted with my expert report, called a PPE Matrix, it

15   actually has a listing of every job title in the plant that

16   requires PPE, sanitation equipment, and items such as that.

17       More conveniently, it lists them by geographic boundaries,

18   which are these departments.  And so in this particular case --

19   I'm going to put this in my pocket.

20           THE COURT:  What's the exhibit number of the document

21   he's using?

22           MR. STINE:  I'll have to look at that one, Your Honor.

23   It's his report.  And I don't know if we have attached all the

24   backup appendices to that expert report.

25           THE LAW CLERK:  36 or 37.

1          THE COURT:  36 or 37.  I don't have 36 or 37.  My book

2     stops at 34.  It must be a second book.

3          THE WITNESS:  I have a copy, if you'd like it, sir.

4          THE COURT:  I don't.  I don't want to take yours.  It

5     seems I don't have it.

6          MR. STINE:  Did you say Exhibit 31, Your Honor?

7          THE COURT:  My exhibit book stops at Exhibit 34.  The

8     defendant's book stops at Exhibit 34.

9          MR. OLIVER:  There's two volumes.

10         THE COURT:  Right.  We don't have a second volume of

11    the defendant's exhibits.

12         MR. STINE:  The Dr. Davis, 35 and 36.

13         THE COURT:  We don't have a 35 and 36.

14         MR. STINE:  Those are DVD's, those.

15         MS. FLANAGAN:  We have up to 52.

16         MR. STINE:  Those are exhibits --

17         THE LAW CLERK:  These are 32 and 37.

18         THE COURT:  Wait.  Wait.  Wait.  Time out.  Time out.

19    Time out.  Mr. Oliver just said that the defendant's exhibits

20    come in two volumes.  I only have one volume.

21         MR. STINE:  Yes, Your Honor.  We put ours in two.  We

22    tried to put you all in one volume.

23         MR. OLIVER:  All right.  I may have misspoke.  I'm

24    sorry.  I apologize for that.

25         THE COURT:  Okay.  All right.  So what are those

1    you're looking at now, because I don't have those, either?  This

2    is the charts.  Were they just handed up this morning?  Is that

3    what happened?

4              THE CLERK:  No, I got them the other day.

5              THE WITNESS:  Your Honor, those three documents are

6    exactly the same three as these except they're just not hard

7    bound.

8              THE COURT:  All right.  So there's no exhibit tag on

9    this.

10             THE CLERK:  They were attached to Exhibit 35

11   yesterday.

12             MR. STINE:  Page one, two, and three, Your Honor.

13             THE COURT:  So 35 is three separate --

14             MR. STINE:  Pages.

15             THE COURT:  Well, you say pages.  You mean charts?

16             MR. STINE:  Yes, Your Honor.

17             THE COURT:  Or diagrams.

18             MR. STINE:  Or layouts.  Yes, Your Honor.

19             THE COURT:  And what's 36?

20             THE LAW CLERK:  A spreadsheet.

21             MR. STINE:  That's an interactive spreadsheet that is

22   contained, it's contained in 37.

23             THE LAW CLERK:  This has 35, 36 and 37?

24             MR. STINE:  No, it does not have 35.

25             THE LAW CLERK:  So it's 36 and 37.

1              MR. STINE:  I apologize.

2              (Pause in proceedings.)

3              MR. STINE:  The PPE Matrix has been introduced by the

4    plaintiffs.  So the matrix is in the plaintiffs.

5              MS. FLANAGAN:  You want to know what number of ours?

6              MR. STINE:  Yes.

7              THE COURT:  Is what you're referring to as the matrix

8    what Dr. Davis is now holding?

9              MR. STINE:  I believe so.

10             THE COURT:  Okay.  It's marked separately as a

11   plaintiff's exhibit and Ms. Flanagan's going to tell us in a

12   second, I think.

13             MR. STINE:  I believe we both put it in.  You put it

14   in and we put it in.  We have it as Defendant's Exhibit 34.  And

15   I believe you all put the same chart in.

16             MS. FLANAGAN:  Plaintiff's Six.

17             MR. STINE:  Plaintiff's Six, Your Honor.

18             THE COURT:  Okay.  So I have 34.

19             MR. STINE:  Yes, Your Honor.

20             THE COURT:  All right.  And Plaintiff's Six is the

21   same thing?

22             MR. STINE:  Yes, Your Honor.

23             THE COURT:  Okay.  Good.  We're good.

24   BY MR. STINE:

25   Q    All right.  So you had this matrix.  So you were able to

1    ascertain the jobs.  Okay.  What did you do after that?

2    A    Yes.  Sir, so the point was I'm trying to ascertain natural

3    divisions that or boundaries that the company already has

4    identified, what already exists instead of creating some on my

5    own.  And so I referred --

6              THE COURT:  I'm sorry.  May I interrupt for just one

7    second so I'm sure to follow?  Are we talking now exclusively

8    about the issue of walking to and fro?

9              MR. STINE:  Yes, Your Honor.  He did two separate

10   reports.  A walking report and we're going to go through that.

11   And then he did a separate, distinct donning and doffing.  We'll

12   do walking and we'll do donning.

13             THE COURT:  I got it.  Okay.

14             MR. STINE:  He did the two studies and broke them

15   down.  Just much more logical to present them this way.

16             THE COURT:  Sorry.

17   BY MR. STINE:

18   A    No, sir.  That's fine.  And so what I do is once I've

19   established some kind of a mechanism to facilitate this

20   division, and the natural division to me for a case like this is

21   a document that already exists.  So Mountaire has provided me,

22   at my request, with a document that already has 20 departments,

23   with every job title listed on them by department.  And I go

24   ahead and segregate the employees' jobs by these divisions that

25   are already established.

1    Q    So then you had two other.

2    A    Yes.

3    Q    You've got breakdown layouts?  So start with, this is the

4    second chart of Defendant's Exhibit 35.  This is the front hall.

5    Right here.  Your Honor, this is the diagram is the front hall

6    area.

7              THE COURT:  Got it.  Says "office", says "office" on

8    the bottom of yours.  It's cut off on the display exhibit.

9              All right.

10   A    Okay.  So what you'll see, Your Honor, is, you can take a,

11   basically a block of this size -- I'm pointing to the primary

12   front office area on the large drawing, the layout -- and blow

13   them up for the detail that you will need on smaller drawings.

14        And from these, I will determine those landmarks that I

15   want to take measurements from.  And in this particular case in

16   walking, those would be distance of measurement.  And I will

17   work my way systematically through the plant doing that.  And I

18   will grab the next drawing if I can.

19   Q    Okay.

20   A    And in this particular case, we'll just look at -- sir, I'm

21   on this drawing, evisceration.

22              THE COURT:  Got it.

23   A    And so what I would do for a drawing, for a department such

24   as this in Evisceration, is, again, I would have walked my way

25   through.  I'll be with a supervisor or manager.  He or she will

1      walk me through the department.  I will stop at every single job

2      location, understand where that job is, mark this schematic

3      accordingly.  I use these codes just for my own purposes because

4      when you're talking with over 200 jobs, there has to be a way to

5      economize.  So I'll code them.

6           Then I go ahead and work my way systematically through

7      departments, picking up every job -- this is what's critical --

8      that's identified on this PPE matrix.

9           All right.  And at that point, having done that for all the

10     various departments, I will go ahead and then start obtaining

11     those distance measures.

12     Q    Okay.  And how did you do the distance measures?

13     A    To obtain the distance measurements, once I understood

14     exactly what was going on, I would go ahead and take a device

15     called an ergometer.  Perhaps you've seen them.  They're the

16     people walking with wheels.  And I will start at a point of

17     interest, whatever that point might be.  And then I will follow

18     the walking path that I've already established to that specific

19     job.  And then I will stop at that job and record the distance.

20          Also, while I'm doing that, I record other criteria that

21     would impact walking, such as I note the presence of doors and

22     how many doors the employees have to pass through.  I also note

23     whether those doors have knobs that they have to turn and then

24     pull or push to open the door, or if they're simply swing doors

25     that they can just push up against and push without having to

1    turn.

2              THE COURT:  Okay.  So again, excuse me for

3    interrupting.  I just want to be sure to follow.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  The point here is you want to calculate

6    the amount, the amount of time it takes particular employees at

7    particular locations to get to their job site.

8              THE WITNESS:  Absolutely.

9              THE COURT:  From some predetermined point in the

10   plant.

11             THE WITNESS:  Absolutely, sir.

12             THE COURT:  Got it.  Okay.  All right.

13             THE WITNESS:  So I'll note the presence of those doors

14   and any impediment to walking.  Another one would be if an

15   employee had to walk up and down stairs to get to their jobs.

16   It's not untypical that there would be a second floor.  It's

17   also very typical, especially on Debone lines, that the product

18   has to actually go under or over, crossing between lines.

19             And so we'll see what we call bridges that the

20   employees have to go up and down as they work their way back to

21   certain areas.  Okay?  So these are things that might be endemic

22   in certain plants.

23             The last thing that I'll do while I'm doing that is

24   I'll also note the floor condition.  And I'm very specific to

25   look at the condition of the floors, agents on the floor, such

1    as I think we saw one picture with some soap, whether the floors

2    are wet or dry, whether there's, the floors are in disrepair,

3    these kind of things.  Things that would impact walking.

4             THE COURT:  And the purpose there is the, I guess,

5    common sense assumption that a person, an adult, certainly, is

6    going to take greater care walking across such a surface that

7    might post a hazard compared to a clean, well rubbed kind of

8    floor, kind of situation.

9             THE WITNESS:  Absolutely.

10            THE COURT:  So again, you're trying to calculate what

11   the reasonable person is likely to do in locomoting from Point A

12   to Point B?

13            THE WITNESS:  That's exactly what I'm trying to do,

14   sir.

15            THE COURT:  Okay.  I'm following.

16            THE WITNESS:  So I will work my way through all the

17   jobs in the plant doing this.  Now, I don't know the plant.  But

18   as you've seen before, employees, there's not that many routes

19   that are, that are available to walk because most of the layout

20   is, most of the available floor space is occupied with product

21   or equipment.  And so there's natural divisions that these

22   employees follow.

23            For instance, if they're between two debone lines,

24   clearly, they follow that corridor out, take a left, if that's

25   the applicable thing, and walk up.

1          I go to the effort of verifying with management and/or

2     the supervisor that's with me initially what the walking path is

3     as they envision it.  And then independently I go back and

4     actually watch the employees, how they exit and then go through

5     the plant.

6          I also note that employees don't take short cuts that

7     are unauthorized, meaning climbing over, under, or around

8     equipment, because it saves them considerable time, or they

9     perceive that, that would put them at risk.  And so I would

10     defer to the more time honored route, so to speak.

11          So at that point I have the actual, physical data that

12     I need from the plant, meaning I went through and looked at

13     items like where the locker room is located.  Can I put this

14     other exhibit back up, sir?

15          THE COURT:  Sure.

16          THE WITNESS:  Mr. Brown, I'm going to shift back to

17     the front office one.

18          MR. BROWN:  Okay.

19          THE WITNESS:  And so of interest to me in measuring

20     the walking -- when I'm in a facility like this, I have to take

21     the time and the care to get everything I need in the future to

22     be able to answer any questions that you might have, sir.  So I

23     measure the distance to the front door.  I measure the distance

24     to the center of the locker room because that's where the

25     average employee would be leaving from or departing from.

1          I measure the threshold to the break room door.  This

2     is the area of the supply room window.  And that would be

3     measured up to where they actually come up to the window and get

4     whatever item it is.

5          This door at the end of the main corridor is

6     specifically measured because in the case of the employees at

7     the back dock in Receiving, what they do, again, is they'll come

8     in the front door, they'll go punch in the time clock, they'll

9     come back out, and then they will exit this door, sir.  Then

10     they will work their way around off this.  They'll come on the

11     big layout, come back into the receiving/break room area, and

12     then do don/doff.  So I need that door measurement, too.

13          Other things that are germane in this particular

14     matter are the measurement to the central area of the time

15     clocks.  These are the restroom/wash-up areas.  And we saw that

16     in the DVD earlier where the lady went in and put her smock on.

17          Then the final point of interest right here is this

18     sanitizing foot bath.  And as these employees exit this area and

19     go into the processing area, sir, they can go essentially one of

20     two ways.  And so to account for all employees, I'll go ahead

21     and be conservative and pick the geometric center of that.

22          The reason that this is important is I'm picking way

23     points or mile markers, so to speak, because I am charged with

24     trying to find the distance in obstacles and floor condition

25     that 1296 employees are going to walk on.  And I have to be able

1      to economize and take common measurements as much as possible.

2             Okay?

3             THE COURT:  By the way, how, if at all, do you factor

4      in, quote-unquote, "crowded conditions?"  In other words, the

5      presence.  You mentioned other obstacles.  But what about just

6      the crowd of employees coming and going?

7             THE WITNESS:  Yes, sir.  And I'm going to allude to

8      that a little later but specifically I can answer that right

9      now.  I was talking before about the standard data system.  So

10     this is a modular type system, meaning we're going to take

11     benchmark data.  We know, we're statistically confident that

12     using 3.0 miles per hour as an average walking speed for the

13     population is a prudent number to use.

14            And we'll assign everybody that number, unless there's

15     a different specific reason not to, like within a certain

16     section of then plant, then we would accommodate for that.

17            And then what we would do is the model that I'll be

18     referring to in a second is simply an approximation.  It's an

19     estimate of how long it would take an average employee to walk

20     from this area, containing this job, and these areas are pretty

21     small now, through these paths to this location.

22            Now, you have an estimate.  And then you would want to

23     verify that, somehow do some kind of pseudo validation, because

24     you're interested in how the model performs and, hopefully, be

25     equitable in this.  So later, I would run that study.  And I'll

1    report those results to you, sir.

2              Mr. Stine.

3    BY MR. STINE:

4    Q    All right.  Now, so at this point, after having done the

5    layout and gotten the distances, now have the number of feet,

6    common points for each one of the employees.  What do you, what

7    is the next step for a time study expert to do at this point?

8    A    Okay.  The next step would be, I have all the source data

9    that I need.  So I will enter that data into a spreadsheet model

10   that I've created in Excel, which I did attach to my expert

11   report.  And I'm referring to this walking model right now.

12   Q    Defendant's Exhibit 31.

13   A    I'll take that source data, sir.  I will enter it into some

14   spreadsheets.  And I'd like to just give you an example of this.

15   For a typical job that we would be referring to, I would enter

16   data such as this -- the distance from the time clock to the

17   supply room window, from the supply room window to the don/ doff

18   area, which we're referring to as the locker room, from the

19   locker room to that plant door.  And that plant door in this

20   context is from the front office to the processing area.  And I

21   took the geometric center of this as a way point.  From the

22   plant door to that specific employee's job that I'm measuring in

23   this context.  That would categorize the initial trip out.

24        And Dr. Radwin, you remember, had four activities.  So to

25   talk in that sense, that would be that one, just from the

1    walking perspective.

2         Coming back on lunch, I would go from the job to the plant

3    door, which is the way point, the plant door to the break room

4    door is a measurement that I have.  After lunch, I have a

5    measurement from the break room door back to the plant door, and

6    then from the plant door back to the employee's job.

7         Also, I have accommodated the fact that I have washed,

8    watched a number of employees, a very large number, sanitize,

9    wash up, and observe where they do that.  And if they do not do

10   it in their specific department, the company has a number of

11   those options along the way.  So the further employees have more

12   options, so to speak, to be able to do that.  So I've noted all

13   those kind of things.

14        And if there was the case where employees had to

15   specifically go a significant distance out of their way, I would

16   also include that.  And I did not notice that in any particular

17   time.

18        All right.  I will then take those numbers and, in a matter

19   such as this, look at those for the entire day.  And I will come

20   up with an average measurement of --

21             THE COURT:  May the witness resume the witness stand

22   now?

23   BY MR. STINE:

24   Q    Yes.  You may resume the witness stand.  All right, Dr.

25   Davis.  You told us you've gotten the distance for the

1    individual positions.  Then what did you do with the distance at

2    that point?

3    A    I will take, now I'm confident that I have the average

4    distance that an employee walks over the course of their day for

5    any of these job titles that are listed in this PPE Matrix, the

6    amount of doors that they walk through and the amount of steps

7    and stairs.  And I've noted all the environmental conditions.  I

8    will take them and enter them into this walking model, Your

9    Honor.

10        It will use the standard data concept to calculate walking

11   time for an individual person and/or groups of people that are

12   assign to those jobs.  And it uses a benchmark time of 0.38

13   minutes for 100 feet of walking.  And that equates to a 3.0 mile

14   per hour pace.

15        So it would take the amount of distance that they walk and

16   make the conversion from feet through time via that metric I

17   just gave you, and come up with a time that it would take a

18   person, the average person, walking at 3.0 miles to, miles per

19   hour to be able to accomplish that.

20        It will also add in additional times for the amount of

21   doors that they have to pass through.  And it will add in

22   additional time for each step that they have to take.  And by

23   step, I mean stepping on and off of their platform, their

24   platform by their job, actually count that step on and off.  Or

25   if they go up and downstairs.  Or if they have to step over an

1    impediment along the way, such as in certain parts of the plant

2    in the wet areas there are many structures that are built into

3    the floor to channel fluids and blood and these kind of things.

4    So if the employee has to step over them and break stride, I

5    want to account for that.

6         It will go all the way through a department.  And I will

7    know the average department walking time.

8    Q    Just before you go too much further.  Perhaps, I don't know

9    if we got a good explanation of where the -- where did you get

10   the 3.0 miles per hour walking time?

11   A    Mr. Stine, the 3.0 mile per hour walking time is one of

12   three classic bench marks in industrial engineering.  And this

13   has been actually Persgrave (phonetic) is the person who

14   introduced this in the 1950's, formally.  And so this metric has

15   been out there.  This benchmark is a classical industrial

16   engineering benchmark.

17        In addition to that, in my report I went to at least, off

18   the top of my head, six other literature sources, one being my

19   own personal study, that justifies the use of 3.0 miles per hour

20   as a conservative value, including the fact that people are

21   walking on wet surfaces.

22   Q    Thank you.

23        THE COURT:  I'm sorry.  As you know, I'm insatiably

24   curious.  What are the other two traditional, long accepted

25   benchmarks?

1          THE WITNESS:  Absolutely.  The other two traditional

2    benchmarks in industrial engineering are dealing a deck of

3    playing cards, 52, into four distinguishable piles in one-half

4    of a minute.  And then a third test called the Purdue peg board

5    test, which an employee or, actually, it's a rehab test,

6    somebody that has lost motor function, motor control, they will

7    actually have to reach into a little cup, pick out the little

8    metal peg, and then take it, align, orient, and insert into a

9    hole.  And they time that evolution as a matter of dexterity,

10   function, tactile response, these type of things, sir.

11         THE COURT:  Does the card dealing apply both to poker

12   and pinochle?

13              THE WITNESS:  It does, sir.

14         THE COURT:  Well, pinochle only has 48 cards.  That

15   was a trick question.

16              THE WITNESS:  And so --

17         MR. STINE:  It was a trick question, Your Honor.  I

18   didn't know it had 48 cards, either.

19         THE WITNESS:  And so we use these benchmarks to be

20   able to rationalize and normalize human performance, human

21   movement in industrial situations.

22         THE COURT:  Sure.  Okay.  Thank you, Mr. Stine.

23   BY MR. STINE:

24   Q    All right.  So now you have, in these adjustments for doors

25   and thresholds, where did you get that information from?

1    A    I would not call them adjustments.  I would call them the

2    quantification of doors and thresholds is, is documented in the

3    literature.  If you look at predetermined time and motion

4    systems such as the Maynard Operational Sequence Technique,

5    acronym is MOST, M-O-S-T, if you're certified in these type of

6    things, you would, you would have been trained and know that.

7    So these are, these are very well documented.

8         So the allowance or that quantification of the doors comes

9    from MOST, meaning there's a predetermined time that we allocate

10   to that.  And then the stairs comes from a second predetermined

11   time system called Work Factor Time Units.

12   Q    All right.  So after you've got this, this, the distance

13   and the other issues, what do you do next?

14   A    So we could fast forward to Page 14, and we'd have worked

15   our way geographically through the plant, through all 20

16   departments.  And you would see, essentially, a summary table on

17   Page 14.

18        And what I'm looking at is, I won't read the whole table

19   but I'll just give you a couple of for instances.  For the

20   Receiving Department, the 46 people are assigned to the

21   Receiving Department.  And based upon that source data and the

22   equations that I have entered into the spreadsheet, you would

23   see that the average person takes 8.9 minutes per shift walking

24   as, based on the data that I've entered in my observations.

25   Q    Okay.  So just, for example, let's just use Receiving,

1   then, for example.  Let's make certain we understand where

2   you're measuring the walks from so we can get that clear because

3   I'm going to ask some questions about subtracting some of this a

4   little later.  So I want to make certain it's clear what you're

5   doing.

6        Would you mind just giving us once again the components of

7   that 8.9 minutes, please?

8   A    Absolutely.  Okay.  So for receiving, I have personally

9   verified, been told and verified --

10            THE COURT:  I'm sorry.  Can you help me find, what

11   page are you looking at in the exhibit book?

12   Q    I don't believe that is in exhibit book.

13            THE COURT:  Okay.  All right.  Never mind.  Go ahead.

14   Q    Your Honor, he had thousands of pages.  We didn't want to

15   put a thousand pages in the exhibit?

16            THE COURT:  That's fine.  I'm sorry.  Go ahead, Dr.

17   Davis.

18            THE WITNESS:  I'm sorry, Your Honor.

19            MR. BROWN:  Excuse me, Your Honor.  Aren't we on Page

20   14, the attachment to your report?

21            THE WITNESS:  Yes.

22            MR. STINE:  We're referring to that because he's now

23   looking at his base data.  It's that thick.

24            MR. BROWN:  I understand.

25            MR. STINE:  Where he's got each one of these charts

1     made out in much more detail.

2              THE WITNESS:  Right.  So I guess what I would like to

3     express to the Court is every one of these job titles is treated

4     independently of every one else.  There are many, many common

5     things and I do concur, and I'll show you that.

6              And again, the reason that we would approach this from

7     a standard data system perspective is to be able to have the

8     flexibility to add or delete pieces as requirements come, jobs

9     change, things like that.  So it's extremely flexible, extremely

10    accurate, and very well accepted.

11    BY MR. STINE:

12    Q    Okay.  So let's go back to Receiving.  Give us, I think you

13    used either bench points or mile posts.

14    A    Right.

15    Q    Let's hear what those are.

16    A    Right.  So for the average back dock person, the way I have

17    them entered in my model is, I'll take them right from the

18    front.  They come through the front door of the plant, meaning

19    they've just passed Security.  They will walk -- these are those

20    folks.  They will walk to the time clocks, swipe their time

21    clock, go back to that main corridor, go out the main corridor

22    on that door that I indicated on the front office exhibit, and

23    then take a path around to the back of the plant, enter the live

24    hang/receiving/back dock/break room where they have lockers.

25    That's where they'll do their don/doff, and then they'll proceed

1    to their job.

2          So I have them characterized in my model from starting with

3    time clock to that back dock locker room.  And in that

4    particular case that's 857 feet.  And they go through two doors

5    and two steps.

6    Q    Then what else is included in that model?

7    A    I have them on the front end don/doff the job.  And then

8    for the lunch period, I have them job to wash up.  And just for

9    explanation, the wash up in the back dock area is proximate to

10   their locker room, their don/doff area.  As a matter of fact,

11   it's right across the hall.  But I have accounted for that time

12   in my model, sir.  Distance.

13         Wash up to their break room.  Break room back to their job.

14   So that would be for lunch.

15         And at the end of the day I have them job to wash up, wash

16   up to don/doff, which is their live hang break room where their

17   lockers are.  Then from don/doff back to the time clock, which

18   is the reciprocal, another 857 feet.

19   Q    Okay.  We'll come back to that a little bit later, Dr.

20   Davis.

21         So you've got these times now.  What did you do to test the

22   model?

23   A    Yes.  So I did that for every job in the, every job in the

24   plant, which I'd have to look for sure, Your Honor, but I

25   believe that's 209 discrete job titles.  And then I randomly

1    sampled from each of those -- I want to drop back one second.

2         I, from the PPE Matrix, it was clear to me that there were

3    20 divisions of geography.  And so I broke the entire studies,

4    the PPE study and the walking study, up into 20 units, 20 areas,

5    and have reported them that way.

6         And so what I would do, then, once I had the model time --

7    actually, I would like to finish that if I may, Mr. Stine.

8    Q    Certainty.  Finish it up.

9    A    So let me drop back because it will continue to your

10   question.  So I was showing you, sir, that there's 46 receiving

11   employees on the summary page.  Average walking time is 8.9

12   minutes.  And so we'll have a subtotal.  We'll go ahead and

13   total that through all 20 departments.  And you'll see that

14   there's 1296 impacted employees, summing to a total of 8,748

15   minutes per shift of walking, which is a significant amount of

16   walking.

17        And then what I will do is, I found out that that equated

18   to 6.75 minutes for the average employee.  I would add in an

19   allowance.  Now, you'll notice that these allowances, these are

20   what we call allowances.  They are added in after the fact that

21   we've established the average time, the standard.

22        And I allowed 1% per surface factor.  And the reason that I

23   did that was, because as I told you before, there was some

24   wetness on the floor.  There was some soap.  And that concerned

25   me.  And I also asked Mountaire Farms if they had a history of

1    people slipping, tripping, and falling on what we call the same

2    level.  So I requested their OSHA logs, and they provided those

3    to me.

4         And in the previous three years, there was only one

5    recordable slip, trip, fall on the same level, and that occurred

6    specifically on ice in a freezer.

7         So that gives me a lot of reassurance, Your Honor, that

8    these folks are very comfortable walking on this plant in

9    general terms because their logs are not full of recordable

10   instances.

11        The second allowance that I allowed was boot factor.  And I

12   allowed an additional -- now, these allowances, you will see

13   that they're adding to the time.  So these are, these are

14   accommodations for things that are of interest to the engineer

15   or the analyst doing the study.

16        I added one more percent because, from the literature, we

17   acknowledge that people do perform a little bit different in

18   boots than they do in their street shoes.  And 1% is a good

19   figure that I could ascertain from that.  And so I added that

20   allowance to every one else's time, also, Mr. Stine.

21        So those two allowances are applied to all 1296 employees.

22   If there was ever the case that there was a specific area that

23   was incredibly slippery, wet, whatever it might be, that would

24   be an allowance that would only be applied to the departmental

25   model.

1    Q    Okay.  So now you've got the model.  You've got the

2    predictions for these distances that we talked about, the

3    benchmark.  Now what did you do to test these?

4    A    Yes.  So I have a time that says average employee should

5    take 6.89 minutes per shift walking under the rules set that

6    I've established and the data that I've collected.  And I'm

7    interested in seeing how effective this model is.

8         So what I did was I went out and conducted a time study on

9    the routes for each of those 20 departments.  And I randomly

10   sampled the jobs within each of those 20 departments, approached

11   the supervisor or manager that was there, and said, I would like

12   this particular employee to go ahead and walk to break.  And,

13   actually, I stopped them at the, at the plant door, the common

14   point.  And they were told that, too.  They didn't think they

15   were going on break.

16        And then I would go ahead and watch them do that, meaning I

17   would actually walk with them, which also provided me

18   verification that my model was indeed accurate and correct.

19        We would walk out.  I would walk back.  And then I would go

20   ahead and repeat the identical walk while time studying myself.

21   And the reason that I time studied myself is because I'm a

22   consistent walker.  I have very good control of walking at 3.0

23   miles per hour, which is the basis for my model.

24        I would measure the time out, record it.  I would measure

25   the time in, record it.  And then I would look at the delta of

1   those two times, or the difference as a measure of consistency.

2   And I believe that for, again, I'd have to look back at the

3   specific numbers, but I believe that I sampled 49 times out of

4   those 20 departments, if that's the correct number.  And my

5   walking time out compared to my walking time in as measured

6   independently was within 1.7% of each other, which is extremely

7   consistent.  And that's why I do that, to be able to see.

8        And I'm walking under real world conditions.  Right there,

9   they're moving product, they're processing.  These kind of

10  things.

11       So the next thing that I do to continue this is I actually

12  now enter my model for that specific walk that I just did, and

13  see what my model predicts.  And then I compare what I actually

14  did against what my model predicts.  And I measure the

15  difference on that.

16       And across all those sample jobs, which is basically a

17  quarter of all the job descriptions in the plant, my model

18  overestimated the average walking time by almost 14%, which

19  tells me that my model is very conservative.

20  Q    Okay.  Now, you've indicated during your testimony that

21  your model is a very flexible model.  And I have asked you to

22  look at some adjustments, have I not, Dr. Davis?

23  A    You did, Mr. Stine.

24  Q    And I asked you to look at one on the, on Receiving,

25  because my understanding is, from your testimony is, that you

1    included the time from the time clock back to their break room.

2    And it was, their break room is where they receive their

3    equipment, is that correct?

4    A    Could you repeat that?

5    Q    Sure.  For the back up folks.  If I understand correctly,

6    from your testimony, is that you clock, you time them from their

7    time card back to the don and doff area.  But for these folks,

8    the Receiving, their don/doff, where they got their equipment,

9    where they did the donning and doffing, is back in that

10   particular area, correct?

11   A    That's correct.

12   Q    And I asked you to subtract, then, that particular

13   distance, is that correct?

14   A    It is.

15   Q    And could you tell us what -- I guess he needs to have

16   access to his computer to put it on the screen.  All right.

17   A    So you'll see that --

18   Q    We don't see anything, Dr. Davis.

19   A    Apparently, when you come through the computer you get the

20   yellow or green screen.

21        Sir, if you would look at the Receiving model up at the top

22   left corner, I have eliminated those from the previous model.

23             MR. BROWN:  Is this something you provided us already?

24             THE WITNESS:  Yes.  That's the walking model, sir.

25   That's the 14 page walking -- oh, you mean this change?

1          MS. FLANAGAN:  This spreadsheet we're looking at.

2          THE WITNESS:  This spreadsheet has been modified.  Mr.

3     Stine asked me a question and I have changed the spreadsheet to

4     answer his question.  And that's all I'm doing.

5          MR. STINE:  This is to illustrate his testimony, Your

6     Honor, so that you will understand what he did and how he did

7     it.  This is not an exhibit.  It's demonstrative.  Go ahead, Dr.

8     Davis.

9          THE WITNESS:  So in this particular case, I have

10    eliminated the 857 feet walk at the beginning of shift and end

11    of shift for those back dock employees.  And I went through the

12    litany of how we measured the to and from throughout the course

13    of the day.

14         In this case, on this spreadsheet, I'm only looking

15    from their locker room where they'll be provided their

16    sanitation items and PPE equipment out through the day, and then

17    back to that locker room.  So I've eliminated the two 857-feet

18    walks, the two doors, and the two steps.

19    BY MR. STINE:

20    Q    Okay.  What is the impact of taking that distance from the

21    time clock to the place where they got their supplies and donned

22    and doffed?

23    A    Well, it drove the walking time for that department down to

24    2.1 minutes per shift.

25    Q    And what did it do to your overall numbers that were

1    previously contained on Page 14?

2    A    Well, let me just back up one second because there's

3    another factor that impacted here.

4    Q    All right.

5    A    The back dock also includes the pinning employees.  So I

6    made the same modification, meaning eliminating the 857 foot

7    walk back and forth, and the doors and steps that are associated

8    with that.

9    Q    Just for clarification, what are the pinning employees?

10   A    Yeah.  The pinning employees are those job titles, sir,

11   that we see on the left there, which would be the back-up

12   killers, the picking attendants, calcan (phonetic) and the floor

13   relief folks.  Four discrete job titles in Pinning and five

14   discrete job titles in Receiving.  So that drove the, that drove

15   the average walk time for the pinning department employee down

16   to 2.9 minutes per shift.

17        I would also like to say one other thing, Your Honor.  You

18   can see that by doing it in this format, you can, I can also

19   answer questions for any one specific job code and how that

20   impacts that number of associated employees.  And that's the

21   flexibility that you have from standard data.

22        So if we look for those two changes and simply those two

23   changes, you'll see that in this cell right here, I replace that

24   with a 2.1.  That was the new value that was calculated.  And

25   the 2.9 for the Pinning Department right here.  And then that

1    changed the total number of minutes of walk.  You still divide

2    by the 1296 for the average employee.  And so the mean walking

3    time drops to 6.46.  You apply the allowances, which are

4    percentages.  So if you change the aggregate number of minutes,

5    you change the allowances.  And it results in a walking time for

6    the average employee of 6.58 minutes per shift.

7    Q     And that still includes, also, the time, the walking time

8    for the lunch?

9    A     That includes everything, sir, with the exception of what I

10   just stated, which was the elimination of the 857 feet walk on

11   the front of the day and the back of the day, and the associated

12   doors and steps only for the back dock folks, which are the 56

13   employees in Receiving and Pinning.  That's all that was

14   changed.

15   Q     And I asked you, also, to look at another adjustment, did I

16   not, Dr. Davis?

17   A     You did.

18   Q     And I asked you to look at an adjustment to see what the

19   walking distances would be if the walks were from the production

20   door for all four don/doffs at the start of the shift, end of

21   the shift, beginning of the lunch, end of the lunch, did I not?

22   A     You did.

23   Q     And can you tell me what you did when I requested you look

24   at this data and what would happen if you time the walk time to

25   the production door.

1    A    Yes, sir, but I'm going to need some backup data for that.

2              MR. BROWN:  Your Honor, may I ask counsel to ask again

3    that last question?

4              THE COURT:  I was thinking the same thing.

5              MR. STINE:  Yes, Your Honor.

6              THE COURT:  From or to the production door, from what?

7    BY MR. STINE:

8    Q    I'll put it in more detail.

9              THE COURT:  Okay.  Great.

10   Q    I will ask the question again, Dr. Davis.  I asked you to

11   make an adjustment so that when you calculated the distance for

12   the donning at the start of the shift, that you calculated the

13   walk time from the time they went to the production door,

14   correct?  The don, starting at the production door?

15   A    Yes.

16   Q    Okay.  At the doff at the end of the lunch, stop the walk

17   at the production door?

18   A    Yes.

19   Q    At the don at the end of the lunch, to start the walk

20   distance at the production door?

21   A    Yes.

22   Q    And at the doff, I asked you to readjust the walking time

23   to get to the production area where the foot baths are, correct?

24   A    That's correct.

25   Q    Does that clarify it, Your Honor?

1          THE COURT:  Mr. Brown?

2          MR. BROWN:  Could I ask a question on the question?

3          MR. STINE:  I want this to be clear.

4          MR. BROWN:  I think what you're doing is instead of,

5     you're assuming that donning and doffing starts or stops,

6     depending which one it is, at the production door.

7          MR. STINE:  Part of what I'm trying to do is, for the

8     record, Your Honor, is some of the courts have made a

9     distinction between aprons and the gloves and the other items.

10    And if the Court wanted to make that distinction, most of the

11    aprons and gloves were put on once they entered the production

12    area or before they entered the production area.

13         And also, as to the lunch time, our point is all

14    donning is done prior to leaving the production area.  That's

15    shown by the videos by Dr. Radwin.  So we're just trying to get

16    that type of flexibility to the Court to look at these numbers,

17    also.

18         MR. BROWN:  Can I ask this?  You're introducing a time

19    study that assumes certain kinds of starting and stopping,

20    donning and doffing times?

21         MR. STINE:  Yes.

22         MR. BROWN:  Different?

23         MR. STINE:  Yes.

24         MR. BROWN:  So you're turning the clock on at the

25    plant door.

1          MR. STINE:  Correct.  That's fundamentally, that's the

2     way --

3          MR. BROWN:  Production.  Excuse me.  Production.

4          MR. STINE:  The production door.  Where the foot baths

5     are.

6          MR. BROWN:  Where the foot baths are.

7          THE COURT:  Okay.  The only thing that I'm confused

8     about, the production door, remind me what you mean by the

9     production door.

10          MR. STINE:  Okay.  Perhaps it would be best if I --

11          THE COURT:  I think you can just point it out.  I

12     think I know what it is.  It's just, it's the double door just

13     before you go into the lines.

14          MR. STINE:  Well, actually, it's right here, Your

15     Honor, on this drawing.  If you're looking at the office, there

16     are two points.  This is where the foot baths are on the

17     drawing.

18          THE COURT:  Okay.  All right.

19          MR. STINE:  They go to production this way or this

20     way.  Some of these distances are as much as 273 feet after you

21     walk through this foot bath.  You have to have your smock and

22     your hair net on when you enter these doors.

23          THE COURT:  Right.

24          MR. STINE:  But you don't have to have your apron or

25     gloves.  When you watch the video, you will normally see that

1    most of the employees put their aprons and gloves on after going

2    to the foot bath.

3            THE COURT:  Okay.  I'm with you.

4            MR. STINE:  All right.  Do you understand, Mr. Brown,

5    where I'm coming from?

6            MR. BROWN:  Yes.

7            MR. STINE:  I know you don't agree, but do you

8    understand?

9            MR. BROWN:  Yes.

10   BY MR. STINE:

11   Q    All right.  Can you proceed, Dr. Davis?

12   A    Okay.  Let me reiterate this just so we have, we're on

13   common ground here.  You would like me to recalculate the time

14   with the elimination of, I know from my measurements that it's

15   103 feet from the break room cafeteria door to my way point of

16   the production door.  And if I understand you correct, you want

17   me to eliminate the 103 feet from the walk going to lunch and

18   back from lunch, is that correct, sir?

19   Q    For the lunch, that's correct.

20   A    Okay.  Just for the lunch.

21   Q    And then at the start, you had additional time from the

22   time clock to the locker room, the locker room to the supply

23   room, and I believe the supply room to the production line,

24   correct, for donning?  Is that correct?

25   A    It is correct.

1    Q    Did you make that calculation?

2    A    No, I have not made that.

3    Q    All right.  Tell me what calculation you've done.  We'll

4    use that one.

5    A    No.  That's all right.  I'm prepared to make the

6    calculation.

7    Q    You've already done one.  So tell me what you've used for

8    that and we'll use that.

9    A    Actually, let me just show you.  That will be easier.

10   Q    Yes.

11   A    All right, Your Honor.  What I'm looking at -- actually,

12   Mr. Stine, I do not have that calculation in front of me.  I'm

13   just going to have to make it.  Actually, I do.  Here it is.

14   Q    You made one.

15   A    Okay.  So, for instance, let's just look at this, let's

16   just look at the scenario where you asked me to remove the 103

17   feet, the one door and one obstacle which, again, is between the

18   way point and the production door to the break room/cafeteria

19   threshold.

20   Q    Okay.

21   A    All right.  So we would, if I was doing this in the

22   spreadsheet -- now, I can't do this in the spreadsheet because

23   I'd have to go through 209 instances of this to be able to make

24   this change.  But I can do it one time and show you the impact

25   and then apply it across the employees.  And I'm going to show

1    you how.

2         And the reason I can do that is because I know how many

3    employees walk on that route.  And everybody walks on that route

4    with the exception of the back dock folks that we've already

5    talked about.

6         And then there's a second group of folks, Your Honor,

7    called way price label, and they have their own break room,

8    which is geographically remote.  And the reason it's remote is

9    because it's on the second floor of the plant.  And it would

10   take them a fairly substantial time to walk down to the break

11   room for lunch and do that.  So the company has provided a very

12   nice facility up there for them.

13        So we start with the fact that we have 103 feet that's

14   measured.  And we have one door and one obstacle, which actually

15   is the foot bath.  I actually accounted for that because you

16   cannot walk across that without breaking stride unless you

17   happen to be fortunate.  But people are cognizant of that.  And

18   you see them looking down.

19        So in a predetermined time system, we have 103 feet.  I'll

20   do this right for you here.  We have 103 feet.  We're going to

21   divide that by the constant of a hundred, because it's .38

22   minutes per 100 feet.  Then we're going to multiply that times

23   .38.  And that would give us .3914 minutes.

24        Now, we're going to add for the door and we're going to add

25   for the step .50 minutes.

1        Now, we're doing that twice.  We're doing that once on the

2    way and once on the return.  Okay?  So Mr. Stine, that would

3    equate to 1.0 minutes per day.

4        So if we want to know the impact on the overall average

5    time for all employees, we'll have to weight this by how many

6    employees it affects, which is 1172.  And that number, again,

7    was taken from the 1296 minus those employees in back dock,

8    minus those employees at weigh/price/label that do not follow

9    that path.

10        So we'll take that 1172 and multiply it times that number.

11    That will be 1175 minutes, essentially.  Okay?  If you round it

12    to one, you would see that.  Let's look at the model again.

13    Your Honor, the original model shows that there is an aggregate

14    of 8,748 minutes per day, which we previously covered, just as a

15    reminder.

16        We will go ahead and take that 8,748, subtract that 1172

17    minutes that we just calculated for that distance, and that will

18    result in 7,576 minutes now walked by the employees per day.

19        And if we want divide that by the total employees, just so

20    we can keep it on the total employee basis, by 1296, that means

21    that there's 5.85 minutes per employee.  We'll reapply those

22    allowances and it will equate to 5.97 minutes per shift, or 6.0.

23    Q    Okay.  Is there anything else that you need to tell us

24    about the walking and working, I mean the walking report, before

25    we proceed?

1    A    Just, I can answer any questions that you or the Court

2    desires.

3    Q    All right much.  Well, I think you've answered all the

4    questions I desire, Dr. Davis.

5         Why don't we move to the donning and doffing report?  Okay?

6    A    Yes, sir.  I will jump back over to it.

7    Q    Okay, Dr. Davis.  You also did a donning and doffing study,

8    is that correct?

9    A    That's correct, Mr. Stine.

10   Q    And how long were are at the facility for the donning and

11   doffing?

12   A    I don't think that I'd have the ability right off the top

13   of my head to characterize the difference between the amounts

14   time spent in donning and doffing and walking.  But

15   historically, the walking study takes about one third of the

16   time at a location.  And the don/doff study takes approximately

17   two-thirds of the time.

18   Q    And how long were you there total, approximately?

19   A    I was there approximately two weeks in actual days.

20   Q    Okay.  Now --

21        MR. BROWN:  Let me just -- two weeks for both the

22   donning and doffing report and the walking report?  Two weeks

23   each?

24        THE WITNESS:  For the studies.  No.  No.  Not two

25   weeks each.  Two weeks in total.

1          MR. BROWN:  Two weeks total.

2          THE WITNESS:  At the plant.  Yes.  And can I clarify?

3   At two different points.  Meaning went up for a week, collected

4   data on both, got what I needed.  Went back.  Went a second time

5   and got the remaining part of what I needed.

6   BY MR. STINE:

7   Q    Okay.  Now, in planning this donning and doffing study,

8   could you tell me what you, how you planned this study?

9   A    Sure.  Essentially, I'm following the same principles and

10  practices where I'm going to use a standard data system, again,

11  well documented in the literature, specifically designed for

12  these type of applications, and also make it complementary to

13  the walking study.

14         Primarily, the reason is, have great scientific background

15  for this in the literature, easy to conduct, very accurate,

16  reliable.  And besides that, have the flexibility to modify this

17  to answer any number of questions that can be asked in the

18  future, and still maintain validity.

19  Q    All right.  So where did you get the ideas for how to do

20  this study?

21  A    I got the ideas from education and experience in my field.

22  Q    All right.  So explain how you set the study up again.

23  A    All right.  So again, we have, as with the walking, where

24  the confounding factor is, yes, they're all walking to and from

25  events and they're walking on common surfaces and these type of

1    things, very similar with the personal protective equipment and

2    sanitation items.

3         Essentially, they're all wearing PPE and sanitation

4    equipment of various specifications.  But if you look across the

5    209 job titles, it would, you can see right away that there are

6    groups that pop out at you.  And those are these basic groups

7    where, Judge Davis, you already alluded to this, actually, in

8    your opening, where you have folks that are wearing essentially

9    the basics to get out in the plant.  And that would be the exact

10   same items that Mountaire Farms required of me to get into their

11   plant as a visitor, although I was performing no work.

12        That would be items such as the boots, smock, hair net,

13   bump cap, and ear plugs.  So those are the five basic items.

14   And if you look through, you'll actually find some job titles,

15   not very many, but some that actually wear those type of things.

16        Then you'll see a second set of employees just in general

17   that wear the basic ensemble.  And then they add things like

18   gloves, sleeves, the things, oh, and apron.  Things like this.

19   So they are wearing the basics to get in the plant.  And then

20   they have an add-on.  A block of add-on equipment, whatever that

21   add-on equipment might be.

22        And finally, you would have these final group of folks out

23   there that usually wear the most stuff.  And those are the

24   people that are exposed to various hazards, whatever those

25   hazards might be.  Usually in this context they're cut/puncture

1      type hazards.  So you'll see them wear the anti-cut protection.

2      And that would take the flavor of Kevlar gloves, chain gloves,

3      and plastic arm guard, sir.

4           So knowing this and then looking at -- well, by the way,

5      you get that kind of information from the PPE Matrix.  And so

6      the employer has gone through, in accordance with the OSH Act,

7      and done a PPE evaluation for each of these job titles and

8      indicated which equipment is required for each of those unique

9      titles.  So that makes it very easy for someone like me to come

10     in and then design a study to measure these.

11          So here's what I'm interested in.  I'm interested in how

12     much time does it take to don and doff these items.  And this is

13     a pretty hard problem, if you think about it, because you have

14     everybody wearing different combinations.  And you have a lot of

15     things like the way they want to wear the items, the order that

16     they put the items on in.  These type of things are very

17     confounding to a scientific study.

18          So it's prudent, in my opinion, that we set up an

19     environment that I can get them to, I can get actual Mountaire

20     Farm employees to actually don and doff equipment, real

21     equipment that is provided by the company under a fairly

22     controlled set of circumstances.  And I can apply good

23     time-study practice and technique and record and analyze this

24     data, feed it to the standard data system, and then answer any

25     number of questions similar to the question you engaged me on,

1    which is, how long does it take to don and doff these required

2    items.

3          And essentially, that's the context of how I set the study

4    up.

5    Q    Okay.  And you talked about a control.  Is that something

6    that in your field is the way that they recommend that you do

7    these types of tests?

8    A    Absolutely.  The core, the foundation, the building blocks

9    of a time study is going to be the methodology.  And it is

10   essential that if we're going to conduct any accurate

11   measurement of time, that we have repeatability, meaning that we

12   have to have the people doing the same thing every time.

13         We are defining what we call elements.  And these elements

14   have to be chronological, meaning one precedes another one,

15   whatever they might be.  They have to have distinct start and

16   end points.  They have to be in the literature fairly small.

17   And if they're not fairly small, we have to apply special

18   consideration to those things if we're going to study them.

19         And then they have to be repeatable and measurable and,

20   from a control perspective, I wouldn't want to go out to the

21   middle of the plant and do this because it could be hazardous to

22   the employees or hazardous to me, as the analyst.  I could get

23   run over by a fork truck.

24         I don't want to do it in the locker room or out in the

25   break room or something like that because, I'll be candid with

1    you, I mean, people are going to act differently if they do it

2    in front of a group of their friends, family members,

3    associates, than they do individually with an investigator.

4    People, people's behavior will be altered.  It's called a

5    Hawthorne effect.  And it's a very well documented principle

6    that says that subjects act and perform differently simply

7    because they're subjects.

8              THE COURT:  Is that also referred to as the observer

9    effect?

10             THE WITNESS:  Absolutely, sir.  And we clearly know it

11   from placebo trials on the medical side of things.

12             So this is just good principle and practice.  And

13   again, what I'm trying to provide is a representation of the

14   actual time that things take.  What the other circumstances are,

15   we can, once I know those base times, the same way with the

16   walking, I can, I can add to or eliminate from, in the use of

17   allowances, as I did across everybody, to accommodate for any

18   individual things that need to be addressed that I did not

19   account for.

20             But it's that core methodology, the definition of

21   those elements, and then the implementation of rigid controls

22   that allows me to state, to tell you with statistical confidence

23   and accuracy that I have captured the time that it takes these

24   folks to put this stuff on and off.

25   Q    Okay.  And would you then give us a little bit of detail to

1    what you actually did when you got to the plant?

2    A    Absolutely.  So I would get the PPE Matrix, which I already

3    had, verified that it's correct.  Actually, not just ask one

4    manager, but ask a number of managers, based on my experience,

5    that this is a document that I can live with.  And then I would

6    go to the supply room and get an armload of PPE, meaning boxes

7    of ear plugs, hundreds of hair nets, you know, every size rubber

8    glove that they had of -- let me clarify something -- just the

9    required equipment.  The Kevlar gloves, the chain gloves, the

10   smocks, the aprons, bump caps, all these assorted sleevelets,

11   the arm guards, these type of equipment.  And then I would ask

12   the plant for an environment that I could set up in.

13        And basically in a -- remote is not the right word, I don't

14   know the -- available, close, yet private type space, you know,

15   some place that I could close a door, pull a curtain, something

16   like this.  And I would lay out all my equipment.  And I was

17   working with a Human Resources representative under the Human

18   Resources Manager yesterday, who also acted as a translator.

19   Large majority of these folks needed a translator.

20        And I would go out and, via the plant staff, and ask them

21   for, to randomly pick folks from the line that represented these

22   various combinations of equipment, and again, that being those

23   three big groups, so that I could get a representative sample.

24        They would randomly select somebody.  And I clearly went

25   over with the folks doing the selecting what random actually

1    meant.

2          They would provide me with that person.  That person would

3    be screened to make sure they were not a litigant in this

4    matter.  And then they would be vetted, so to speak.  They would

5    come in.  And I would explain to them what we were going to do,

6    which is, I simply want to measure the time that it takes for

7    you to put these items on and off the way you normally do, and

8    I'm going to time you while you do it.

9          I would click and stop the watch a few times because it,

10   you know, chirps and some people get distracted by that, to make

11   sure they were aware of that.

12         And I would get some basic demographic information from

13   them, either on the way out or on the way in, meaning how long

14   had they been, I wasn't so much interested in how long they had

15   been in the plant.  I was more interested in how long they'd

16   been using the specific equipment that they'd been using so that

17   I don't get what we would term novice users, and have folks that

18   are more experienced.

19              THE COURT:  Could I ask you a question?

20              THE WITNESS:  Absolutely, sir.

21              THE COURT:  And I trust, Mr. Brown, I'm not stepping

22   on any toes over there.  But it's something that you mentioned

23   that obviously floats over this case.  I'm not sure how

24   significant it is.  But I thought I would just go ahead and ask

25   it now since you did mention it.

1          You said just a moment ago that your subjects were

2     screened to make sure they weren't a part of the opt-in class in

3     this case.  And I certainly understand that.  But on the other

4     hand, that means that your subjects were specifically selected

5     because they were not in this case.  And that certainly doesn't

6     mean that they're hostile to the plaintiffs in this case by any

7     means.

8          And so I guess I just want to give you an opportunity,

9     because I think we need to break for lunch, anyway, give you an

10    opportunity to address this question of whatever else can be

11    said, and I know that Mr. Brown and Mr. Stine are going to have

12    a lot to say tomorrow in closing argument about the other

13    studies, but what do you say about the fact that at least the

14    plaintiffs' study allowed for that because, you know, the

15    randomized worker process didn't choose plaintiffs or

16    non-plaintiffs, had no idea, if you accept the study as

17    described, had no idea of whether the subject was one of the

18    plaintiffs and was ready to go with this case or was somebody

19    who thought that the plaintiffs were all crazy and they were

20    going to screw up the company and they're all going to lose

21    their jobs?  I mean, obviously, that's an exaggeration.

22         But you didn't do that.  And the designing of your

23    study, obviously, wouldn't permit you to do that.  So I just

24    want to see what you think about that from a reliability

25    perspective, obviously.

1               THE WITNESS:  Absolutely.

2               THE COURT:  Okay.

3               THE WITNESS:  Okay.  So here's what I would tell you

4       about this.

5               THE COURT:  Okay.

6               THE WITNESS:  Number one, Mr. Stine never asked me to

7       exclude those people.  That is something that I did on my own

8       independently as an experimental control.

9               THE COURT:  Okay.  And please, I don't want my

10      comments to --

11              THE WITNESS:  No, I want you to make sure that that's

12      my idea.

13              THE COURT:  Okay.

14              THE WITNESS:  And actually, I want to take credit for

15      that because that, because that's a great control.

16              THE COURT:  Okay.

17              THE WITNESS:  And here's why, Your Honor.

18              THE COURT:  Okay.

19              THE WITNESS:  I operate, I think much as you do, with

20      the premise that folks, employees are good folks and they're

21      good people who try to do a good job.  Yet, I don't, I don't

22      want to -- again, I'm trying to get the best product that I can

23      for this Court.  Honestly.  This is what I'm striving to do.

24              I don't want to take a chance on having somebody that

25      has an iron in the fire, which is the way I would put it, either

1    try to trick with me as the experimenter or drag it out or

2    sometimes, actually, you folks wouldn't know this, but in

3    industry, it works the same way even not in litigation matter.

4    People do not like to be studied in general.  And so they will

5    try sometimes, some of them, it's a very small percentage, they

6    will try to either go incredibly fast or incredibly slow.  And

7    it tends to skew the study.

8              But I say I studied almost 200 folks, almost.  I think

9    a hundred ninety something.  And I could look at the exact

10   numbers.

11             THE COURT:  198, I think.

12             THE WITNESS:  Right.  Thank you.  You know it better

13   than I do.  They were, they were good.  And they were

14   representative.  And they were honest.  And I mean, I'd be

15   willing to play the 198 tapes for you or whatever.  And you can

16   see this.  And again, I have a significant amount of experience

17   in this area.  And I have done hundreds, if not thousands, of

18   timed studies.  You know, this is not a timed study.  These are

19   multiple studies.

20             I know when somebody's trying to put something over on

21   me because I also rate these people from a pace perspective.

22   And I didn't see that.  Very small exceptions.

23             Also, I only believe honestly that two or three people

24   were actually turned away, might be two, because they were

25   litigants.  So it was a random sample.  It was a very small

1    percentage of them that, that were selected to be in here.

2         Now --

3         THE COURT:  Okay.  Look, I'm sure Mr. Brown, I suspect

4    Mr. Brown's going to have more to inquire.  And I didn't want to

5    divert us from the, from the sequence of your testimony.  But I

6    just couldn't resist the urge to ask.  And I suspect Mr. Stine's

7    going to have some additional questions along this way.

8         But truly, it wasn't random.  It truly wasn't random.

9    And I think as a scientist --

10        THE WITNESS:  Random, how random and in what respect,

11   sir?

12        THE COURT:  Well, if you're studying the plant of 1296

13   employees and, I don't know, 300 have opted in to this class,

14   and you lop off that 300 so you're left with 800, that's not

15   random.  Even if, I mean, I just don't think it's a defensible

16   definition of random to say to a supervisor, go out and find me

17   198 people, may sure none of them are plaintiffs.  That's not a

18   randomized process.

19        THE WITNESS:  Well, maybe I need to explain something

20   a little further to you, just quickly, just to clarify this up a

21   little bit.

22        THE COURT:  Okay.

23        THE WITNESS:  I'm just not looking for people.  I'm

24   looking for people wearing specific combinations of equipment.

25        THE COURT:  Oh, I understand that.

1          THE WITNESS:  And here's the confounding factor to

2     this, Your Honor.  One, I actually have to interrupt production

3     for this, Your Honor.  So the company is not happy because I

4     actually take people in a room and take time away.  Two, I have

5     to, I don't want to see 7,000 hair nets, so to speak, because

6     after I have whatever number it is, 103, just for sake of

7     argument, the remaining hair nets are going to do me no value.

8     So I'm asking employees to do things that are not required.

9          So when you look at it from that perspective, what

10    happens is on Employee One, the ballpark is wide open.  I need

11    numbers of everything.  And as we go through the methodology and

12    I start getting enough observations in certain categories, I

13    very much limit myself on who is available.

14         And the classic example is freezer suits.  I almost

15    have to struggle to find enough freezer suits out there, people

16    wearing freezer suits, to be able to get that.

17         So no place have I told anybody to exclude a certain

18    class of people or was it reported to me.  And indeed, I would

19    suggest to you that it wasn't because people actually got to me,

20    two or three, that were in the case.  And so I would say if I

21    set up --

22              THE COURT:  And you did measure them and include them?

23              THE WITNESS:  I did not measure them.

24              THE COURT:  Okay.

25              THE WITNESS:  No, sir, I did not.  But what I'm saying

1       is the, is the selection process tells me that, you know, it

2       could be biased a little bit because of the fact that I am

3       starting to only look at certain combinations of equipment.  I

4       have no idea who the litigants are.  For instance, they all

5       might come from the back dock area, just hypothetically.  And

6       so, you know, I might not have needed much equipment back there

7       because I saw all the hair nets and I saw all the other items.

8              So something, some systematic bias like that could be

9       introduced.  And I do, I do accept your point gladly.  And I

10      understand what you're saying.

11             But I would say by the fact that three actually got to

12      the human -- now, I didn't turn those folks away.  That three

13      got to the Human Resources person who was with me, a list was

14      checked, and they were excused, I would say that the selection

15      process worked.

16             THE COURT:  Well, I guess you and I are going to

17      disagree about that.  And again, I don't mean to make a big deal

18      about this.

19             THE WITNESS:  No, sir.

20             THE COURT:  Obviously, all kinds of questions are

21      raised here.

22             If you're telling the Court that 201 people selected

23      by supervisors were sent in to see you in that little room and

24      some Human Resources person checked the list of the plaintiffs

25      in this case, and only 3 out of those 201 people turned out to

1    be plaintiffs, that's not by chance.  No statistician would

2    believe that.  So clearly, clearly, and again, I don't mean this

3    as criticism at all --

4              THE WITNESS:  Sure.

5              THE COURT:  -- clearly, somebody was out there doing a

6    prescreen.  Clearly.  I mean, I think your own testimony shows

7    that you did not intend to have those three people come through

8    the door.

9              THE WITNESS:  I did not.

10             THE COURT:  And be sent up.

11             THE WITNESS:  I did not intend to measure them.

12   Again --

13             THE COURT:  Exactly.  And so my point simply is that

14   this is not a random sampling.  It is anything other than a

15   random sampling of the employees at this plant.

16             And I don't mean to say that to say that your study is

17   invalid or anything of the sort.

18             THE WITNESS:  No, I understand.

19             THE COURT:  Not anything of the sort.  But there are

20   any number of other ways it could have been done.  For example,

21   you could have arranged with the company to solicit volunteers.

22             THE WITNESS:  Sure.

23             THE COURT:  Right?  And you could have done the

24   necessary adjustments to make sure you had, you know, sufficient

25   sample of, my favorite, gizzard pullers and, you know, deboners

1    and thigh deboners and drum stick deboners.  You could have done

2    that, but I'm not saying you should have.  I'm not saying you

3    should have.  I'm just saying you could have done that.

4           You could have actually measured, and it actually

5    would have been helpful, frankly, and interesting, you could

6    have measured the mean times for the plaintiff class and the

7    mean time of the non-plaintiff class.  Now, again, it would have

8    been a waste of money, I think.

9           THE WITNESS:  Exactly, sir.

10          THE COURT:  But looks like they, it looks like from

11   your testimony, two weeks there, money was not a particular

12   object here, really.  I say that with admiration.  But it could

13   have been done that way.  You actually could have come in and

14   shown, you know, the plaintiffs were playing games because it

15   took them, you know, a minute and a half longer than the

16   non-plaintiff class.  Or perhaps it could have been the reverse.

17   The plaintiffs could have taken 40 seconds less on average than

18   the non-plaintiffs.

19          That's my only point.  That's my only point.

20   Obviously, at most it goes to the weight of the evidence, which

21   Mr. Stine and Mr. Brown will be arguing and which I will

22   consider.  But again, I took this detour as an introduction for

23   us to get out of here and get some lunch.  And we can come back

24   to that and all the issues.

25          Thank you, Dr. Davis.

1          All right.  Shall we stand in recess until 2:15?  Mr.

2     Stine, how much more do you think you have on direct?  I know we

3     got to watch the videos.  I'm looking forward to that.

4          MR. STINE:  Okay.  The donning and doffing will

5     probably take another ten or fifteen minutes.  I got to have him

6     break down the individual items and some combinations so you can

7     see that.

8          THE COURT:  Okay.

9          MR. STINE:  And then that will be pretty much it for

10    the donning and doffing.  Then we have the videos that I want

11    him to explain.

12         THE COURT:  Okay.  What's the total time on videos?

13    Your guestimate.

14         MR. STINE:  I'm not guessing.  The longest one's 28

15    minutes.

16         THE COURT:  Twenty-eight minutes?  And the shortest

17    one?  Three videos?

18         MR. STINE:  There's three videos.  There's like 28

19    minutes, 8 minutes.

20         THE WITNESS:  I would say 45 minutes would be more

21    than enough.

22         THE COURT:  Okay.  So we come back at 2:15 and we're

23    probably finished with the direct by 3:15.  And Mr. Brown's

24    going to have some cross.  We're going to get you on that plane,

25    I promise you.  Thank you, counsel.  We're in recess.

1            (Luncheon recess.)

2            THE COURT:  Good afternoon.  Whenever you're ready.

3       BY MR. STINE:

4       Q    All right.  Dr. Davis, before lunch we were talking about

5       how you were performing this particular study.  And I wanted to

6       go back a little bit.  Let's talk about the selection a little

7       bit more.  So would you explain to us how you were doing the

8       selection of the people to test?

9       A    The selection of how, of who I studied for the --

10      Q    Yes.

11      A    For the PPE?

12      Q    Yes.  Yes, sir.

13      A    So as I mentioned before, I need to time various items in

14      don/doff so that I can build these combinations of standard

15      data.  So therefore, that immediately suggests stratification.

16      Stratification meaning blocks or units.  And in this particular

17      case, that would be by the individual PPE item.

18           Already mentioned that essentially there's three groups --

19      those that were the basics, advanced group, and then an

20      intermediate group.  And so looking at the PPE Matrix and

21      knowing that there is 1296 employees, and I'm trying to get as

22      representative a sample as I can based on a number of things

23      such as equipment worn, experience, looking at gender as much as

24      possible, looking at not using all the subjects with a

25      translator and, on the other hand, having none of them

1    represented, trying to balance all these things.

2         So I would ask the Mountaire Farms' representative who was

3    with me, I would tell that person I'm interested in studying

4    people that have this characteristic, meaning, let's just say

5    that they are wearing aprons.  And try to be careful, also, not

6    to over-sample in the closest department to me just because it's

7    convenient.  You know, we can grab people right off the line

8    right there and that's it.

9         So I would ask the human resources representative, I'm

10   interested in having two to three employees from these specific

11   areas, if possible, wearing aprons come and don/doff for me.

12   Q    And then what would happen at that point?

13   A    Then the Human Resources Representative would go ahead,

14   verify what I said, obviously, so we're on the same page, go

15   ahead and radio the supervisors/managers from those departments

16   and those groups of interest, meaning, again, by "groups" I mean

17   what equipment they're wearing.

18        And those supervisors would, and managers would randomly

19   select employees.  They would come off the line, clean up as

20   much as they needed to.  They would report to the room.  And

21   then the Human Resources Representative would see if they were

22   on the list of people that were involved in the suit.

23   Q    So did the supervisors have any knowledge as to who or who

24   were not on the list of opt-in plaintiffs?

25   A    I can only tell you what I was told by Mountaire Farms,

1    which is that the supervisors and managers and employees did not

2    know who was involved in the suit.  And only very senior

3    management, meaning the operations manager, plant manager, these

4    type folks, and the senior HR people, knew who was involved in

5    the matter.

6    Q    Okay.  Now, for a moment let's just assume that from the

7    time that you did your inspection, that 20 of the opt-ins were

8    still, were current employees.  What would you have expected to

9    have seen from those numbers by that, that process that you

10   described?

11   A    So what are you saying?

12   Q    Assuming that in the departments in which you were studying

13   that there remained, there was -- let me get this right.

14        Assume for a moment that in the departments that 20 of the

15   opt-in plaintiffs were current employees at that time.  What

16   would you then expect from your method as to how many folks

17   might have been selected to come see you?

18   A    Okay.  I understand.  You're saying that you want the

19   probability of, you want to know the probability of being

20   selected in my sample, if there's 20 in the population, assuming

21   that the population is all 1296 employees eligible to be in the

22   studied.

23   Q    That is correct.

24   A    All right.  So we would say 20 divided by 1296 is equal to

25   1.54%.  That means that of the 1296 employees, 20 of them, or

Case 1:06-cv-00121-BEL  Document 159   Filed 10/19/09  Page 69 of 158

1    1.5%, if I'm just using two digits, you would expect to have

2    whatever characteristic that was.

3    Q    Out of the roughly 200 that you --

4    A    Well, I believe we sampled 198.  You would multiply that.

5    And that would tell you, Mr. Stine, that you would expect

6    3.055555 employees randomly selected based on the strata to have

7    been that characteristic that you would sample for.

8    Q    And what was the number that you recall that you --

9    A    I reported to Judge Davis that we rejected two or three.

10   And we were probability expecting 3.1.

11   Q    And if you had tested the three and they had reported 50%

12   more of their time, what type of impact would that have had on

13   your numbers?

14   A    Well, let me direct this for you.  They would not have

15   reported 50% more of their time.

16   Q    Okay.

17   A    If they were studied and they went intentionally fast or

18   intentionally slow, or unintentionally, they could have

19   segregated themselves out as being a statistical outlier, just

20   the way any employee could.  Again, I'm not differentiating

21   between employees from the design perspective.

22        So one is, that is a possibility, that they could have

23   differentiated themselves, any employee of the 1296, could have

24   differentiated themselves from other employees, for instance, on

25   donning an arm guard.  Now, I'm just talking about individual

1    pieces of --

2              THE COURT:  I'm sorry to interrupt.  But none of this

3    is really necessary, gentlemen.  It's fine.  You need to make

4    your record and I appreciate that.  But if you're actually

5    suggesting to me that there was only 20, there are only 20

6    people in this class still working, that says a lot about a lot

7    of things, but I get your point.

8    Q    All right.

9              THE COURT:  So you don't need to spend any time

10   developing the statistical significance or insignificance of the

11   three.

12   Q    Yes, Your Honor.  Now, you indicated during your testimony

13   something about pace.  Could you tell me what you meant by pace?

14   A    Right.  Each employee, and when you conduct a stop watch

15   time study, Your Honor, each employee, to conduct the study

16   properly, should be pace rated.  And again, that is in reference

17   to those, one of those three benchmarks that we talked about

18   earlier today.  And industrial engineers, work measurement, time

19   study analysts will have appropriate training to be able to do

20   that.

21        Each of those employees that I studied was pace rated.  And

22   by far, the majority were operating well within the bounds of

23   expected normal pace, which is 90% to 110.  Where we expect a,

24   based on, based on our expectation as engineers and analysts, we

25   have an expectation of how fast they're going to move based on

1    these benchmarks.  And we compare that to what they're actually

2    doing.  And typically, that will bounce around between 90 and

3    110.  And by far, most of them were performing within that

4    range.

5        So again, it's fairly easy to ascertain or to pick out

6    employees that are slow, employees that are overly eager and

7    they're fast.  These kind of things are easy to pick up.  And

8    they're very small in numbers.

9    Q    Okay.  Once you got these numbers developed, did you do

10   anything to kind of doublecheck your numbers?

11   A    Yes.  So let me just jump real quick and just take two

12   quick stops.  So the employees were brought in and every piece

13   of required equipment that that employee was required to wear

14   was provided to them.  They had a chance to wash up, clean up,

15   dry off.  And then they would be donned individually and timed.

16   And they would be doffed individually and timed.  And we went

17   through great lengths to be able to make them understand these

18   instructions and feel comfortable with them.

19       And then at the end of obtaining those times, I requested

20   that they don all those items without stopping and then -- while

21   I timed them, and DVD'd them, as I gave to you, Mr. Brown -- and

22   then doff all those items without stopping them.  And so I have

23   that for the record.

24       And the primary reason I have it is twofold.  One is so I

25   have a record of who were, who wore what equipment so in case

1    something's confused or cross reference data.  And the second

2    thing is, again, I can use that as a verification or pseudo

3    validation because, again, out of this PPE model, just produce

4    an estimate of the time that the average employee takes.

5          And so I can use that data for that purpose.

6    Q    Okay.  And after you got your -- and this is how you

7    compose your data and you did it by, also by each item, did you

8    not?

9    A    I did.

10   Q    Now, did you do anything to kind of doublecheck your

11   numbers?

12   A    Yes.

13         THE COURT:  By doublecheck the numbers, meaning what?

14   Meaning?

15   Q    Some other way to make certain the numbers he got at

16   Mountaire are matching other sources.

17   A    Well, I would do two things.  Let me --

18         THE COURT:  Well, I don't see how that's

19   doublechecking the numbers.  But I take your point.  In other

20   words, you timed them.  You did it yourself.

21         THE WITNESS:  Absolutely.

22         THE COURT:  You're no student?

23         THE WITNESS:  No.  Doublechecking is not -- and that's

24   what I was going to tell Mr. Stine -- there is no reason to

25   doublecheck because I record the data, I entered the data in the

1    spreadsheet, and I verified that data personally.  Every piece

2    of it.

3             So what I would do after I model this, Your Honor,

4    was, as I did with the walk-in, is I would use some type of a

5    control mechanism to see how good of an estimate the model's

6    producing.  That's what I mean.

7             THE COURT:  That's what you mean.

8             MR. STINE:  That's what I meant.  That's what I was

9    trying to get across.

10             THE COURT:  Okay.

11             THE WITNESS:  And so I did that.  And I did that on 40

12   of those DVD tapes.  And what I did was I actually timed the

13   employees on the tape donning and doffing.  And I compared that

14   to what my model predicted for the exact same combination.  And

15   here's what I got.

16             On the don, on the don, my model exactly predicted it

17   to within 1%, on the don.

18             On the doff, my model over-predicted it by 22%,

19   meaning that I allocated in my time 22% more time than the

20   average employee out of those 40 took to take off that

21   combination in real life.  This is real life, real time

22   information.

23             And overall, as you're aware, the doff takes

24   significantly less, usually less than a third of the don because

25   they're just pulling stuff off.  That results in the overall

1     model being conservative or overestimating by about 7%, sir.

2          So one more thing.  Even a little further, I like to

3     go back on those -- that's what the employees did -- to look at

4     those individual times.  I've done a number of other plants.

5     And I maintain a larger data base.  And I compared the Mountaire

6     Farms to those numbers just to see if anything was going on

7     differently at Mountaire than what I had historically seen.  And

8     there was no difference.

9          THE COURT:  I'm sorry.  Just so that I'm clear.

10    You've done identical surveys or nearly identical surveys at

11    other poultry plants?

12         THE WITNESS:  Yes, sir, I have.  I have done,

13    previously, I've studied three poultry processing plants for, in

14    the Cagles case.  And then I also studied Claxton Poultry.  And

15    I'm actually involved in another matter right now in which I

16    have not been named as an expert yet, but I've studied nine

17    studies.  And that's just in poultry.

18         THE COURT:  And what you came away with in this case

19    is, you say, is consistent with?

20         THE WITNESS:  Absolutely, sir.  Yes, there are very

21    small differences, of course.  But if you look at it, you could

22    not pick out data that was any different.

23         And you would expect that if the studies were

24    conducted in a similar fashion, designed properly, and

25    conducted, you know, rigorously.

1          The last thing I want to say --

2          THE COURT:  Well, there aren't too many ways to put on

3     a pair of gloves.

4          THE WITNESS:  Sir, you said it, not me.  And I guess

5     the other thing I would say is, I also want you folks to

6     understand that I asked these people to do what they normally

7     do.  And you could even hear this on your DVD tapes that I

8     provided to you, Mr. Brown.

9          I wanted them to do exactly what they did.  I'm not

10    here to, let's get them to do it fast or get them to do it slow.

11    I want to know what they do because I'm interested in human

12    performance, sir.

13    BY MR. STINE:

14    Q    All right.  Now, you came up, when you did the study, you

15    wrote down time that underlies the basis for each individual

16    item, did you not?

17    A    I did.

18    Q    And you established a median time for don and a median time

19    for doff, did you not?

20    A    Did you say median or mean?

21    Q    Well, you established both mean and median?

22    A    I could give you the median, but I have the means.

23    Q    Let's do the means?

24    A    The means are the averages.

25    Q    Give me the averages, means.

1    A    So in my report and in my company model, I have the average

2    don time for the average employee -- this is across all

3    combinations that they might wear -- taking 2.15 minutes to don

4    and doff a full set of required items.  So that would be the

5    beginning and end of the shift.

6    Q    Okay.  And when you did the lunch, did you look at

7    something somewhat different?

8    A    I did.  I actually didn't look at anything different.  What

9    I do is I run my full model, which means, here's all the

10   equipment they would put on and take off at the beginning of the

11   day, at the end of the day.  And then, clearly, we know that at

12   lunch they do not remove everything.  So instead of starting

13   again, I simply subtract from the models what they take off and

14   leave the rest of it on them.  And then that gives me the

15   reduced time, which is what I did.

16   Q    Okay.  And so if you took the total time for all the items

17   that you found required to don and doff at the start of the

18   shift and to partially doff and don during lunch, what were your

19   numbers?

20   A    Right.  And just for the clarification, for the report I

21   would call that a full don and a partial don.

22   Q    Okay.

23   A    2.15 minutes for the full don/doff, and 1.18 minutes for

24   the partial don/doff, resulting in a net time of 3.33 minutes

25   per day to don and doff required sanitation and personal

1    protection equipment for the average employee.

2         Again, if we want to ask specific job titles, I'm prepared

3    to do that.

4    Q    Now, there was also, there's a concept I've heard you talk

5    about is simultaneous operations.  What does that mean?

6    A    Simultaneous operations in time study in general means that

7    you're doing more than one thing at a time.  You know, humans

8    have the capability to walk and chew gum at the same time, so to

9    speak.  And so in this particular case, in this context, we very

10   often see people walking and donning or doffing, whatever the

11   case might be, simultaneously.

12        And I have made no account for that in my model, which

13   means that I've given them full walking credit and I've given

14   them full donning/doffing credit.

15        So the model, even when I told you before that the walking

16   model was conservative and the PPE model is conservative,

17   there's also a conservative factor by the fact that SIMO, we

18   call that SIMO, S-I-M-O, was not accounted for.  And again,

19   that's the conservative default.

20   Q    Okay.  When you, also, during your study, did you not also

21   ask the employees to report what items they were wearing into

22   the facility?

23   A    Yes, sir, I did.

24   Q    And what did you determine from that?

25   A    I alluded to, earlier, Your Honor, that I would ask them

1    some demographic information just for study design balance

2    purposes.  And an additional item that I asked them, two

3    additional items.  One was, what equipment did you personally

4    wear through the gate this morning?  What did you wear in?  And

5    that, I can give you that number exactly.  77% of the

6    respondents, and it looks like there's about 70 of them,

7    roughly, said, 77% reported wearing in the boots through the

8    security gate in the morning.  17% reported wearing in the hair

9    nets.  This is all self-reported data.  18% reported wearing in

10   the bump cap.

11       And overall, out of all 70 that I asked, of the freezer

12   suit, 13 reported that they wore it in.  But of the people that

13   wear freezer suits, virtually everyone wore them in.

14       But do I want to characterize this by saying it was March.

15   And/or snow on the ground.  So that makes sense.

16               THE COURT:  At the time of the --

17               THE WITNESS:  At the time that I did the study a year

18   ago, sir.

19               THE COURT:  Okay.  That would certainly explain 77%

20   wearing the boots.

21               THE WITNESS:  Right.

22               THE COURT:  Or tend to explain it.

23               THE WITNESS:  So --

24               THE COURT:  Because that strikes me as just

25   extraordinarily high.  Wouldn't be anything like that in July.

1             THE WITNESS:  Right.  And this is, this is

2    self-reported data.  So, I mean, they have an option to tell me,

3    I didn't wear anything in.

4             THE COURT:  But, by the way, you mentioned there was

5    77 respondents.  So I take it there was like a hundred, 120

6    people chose not to answer your questions or just --

7             THE WITNESS:  No.  I didn't ask that of everybody, and

8    I'll tell you why.  That's an excellent question.  And I think

9    I've answered it but I want to make this clear for you.

10            When I start, before the first person, I'm looking to

11   see statistical numbers of arm guards, hair nets, beard nets.

12   You get the point the point.  And I have none in each of those

13   categories.  And so everybody kind of has those five basic

14   items.

15            And as I start to pull subjects in, employees, I start

16   filling these up by what they have on.  And that's also what

17   leads me to spread out to these other departments.  And I do

18   want balance and representation.  And so I have to be able to

19   fill in the queue, so to speak, and be able to do that.

20            So once, I guess the whole point, Your Honor, is once

21   I get down close to the end, you know, and that is fairly close,

22   I mean, like starting at a hundred, maybe, 110, I need less, I

23   stop taking individual things.  Again, I think I said before, I

24   don't need to see the 105th hair net because it's not going to

25   do anything for me from a statistical perspective.  And it takes

1      the employee away from work and it costs the company money to

2      get this.

3              So I tried to abbreviate the process, still

4      maintaining the same controls and still telling the employees

5      everything, why they're there, and these kind of things.  But I

6      try not to drag it out.

7              So at the very end -- I'll fast forward -- at the very

8      end I might be just measuring chain gloves.  The very last

9      person or five people might just be chain gloves.  That's the

10     only information that I want.  But I go through the whole

11     protocol with them identically with the exception that I try to,

12     I don't, I know that they're not wearing chain gloves through

13     the, through the front gate, I mean, physically wearing them

14     because we already know that.  That's a given.  So I try not to

15     drag that out.

16     BY MR. STINE:

17     Q    Now, did you come up with a mean time for each item that

18     you measured?

19     A    Certainly.

20     Q    Okay.

21     A    And that's the nature of the standard data system.

22     Q    Okay.  Would you tell the Court, we just need to do this

23     briefly, but let's go through the mean don/doff of the items.

24     Would you please?

25     A    Sure.  Of all the items?

1    Q    Yes, please.

2    A    Okay.

3    Q    It's just easier to do them all than ask you a question

4    about each one of them.

5    A    All right.  The information that I have in front of me is

6    a, just a list of the items, the don/doff times, and the number

7    of samples that I have.  And then the margin of error.

8    Q    Okay.

9    A    How accurate it is.  And on the ear plugs, I have a mean

10   don time of -- I'm going to only go to one digit -- 7.8 seconds

11   to don.  Three point -- excuse me -- 4.7 seconds to doff.

12   Q    Before you do that, I have given counsel a chart.  And the

13   chart's actually got one second less than that.  Could you

14   explain why you're adding one second, so at least counsel for

15   the plaintiff will know why you're reading it higher?

16   A    Yes.  Because these are the actual times that I observed.

17   And then in the predetermined time system model, again, an

18   experimental control for rigor, so that I can replicate the same

19   thing time after time, as I have on the don, I have them reach

20   out.  And when they touch the item, I start the watch.  And then

21   they would, let's just say it's an arm guard, they will put the

22   item on, and they will release, I will stop the watch.

23        So to be able to glue these items together, we're missing

24   the part of returning to get the next item.  So I account for

25   that with a predetermined time in motion value, which is one

1    second.  And that's derived directly from MOSH, Maynard

2    Operational Sequence Technique.  And I add that in.

3         But to be correct, that's not a time value study.  That's a

4    constant that's added in.  And hence it's not in here.  But it

5    is in my final number, sir.

6    Q    I just wanted you to explain that because I was having

7    counsel go along.  I'm certain they were a little confused by

8    looking at it.

9    A    Sure.  So now that way I can make it very quick.

10             THE COURT:  Do I have a copy of that?

11             MR. STINE:  It's not an exhibit because we did not

12   list it.  I do have a copy.

13             THE COURT:  Okay.  If I can have a copy.  Thanks.

14             MR. STINE:  It's for demonstrative purposes.  I didn't

15   list it as an exhibit.  I told Mr. Brown I would not introduce

16   it because I hadn't listed it.  But for demonstrative purposes,

17   reading along, it's a lot easier.

18             THE COURT:  Thank you.

19             THE WITNESS:  From here out, we'll realize, we'll

20   agree that there's one second added to each of those times that

21   I'm going to individually give to one decimal point to account

22   for the returns.  And as you'll see in a second, that's in the

23   model.

24   BY MR. STINE:

25   Q    Okay.

1    A    And also, these are one item of these.  So to don one

2    sleeve, it's 4.7 seconds.  To doff one sleeve, 2.3 seconds.

3         To don one robber glove, 5.6 seconds.  To doff one rubber

4    glove, 4.1 seconds.

5         To don a chain glove, 7.7 seconds.  To doff a chain glove,

6    3.3 seconds.

7         To don a Kevlar glove, 4.2 seconds.  To doff, 3.1.

8         To don a hair net, 3.6 -- excuse me -- 13.6 seconds.  To

9    doff, 3.2.

10        To don one arm guard, 3.3.  To doff, 2.4.

11        To don a pair of safety glasses, 4.7 seconds.  To doff,

12   2.4.

13        To don a beard net, 7.0 seconds.  To doff, 2.5.

14        To don and button a smock, 19.1 seconds.  To doff, 7.8.

15        To don and tie the apron, 15 seconds.  To doff, 7.4.

16        To don a bump cap, 5.8 seconds.  To doff, 3.0.

17        And to don a dust mask, 7.2.  And to doff that dust mask,

18   3.5 seconds.

19   Q    Now, using your system, then, you can tell us how much

20   time's involved in donning and doffing certain items, is that

21   correct?

22   A    I can.

23   Q    Okay.  For example, if I was to ask you how much time is

24   involved in putting on one hair net, putting in the ear plugs in

25   both ears, putting a smock on and a bump cap, you can tell us

1      the donning and doffing?

2      A    I can, but I would have to go to the computer.

3      Q    Why don't you go to the computer?

4      A    Your Honor, is that okay?

5           THE COURT:  Sure.  It's just a matter of adding these

6      up, isn't it?

7           THE WITNESS:  Yes, and I'm going to show you that real

8      quick because it would take just one second.

9           THE COURT:  I know how to add.  You don't have to show

10     me that.  Of course you can.  Of course.  Again, I'm trying to

11     get you on this plane.

12          MR. STINE:  Yes, Your Honor.  We understand that.

13          MR. BROWN:  Your Honor, could we take a five minute

14     break, please?

15          THE COURT:  We certainly may.  Why don't we stand in

16     recess for five minutes?

17          (Recess.)

18     BY MR. STINE:

19     Q    Dr. Davis, I was going to ask you to kind of just give us

20     very quickly the mean donning and doffing for just one or two

21     combinations.  Then let's start with hair net, ear plugs, smock,

22     the bump cap.

23     A    Okay.  So what I would do is now using a standard data

24     system, I have all this data that we've previously seen archived

25     in the database.  I'll simply enter through this face plate and

1     select what I want.

2          So you want a hair net?  And what else did you want?

3   Q    Bump cap.

4   A    A bump cap.

5   Q    Ear plugs.

6   A    Ear plugs.

7   Q    And a smock.

8   A    Right there for this plant.  And a smock.  Cloth, button-up

9   smock is right there.  And that combination to don would be

10  49.5.  To doff would be 21.9.  For a mean total of 71.4.

11  Q    Okay.  Now, let's look at all of those items -- the hair

12  net, ear plugs, smock, bump cap, with an apron and rubber

13  gloves.

14  A    Okay.  If you want to add an apron, you click this.  And

15  what else did you want?

16  Q    I want two rubber gloves.

17  A    I have the option for that.  There's two rubber gloves.

18  Q    And what is the mean --

19  A    119.2 seconds is the total mean don/doff type for that

20  combination.

21  Q    Okay.  Can you add the one cut, the metal mesh glove?

22  A    I can.

23  Q    Do that.

24  A    One chain glove is right there.

25  Q    And what is that result?

1    A    132.3.

2    Q    For donning and doffing?

3    A    Yes, sir.

4    Q    One time?

5    A    Yes, sir.

6    Q    All right.  Thank you very much.  Now, also I'd asked you

7    to look at some of the videotapes of Dr. Radwin, is that

8    correct?

9    A    You had.

10   Q    And you have got one ready for us to look at.  And you were

11   going to explain some of the issues with the videotape, is that

12   correct?

13   A    Yes, sir.

14   Q    Would you mind playing that tape and kind of giving us a

15   running narration, please?

16            THE COURT:  Just, by the way, you probably explained

17   this, but why didn't you do boots?

18            THE WITNESS:  I didn't do boots for two purposes.  One

19   is they wear them in, traditionally, as they had in other

20   plants.  And because they wear this clothing in, I didn't record

21   it.

22            The second thing was, from the design of the study, I

23   asked the employer, Mountaire Farms, if they wanted the boots

24   study and they said no.

25            THE COURT:  How do you feel about that?

1          THE WITNESS:  Well, Your Honor, I guess what I would

2     say is they're the employer.  They do the PPE matrix.  And, you

3     know, I'm there, as I said before, to quantify these times in

4     the best way that I can.  And this is not the first employer

5     that has not asked me to study the boots.

6          So that, I wasn't expecting it but it wasn't

7     unexpected, either.

8          THE COURT:  Okay.  Okay.

9          THE WITNESS:  I guess, let me, I'm not one to

10    volunteer stuff.  But the cotton gloves are not required so I

11    don't study the cotton gloves.

12         THE COURT:  Yeah.  But the boots are required.

13         THE WITNESS:  But the boots are carried in.  I mean,

14    the boots are worn in.  77% here reported wearing the boots.

15    And on --

16         THE COURT:  Well, in a snowy March.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.  All right.  Go ahead.

19    BY MR. STINE:

20    Q    Okay.  Would you mind showing the video, please?

21    A    Sure.  You want to start with the long one?

22    Q    Yes, please.  Your Honor, if you don't mind, I'm going to

23    move to counsel table because it's a lot easier to see the

24    video.

25         THE COURT:  Certainly.

1    A    Okay.  So essentially, this is Dr. Radwin's DVD of this

2    gentleman walking in.  He's going to open his locker, grasp a

3    bump cap.  Looks likes he removes a hair net and asides the bump

4    cap, meaning puts it aside.  Then he will don the hair net and

5    then don the bump cap.

6    Q    Dr. Davis, is this the point in which Dr. Radwin's study

7    started the time?

8    A    Yes.  To the best, to the best that I can ascertain, that's

9    correct.

10   Q    Does it look like he has two --

11   A    He's using the open locker next to it, I believe, as

12   temporary stowage to move things in and out.  So he's grabbed

13   his boots.  Now he's going to go out and walk to the time clock.

14            THE COURT:  By the way, did you control for age?

15            THE WITNESS:  Did I control for age?  No, I did not

16   control for age.

17            THE COURT:  I'm afraid that what prompted that

18   question is that this guy moves like an old guy.

19            THE WITNESS:  Sir, I wouldn't say that out of respect.

20            THE COURT:  I get to say some things that you

21   shouldn't say.

22            THE WITNESS:  Out of respect to you and myself.

23            THE COURT:  Of course, I could have said he moved the

24   way I'd probably move.

25            THE WITNESS:  Actually, Judge, with the aging work

1      force, that's a pretty significant issue.  And again, to be

2      representative, you want to include these folks for sure.

3              So he's walking to the time clock.  He's carrying some

4      PPE with hip.  You'll see that he swipes.  Actually, I believe

5      he swipes twice.  Just to be sure.  There you go.  And now he's

6      going to walk around a little bit.  He doesn't cross that

7      threshold.

8              THE COURT:  Is that the cafeteria?

9              THE WITNESS:  Yes, sir, it is.

10     BY MR. STINE:

11     Q    Dr. Davis, that bin right there in the picture, what's that

12     bin?

13     A    It's a smock bin.

14     Q    For dirty smocks?

15     A    Yes.  That's where they'll return dirty smocks or smocks

16     that they might want to trade end of shift, whatever, whatever

17     it is.

18          And that, by the way, sir, that was directly across from

19     the supply room window, for context.

20     Q    So all this time he's waiting out in the hall, wandering

21     the hall is included as time in Dr. Radwin's study?

22     A    Yes, it is.

23     Q    Did you time this particular amount of time waiting in the

24     hallway?

25     A    I have everything broken down.  There's a lot of

1    categories.  I don't have them lumped into waiting and these

2    kind of things.

3    Q    We'll get to that in a moment.

4    A    The next thing I have is at time 6:40, this gentleman will

5    go into the cafeteria.  Here it is.

6    Q    So that was six minutes and forty minutes?

7    A    Six minutes and forty seconds, sir.

8    Q    Six minute and forty seconds?

9    A    Now he's gone into the cafeteria.  And I have him coming

10   out of the cafeteria at nine minutes and nine seconds.

11   Q    There's no way to speed this up, is there?

12   A    I can give it a shot.  I haven't done that.  If you'd like

13   me to, I'll be willing to try.

14   Q    Let's just let it wait, then.  This time has been deducted

15   from Dr. Radwin's study, once he crossed the threshold to the

16   cafeteria?

17   A    I believe that to be true, yes, sir.

18           THE COURT:  Now, you're going to show me three of the

19   plaintiff's videos, is that right?

20           THE WITNESS:  Yes, one.  This one is by far the

21   longest.

22           THE COURT:  I was going to ask you, did you start with

23   your best?

24           MR. STINE:  That would be an affirmative, Your Honor.

25           THE COURT:  Okay.

1          THE WITNESS:  The next one will be the, an identical

2     employee doing the exact same thing, meaning same equipment,

3     going to the exact same site.

4          THE COURT:  And is there any effort, obviously, don't

5     answer this, I'm not even sure if Dr. Davis could answer it,

6     anyway, but was there any effort apropos our earlier colloquy to

7     identify the subjects in the plaintiffs' videos?  In other

8     words, my point is, it would be impeaching of the plaintiffs'

9     case perhaps if you could show that this gentleman was one of

10    the 20, assuming it's only 20, who still worked there at the

11    time this was done, was actually a member of the class.

12         MR. STINE:  No, Your Honor.

13         THE COURT:  And I understand why you wouldn't.  I

14    don't mean my question to be taken in any way, shape or form as

15    criticism.  You would be charged with all kind of things, I

16    would imagine, if you undertook to do that.  It would be

17    impeaching, arguably impeaching.

18         MR. STINE:  Yes, Your Honor.

19         THE COURT:  Yes, Dr. Davis?

20         THE WITNESS:  Sir, I have never known who was involved

21    in this litigation.

22         THE COURT:  Sure.  That's why I was directing the

23    question to Mr. Stine.

24         THE WITNESS:  Before, after or now.

25         THE COURT:  That's why I was directing the question to

1    Mr. Stine.

2    BY MR. STINE:

3    Q    Yes, Your Honor.  No, we have not.  Is that him coming out

4    now?

5    A    Yes.

6              THE COURT:  That's Grandpop.  Or as I know him,

7    Pop-Pop.

8              MR. BROWN:  What's that?

9              THE WITNESS:  I believe that's his apron, Mr. Brown.

10   I don't have that written in front of me but I believe that to

11   be true.  Actually, I have him earlier grasping his apron and

12   his rubber glove.

13             THE COURT:  Yeah, I thought he took the apron out of

14   the locker.

15             THE WITNESS:  I think he's carrying it.  I believe

16   right now you see, that's an empty smock rack, sir.  He's

17   waiting for some smocks to be pulled out here.  And in my

18   estimation, he has a pretty good feel for when this is going to

19   occur because he came out of this cafeteria or he saw it or

20   something.  Something motivated him.

21             MR. BROWN:  So this is waiting time?

22             THE WITNESS:  Now, let me say this.  This is going to

23   go on until 1605 and we're at 1007.  So we've got six minutes of

24   him standing here, waiting for a smock.

25             MR. STINE:  Six minutes?

1          THE WITNESS:  Yes, sir.

2          MR. BROWN:  I'll stipulate to that.

3          THE COURT:  You want to watch it all, Mr. Stine?  Or

4     Mr. Brown says he'll stipulate that it took another six minutes

5     for the smock.

6          MR. STINE:  I believe there is more after him waiting

7     for the smock, is that right?

8          THE WITNESS:  There is.  After the smock, there will

9     be another 12 minutes of video, which is all the walking and the

10    rest of the donning.

11         THE COURT:  Now, this is very strange.  Or perhaps

12    not.  But I mean, if he, if his line time starts five minutes

13    from now, does this mean he's late because there are no smocks

14    available?

15         MR. STINE:  It would be.  But I think, Your Honor, the

16    point is, they bring the smocks out a little bit closer to the

17    starting line time.  And he is here quite early.

18         THE COURT:  I see.  Okay.  I won't treat that as

19    testimony, obviously, Mr. Stine.  But I suspect Mr. Brown's not

20    contesting that.  Because I have no idea what time he arrived

21    for work or what time his shift starts.

22         THE WITNESS:  Well, all told, sir, it takes 28 -- this

23    is Dr. Radwin's tape.  It takes 28 minutes and 57 seconds from

24    when the man enters the front door until the man is stopped

25    taping at the, his job.  And he arrives before product comes.

1    And Dr. Radwin, I think, reported, actually exactly reported

2    20.685 minutes that contributed into his time for this

3    gentleman.

4    Q    In doing this, did you extract the time that was involved

5    for the donning, the donning, the donning aspect of this and the

6    walking time?

7    A    I did.  But only in context of the way I did my study, Your

8    Honor.  So I want to make it clear to you that I did not add any

9    boot type.  That would be the one exception, I believe, off the

10   top of my head.

11       I want to also make it clear that this is not a time study.

12   This is a counting of time.  By my accounting of time, I see

13   this gentleman having don time of roughly 110 seconds, a walking

14   time of 188 seconds, which equates to 4.97 minutes.  And I would

15   add to you, respectfully, sir, that this gentleman is

16   significantly slow on a pace perspective on the don and on the

17   walk.

18            THE COURT:  Oh, that's pretty obvious.

19            THE WITNESS:  If I had timed this gentleman, he might

20   have very well distinguished himself as a statistical outlier.

21   Again, not meaning a bad thing, just that his time, his time

22   differentiated itself from everybody else's times enough so

23   that, you know, it would be the case that he would isolate

24   himself.

25            But just so you know, sir, I actually, any outliers

1    that I had, and there are a few, I kept them in this model.  And

2    all those outliers are in those reported times that I gave you.

3    So I didn't kick anybody on excessive time.

4              THE COURT:  Okay.  I appreciate that.  No, this guy,

5    he'll probably live to be 120.

6              THE WITNESS:  At least.

7              THE COURT:  Every now and then, we all run into a

8    friend or acquaintance who moves through life at this pace.  And

9    this guy's going to live a long time.  I'll bet his heart only

10   beats about 12 times a minute.

11             MR. BROWN:  Your Honor, this is the Eastern Shore

12   we're talking about.

13             THE COURT:  Yes.  Point taken.

14             MR. BROWN:  That explains that.

15             THE COURT:  By the way, is there a difference between

16   the orange bump caps and the green?

17             THE WITNESS:  Yes, sir.  I can answer that.  If I look

18   at, if I refer to the PPE matrix, various departments have

19   various color combinations so that management, supervisors and

20   employees can identify, at least to some aspect, what department

21   that they're in.

22             THE COURT:  So if you're at a location, nobody has to

23   ask a question.

24             THE WITNESS:  Or perhaps, on the other hand, maybe

25   they are involved with vehicular traffic and that would be just

1     one additional option to know that you need to step out of the

2     way or something.  Or that they're going to get a fork truck or

3     something like that.

4             THE COURT:  So the smocks are here.

5             THE WITNESS:  And he's going to put the smock on.

6             THE COURT:  He wants to make sure all of his

7     colleagues get one before he takes one.  He's also courteous.

8             THE WITNESS:  I would point out that this man had no

9     idea that this was going to occur, that Dr. Radwin's people were

10    going to follow him.  So this is, I mean, he probably is

11    wondering why he's being videotaped.

12            THE COURT:  By the way, as I recall, Dr. Radwin was

13    there in January and then his students in February.  Is my

14    recollection correct?

15            MR. BROWN:  March.

16            THE WITNESS:  I believe it was March, sir.

17            THE COURT:  So did you two overlap in any way?

18            THE WITNESS:  Absolutely.  I was there the, I was

19    there for the week preceding his students, collecting my initial

20    data on the walking study.  And then I specifically stayed to

21    observe part of the methodology that they did.

22            THE COURT:  I see.  Okay.  So my point in questioning,

23    asking that question, one would suspect that word got around the

24    plant pretty quickly that, you know, all this stuff was going

25    on.  But you're right.  He wouldn't have known that he, in

1    particular, was going to be the star.

2              THE WITNESS:  Right.  And again, just as a thought.  I

3    brought the people to me and they were in isolation, so to

4    speak, you know, meaning -- and in this particular case, this

5    gentleman probably wouldn't have expected that somebody was

6    going to follow him with a DVD.

7              THE COURT:  Well, depends on whether he was Day Two or

8    Day Four.

9              THE WITNESS:  Could be.

10             THE COURT:  I mean, I suspect that after Day One,

11   everybody in the plant knew that there were these young people

12   running around with these cameras.

13             THE WITNESS:  That would be the Hawthorne effect, sir.

14             THE COURT:  Right.  And of course, in fact, I think

15   Dr. Radwin acknowledged that management notified the employees

16   that this would be happening.  They didn't just have people show

17   up on a Monday morning with a camcorder.

18             THE WITNESS:  That I would not know.

19             THE COURT:  I'm going to infer that the employees were

20   given the courtesy of forewarning.

21             THE WITNESS:  Your Honor, he walked into the cafeteria

22   at 1727.  He's going to be in there for five minutes and four

23   seconds.  He has donned his smock already.

24   BY MR. STINE:

25   Q    So he donned his smock before entering?

1    A    And he placed the gloves in the smock pockets.

2    Q    At what point did he do that?

3    A    He donned the smock at 1605 to 1652.  And he placed apron

4    and rubbers gloves in smock pocket, 1653 to 1709.  1710 to 1726,

5    walk to cafeteria.  As I reported, he's inside for five minutes

6    and four seconds.  And then he'll come out.

7         And just so you know, when he comes out, he will actually

8    start to walk towards his job.  And that's going to be at 2231.

9    Q    Dr. Davis, while we're waiting for him to come out of the

10   cafeteria, could you just take us through the breakdown that

11   you've observed so we have that ready, for the record?  For this

12   particular individual from start to finish, how you broke it

13   down.

14   A    Do you want me to go over all the individual times?

15   Q    Yes, please.

16   A    Okay.  Time 0 to 037, enter plant, walk to and open locker.

17   Time 38 to 41, at locker.

18        Time 42 to 50 -- these are in seconds is -- grasps bump

19   cap, removes hair net, asides bump cap.

20        51 seconds to 1 minute and 2 seconds, don hair net.  1

21   minute 3 seconds to 1 minute 13 seconds, don bump cap.

22        1 minute 14 seconds to 1 minute 33 seconds, at locker.

23        1 minute 34 seconds to 2 minutes, grasp boots, don booths,

24   stow shoes.

25        2 minutes and 1 second to 2 minutes and 34, at locker.

1        2 minutes and 35 to 2:49, grasp safety glasses from locker,

2   don on the back of bump cap.

3        2 minutes and 50 seconds to 3 minutes and 6 seconds, at

4   locker.

5        3 minutes and 7 seconds to 3 minutes and 19 second, grasp

6   PPE, which the apron and the rubber gloves.

7        3 minutes and 20 seconds to 3 minutes and 50 seconds,

8   walking to time clock carrying PPE.

9        3:51 to 4 minutes, swipe in time clock.

10       4:01 to 4:24, walk around.

11       4:25 to 6:39, idle, stop at cafeteria door.

12       6:40 to 9:09, inside cafeteria.

13       9:10 to 9:26, walk around by supply room.

14       9:27 to 16:04, waiting on smock.

15       16:05 to 16:52, grasp smock, don smock.

16       16:53 to 17:09, place apron and rubber gloves in smock

17  pockets.

18       17:10 to 17:26, walk to cafeteria.

19       17:27 to 22:31, inside cafeteria.

20       22:32, which we're about to come up on, to 24, 24:47, walk

21  to Evis.

22       24:48 to 24:57, roll up sleeves on smock.  24:58 to 25:25,

23  don apron.

24       And he's about to come out, Your Honor.  25:26 to 26:32,

25  handling PPE gloves.

1          23:33 to 26:48, walk to sanitize.  Here he comes.  And I'll

2     finish this, if I can, while you folks watch this.

3          27:10 to 27:34, sanitize hands and apron.

4          27:35 to 28:10, walk to work station.

5          28:41 to 28:57, at work.  So he arrives at work at 28:57.

6     Q    This is the production door area we were talking about, Dr.

7     Davis?

8     A    Yes, it is.

9     Q    And that's the foot bath right there?

10    A    Yes, sir.

11    Q    From the production door to the Evisceration, do you recall

12    how long that walk is?

13    A    I believe that's 273 feet, if I'm correct.

14    Q    Thank you, Doctor.

15    A    And just for context, you can see the other employee easily

16    accelerating past that employee without, again, I'm not being

17    facetious, but without any trouble at all.  He's rolling up his

18    sleeves and he's about to put on the apron.  He's actually in

19    Evis now.

20              MR. BROWN:  Are they the gloves?

21              THE WITNESS:  They are, sir.  He's going to don these,

22    these white cotton gloves first.  And then he'll don the rubber

23    gloves over the top of those.

24              MR. BROWN:  And you wouldn't count that white glove?

25              THE WITNESS:  I would not, because according to the

1    employer required equipment list, they're not required.

2    BY MR. STINE:

3    Q    He's still ahead of the product at this point, is he not?

4    A    Oh, yes.  At the end of the video, he's going to arrive to

5    his work station and there's not going to be any bird there.

6    He's going to be on time.

7          He's got a routine.  He knows what time he has to be where.

8    And he's going to perform that.

9          And just in the background right there, Your Honor, you can

10   get a pretty good idea of the people doing the sanitizing in

11   general, where they just stick their hands in and then go.  You

12   know, there's various options.  Different people do it different

13   ways.

14         And here comes the birds.  And he actually sees that

15   coming.  And he's a USDA helper inspector.  He's climbing up on

16   that inspection stand.  And there is the inspector with the

17   white hat.  And there's no product in front of him.  And I think

18   the video's going to terminate.

19              MR. BROWN:  Prematurely?

20              THE WITNESS:  Well, I mean, he's arrived and worked at

21   his, he's arrived at his work station.  So the walking is

22   complete.

23   BY MR. STINE:

24   Q    Now, Dr. Davis, you also found another video of another

25   employee doing the same position or --

1    A    I did.  I found another video that Dr. Radwin had

2    submitted, which is essentially an identical employee, a young

3    lady coming in, donning and doffing, well, donning the same

4    equipment, walking the same distance, and doing it in a

5    significantly shorter amount of time.

6         And I also think, Your Honor, you asked if this was Day

7    One.  I believe, looking back, this is Day One at 0544 in the

8    morning.  So this individual actually might be one of the first

9    individuals DVD'd in the entire plant for Dr. Radwin's study.

10        Of interest, too, the comparison case is two days later,

11   same shift, same time of day, same PPE, same job.  So it's

12   actually a nice match pair from a comparison perspective.  And

13   if I may, I would like to show that.  This is a fairly short

14   video.

15        And here comes this young lady.  And she's wearing her hair

16   net and her bump cap in.  And she's wearing in her shoes.  She's

17   going to walk to the cafeteria and put her lunch up and then

18   walk to the smock rack.  There she goes.

19        She's going to grasp a smock aside the hanger and then take

20   that smock to her locker.

21   Q    And she is wearing boots, is she not?

22   A    I believe she is.

23   Q    Dr. Radwin started the time when she reached to grab the

24   smock, is that correct?

25   A    I believe so.  That's correct, sir.  She's going to don the

1    smock.

2    Q     Could you give the video number, just for the record, so we

3    can have it?

4    A     Yes.  This video number is CAMA-D20080320T54350.

5    Q     Thank you, Dr. Davis.

6    A     She places the apron and the other PPE in the smock

7    pockets.  Then at 1:58, she'll walk out of the locker room to

8    the time clock.  There she goes.  This young lady will swipe and

9    then walk to the work station.  And the important thing to

10   notice here, sir, is she's also going to do some SIMO right now.

11   She's going to walk and don the ear plugs.  And then she's going

12   to continue walking and don the apron in just a moment.  Just

13   put the ear plugs in.

14       All right.  She's going to don the apron while walking.

15   This is an example of simultaneous operations or SIMO.

16       THE COURT:  You know, it just occurred to me watching

17   her.  Do I understand that the boots are not company issued?

18   That people can -- so long as they're steel towed.  Is that it?

19       MR. STINE:  Yes, Your Honor.

20       THE COURT:  Because she clearly is not wearing sort of

21   the standard issued boots.  But it appears that she's in

22   compliance.

23       MR. STINE:  Yes, Your Honor.  They're not required to

24   wear the company supplied boots.  They have to be steel toe,

25   rubber sole.  In other words, work boots.  So they can wear

1    different boots.  A lot of them wear ours because it's

2    convenient.

3              THE COURT:  Do they have to buy them from you?

4              MR. STINE:  No.

5              THE WITNESS:  Sir, indeed, in my observations, many of

6    them do not wear the kind of boots that we have shown, although

7    some of them clearly do, as you've seen.

8              THE COURT:  Clearly, you can see them there.  But some

9    of them aren't.  So I see what, I understand now what the source

10   of some of the controversy over this is.

11             THE WITNESS:  So she's going to sanitize, I've got her

12   sanitizing for three seconds.  Excuse me.  Let me correct that.

13   Four seconds.  And now she's going to be walking to her work

14   station.  And the camera will drop off.

15             THE COURT:  That's obviously the investigator, not --

16   he's not on her shoulders.

17             THE WITNESS:  And you'll see here, sir, she's walking

18   down the same aisles at Evis, and she's going to walk to an

19   inspector station.  She was up there.  You can recognize, the

20   only way you can recognize is actually through the boots because

21   of the videographer.

22             THE COURT:  Okay.

23             THE WITNESS:  So she, that total time took, the entire

24   length of the segment was six minutes and three seconds.  Dr.

25   Radwin reported 5.414 minutes.  I did a time accounting on it on

1    the don and the walking and my time is 186 seconds or 3.1

2    minutes.

3            And this young lady was a little above average.  She

4    would be roughly in the neighborhood of 1:10 to 1:15 on walking,

5    meaning she was a little faster, and she was also a little

6    faster on her donning.  And that's all taken into account in the

7    model by the pace rating.

8    BY MR. STINE:

9    Q    I believe I asked you to look at one more video.

10   A    There is one more.  Yes, sir.  I believe that would be this

11   one.

12   Q    While you're there, before you go into it.  Would you give

13   us the video clip of the 28 minutes -- I don't think you gave us

14   the citation -- so we'll be able to find it.

15   A    CAMC-D20080318T054444.

16   Q    Okay.  And there's one more that you will show?

17   A    Yes.

18   Q    Show us that.

19   A    The final clip is CAMA-D20080318T080344.

20   Q    Okay.  Show that, please.

21   A    And you'll see this gentleman right here, sir, he's wearing

22   in his freezer suit, his boots, his helmet, his hair net, his

23   beard net, and I believe his eyeglasses, the guy before him, the

24   gentleman before him.  So the man that's being followed by Dr.

25   Radwin is the gentleman that just swiped.  He's going to go to

1    his locker.

2    Q    Is he wearing his boots already?

3    A    It looks like he's wearing his boots.  I'd have to check my

4    write-up to make sure.  I did not see him putting boots on here.

5    So I would say, yes, sir, he is.

6    Q    So he grabbed his bump cap, right?

7    A    Yes.

8    Q    And that's when Dr. Radwin started the time?

9    A    I believe Dr. Radwin -- he initially grabbed his bump cap

10   and put it in the locker next to him.  I believe basically

11   that's when he started his time.  So here's make some

12   adjustments and he'll put his hair net on.

13   Q    He's walking through the food lab?

14   A    Yes.

15   Q    And he's now into production?

16   A    He is, and he's holding the door open for the videographer

17   which, again, the subjects act as subjects just because they

18   know they're subjects.  But that's okay.  That's human behavior.

19   And I believe he's going to be a gentleman and hold this door

20   open, also.

21   Q    And where's he proceeding to?

22   A    He's proceeding to this, this cut-up, packing area right

23   here.  Part of cut-up.  This is one of the wet cooler areas.

24   And so he's standing here talking to a fellow employee.

25   Q    What type of gloves is he putting on?

1    A    He's putting on, he's actually got two sets of gloves.  You

2    notice that he had those white cotton liners, those white cotton

3    gloves, which he's putting on right now.  And then he has on a

4    heavier rubber glove, which is basically a slighter version of a

5    freezer glove.

6         And I've timed both of those.  And if the sizes are

7    correct, the time disparities are nil between them and the

8    regular gloves.

9         The key thing is sizing.  He goes over and is talking to

10   somebody about his job assignment.

11   Q    The chickens are coming in on the bin right now, correct?

12   A    Yes.

13   Q    You can't tell from this as to whether, whether his time

14   has started, his time, or not, have you?

15   A    His time, according to Dr. Radwin, his time started when he

16   grabbed that bump cap.  In my system, Your Honor, I'm

17   classifying this as work, not donning, doffing, walking.

18   Q    And can you tell from this at what point did this

19   individual's paid time starts?

20   A    Paid time start?

21   Q    Paid time.  Can you tell from this when he started getting

22   paid?

23   A    No.

24   Q    Thank you, Doctor.  Do you know when Dr. Radwin stopped the

25   study?

1    A    I do, but one second.  Also notice that he hasn't finished

2    putting on his equipment and yet he's working.  He's already got

3    his work instructions.  And he's actually physically working and

4    he's doing his job or sub-tasks of it.  But yet the Radwin video

5    is still, still counting.

6         Put on the other white cotton liner and going to do some

7    more work.  Now he's going to don that second glove.  It's

8    obscured.  And we'll see it donned here when we see it come up.

9    It's on.

10   Q    Is this the place where Dr. Radwin stopped the clock?

11   A    I can't tell you the exact point, but I can tell you that

12   the video is 4 minutes and 33 seconds long.  And Dr. Radwin

13   reported 1.883 minutes.  And in my time accounting of this

14   video, I credited 1.35 minutes.  So on that time, Dr. Radwin and

15   I are much closer together.

16             THE COURT:  Okay.  I'm really confused by that.  And

17   perhaps, Dr. Davis, you can, you can elaborate.

18             Yes.  If you could resume the witness stand.

19             THE WITNESS:  Sir?  You asked me to elaborate on

20   something?

21             THE COURT:  Yes.  You said that the video we just

22   watched of the gentleman, that by your calculation and Dr.

23   Radwin's calculation, you were only two seconds apart.

24             THE WITNESS:  No.

25             THE COURT:  I misunderstood.

1          THE WITNESS:  Yes, sir.  We were 32 seconds apart.

2    Dr. Radwin reported 1.883 minutes.

3          THE COURT:  For donning and doffing?  For donning?

4          THE WITNESS:  For all.

5          THE COURT:  Donning and walking.

6          THE WITNESS:  Yeah.  Dr. Radwin lumps all activities.

7    An again, this is a, if I may, this is one of those four

8    elements that Dr. Radwin had.  This is a star of shift don

9    element.

10          THE COURT:  Right.

11          THE WITNESS:  So we would have don and walk and

12   possibly wash up or sanitize if they did that, which I don't

13   believe we saw this gentleman.

14          THE COURT:  Okay.  So we just watched, I believe, a 4

15   minute 50 seconds or 4 minute --

16          THE WITNESS:  4 minutes and 33 seconds, Your Honor.

17          THE COURT:  Okay.  So the plaintiffs are counting

18   1.33, not one point --

19          THE WITNESS:  1.883.  1.883 minutes.

20          THE COURT:  1.883.

21          THE WITNESS:  883.

22          THE COURT:  Which is how many seconds?

23          THE WITNESS:  Well, that would be --

24          THE COURT:  Whatever it is.  That's okay.  So 1.8

25   minutes.

1          THE WITNESS:  113, roughly.

2          THE COURT:  Okay.  So 1.8 minutes of that four minute

3   and whatever video the plaintiffs are crediting for beginning of

4   shifting, donning and walking, and sanitizing and so on.

5          THE WITNESS:  In this particular case, that's correct,

6   sir.

7          THE COURT:  Okay.  So you, your model on this guy --

8   well, you didn't actually measure anybody.

9          THE WITNESS:  Yes.  I didn't run the model on this

10  guy.

11         THE COURT:  So what is your model for what he's doing?

12         THE WITNESS:  I analyzed Dr. Radwin's tape, taking

13  account of my activities that I would count, which was the

14  donning and the walking and only the required items.

15         THE COURT:  Okay.

16         THE WITNESS:  And I came up with a time of 1.35

17  minutes, which is 81 seconds.

18         THE COURT:  So the difference is 81 second versus --

19         THE WITNESS:  Versus 113 seconds.  So I reported, I

20  would report to you that Dr. Radwin estimated, overestimated

21  that by 32 seconds.

22         THE COURT:  Okay.  Did you do that for all of them.

23         THE WITNESS:  No, sir.

24         THE COURT:  You didn't do that for all of them?

25         THE WITNESS:  No, sir.  I only did that for the three

1   that I showed you.

2              THE COURT:  I see.  Okay.  Thank you.

3              THE WITNESS:  But again, that takes a lot of work to

4   go through and watch these things on a micro level.

5              MR. STINE:  And we didn't think you wanted to sit

6   through 198 of them, for some reason, Your Honor.

7              THE COURT:  I understand fully.

8              MR. STINE:  May I proceed?

9              THE COURT:  Please.

10  BY MR. STINE:

11  Q    Now, I asked you to review Dr. Radwin's study and if you'd

12  had any criticism, did I not?

13  A    I provided --

14  Q    A report.

15  A    A report to you and Mr. Brown.  I'm sure that got to Your

16  Honor.

17  Q    It did.  And then you heard his testimony and indicated

18  that you solved some of your criticisms, correct?

19  A    That's correct.  After I heard Dr. Radwin's testimony, it

20  did clear some things up for me, although I have come to the

21  conclusion, as I'm sure you have, that Dr. Radwin sees things

22  from the opposite perspective that I do.  The basic way to say

23  this is I, as a work measurement, time study trained industrial

24  engineer, analyst, Dr. Radwin said, We don't want to include

25  non-value activities, and 1 100% support that.  And that's fair.

1        Therefore, if you have that kind of training and that

2    discipline, you tend to have what's called a bottoms-up

3    approach, meaning you start with zero and you add the things

4    that are required and, you know, these allowances, and be fair

5    about it.  And scientific.

6        Dr. Radwin has the approach that this is holistic and he's

7    going to start with everything and then exclude things.  And

8    that is not the work measurement time study approach.  That is

9    the human factors, ergonomics, engineering, biomedical approach.

10       And honestly, Judge, Dr. Radwin is very well respected in

11   his field as a biomedical, human factors, ergonomics engineer.

12   He's got a tremendous reputation.

13       I've seen some of Dr. Radwin's previous work and he's never

14   referenced to work measurement, time study documentation,

15   scientific material, with the exception of one time of what I've

16   seen.  Now, I clearly haven't seen everything that he's done

17   pertaining to donning and doffing and walking.

18       But that struck me odd.  And in one particular instance, he

19   went ahead and did that.  And if you see somebody that's more

20   classically trained in this area, we default on these texts and

21   peer reviewed literature.  And we have very similar approaches.

22       So I've gone to the literature.  And it clearly supports

23   this modular, build up, standard data system approach.  And

24   there is nothing there to support what Dr. Radwin did from a

25   scientific perspective.

1        I understand why he did it.  I clearly do not agree with

2    that approach.  And I would not do it that way.

3    Q    And more specifically, did you have any more specific

4    criticisms of the study?

5    A    Well, in reviewing other previous documents that Dr. Radwin

6    has either reported on or analyzed, critiqued from other

7    studies, Dr. Radwin has previously indicated that he, when he

8    conducted studies -- I want to be sure I got this correctly --

9    do you mind if I look back at this?

10                THE COURT:  Of course.

11   A    Because I think this is pretty important, sir.  Yeah.

12   Doctor, on this, there's basically three or four issues.

13   Determining employee identity and eligibility to be studied.

14       In Dr. Radwin's study, Chao versus Tyson Foods

15   Incorporated, after each employee was videotaped the

16   videographers asked an accompanying plant representative to

17   identify the employee who was videotaped by name, job title, and

18   line.  And that actually was one of my bigger criticisms, was to

19   find out, again, from the study perspective I do not want to

20   include people that are not paid by line time, to start with,

21   because they have no representation in the matter, meaning that,

22   like, for instance, maintenance folks.  Maintenance.  If it was

23   sanitation, if that might be the case, it's subcontracted out

24   now.  It's not appropriate from an empirical design,

25   experimental design perspective to include these classes of

1    folks because they are not germane to the matter.

2         And so what this tells me is that Dr. Radwin actually has

3    done this before, but in the Mountaire Farm matter he didn't do

4    it.  And without knowing that, I identified that.

5         So I don't understand why he would not have considered that

6    because he clearly knows how to did it because he's done it

7    before.  So that was one criticism I had.

8         Here's another one.  This is Chao versus Tyson Foods.  And

9    this is a Dr. Radwin study.  Employees who cannot be identified

10   by a master card number were excluded from this analysis.  But

11   he didn't do that for Mountaire Farms, either.  So on some of

12   his studies, he clearly says that if you're not a master card

13   person, I'm going to exclude you if I can't identify you.  But

14   on this study he didn't do that.

15        THE COURT:  I'm sorry.  In this context, what is a

16   master card person?

17        THE WITNESS:  Paid by line time.  Master card is the

18   card that the supervisor or manager swipes to, I guess it has a

19   special code to it.  So it starts everybody and stops everybody.

20        THE COURT:  I see.

21        THE WITNESS:  I'm sorry about that, sir.

22        THE COURT:  That's all right.  So again, just so that

23   I'm sure to understand.  Your point is that one criticism of the

24   randomized selection or the selection on a randomized basis of

25   individuals from whom to capture data is that you don't know who

1    those people are and whether they are actually paid by line

2    time?

3            THE WITNESS:  Correct.  And again, I don't want to

4    dredge up old items.  But from my perspective, there's many ways

5    to design studies, as you are certainly aware.  There is no

6    exact right or wrong way.  Every choice you make in this study

7    design and execution has plusses and minuses.  And hopefully,

8    it's the job of the experts in these cases to identify what

9    those plusses and minuses are.

10           But the fact that, that he has no idea who he studies

11   and whether they are involved in a class or not involved,

12   whether they are paid by master card, they're not paid by master

13   card, these are pretty big issues from being able to infer this

14   data.

15           And therefore, he doesn't even know, he doesn't know

16   what employee wears what equipment and whether it's optional,

17   required.  If they put on two pairs of gloves, he's included

18   that -- two pairs of cotton gloves, he's included that.  If they

19   put on, hypothetically, two hair nets, he's included that.

20           I am not here to tell anyone anything, Your Honor,

21   that people cannot put on what they want.  However, I do

22   believe, as a work measurement expert and industrial engineer

23   that the employer has a responsibility to protect its employees

24   and provide this equipment.  And therefore, they should pay to

25   put on required items and the amount of those.  If the employee

1    wants to put on more than that, so be it.  They put on anything

2    they want to wear as long as it's okay with company policy.

3         So the other thing that was of interest to me, too, is

4    that Dr. Radwin basically had -- let me see if I can find this

5    for you -- yes.

6         THE COURT:  Have you two been on opposite sides of

7    cases previously?

8         THE WITNESS:  No, sir.

9         THE COURT:  Okay.  Just curious.

10        THE WITNESS:  No.  Actually, Judge, I would like to

11   say on the record, and I told this to Mr. Brown, I have a very

12   high opinion of Dr. Radwin.

13        THE COURT:  No, you've said that.

14        THE WITNESS:  I have a very high opinion of Dr. Radwin

15   in his field.

16        THE COURT:  Okay.

17        THE WITNESS:  I do not have a high opinion of this

18   study.

19        THE COURT:  Okay.

20        THE WITNESS:  This is something else that's very

21   interesting to me.  So if we're talking about, I think that if

22   you read my report, one of my big criticisms was shooting out

23   this giant DVD, as we just saw, and not accounting for the time.

24   And I know, I heard Dr. Radwin say, Look, here's my trigger

25   point and this person goes in the cafeteria or the restroom and

DIRECT EXAMINATION OF DR. DAVIS                    117

1    I'm going to subtract that out, great, I can see that.

2            To be equitable in this, sir, all this non-value added

3    time hanging around because you come in early when that's when

4    you arrive, that's when you choose to, you want to have a cup of

5    coffee.  Again, people can do what they want to do.  But to

6    include that in a study, to say that this is quantifiable time

7    because you've hit some trigger -- I'm not an attorney, I have

8    no legal training whatsoever, but I cannot ascertain that that's

9    what any court meant, that we should count all this, this down

10   time.

11           THE COURT:  Well, but you do understand the concept of

12   the continuous work day?

13           THE WITNESS:  Oh, absolutely, sir.  And on the

14   parallel to that, respectfully, I also understand that people,

15   these are adults, as they said yesterday, these are grown

16   adults.  And I respect these individuals and they should have

17   the opportunity to do what they want and come and go as they

18   choose to see fit.

19           And because they want to drop something off in their

20   locker and then go sit in the lunch room twice because that's

21   what their normal routine is, and they touch a piece of PPE or

22   sanitation equipment, that does not make sense to me personally

23   that that starts the continuous work day, from a methodology

24   perspective in an accounting of time.

25           THE COURT:  Yeah.  But the law's not concerned at all

1    with methodology.

2              THE WITNESS:  I understand that.

3              THE COURT:  The law is designed to interpret statutes

4    and to create as much stability and predictability as possible.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  So certainly there is some tension between

7    the scientific methodology and the goal of the scientists on the

8    one hand, or the engineer, and the law on other.  But I take

9    your point.

10             THE WITNESS:  Yes, sir.  I can only tell you from my

11   perspective because I only know one-half of the story, sir.

12             THE COURT:  I understand.

13             THE WITNESS:  Just one, just two more quick things.

14             THE COURT:  Okay.

15             THE WITNESS:  Dr. Radwin, in Chao v. Tyson Foods, he

16   has said, analyzing the precise time of day that employees

17   started the initial donning process before a shift, when the

18   first principal act of acquiring or touching.  And then

19   analogously, for doffing, which is pretty much what he's doing

20   here.

21             But then in the same study, Chao v. Tyson Foods, he

22   goes on to say, and I quote:  "The time of day that the

23   employees punched in was compared to their paid start time and

24   their first principal activity.  The time of day that employees

25   punched out was compared against their paid end time and their

1    last doffing activity."

2           Now, that was what I would have expected in a Dr.

3    Radwin report.  Which is, the employee got to work, I started

4    videotaping.  They touched this and the continuous work day

5    starts, whatever the rule is.  And then they went in to the

6    cafeteria.  And he basically, he reports this stuff.

7           And in the sense of full disclosure to the Court,

8    here's when their shift starts, here's when they swiped it, and

9    give these accounting times.  And he did no such thing in

10   Mountaire Farms.  But he has done had in other studies.

11          And I cannot figure out for the life of me why he

12   would not include these things at this point when he not only

13   knows about them and is aware of them, but he's actually

14   included them in previous studies.  And the only way I knew this

15   was by searching for this and finding it.

16          THE COURT:  Okay.

17   BY MR. STINE:

18   Q    And finally, Dr. Davis, there were some criticisms of your

19   donning and doffing methodology, about not having the items wet.

20   What is your response to that, please?

21   A    My response to that particular comment was if you look at

22   the, at the classic times that employees don when they are off

23   the clock, they are donning in the morning when their equipment

24   is usually, most of them, in what I've observed for the most

25   part, sir, is they've don their gloves, swooshed their hand

1    through the sanitizing agent or under the water, and then they

2    go on to the final leg of their walk.

3        So for the most part, I'm sure there's exceptions, but for

4    the most part, based on my observations, their hands are dry

5    when they put them on in the morning unless they have, unless

6    they have sweaty hands or something, or they touch something in

7    cafeteria, or they're wet.

8        And the next time they would don in a non-compensated

9    perspective would be after lunch and they would be in a similar,

10   in a similar manner.  So that is if they, if they put their

11   gloves on and off out in the process area or for their break,

12   they're already on company time.  So I didn't see that as being

13   applicable.

14   Q    At this time, Your Honor, we would like to submit Dr. Gerry

15   Davis as an expert in time study.

16              THE COURT:  I don't believe there's any objection.

17              MR. BROWN:  No objection.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  Thank you, Dr. Davis.

20              MR. STINE:  And I believe that ends my direct

21   examination, Your Honor.

22              THE COURT:  Very well.

23              CROSS EXAMINATION

24   BY MR. BROWN:

25   Q    Dr. Davis, good afternoon.

1    A    Good afternoon, Mr. Brown.

2    Q    Let's talk first, if we may, about your walking study.  I

3    got confused, and I was sort of shuffling back and forth between

4    looking at this and looking at the maps and I think I lost

5    something.

6    A    I apologize.

7    Q    Would you please go through, I'm talking specifically about

8    the people over here at the receiving end, the more distant part

9    of the plant?  And what's their, would you go through their

10   journey one more time?

11   A    Absolutely.  And if I may flip back to my backup material,

12   I could give you the exacts.  Is that okay?

13   Q    No.  I just would like, where they start event, place of

14   significance by place of significance.

15   A    Okay.  For the back dock area.

16   Q    Yeah, they come in the regular --

17   A    Yes.  Okay.  So the employee would essentially park their

18   car in the parking lot, come up the bridge, over the highway,

19   come down, and go past the security office, and then come

20   through the main plant door, if that's what we want to call it.

21   And that's that long corridor that you're familiar with.

22        And then in the morning --

23   Q    Now, do they pick up any PPE at that place?

24   A    No, sir.  They do not.  In my experience with them, they do

25   not.  That PPE and sanitation items that they are required to

1    wear, and/or even the optional ones, once again is provided by

2    their supervisor en masse.

3         So the evening before, one of the folks, the employees that

4    works in the supply room --

5              THE COURT:  You're okay.

6    A    One of the folks who works in the supply room will, they

7    know who works back there and what sizes and what they need,

8    they will take all that stuff, put it in a big trash bag, and

9    they will drop it off at the security shack, shed, door, on the

10   way out in the morning.

11   Q    Where is the security shed?

12   A    The security --

13   Q    You walk in.

14   A    You walk in and --

15   Q    You walk in the front door.

16   A    If you're on ground level, as soon as you walk up the

17   stairs, you have to go through the security zone.  There's a

18   window on the right side.  And you have to sign in and all these

19   kind, be escorted or whatever the case might be.

20        The employees enter that same corridor but they come from

21   the bridge over the highway.  So they come and they walk down

22   and they arrive in the exact same area in front of the security

23   window.  And then they would enter that main plant door, if we

24   could call it that for common terminology.

25   Q    You were just referring to some PPE that was put in a bag?

CROSS EXAMINATION OF DR. DAVIS                                    123

1    A    Yes.  The supervisor, as I said, Mr. Brown, the supervisor

2    will grab that bag of, that lawn bag, trash bag full of PPE,

3    replacement items, and carry it back with him or her to the

4    receiving live hang, pinning, locker room, don/doff area.  Let

5    me just finish with you real quick.

6         Those employees then, what they'll do is, let's just start

7    them on the bridge.  They're over the highway.  They'll come

8    down the stairs, come past Security, show their badge.  They'll

9    go through the door and they'll walk down and past the lockers,

10   because they have lockers in the back.  They will take a right

11   and swipe on the time cards where we've seen.  And then they

12   will come back the same way, and then take a right and walk past

13   the supply room, which is not open at this point, because,

14   again, this is the first part of the processing chain.

15        They will leave that door on the back end.  And then they

16   will walk outside around the back to the access point, which is

17   the live hang receiving back, back dock area, locker room, where

18   they will join up with their PPE items and go through their

19   donning process and then go off to work.

20   Q    Okay.  Now, in your traffic test, I'm right, am I not, in

21   saying that you took no account of congested traffic, congested

22   pedestrian traffic that might be encountered by the one?  We saw

23   a lot of clusters of people on the films we saw yesterday and

24   today.

25   A    Right.  In our deposition, we discussed this briefly.  And

CROSS EXAMINATION OF DR. DAVIS

1    I told you that I did indeed notice that there is some

2    congestion at certain points, at certain times.  However, for

3    the most part, in my opinion, and I have a lot of observations

4    in this plant, the serial nature of the line that you can see

5    lends itself to there being traffic, for sure, meaning people

6    are not walking in isolation.  But the way they peel off the

7    line and fill the line based on the line speed, they are subject

8    to certain points of congestion for limited times at certain

9    points.

10         And I would say this, too.  It was my observation many

11   times that -- and I think we talked about this earlier -- the

12   further back in the plant you are, so let's just say Evis, for

13   instance, if we can, they not only have the Evis wash up area to

14   them, they have the Re-Hang wash up area.  They have the

15   Cone/Debone line wash up area.  And they actually walk past, if

16   I'm correct, Leg or Thigh Debone right there.

17         So these employees tend to look at targets of opportunity,

18   meaning that if -- because, let's face it, they want to get to

19   break.  I mean, that's the point here.

20         So if they see a line, they will go forward and move their

21   event forward.  And in my opinion, the way that the breaks

22   ripple through the plant based on the product, that's very

23   beneficial to this rather than a manufacturing plant.  Boom,

24   they blow the whistle, and everybody runs for the door at one

25   point.

CROSS EXAMINATION OF DR. DAVIS                     125

1    Q    To summarize, you did not, then, take into account

2    congested traffic, pedestrian traffic?

3    A    No, sir.  I did take it into account but I did not add an

4    allowance to it.  And the specific reason that I did not,

5    because my model was already conservative by a fairly

6    significant factor.  And so I felt that because my model

7    overestimates the time by a significant factor, that that was

8    indeed accounted for.

9        If I had not, you can rest assured that I would have added

10   another factor as an allowance.  And did I not feel that was

11   necessary.  But I did consider that specifically.

12   Q    Now, you also didn't consider, as I understand it, the

13   washing and sanitizing periods of time?

14   A    I did -- you are correct with washing, I did not.  Meaning

15   I did consider it but I did not study it.  Again, because I was

16   not asked to.  And so I did not study that, that portion of it.

17       The sanitizing, I did consider.  And it is of short nature,

18   as we just saw on these three videos, actually, which are Dr.

19   Radwin's own videos.  And my own observations of looking at not

20   only those three tapes but the other tapes plus, basically, two

21   weeks in that plant, the sanitizing, it's very hard to say that

22   they do not break stride and I would not say that.  I do not

23   believe that.

24       But they stop momentarily.  Sometimes they have to wait for

25   a matter of moments.  And as I said, they usually do what I

1    would term basically a dip and go, or something like this

2    (indicating).  And we've seen that in a number of videos over

3    the course of the week.

4    Q    Haven't we also seen some instances in which people are

5    waiting to get to the sanitizing line?

6    A    We have.  But I think that on the average, you can't look

7    at these in isolation, in -- that would be the same thing in

8    some matter of looking at the longest DVD and the shortest DVD

9    of anything.  And that's not the way that we look at things.

10        We look at things on means and with statistical competence

11   and accuracy.  So we're not, people in my field, we're not

12   extremists, meaning we're not putting a lot of credibility out

13   on these tails.  People, whatever that performance might be.

14   We're looking more for the, what the distribution looks like and

15   what that tells us from a statistical perspective.

16        So I do feel that I have accounted for that but I did not

17   account for washing.  You are correct.

18   Q    And you didn't account for boots, as I understand?

19   A    I did not account for boots, as I mentioned before.

20   Q    You brought in several tapes.  You reviewed several tapes.

21   We saw, three of which we saw just a few minutes ago.  How many

22   tapes did you review altogether, Dr. Radwin's tapes?  Or how

23   many clips, if that's the correct terminology?

24   A    I would say probably a dozen.  And that would be an

25   estimate.  But it's fairly close.

1    Q    One of the things that puzzled me, now shifting a bit to

2    your doffing and donning report.  How did you know in advance

3    the size that would be required of the individuals who came into

4    your room?

5    A    The size in respect to physical size or the amount of

6    employees that I needed to measure?

7    Q    How did you know that you needed a size eight glove as

8    opposed to a size six glove?

9    A    Oh, I'd ask them, sir.  And I would ask them to self-report

10   that, sir.  And I would show them, I didn't force anything on

11   anybody.  I would have every size of every item available to

12   them.  And I would ask them.  And they would pick it up and try

13   it on.  And they would be like, yes, that's good.  Or sometimes

14   people, self reporting is people report things --

15            THE COURT:  I'm sorry to interrupt.  Maybe I'm wrong.

16   But I think what Mr. Brown is asking, certainly, what I would

17   like to know is, all I've seen is you in that room and the woman

18   standing there and the stuff on table.

19            THE WITNESS:  Oh, that's because --

20            THE COURT:  So the question is, somebody walks in, how

21   do you know to reach behind you or wherever it came from to get

22   a size six rather than a six eight?

23            THE WITNESS:  Oh, no, sir.  Before we start --

24            THE COURT:  Is that what you were asking?

25            MR. BROWN:  Yes.

1          THE COURT:  Okay.  That's a part.

2          THE WITNESS:  I guess maybe we need to clarify this

3     for just a moment.  So apparently that, you entered that

4     midstream.  And I didn't videotape the putting on one item at a

5     time portion of the study.  I only videotaped the total don/doff

6     without stopping.

7          THE COURT:  So in other words, you had already

8     interacted with everyone appearing in that video quite a bit,

9     actually, because you timed --

10          THE WITNESS:  I timed --

11          THE COURT:  -- every item?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  So you were with these people for, what,

14     ten minutes, before you actually shot the video?

15          THE WITNESS:  Ten to twelve minutes would be probably

16     a, of depending on what they wear.  Some as small as five items

17     and some --

18          THE COURT:  You see, my point is, when I looked at it,

19     it looked like she walks in, you're sitting there at the table.

20          THE WITNESS:  Judge, no, sir.

21          THE COURT:  And you said, Hi, I'm Dr. Davis, put on

22     your stuff.  It didn't work that way?

23          THE WITNESS:  No.

24          THE COURT:  Okay.

25          THE WITNESS:  No, Your Honor.

1          THE COURT:  I should have known that.

2          THE WITNESS:  I'll give you the expedited version.

3          THE COURT:  You don't have to.  We want to get you on

4     your plane.  Go ahead, Mr. Brown.

5          THE WITNESS:  Yes, sir.

6     BY MR. BROWN:

7     Q    Now, you've discussed a few moments ago that you do

8     understand the continuous work day rule which, to summarize,

9     requires, the courts require you measure the first significant

10    event to the last, and include everything in the middle?

11    A    Sir, I didn't design my study by any rules or any, any

12    legal guidance or any motivation from anybody.  I designed my

13    study for the question that I was asked.  And the question that

14    I was asked, Your Honor, was, How much time does it take

15    Mountaire Farm employees to don and doff required items of

16    sanitation and personal protective equipment and to walk back

17    and forth among these various routes?

18         And that's the only question I was asked.  And I do not

19    consider those in any part of my study aspect.  Because, again,

20    I cannot sit here and tell you I know the continuous work day

21    rule, I understand it, or anything.

22         And so my study is not designed for these triggers.  My

23    study is designed to answer that question specifically, How much

24    time does it take to do with these things?  And then once I know

25    those times, which I feel that I do with statistical confidence

CROSS EXAMINATION OF DR. DAVIS                    130

1   and accuracy, if we have to account for other things, we can do

2   that through allowances, these factors that go across the board

3   at the end.  But the most important thing to me is to quantify

4   that time.  And that's what I did.

5            THE COURT:  And if you don't mind, Mr. Brown, just to

6   refresh my recollection.  For the time study, you started -- do

7   I get this right -- you started everybody from the center of the

8   locker room?

9            THE WITNESS:  Yes.  But there's two ways to walk,

10  Judge.  And so I --

11           THE COURT:  No.  I understand once you get to the

12  door, you can go that way.

13           THE WITNESS:  No.  Out of the locker room to the plant

14  door.

15           THE COURT:  Right.  Right.

16           THE WITNESS:  I measured --

17           THE COURT:  Right.  You can go that way around to

18  the --

19           THE WITNESS:  And I measured both ways and take the

20  mean.

21           THE COURT:  Right.  But in other words, you started

22  everybody from the center of the locker room?

23           THE WITNESS:  Absolutely.  Because that's the average

24  employee.

25           THE COURT:  Got it.  Okay.

CROSS EXAMINATION OF DR. DAVIS

1          THE WITNESS:  And I count all possible ways.

2          THE COURT:  Okay.  Go ahead, Mr. Brown.  Sorry to

3    interrupt.

4    BY MR. BROWN:

5    Q    One of the things we've seen here from the videos is that

6    workers often don't, or never do workers go to a table and have

7    their items pre-selected for them.  Instead, workers go to the

8    locker to get something.  They go to the store to get something.

9    They go to the, the rack that has smocks on them to get

10   something.  So it's an accumulation that takes a bit of time and

11   takes a bit of walking.

12        You didn't consider that in your doffing and donning

13   report, either, did you?

14   A    No, I would not agree with that.  Because if, if you look

15   at what Mr. Stine asked me, I went ahead and added all the times

16   from the time clock on.  So every employee, with the exception

17   of those back dock people, folks, and the weigh price label

18   folks, I have, I counted walking for them in my reported time to

19   you, Your Honor, from swiping the time clock, taking them to the

20   supply window.

21        THE COURT:  I don't think you're being responsive.

22   Maybe you didn't understand the question.

23   Q    You gave us two reports.  The walking report and the

24   doffing and donning report.  And the model that you've created

25   for your doffing and donning report was the table with the

1    various PPE on the table?

2    A    Right.

3    Q    And you measured how long it took to pick each up and put

4    it on?

5    A    Sure.  Yes, sir.

6    Q    That model is very different from the model reality that we

7    saw in the last couple of days, in which people don't have --

8    nowhere are you presented, except maybe at the apron rack or the

9    smock rack, but nowhere are you presented with something.  You

10   have to go get it.

11   A    And again, I would say to you that the way I designed that

12   study is any of that walking is accounted for at certain levels

13   in the walking part of the study.  So I guess I can't answer it

14   any differently than that.

15   Q    And I guess your model, also, if someone were to wear

16   something that was not required, that wouldn't be counted in

17   your doffing and donning study?

18   A    That's correct, Mr. Brown.  Only the required items from

19   that PPE matrix determined by the employer were included in my

20   calculations.

21   Q    So that, too, would be an exception to this continuous day

22   rule where you count everything that happened in the middle of

23   the day, would it not?

24   A    I don't know.  I personally don't understand how that would

25   be an exception when an item is not required.  I mean, if an

1    item is required, it should be measured and accounted for,

2    certainly.  I have absolutely -- and that's what I did.  But if

3    items are not required and hence optional, I --

4    Q    Maybe it's a legal issue.

5    A    Yeah.  I don't know where, where you segregate for that

6    from -- I mean, when are you supposed to stop measuring?  I've

7    seen people put on head bands because they want something under

8    their hair net.  Am I supposed to measure that and quantify

9    that?

10        Again, I'm not trying to be sarcastic.  Do you see what

11   we're faced with?  How do you know where to stop?  And so I rely

12   on guidance from the employer, following Department of Labor

13   rules and laws that says things.  And then I answer questions

14   that I'm asked and provide that information.

15   Q    Another question I have is, you indicated a little bit

16   earlier that you had some reservations about Dr. Radwin's report

17   but you have withdrawn your critical observations.  Could you

18   tell us what you've changed your mind on?

19   A    I don't know that, that I have withdrawn anything.  I would

20   not say that.  I would say that Dr. Radwin's testimony clearly

21   cleared up issues for me.  So those points that I discussed with

22   Judge Davis, I still am strongly in belief of.

23        But I have learned this week that probably experts need to

24   be a little more specific in their reports without being without

25   being verbose, especially when your work is going to be

1    critiqued, to be fair.  And so it was nice to be able to hear

2    Dr. Radwin's testimony.  And it did clear up some things in my

3    mind, for sure.

4    Q    One last question or two, Your Honor.  One of your

5    criticisms of a random study is that you are not always sure of

6    where you're going to end up, where the subject, who the subject

7    is, I guess, specifically.  Dr. Radwin testified yesterday, as

8    best I recall and as best I remember it, that he took out -- one

9    of your criticisms was it included non-production line,

10   non-hourly paid persons, namely the people called Delaware --

11   A    Support.

12   Q    Delaware support.  Dr. Radwin yesterday said that he took

13   those people out of his, he recalculated his study with them

14   out.  And it either was negligible or, indeed, took them out

15   helped the plaintiff's side.  Do you agree or disagree?

16   A    I didn't do the statistical analysis on that so I really

17   can't comment.  I don't know why Dr. Radwin just wouldn't have

18   said that.  If I understand Dr. Radwin's report correctly, and

19   maybe we should flip to it.

20   Q    Maybe I should ask yes or no questions.

21   A    In his activities -- just looking for that summary table.

22   I'm on Table One on Page Seven of Dr. Radwin's report, which is

23   the results.  And essentially, Dr. Radwin is trying to justify

24   the sampling proportion that he's taken.

25            THE COURT:  Give us the exhibit number, please,

1    somebody.

2    Q    17.  Page 7.

3         THE COURT:  Thank you.  Okay.  Go ahead, Dr. Davis.

4    A    Yes, sir.  Grab some water here.  All right.  All right.

5    Let me just read this.  A list of departments and corresponding

6    number of employees included in this study are provided in Table

7    One.  The number of employees in each department was based on

8    data from Mountaire Farms of Delaware for actual, on payroll,

9    effective this date.  In total, 14% of the employee payroll

10   population was included in the sample.

11        A plot of the proportion of departments represented in the

12   sample is provided in Figure One.

13        And then -- so Dr. Radwin has First Processing, Second

14   Processing, Deboning, Further Processing, Production Support,

15   and Delaware Support.  And then he has a footnote that says,

16   Delaware Support jobs only included maintenance, pallets and

17   live hang catching crew.  And these are the numbers that Dr.

18   Radwin is proposing or reports in his testimony.

19        And I say to you, Mr. Brown, that Dr. Radwin's analysis did

20   include people that were not paid by line time.  But yet Dr.

21   Radwin, as I mentioned earlier, specifically went to the trouble

22   in previous studies of making sure that they weren't included.

23        So I can't understand, when you know about this and you

24   exclude it previously, why would you include it this time?  I

25   can't answer that, except that's what I reported to you and

1    Judge Davis.

2    Q    Okay.  And we don't know, really, what happened in this

3    other case you've been talking about.  We don't really know the

4    details of this other case you're talking about, the Chao case?

5    A    We don't know the details, but I have quotes from Dr.

6    Radwin's work and I can give you line and page numbers that

7    specifically says what I mentioned to you.  And I have the

8    quotes if you would like them.

9    Q    Okay.  Thank you.  I have no further questions, Your Honor.

10              MR. STINE:  No further questions, Your Honor.

11              THE COURT:  Thank you very much, counsel.  Dr. Davis,

12   thank you very much, sir.

13              THE WITNESS:  Judge Davis, thank you very much for

14   your patience, and I enjoyed being here and spending time with

15   you, sir.

16              THE COURT:  Thank you very much.  Have a safe trip

17   home.  Mr. Stine?

18              MR. STINE:  Defense rests.

19              THE COURT:  Excellent.  I look forward to seeing you

20   gentlemen and ladies tomorrow morning.  I'm thinking neither

21   side will want more than an hour for closing argument.  Is that

22   a fairly safe assumption?

23              MR. BROWN:  No, that's fine.

24              THE COURT:  And I assume there's no rebuttal case from

25   the plaintiff?

1              MR. BROWN:  No, we have none.

2              THE COURT:  Okay.  All right.  So why don't we convene

3     at ten tomorrow?  And I look forward to hearing from counsel.

4     As I told you, I don't anticipate ruling orally or tomorrow, but

5     I'm sure I'll be aided immensely by your arguments and

6     marshalling of the evidence.

7              I'm not sure, frankly, I will have the time tonight to

8     look at those exhibits that I haven't really looked at.  But

9     I'll be happy to look at anything you want to direct my

10    attention to beyond what you already have tomorrow.

11             But I'm deeming everything in the exhibit books

12    admitted at this point.

13             MR. STINE:  Yes, Your Honor.

14             THE COURT:  Okay?  Thank you all very much.

15             (Conclusion of Proceedings at 4:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3                                                    PAGE

4      WITNESS: DR. GERARD DAVIS

5      DIRECT EXAMINATION BY MR. STINE              2

6      CROSS EXAMINATION BY MR. BROWN             120

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4     stenographically the proceedings in the matter of Perez, et al.,

5     v. Mountaire Farms, Inc., et al., Case Number(s) AMD-06-121, on

6     March 26, 2009.

7          I further certify that the foregoing pages constitute

8     the official transcript of proceedings as transcribed by me to

9     the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my signature

11    this _____ day of _____, 2009.

12

13

14

15                        _____

                          Mary M. Zajac,
16                        Official Court Reporter

17

18

19

20

21

22

23

24

25

**/**

**/KAL** [1] - 40:12

**0**

**0** [1] - 98:16
**0.38** [1] - 27:12
**037** [1] - 98:16
**0544** [1] - 102:7

**1**

**1** [8] - 98:20, 98:21, 98:22, 98:23, 98:25, 111:25
**1%** [3] - 34:22, 35:18, 73:17
**1.0** [1] - 48:3
**1.18** [1] - 76:23
**1.33** [1] - 109:18
**1.35** [2] - 108:14, 110:16
**1.5%** [1] - 69:1
**1.54%** [1] - 68:25
**1.7%** [1] - 37:6
**1.8** [2] - 109:24, 110:2
**1.883** [5] - 108:13, 109:2, 109:19, 109:20
**100** [2] - 27:13, 47:22
**100%** [1] - 111:25
**1007** [1] - 92:23
**101** [1] - 1:24
**103** [7] - 45:15, 45:17, 46:16, 47:13, 47:19, 47:20, 61:6
**105th** [1] - 79:24
**110** [4] - 70:23, 71:3, 79:22, 94:13
**113** [2] - 110:1, 110:19
**1172** [3] - 48:6, 48:10, 48:16
**1175** [1] - 48:11
**119.2** [1] - 85:19
**11:10** [1] - 2:1
**12** [2] - 93:9, 95:10
**120** [3] - 79:5, 95:5, 138:6
**1296** [12] - 23:25, 34:14, 35:21, 41:2, 48:7, 48:20, 60:12, 66:21, 68:21, 68:24, 68:25, 69:23
**13** [2] - 78:12, 98:21
**13.6** [1] - 83:8
**132.3** [1] - 86:1
**14** [6] - 30:14, 30:17, 31:20, 38:25, 40:1, 98:22

**14%** [2] - 37:18, 135:9
**15** [1] - 83:15
**1605** [2] - 92:23, 98:3
**1652** [1] - 98:3
**1653** [1] - 98:4
**16:04** [1] - 99:14
**16:05** [1] - 99:15
**16:52** [1] - 99:15
**16:53** [1] - 99:24
**17** [1] - 135:2
**17%** [1] - 78:8
**1709** [1] - 98:4
**1710** [1] - 98:4
**1726** [1] - 98:4
**1727** [1] - 97:22
**17:09** [1] - 99:16
**17:10** [1] - 99:18
**17:26** [1] - 99:18
**17:27** [1] - 99:19
**18%** [1] - 78:9
**186** [1] - 105:1
**188** [1] - 94:14
**19** [1] - 99:5
**19.1** [1] - 83:14
**1950's** [1] - 28:14
**198** [5] - 59:11, 59:15, 60:17, 69:4, 111:6
**1:10** [1] - 105:4
**1:15** [1] - 105:4
**1:58** [1] - 103:7

**2**

**2** [7] - 98:20, 98:23, 98:25, 99:1, 99:3, 138:5
**2.1** [2] - 39:24, 40:24
**2.15** [2] - 76:3, 76:23
**2.3** [1] - 83:2
**2.4** [2] - 83:10, 83:12
**2.5** [1] - 83:13
**2.9** [2] - 40:16, 40:25
**20** [20] - 10:7, 17:22, 30:15, 34:3, 34:4, 34:13, 36:9, 36:10, 37:4, 68:7, 68:14, 68:20, 68:24, 68:25, 70:5, 91:10, 99:7
**20.685** [1] - 94:2
**200** [3] - 19:4, 59:8, 69:3
**2009** [3] - 1:11, 139:6, 139:11
**201** [2] - 62:22, 62:25
**209** [3] - 33:25, 46:23, 51:5
**21.9** [1] - 85:10
**21201** [1] - 1:24
**22%** [2] - 73:18, 73:19
**2231** [1] - 98:8
**22:31** [1] - 99:19

**22:32** [1] - 99:20
**23:33** [1] - 100:1
**24** [1] - 99:20
**24:47** [1] - 99:20
**24:48** [1] - 99:22
**24:57** [1] - 99:22
**24:58** [1] - 99:22
**25:25** [1] - 99:22
**25:26** [1] - 99:24
**26** [2] - 1:11, 139:6
**26:32** [1] - 99:24
**26:48** [1] - 100:1
**273** [2] - 44:20, 100:13
**27:10** [1] - 100:3
**27:34** [1] - 100:3
**27:35** [1] - 100:4
**28** [5] - 65:14, 65:18, 93:22, 93:23, 105:13
**28:10** [1] - 100:4
**28:41** [1] - 100:5
**28:57** [2] - 100:5
**2:15** [2] - 65:1, 65:22
**2:49** [1] - 99:1

**3**

**3** [7] - 62:25, 98:21, 99:3, 99:5, 99:7
**3.0** [8] - 24:12, 27:13, 27:18, 28:10, 28:11, 28:19, 36:22, 83:16
**3.055555** [1] - 69:6
**3.1** [3] - 69:10, 83:7, 105:1
**3.2** [1] - 83:9
**3.3** [2] - 83:6, 83:10
**3.33** [1] - 76:24
**3.5** [1] - 83:18
**3.6** [1] - 83:8
**300** [2] - 60:13, 60:14
**31** [2] - 14:6, 25:12
**32** [3] - 14:17, 109:1, 110:21
**33** [2] - 98:22, 108:12, 109:16
**34** [7] - 14:2, 14:7, 14:8, 16:14, 16:18, 98:23, 98:25
**35** [11] - 6:17, 7:5, 7:7, 14:12, 14:13, 15:10, 15:13, 15:23, 15:24, 18:4, 99:1
**36** [8] - 13:25, 14:1, 14:12, 14:13, 15:19, 15:23, 15:25
**36830** [1] - 2:20
**37** [7] - 13:25, 14:1, 14:17, 15:22, 15:23, 15:25

**38** [3] - 47:21, 47:23, 98:17
**3883** [1] - 2:20
**3914** [1] - 47:23
**3:15** [1] - 65:23
**3:51** [1] - 99:9

**4**

**4** [5] - 99:9, 108:12, 109:14, 109:15, 109:16
**4.1** [1] - 83:4
**4.2** [1] - 83:7
**4.7** [3] - 81:11, 83:2, 83:3
**4.97** [1] - 94:14
**40** [3] - 64:17, 73:11, 73:20
**41** [1] - 98:17
**42** [1] - 98:18
**45** [1] - 65:20
**46** [2] - 30:20, 34:10
**48** [2] - 29:14, 29:18
**49** [1] - 37:3
**49.5** [1] - 85:10
**4:01** [1] - 99:10
**4:24** [1] - 99:10
**4:25** [1] - 99:11
**4:30** [1] - 137:15

**5**

**5.414** [1] - 104:25
**5.6** [1] - 83:3
**5.8** [1] - 83:16
**5.85** [1] - 48:21
**5.97** [1] - 48:22
**50** [5] - 47:25, 98:18, 99:3, 99:7, 109:15
**50%** [2] - 69:11, 69:15
**51** [1] - 98:20
**52** [2] - 14:15, 29:3
**5515** [1] - 1:23
**56** [1] - 41:12
**57** [1] - 93:23
**5:33** [1] - 10:2

**6**

**6** [1] - 99:3
**6.0** [1] - 48:22
**6.46** [1] - 41:3
**6.58** [1] - 41:6
**6.75** [1] - 34:18
**6.89** [1] - 36:5
**6:39** [1] - 99:11
**6:40** [2] - 90:4, 99:12

**7**

**7** [2] - 99:5, 135:2
**7%** [1] - 74:1
**7,000** [1] - 61:5
**7,576** [1] - 48:18
**7.0** [1] - 83:13
**7.2** [1] - 83:17
**7.4** [1] - 83:15
**7.7** [1] - 83:5
**7.8** [2] - 81:10, 83:14
**70** [2] - 78:6, 78:11
**71.4** [1] - 85:10
**77** [1] - 79:5
**77%** [4] - 78:5, 78:7, 78:19, 87:14

**8**

**8** [1] - 65:19
**8,748** [3] - 34:14, 48:14, 48:16
**8.9** [3] - 30:23, 31:7, 34:11
**800** [1] - 60:14
**81** [2] - 110:17, 110:18
**857** [5] - 33:4, 33:18, 39:10, 40:6, 41:10
**857-feet** [1] - 39:17
**883** [1] - 109:21

**9**

**90** [1] - 71:2
**90%** [1] - 70:23
**9:09** [1] - 99:12
**9:10** [1] - 99:13
**9:26** [1] - 99:13
**9:27** [1] - 99:14

**A**

**a.m** [1] - 2:1
**abbreviate** [1] - 80:3
**ability** [1] - 49:12
**able** [22] - 4:25, 5:24, 12:1, 16:25, 22:22, 23:25, 26:12, 27:19, 29:20, 32:7, 37:7, 46:23, 61:16, 70:19, 71:17, 79:18, 79:19, 81:23, 105:14, 115:13, 134:1
**absence** [1] - 10:22
**Absolutely** [15] - 20:8, 20:11, 21:9, 29:1, 31:8, 53:8, 54:10, 55:2, 56:20, 58:1, 72:21, 74:20,

96:18, 121:11, 130:23
**absolutely** [2] - 117:13, 133:2
**accelerating** [1] - 100:16
**accept** [2] - 57:16, 62:9
**accepted** [2] - 28:24, 32:10
**access** [2] - 38:16, 123:16
**accommodate** [2] - 24:16, 54:17
**accommodated** [1] - 26:7
**accommodations** [1] - 35:14
**accompanying** [1] - 113:16
**accomplish** [1] - 27:19
**accordance** [1] - 52:6
**according** [2] - 100:25, 107:15
**accordingly** [1] - 19:3
**account** [15] - 23:20, 28:5, 54:19, 77:12, 81:24, 82:21, 105:6, 110:13, 123:21, 125:1, 125:3, 126:17, 126:18, 126:19, 130:1
**accounted** [7] - 33:11, 47:15, 77:18, 125:8, 126:16, 132:12, 133:1
**accounting** [6] - 94:12, 104:25, 108:13, 116:23, 117:24, 119:9
**accumulation** [1] - 131:10
**accuracy** [3] - 54:23, 126:11, 130:1
**accurate** [6] - 32:10, 36:18, 50:15, 53:10, 81:9, 139:9
**acknowledge** [1] - 35:17
**acknowledged** [1] - 97:15
**acquaintance** [1] - 95:8
**acquiring** [1] - 118:18
**acronym** [1] - 30:5
**act** [4] - 54:1, 54:6, 106:17, 118:18
**Act** [1] - 52:6
**acted** [1] - 55:18
**activities** [5] - 25:24, 109:6, 110:13, 111:25, 134:21
**activity** [2] - 118:24, 119:1
**actual** [6] - 22:11, 49:19, 52:19, 54:14,

81:16, 135:8
**add** [19] - 27:20, 27:21, 32:8, 34:18, 47:24, 51:17, 51:20, 51:21, 54:16, 82:2, 84:9, 85:14, 85:21, 94:8, 94:15, 112:3, 125:3
**add-on** [3] - 51:20, 51:21
**added** [8] - 34:20, 35:16, 35:19, 82:4, 82:20, 117:2, 125:9, 131:15
**adding** [3] - 35:13, 81:14, 84:5
**addition** [1] - 28:17
**additional** [8] - 27:20, 27:22, 35:12, 45:21, 60:7, 78:2, 78:3, 96:1
**address** [4] - 2:14, 2:19, 4:25, 57:10
**addressed** [1] - 54:18
**addresses** [1] - 2:18
**adjustment** [3] - 41:15, 41:18, 42:11
**adjustments** [5] - 29:24, 30:1, 37:22, 63:24, 106:12
**admiration** [1] - 64:12
**admitted** [1] - 137:12
**adult** [1] - 21:5
**adults** [2] - 117:15, 117:16
**advance** [1] - 127:2
**advanced** [1] - 66:19
**advancement** [1] - 3:10
**affects** [1] - 48:6
**affixed** [1] - 139:10
**afraid** [1] - 88:17
**afternoon** [3] - 66:2, 120:25, 121:1
**age** [3] - 88:14, 88:15, 88:16
**agent** [1] - 120:1
**agents** [1] - 20:25
**aggregate** [2] - 41:4, 48:13
**aging** [1] - 88:25
**ago** [4] - 57:1, 78:18, 126:21, 129:7
**agree** [5] - 45:7, 82:20, 113:1, 131:14, 134:15
**ahead** [6] - 4:23, 8:6, 9:5, 17:24, 19:6, 19:10, 19:14, 23:20, 31:13, 31:16, 34:12, 36:12, 36:16, 36:20, 39:7, 48:16, 56:24, 67:13, 67:15, 87:18, 101:3, 112:19, 129:4, 131:2,

131:15, 135:3
**aid** [1] - 5:23
**aided** [1] - 137:5
**aisles** [1] - 104:18
**al** [2] - 139:4, 139:5
**AL** [2] - 1:5, 1:7
**Alabama** [1] - 2:20
**Albert** [1] - 2:10
**align** [1] - 29:8
**allocate** [1] - 30:9
**allocated** [1] - 73:19
**allowance** [7] - 30:8, 34:19, 35:11, 35:20, 35:24, 125:4, 125:10
**allowances** [10] - 34:19, 34:20, 35:12, 35:21, 41:3, 41:5, 48:22, 54:17, 112:4, 130:2
**allowed** [4] - 34:22, 35:11, 35:12, 57:14
**allows** [1] - 54:22
**allude** [1] - 24:7
**alluded** [2] - 51:7, 77:25
**alluding** [2] - 7:9, 8:17
**almost** [5] - 11:14, 37:18, 59:8, 61:14
**altered** [1] - 54:4
**altogether** [1] - 126:22
**AMD-06-121** [2] - 1:6, 139:5
**amount** [15] - 4:3, 11:20, 12:8, 20:6, 27:6, 27:15, 27:20, 34:15, 59:16, 89:23, 102:5, 115:25, 127:5
**amounts** [1] - 49:13
**analogously** [1] - 118:19
**analysis** [3] - 114:10, 134:16, 135:19
**analyst** [3] - 35:15, 53:22, 111:24
**analysts** [2] - 70:19, 70:24
**analyze** [1] - 52:23
**analyzed** [2] - 110:12, 113:6
**analyzing** [1] - 118:16
**Andre** [1] - 1:13
**answer** [15] - 22:22, 24:8, 39:4, 40:19, 49:1, 50:17, 52:24, 79:6, 91:5, 95:17, 129:23, 132:13, 133:13, 135:25
**answered** [2] - 49:3, 79:9
**anti** [1] - 52:1
**anti-cut** [1] - 52:1
**anticipate** [1] - 137:4
**anyway** [2] - 57:9, 91:6

apart [2] - 108:23, 109:1
**apologize** [3] - 14:24, 16:1, 121:6
**Appearances** [1] - 1:15
**appearing** [1] - 128:8
**appendices** [1] - 13:24
**applicable** [2] - 21:25, 120:13
**applications** [1] - 50:12
**applied** [2] - 35:21, 35:24
**apply** [5] - 29:11, 41:3, 46:25, 52:22, 53:17
**appreciate** [2] - 70:4, 95:4
**approach** [6] - 5:8, 32:6, 112:3, 112:6, 112:8, 112:9, 112:23, 113:2
**approached** [1] - 36:10
**approaches** [1] - 112:21
**appropriate** [3] - 4:14, 70:19, 113:24
**approximation** [1] - 24:18
**apron** [18] - 44:24, 51:18, 83:15, 85:12, 85:14, 92:9, 92:11, 92:13, 98:3, 99:6, 99:16, 99:23, 100:3, 100:18, 103:6, 103:12, 103:14, 132:8
**aprons** [1] - 43:9, 43:11, 45:1, 55:10, 67:5, 67:11
**apropos** [1] - 91:6
**archive** [1] - 4:24
**archived** [1] - 84:24
**area** [49] - 7:23, 7:24, 8:9, 8:12, 8:16, 8:17, 8:18, 8:19, 8:21, 9:9, 9:23, 9:24, 9:25, 11:17, 11:20, 11:24, 12:13, 18:6, 18:12, 23:2, 23:11, 23:14, 23:18, 23:19, 24:20, 25:18, 25:20, 33:9, 33:10, 35:22, 38:7, 38:10, 42:23, 43:12, 43:14, 59:17, 62:5, 100:6, 106:22, 112:20, 120:11, 121:15, 122:22, 123:4, 123:17, 124:13, 124:14, 124:15
**areas** [12] - 8:6, 8:16, 11:1, 11:2, 12:9, 20:21, 23:15, 24:20, 28:2, 34:4, 67:11, 106:23
**arguably** [1] - 91:17
**arguing** [1] - 64:21

argument [3] - 57:12, 61:7, 136:21
**arguments** [1] - 137:5
**arm** [6] - 52:3, 55:11, 69:25, 79:11, 81:21, 83:10
**armload** [1] - 55:6
**arranged** [1] - 63:21
**arrive** [2] - 101:4, 117:4, 122:22
**arrived** [2] - 93:20, 101:20, 101:21
**arrives** [2] - 93:25, 100:5
**ascertain** [7] - 12:20, 17:1, 17:2, 35:19, 71:5, 88:8, 117:8
**aside** [2] - 88:4, 102:19
**asides** [2] - 88:3, 98:19
**aspect** [3] - 94:5, 95:20, 129:19
**aspects** [2] - 5:16, 5:17
**assign** [2] - 24:14, 27:12
**assigned** [1] - 30:20
**assignment** [1] - 107:10
**Assistant** [1] - 2:22
**Associate** [1] - 3:10
**associated** [5] - 6:13, 10:12, 40:7, 40:20, 41:11
**associates** [1] - 54:3
**assorted** [2] - 4:5, 55:10
**assume** [2] - 68:6, 136:24
**Assume** [1] - 68:14
**assumes** [1] - 43:19
**Assuming** [1] - 68:12
**assuming** [3] - 43:5, 68:20, 91:10
**assumption** [2] - 21:5, 136:22
**assured** [1] - 125:9
**attach** [1] - 25:10
**attached** [2] - 13:23, 15:10
**attachment** [1] - 31:20
**attendants** [1] - 40:12
**attention** [1] - 137:10
**attorney** [1] - 117:7
**attorneys** [1] - 4:17
**Auburn** [4] - 2:20, 2:23, 3:5, 3:7
**available** [6] - 21:19, 21:20, 55:14, 61:13, 93:14, 127:11
**Average** [1] - 34:11
**average** [27] - 7:13, 22:25, 24:12, 24:19,

26:20, 27:3, 27:18, 28:7, 30:23, 32:16, 34:18, 34:21, 36:4, 37:18, 40:15, 41:2, 41:6, 48:4, 64:17, 72:4, 73:20, 76:1, 76:2, 77:1, 105:3, 126:6, 130:23
**averages** [2] - 75:24, 75:25
**awarding** [1] - 3:10
**aware** [4] - 56:11, 73:23, 115:5, 119:13

## B

**Bachelor** [1] - 3:2
**back-up** [1] - 40:11
**background** [3] - 3:1, 50:14, 101:9
**backup** [3] - 13:24, 42:1, 121:11
**bad** [1] - 94:21
**badge** [1] - 123:8
**bag** [7] - 9:14, 9:20, 122:8, 122:25, 123:2
**balance** [3] - 67:1, 78:1, 79:18
**ballpark** [1] - 61:10
**Baltimore** [2] - 1:11, 1:24
**bands** [1] - 133:7
**base** [3] - 31:23, 54:15, 74:5
**based** [12] - 30:21, 30:24, 55:4, 66:22, 69:6, 70:24, 70:25, 120:4, 124:7, 124:22, 135:7
**basic** [6] - 51:6, 51:13, 51:17, 56:12, 79:13, 111:22
**basics** [3] - 51:9, 51:19, 66:19
**basis** [4] - 36:23, 48:20, 75:15, 114:24
**bath** [3] - 23:18, 44:21, 45:2, 47:15, 100:9
**baths** [4] - 42:23, 44:4, 44:6, 44:16
**beard** [3] - 79:11, 83:13, 105:23
**beats** [1] - 95:10
**begin** [2] - 2:8, 5:10
**beginning** [5] - 39:10, 41:21, 76:5, 76:10, 110:3
**Behalf** [2] - 1:16, 1:18
**behavior** [2] - 54:4, 106:18
**behind** [1] - 127:21
**belief** [1] - 133:22

**bench** [2] - 28:12, 32:13
**Bench** [1] - 1:10
**benchmark** [5] - 24:11, 27:12, 28:15, 28:16, 36:3
**benchmarks** [5] - 28:25, 29:2, 29:19, 70:17, 71:1
**beneficial** [1] - 124:23
**best** [8] - 44:10, 58:22, 87:4, 88:8, 90:23, 134:8
**bet** [1] - 95:9
**better** [1] - 59:12
**between** [14] - 4:5, 11:8, 11:11, 20:18, 21:23, 43:9, 46:17, 49:13, 69:21, 71:2, 95:15, 107:7, 118:6, 121:3
**beyond** [1] - 137:10
**bias** [1] - 62:8
**biased** [1] - 62:2
**big** [7] - 11:10, 23:11, 55:23, 62:17, 115:13, 116:22, 122:8
**bigger** [1] - 113:18
**bin** [4] - 89:11, 89:12, 89:13, 107:11
**biomedical** [2] - 112:9, 112:11
**bird** [1] - 101:5
**birds** [1] - 101:14
**bit** [14] - 33:19, 35:17, 54:25, 60:21, 62:2, 66:6, 66:7, 89:6, 93:16, 127:1, 128:8, 131:10, 131:11, 133:15
**block** [2] - 18:11, 51:20
**blocks** [2] - 53:8, 66:16
**blood** [1] - 28:3
**blow** [7] - 5:25, 6:2, 6:16, 8:3, 8:5, 18:12, 124:24
**blow-up** [2] - 6:2, 8:3
**blow-ups** [2] - 5:25, 6:16, 8:5
**blown** [2] - 6:8, 6:14
**blown-up** [2] - 6:8, 6:14
**board** [2] - 29:4, 130:2
**book** [7] - 6:25, 14:1, 14:2, 14:7, 14:8, 31:11, 31:12
**books** [1] - 137:11
**Boom** [1] - 124:23
**boot** [2] - 35:11, 94:9
**booths** [1] - 98:23
**boots** [28] - 35:18, 51:12, 78:7, 78:20, 86:17, 86:18, 86:23, 87:5, 87:12, 87:13, 87:14, 88:13, 98:23,

102:21, 103:17, 103:21, 103:24, 103:25, 104:1, 104:6, 104:20, 105:22, 106:2, 106:3, 106:4, 126:18, 126:19
**bottom** [2] - 8:20, 18:8
**bottoms** [1] - 112:2
**bottoms-up** [1] - 112:2
**bounce** [1] - 71:2
**bound** [1] - 15:7
**boundaries** [3] - 13:8, 13:17, 17:3
**bounds** [1] - 70:22
**boxes** [1] - 55:6
**break** [25] - 4:5, 9:9, 9:14, 9:25, 23:1, 26:3, 26:5, 28:4, 33:13, 33:16, 36:12, 36:15, 38:1, 38:2, 45:15, 46:18, 47:7, 47:10, 53:25, 57:9, 65:6, 84:14, 120:11, 124:19, 125:22
**Break** [1] - 33:13
**breakdown** [2] - 13:3, 18:3, 98:10
**breaking** [1] - 47:16
**breaks** [2] - 9:14, 124:21
**bridge** [3] - 121:18, 122:21, 123:7
**bridges** [1] - 20:19
**briefly** [2] - 80:23, 123:25
**bring** [1] - 93:16
**broke** [3] - 17:14, 34:3, 98:12
**broken** [1] - 89:25
**brought** [3] - 71:12, 97:3, 126:20
**Brown** [23] - 1:17, 22:16, 43:1, 45:4, 56:21, 57:11, 60:3, 64:21, 71:21, 75:8, 82:15, 92:9, 93:4, 111:15, 116:11, 121:1, 123:1, 127:16, 129:4, 130:5, 131:2, 132:18, 135:19
**BROWN** [35] - 3:14, 22:18, 31:19, 31:24, 38:23, 42:2, 43:2, 43:4, 43:18, 43:22, 43:24, 44:3, 44:6, 45:6, 45:9, 49:21, 50:1, 84:13, 92:8, 92:21, 93:2, 95:11, 95:14, 96:15, 100:20, 100:24, 101:19, 120:17, 120:24, 127:25, 129:6, 131:4, 136:23, 137:1, 138:6
**Brown's** [3] - 60:4,

65:23, 93:19
**brunt** [2] - 10:7, 10:8
**build** [2] - 66:14, 112:23
**building** [2] - 11:6, 53:8
**built** [1] - 28:2
**bulk** [1] - 11:15
**Bump** [1] - 85:3
**bump** [20] - 51:13, 55:10, 78:10, 83:16, 83:25, 84:22, 85:4, 85:12, 88:3, 88:4, 88:5, 98:19, 98:21, 99:2, 102:16, 106:6, 106:9, 107:16
**button** [2] - 83:14, 85:8
**button-up** [1] - 85:8
**buy** [1] - 104:3
**BY** [31] - 2:13, 3:16, 16:24, 17:17, 25:3, 26:23, 29:23, 32:11, 39:19, 42:7, 45:10, 50:6, 66:3, 75:13, 80:16, 82:24, 84:18, 87:19, 89:10, 92:2, 97:24, 101:2, 101:23, 105:8, 111:10, 119:17, 120:24, 129:6, 131:4, 138:5, 138:6

## C

**cafeteria** [18] - 45:15, 89:8, 90:5, 90:9, 90:10, 90:16, 92:19, 97:21, 98:5, 98:10, 99:11, 99:12, 99:18, 99:19, 102:17, 116:25, 119:6, 120:7
**Cagles** [1] - 74:14
**calculate** [3] - 20:5, 21:10, 27:10
**calculated** [4] - 40:24, 42:11, 42:12, 48:17
**calculation** [6] - 46:1, 46:3, 46:6, 46:12, 108:22, 108:23
**calculations** [1] - 132:20
**CAMA** [2] - 103:4, 105:19
**CAMA-D20080318T 080344** [1] - 105:19
**CAMA-D20080320T 54350** [1] - 103:4
**CAMC** [1] - 105:15
**CAMC-D20080318T 054444** [1] - 105:15
**camcorder** [1] - 97:17
**camera** [1] - 104:14

**cameras** [1] - 97:12
**candid** [1] - 53:25
**cannot** [6] - 47:16, 114:9, 115:21, 117:8, 119:11, 129:20
**cap** [19] - 51:13, 78:10, 83:16, 83:25, 84:22, 85:3, 85:4, 85:12, 88:3, 88:4, 88:5, 98:19, 98:21, 99:2, 102:16, 106:6, 106:9, 107:16
**capability** [1] - 77:8
**caps** [2] - 55:10, 95:16
**capture** [1] - 114:25
**captured** [1] - 54:23
**car** [1] - 121:18
**card** [9] - 29:11, 38:7, 114:10, 114:12, 114:16, 114:17, 114:18, 115:12, 115:13
**cards** [4] - 29:3, 29:14, 29:18, 123:11
**care** [2] - 21:6, 22:21
**careful** [1] - 67:5
**Carolina** [1] - 3:3
**carried** [1] - 87:13
**carry** [1] - 123:3
**carrying** [4] - 7:20, 89:3, 92:15, 99:8
**case** [36] - 4:20, 6:6, 13:18, 17:20, 18:15, 18:20, 23:6, 26:14, 33:4, 35:22, 39:9, 39:14, 56:23, 57:3, 57:5, 57:6, 57:18, 61:20, 62:25, 66:17, 71:25, 74:14, 74:18, 77:9, 77:11, 91:9, 94:23, 97:4, 102:10, 110:5, 113:23, 122:19, 136:3, 136:4, 136:24
**Case** [1] - 139:5
**CASE** [1] - 1:6
**cases** [2] - 115:8, 116:7
**catching** [1] - 135:17
**categories** [3] - 61:12, 79:13, 90:1
**categorize** [1] - 4:23, 25:23
**cell** [1] - 40:23
**center** [7] - 10:23, 11:6, 22:24, 23:21, 25:21, 130:7, 130:22
**central** [2] - 11:17, 23:14
**certain** [18] - 20:21, 20:22, 24:15, 28:1, 31:1, 31:4, 43:19, 61:12, 61:17, 62:3, 72:15, 82:7, 83:20, 124:2, 124:8, 132:12

**Certainly** [2] - 80:19, 87:25
**certainly** [11] - 12:8, 12:18, 21:5, 57:3, 57:5, 78:19, 84:15, 115:5, 118:6, 127:16, 133:2
**Certainty** [1] - 34:8
**CERTIFICATE** [1] - 139:1
**certified** [1] - 30:5
**certify** [2] - 139:3, 139:7
**chain** [9] - 52:2, 55:9, 80:8, 80:9, 80:12, 83:5, 85:24, 123:14
**chance** [3] - 58:24, 63:1, 71:14
**change** [5] - 32:9, 38:25, 41:4, 41:5, 46:24
**changed** [4] - 39:3, 41:1, 41:14, 133:18
**changes** [2] - 40:22, 40:23
**channel** [1] - 28:3
**Chao** [5] - 113:14, 114:8, 118:15, 118:21, 136:4
**characteristic** [3] - 67:4, 69:2, 69:7
**characterize** [3] - 12:17, 49:13, 78:14
**characterized** [1] - 33:2
**charged** [2] - 23:23, 91:15
**chart** [3] - 16:15, 18:4, 81:12
**chart's** [1] - 81:13
**charts** [3] - 15:2, 15:15, 31:25
**Cheaper** [1] - 5:7
**check** [1] - 106:3
**checked** [2] - 62:14, 62:24
**chew** [1] - 77:8
**chicken** [1] - 11:22
**chickens** [1] - 107:11
**chirps** [1] - 56:10
**choice** [1] - 115:6
**choose** [3] - 57:15, 117:4, 117:18
**chose** [1] - 79:6
**Christopher** [1] - 1:17
**chronological** [1] - 53:14
**circumstances** [2] - 52:22, 54:14
**citation** [1] - 105:14
**CIVIL** [1] - 1:6
**clarification** [2] - 40:9, 76:20
**clarify** [5] - 42:25, 50:2,

55:8, 60:20, 128:2
**class** [9] - 57:2, 60:13, 61:18, 64:6, 64:7, 64:16, 70:6, 91:11, 115:11
**classes** [1] - 113:25
**classic** [3] - 28:12, 61:14, 119:22
**classical** [1] - 28:15
**classically** [2] - 5:7, 112:20
**classifying** [1] - 107:17
**Claxton** [1] - 74:14
**clean** [4] - 8:11, 21:7, 67:19, 71:14
**clear** [10] - 31:2, 31:4, 34:2, 43:3, 74:9, 79:9, 94:8, 94:11, 111:20, 134:2
**cleared** [1] - 133:21
**clearly** [15] - 21:24, 54:10, 55:24, 63:2, 63:5, 76:11, 103:20, 104:7, 112:16, 112:22, 113:1, 114:6, 114:12, 133:20
**Clearly** [2] - 63:6, 104:8
**CLERK** [5] - 2:6, 2:8, 13:25, 14:17, 15:4, 15:10, 15:20, 15:23, 15:25
**click** [2] - 56:9, 85:14
**climbing** [2] - 22:7, 101:15
**clip** [2] - 105:13, 105:19
**clips** [1] - 126:23
**clock** [21] - 9:4, 10:11, 23:8, 25:16, 32:21, 33:3, 33:17, 38:1, 38:6, 39:21, 43:24, 45:22, 88:13, 89:3, 99:8, 99:9, 103:8, 108:10, 119:23, 131:16, 131:19
**clocks** [2] - 23:15, 32:20
**close** [5] - 55:14, 55:15, 79:21, 126:25
**closed** [1] - 10:2
**closer** [2] - 93:16, 108:15
**closest** [1] - 67:6
**closing** [2] - 57:12, 136:21
**Cloth** [1] - 85:8
**clothing** [1] - 86:20
**clusters** [1] - 123:23
**code** [3] - 19:5, 40:19, 114:19
**codes** [1] - 19:3
**coffee** [1] - 117:5
**cognizant** [1] - 47:17
**colleagues** [1] - 96:7

**collect** [1] - 4:15
**collected** [2] - 36:6, 50:3
**collecting** [1] - 96:19
**collection** [1] - 12:25
**College** [1] - 2:23
**colloquy** [1] - 91:6
**color** [4] - 8:16, 10:21, 10:22, 95:19
**combination** [4] - 73:14, 73:21, 85:9, 85:20
**combinations** [10] - 4:25, 52:14, 55:22, 60:24, 62:3, 65:6, 66:14, 76:3, 84:21, 95:19
**comfortable** [3] - 5:17, 35:8, 71:18
**Coming** [1] - 26:2
**coming** [8] - 7:25, 24:6, 45:5, 90:9, 92:3, 101:15, 102:3, 107:11
**comment** [1] - 119:21, 134:17
**comments** [1] - 58:10
**common** [8] - 21:5, 24:1, 25:6, 32:4, 36:13, 45:13, 50:25, 122:24
**company** [15] - 4:17, 9:15, 17:3, 26:10, 47:11, 52:21, 57:20, 61:3, 63:21, 76:1, 80:1, 103:17, 103:24, 116:2, 120:12
**compare** [2] - 37:13, 71:1
**compared** [6] - 21:7, 37:5, 73:13, 74:5, 118:23, 118:25
**comparison** [2] - 102:10, 102:12
**compensated** [1] - 120:8
**competence** [1] - 126:10
**compilation** [1] - 4:22
**complementary** [1] - 50:12
**complete** [3] - 6:14, 101:22, 139:9
**compliance** [1] - 103:22
**components** [1] - 31:6
**compose** [1] - 72:7
**computer** [5] - 5:23, 38:16, 38:19, 84:2, 84:3
**concentration** [1] - 11:20
**concept** [4] - 5:5, 27:10, 77:4, 117:11
**concerned** [2] - 34:24, 117:25

**Conclusion** [1] - 137:15
**conclusion** [1] - 111:21
**concur** [1] - 32:5
**condition** [3] - 20:24, 20:25, 23:24
**conditions** [3] - 24:4, 27:7, 37:8
**conduct** [6] - 3:20, 3:25, 50:15, 53:10, 70:14, 70:15
**conducted** [5] - 4:1, 36:8, 74:24, 74:25, 113:8
**Cone** [1] - 11:10
**Cone/Debone** [2] - 11:3, 11:8, 124:15
**confidence** [2] - 54:22, 129:25
**confident** [2] - 24:11, 27:3
**confounding** [3] - 50:24, 52:17, 61:1
**confused** [4] - 44:7, 72:1, 82:7, 108:16, 121:3
**congested** [3] - 123:21, 125:2
**congestion** [2] - 124:2, 124:8
**Congratulations** [2] - 3:12, 3:14
**conservative** [9] - 23:21, 28:20, 37:19, 74:1, 77:16, 77:17, 77:19, 125:5
**consider** [7] - 64:22, 125:11, 125:12, 125:15, 125:17, 129:19, 131:12
**considerable** [1] - 22:8
**consideration** [1] - 53:18
**considered** [1] - 114:5
**consistency** [1] - 37:1
**consistent** [3] - 36:22, 37:7, 74:19
**constant** [2] - 47:21, 82:4
**constitute** [1] - 139:7
**contained** [3] - 15:22, 40:1
**containing** [1] - 24:20
**contesting** [1] - 93:20
**context** [10] - 7:12, 25:20, 25:23, 51:25, 53:3, 77:9, 89:19, 94:7, 100:15, 114:15
**continue** [3] - 34:9, 37:11, 103:12
**continuous** [6] - 117:12, 117:23, 119:4, 129:8, 129:20, 132:21
**contributed** [1] - 94:2

**control** [11] - 29:6, 36:22, 53:5, 53:20, 58:8, 58:15, 73:5, 81:18, 88:14, 88:15, 88:16
**controlled** [1] - 52:22
**controls** [2] - 54:21, 80:4
**controversy** [1] - 104:10
**convene** [1] - 137:2
**convenient** [2] - 67:7, 104:2
**conveniently** [1] - 13:17
**Conversely** [1] - 12:22
**conversion** [2] - 27:16
**cooler** [1] - 106:23
**coolers** [3] - 12:6, 12:10, 12:12
**Coolers** [1] - 12:12
**copy** [4] - 14:3, 82:10, 82:12, 82:13
**core** [3] - 11:17, 53:8, 54:20
**corner** [3] - 12:4, 12:5, 38:22
**correct** [42] - 8:1, 8:22, 11:12, 36:18, 37:4, 38:3, 38:10, 38:11, 38:13, 42:14, 42:23, 42:24, 45:16, 45:18, 45:19, 45:24, 45:25, 49:8, 49:9, 55:3, 68:23, 82:3, 83:21, 86:8, 86:12, 88:9, 96:14, 100:13, 102:24, 102:25, 104:12, 107:7, 107:11, 110:5, 111:18, 111:19, 124:16, 125:14, 126:17, 126:23, 132:18
**Correct** [2] - 44:1, 115:3
**correctly** [3] - 38:5, 113:8, 134:18
**corresponding** [1] - 135:5
**corridor** [8] - 7:19, 9:4, 21:24, 23:5, 32:21, 121:21, 122:20
**costs** [1] - 80:1
**cotton** [7] - 87:10, 87:11, 100:22, 107:2, 108:6, 115:18
**counsel** [8] - 42:2, 65:25, 81:12, 81:14, 82:7, 87:23, 136:11, 137:3
**Counsel** [1] - 2:2
**count** [6] - 27:24, 100:24, 110:13, 117:9, 131:1, 132:22
**counted** [2] - 131:18,

132:16
**counting** [3] - 94:12, 108:5, 109:17
**couple** [2] - 30:19, 132:7
**course** [9] - 27:4, 39:12, 74:21, 84:10, 88:23, 97:14, 113:10, 126:3
**Court** [12] - 2:20, 3:21, 4:17, 32:3, 43:10, 43:16, 49:1, 58:23, 62:22, 80:22, 119:7, 139:16
**court** [1] - 117:9
**COURT** [219] - 1:1, 2:2, 2:16, 6:22, 6:24, 13:20, 14:1, 14:4, 14:7, 14:10, 14:13, 14:18, 14:25, 15:8, 15:13, 15:15, 15:17, 15:19, 16:7, 16:10, 16:18, 16:20, 16:23, 17:6, 17:13, 17:16, 18:7, 18:22, 20:2, 20:5, 20:9, 20:12, 21:4, 21:10, 21:15, 22:15, 24:3, 26:21, 28:23, 29:11, 29:14, 29:22, 31:10, 31:13, 31:16, 42:4, 42:6, 42:9, 43:1, 44:7, 44:11, 44:18, 44:23, 45:3, 54:8, 56:19, 56:21, 58:2, 58:5, 58:9, 58:13, 58:16, 58:18, 59:11, 60:3, 60:12, 60:22, 60:25, 61:22, 61:24, 62:16, 62:20, 63:5, 63:10, 63:13, 63:19, 63:23, 64:10, 65:8, 65:12, 65:16, 65:22, 66:2, 70:2, 70:9, 72:13, 72:18, 72:22, 73:7, 73:10, 74:9, 74:18, 75:2, 78:16, 78:19, 78:22, 78:24, 79:4, 82:10, 82:13, 82:18, 84:5, 84:9, 84:15, 86:16, 86:25, 87:8, 87:12, 87:16, 87:18, 87:25, 88:14, 88:17, 88:20, 88:23, 89:8, 90:18, 90:22, 90:25, 91:4, 91:13, 91:19, 91:22, 91:25, 92:6, 92:13, 93:3, 93:11, 93:18, 94:18, 95:4, 95:7, 95:13, 95:15, 95:22, 96:4, 96:6, 96:12, 96:17, 96:22, 97:7, 97:10, 97:14, 97:19, 103:16, 103:20, 104:3, 104:8, 104:15, 104:22, 108:16, 108:21, 108:25,

109:3, 109:5, 109:10, 109:14, 109:17, 109:20, 109:22, 109:24, 110:2, 110:7, 110:11, 110:15, 110:18, 110:22, 110:24, 111:2, 111:7, 111:9, 113:10, 114:15, 114:20, 114:22, 116:6, 116:9, 116:13, 116:16, 116:19, 117:11, 117:25, 118:3, 118:6, 118:12, 118:14, 119:16, 120:16, 120:19, 120:22, 122:5, 127:15, 127:20, 127:24, 128:1, 128:7, 128:11, 128:13, 128:18, 128:21, 128:24, 129:1, 129:3, 130:5, 130:11, 130:15, 130:17, 130:21, 130:25, 131:2, 131:21, 134:25, 135:3, 136:11, 136:16, 136:19, 136:24, 137:2, 137:14
**courteous** [1] - 96:7
**courtesy** [1] - 97:20
**Courthouse** [1] - 1:23
**courts** [2] - 43:8, 129:9
**covered** [1] - 48:14
**crazy** [1] - 57:19
**create** [1] - 118:4
**created** [2] - 25:10, 131:24
**creating** [1] - 17:4
**credentials** [1] - 2:25
**credibility** [1] - 126:12
**credit** [3] - 58:14, 77:13, 77:14
**credited** [1] - 108:14
**crediting** [1] - 110:3
**Crest** [1] - 2:20
**crew** [1] - 135:17
**criteria** [1] - 19:20
**critical** [2] - 19:7, 133:17
**criticism** [5] - 63:3, 91:15, 111:12, 114:7, 114:23
**criticisms** [7] - 111:18, 113:4, 113:18, 116:22, 119:18, 134:5, 134:9
**critiqued** [2] - 113:6, 134:1
**CROSS** [2] - 120:23, 138:6
**cross** [3] - 65:24, 72:1, 89:6
**crossed** [1] - 90:15
**crossing** [1] - 20:18
**crowd** [1] - 24:6
**crowded** [1] - 24:4
**cup** [2] - 29:7, 117:4

**curious** [2] - 28:24, 116:9
**current** [3] - 2:21, 68:8, 68:15
**curtain** [1] - 55:15
**cut** [5] - 18:8, 52:1, 85:21, 106:22, 106:23
**cut-up** [1] - 106:22, 106:23
**cut/puncture** [1] - 51:25
**cuts** [1] - 22:6

# D

**D20080318T054444** [1] - 105:15
**D20080318T080344** [1] - 105:19
**D20080320T54350** [1] - 103:4
**data** [45] - 4:15, 4:21, 5:5, 12:25, 22:11, 24:9, 24:11, 25:8, 25:9, 25:13, 25:16, 27:10, 30:21, 30:24, 31:23, 32:7, 36:6, 40:21, 41:24, 42:1, 50:4, 50:10, 52:24, 66:15, 72:1, 72:5, 72:7, 72:25, 73:1, 74:5, 74:22, 78:9, 79:2, 80:21, 84:23, 84:24, 96:20, 112:23, 114:25, 115:14, 135:8
**database** [2] - 4:24, 84:25
**date** [1] - 135:9
**DAVIS** [2] - 2:4, 138:4
**Davis** [42] - 1:13, 2:3, 2:11, 4:8, 8:15, 14:12, 16:8, 26:25, 31:17, 33:20, 37:22, 38:18, 39:8, 41:16, 42:10, 45:11, 49:4, 49:7, 51:7, 64:25, 66:4, 69:9, 84:19, 88:6, 89:11, 91:5, 91:19, 98:9, 100:7, 101:24, 103:5, 108:17, 119:18, 120:15, 120:19, 120:25, 128:21, 133:22, 135:3, 136:1, 136:11, 136:13
**days** [3] - 49:19, 102:10, 132:7
**deal** [1] - 62:17
**dealing** [2] - 29:2, 29:11
**dealt** [1] - 4:3
**debone** [5] - 11:1, 11:2, 11:4, 11:19, 21:23
**Debone** [5] - 11:2, 11:3, 11:5, 11:9, 11:11, 12:8, 12:14, 20:17, 124:16

**deboners** [3] - 63:25, 64:1
**Deboning** [1] - 135:14
**decimal** [1] - 82:21
**decisions** [1] - 4:16
**deck** [1] - 29:2
**deducted** [1] - 90:14
**deeming** [1] - 137:11
**default** [2] - 77:19, 112:20
**defendant's** [3] - 14:8, 14:11, 14:19
**DEFENDANT'S** [1] - 2:4
**Defendant's** [6] - 6:17, 7:4, 7:7, 16:14, 18:4, 25:12
**Defendants** [2] - 1:8, 1:18
**Defense** [1] - 136:18
**defensible** [1] - 60:15
**defer** [1] - 22:10
**defining** [1] - 53:13
**definitely** [1] - 11:18
**defining** [2] - 54:20, 60:16
**Delaware** [3] - 134:10, 134:12, 135:8, 135:15, 135:16
**delete** [1] - 32:8
**delta** [1] - 36:25
**Demographic** [2] - 56:12, 78:1
**demonstrative** [3] - 39:7, 82:14, 82:16
**density** [1] - 11:20
**departing** [1] - 22:25
**department** [12] - 6:10, 17:23, 18:23, 19:1, 26:10, 28:6, 28:7, 39:23, 40:15, 67:6, 95:20, 135:7
**Department** [6] - 10:16, 10:18, 30:20, 30:21, 40:25, 133:12
**departmental** [1] - 35:24
**departments** [28] - 5:14, 5:18, 6:1, 6:2, 6:7, 6:15, 10:6, 10:7, 10:9, 12:2, 13:18, 17:22, 19:7, 19:10, 30:16, 34:13, 36:9, 36:10, 37:4, 67:15, 68:12, 68:14, 79:17, 95:18, 135:5, 135:11
**deposition** [1] - 123:25
**derived** [1] - 82:1
**described** [2] - 57:17, 68:10
**descriptions** [1] - 37:17
**design** [10] - 12:24, 52:10, 69:21, 78:1,

**86:22, 113:24, 113:25, 115:5, 115:7, 129:11
**designed** [7] - 50:11, 74:24, 118:3, 129:12, 129:22, 129:23, 132:11
**designing** [1] - 57:22
**desire** [1] - 49:4
**desires** [1] - 49:2
**detail** [5] - 9:7, 18:13, 32:1, 42:8, 54:25
**details** [2] - 136:4, 136:5
**determine** [6] - 4:13, 9:18, 12:24, 13:7, 18:14, 77:24
**determined** [1] - 132:19
**Determining** [1] - 113:13
**detour** [1] - 64:22
**developed** [1] - 71:9
**developing** [1] - 70:10
**device** [1] - 19:14
**dexterity** [1] - 29:9
**diagram** [1] - 18:5
**diagrams** [1] - 15:17
**difference** [6] - 37:1, 37:15, 49:13, 74:8, 95:15, 110:18
**differences** [1] - 74:21
**Different** [2] - 43:22, 101:12
**different** [15] - 3:19, 5:14, 5:17, 9:10, 11:4, 24:15, 35:17, 50:3, 52:14, 74:22, 76:7, 76:8, 101:12, 104:1, 132:6
**differentiated** [3] - 69:23, 69:24, 94:22
**differentiating** [1] - 69:20
**differently** [4] - 54:1, 54:6, 74:7, 132:14
**digit** [1] - 81:10
**digits** [1] - 69:1
**dip** [1] - 126:1
**direct** [5] - 65:2, 65:23, 69:14, 120:20, 137:9
**DIRECT** [2] - 2:12, 138:5
**directing** [2] - 91:22, 91:25
**directly** [3] - 11:14, 82:1, 89:18
**dirtier** [1] - 8:11
**dirty** [3] - 8:11, 89:14, 89:15
**disagree** [2] - 62:17, 134:15
**disassembling** [1] - 11:21

discipline [1] - 112:2
disclosure [1] - 119:7
discrete [3] - 33:25, 40:13
discussed [3] - 123:25, 129:7, 133:21
disparities [1] - 107:7
dispersed [1] - 12:6
display [1] - 18:8
disrepair [1] - 21:2
Distance [1] - 33:12
distance [22] - 9:12, 18:16, 19:11, 19:12, 19:13, 19:19, 22:23, 23:24, 25:16, 26:15, 26:25, 27:1, 27:4, 27:15, 30:12, 38:13, 39:20, 42:11, 42:20, 48:17, 102:4
distances [5] - 12:23, 25:5, 36:2, 41:19, 44:20
distant [1] - 121:8
distinct [2] - 17:11, 53:15
distinction [2] - 43:9, 43:10
distinguishable [1] - 29:3
distinguished [1] - 94:20
distinguishes [2] - 9:10, 9:11
distinguishing [1] - 9:1
distracted [1] - 56:10
distribution [1] - 126:14
DISTRICT [2] - 1:1, 1:2
divert [1] - 60:5
divide [3] - 41:1, 47:21, 48:19
divided [1] - 68:24
division [2] - 17:20
DIVISION [1] - 1:2
divisions [5] - 13:8, 17:3, 17:24, 21:21, 34:3
dock [4] - 8:9, 23:7, 32:16, 33:3, 33:9, 39:11, 40:5, 41:12, 47:4, 48:7, 62:5, 121:15, 123:17, 131:17
dock/break [1] - 32:24
Doctor [3] - 100:14, 107:24, 113:12
document [7] - 13:9, 13:13, 13:20, 17:21, 17:22, 55:5
documentation [1] - 112:14
documented [4] - 30:2, 30:7, 50:11, 54:5

documents [3] - 13:12, 15:5, 113:5
doff [30] - 25:17, 38:7, 42:16, 42:22, 52:12, 52:20, 53:1, 71:22, 73:18, 73:23, 75:19, 76:4, 76:17, 76:18, 76:25, 81:11, 83:2, 83:3, 83:5, 83:7, 83:9, 83:10, 83:11, 83:13, 83:14, 83:15, 83:16, 83:17, 85:10, 129:15
doffed [2] - 39:22, 71:16
doffing [32] - 4:1, 7:21, 17:11, 38:9, 43:5, 43:20, 49:5, 49:7, 49:11, 49:14, 49:22, 50:7, 65:4, 65:10, 73:13, 77:10, 83:20, 84:1, 84:20, 86:2, 102:3, 107:17, 109:3, 112:17, 118:19, 119:1, 119:19, 127:2, 131:12, 131:24, 131:25, 132:17
don [60] - 25:17, 38:7, 42:14, 42:19, 52:12, 52:20, 53:1, 71:20, 73:16, 73:17, 73:24, 75:18, 76:2, 76:3, 76:17, 76:18, 76:21, 76:25, 81:10, 81:11, 81:19, 83:1, 83:3, 83:5, 83:7, 83:8, 83:10, 83:11, 83:13, 83:14, 83:15, 83:16, 83:17, 85:9, 88:4, 88:5, 94:13, 94:16, 98:20, 98:21, 98:23, 99:2, 99:15, 99:23, 100:21, 100:22, 102:25, 103:11, 103:12, 103:14, 105:1, 108:7, 109:8, 109:11, 119:22, 119:25, 120:8, 129:15
don/doff [20] - 9:9, 9:25, 10:11, 23:12, 32:25, 33:7, 33:10, 33:16, 33:17, 38:8, 49:16, 66:14, 67:11, 76:23, 76:24, 80:23, 81:6, 85:19, 123:4, 128:5
don/doffs [1] - 41:20
done [22] - 2:17, 19:9, 25:4, 43:14, 46:3, 46:7, 52:7, 59:17, 63:20, 63:23, 64:1, 64:3, 64:13, 74:4, 74:10, 74:12, 90:12, 91:11, 112:16, 114:3, 114:6, 119:10
done/doff [1] - 9:12
donned [6] - 39:21,

71:15, 97:23, 97:25, 98:3, 108:8
donning [47] - 4:1, 7:21, 17:11, 17:12, 38:9, 42:12, 43:5, 43:14, 43:20, 45:24, 49:5, 49:7, 49:10, 49:14, 49:22, 50:7, 65:4, 65:10, 69:25, 73:13, 77:10, 83:20, 84:1, 84:20, 86:2, 93:10, 94:5, 102:3, 105:6, 107:17, 109:3, 110:4, 110:14, 112:17, 118:17, 119:19, 119:23, 123:19, 127:2, 131:12, 131:24, 131:25, 132:17
Donning [1] - 109:5
donning/doffing [1] - 77:14
door [55] - 19:24, 22:23, 23:1, 23:5, 23:8, 23:9, 23:12, 25:19, 25:22, 26:3, 26:4, 26:5, 26:6, 32:18, 32:22, 36:13, 41:20, 41:25, 42:6, 42:13, 42:14, 42:17, 42:20, 43:6, 43:25, 44:4, 44:8, 44:9, 44:12, 45:15, 45:16, 46:17, 46:18, 47:14, 47:24, 55:15, 63:8, 93:24, 99:11, 100:6, 100:11, 106:16, 106:19, 121:20, 122:9, 122:15, 122:23, 123:9, 123:15, 124:24, 130:12, 130:14
doors [15] - 19:21, 19:22, 19:23, 19:24, 20:13, 27:6, 27:21, 29:24, 30:2, 30:8, 33:4, 39:18, 40:7, 41:12, 44:22
double [1] - 44:12
doublecheck [4] - 71:10, 72:10, 72:13, 72:25
doublechecking [1] - 72:19
Doublechecking [1] - 72:23
down [21] - 7:18, 9:3, 12:23, 17:15, 20:15, 20:20, 39:23, 40:15, 47:10, 47:18, 65:6, 75:15, 79:21, 89:25, 98:13, 104:18, 117:9, 121:19, 122:21, 123:8, 123:9
downstairs [1] - 27:25
dozen [1] - 126:24
Dozen [1] - 5:7

Dr [100] - 2:3, 4:8, 8:15, 14:12, 16:8, 25:24, 26:24, 31:16, 33:19, 37:22, 38:18, 39:7, 41:16, 42:10, 43:15, 45:11, 49:4, 49:7, 64:25, 66:4, 84:19, 86:7, 88:1, 88:6, 89:11, 89:21, 90:15, 91:5, 91:19, 93:23, 94:1, 96:9, 96:12, 97:15, 98:9, 100:6, 101:24, 102:1, 102:9, 102:23, 103:5, 104:24, 105:24, 106:8, 106:9, 107:15, 107:24, 108:10, 108:12, 108:14, 108:17, 108:22, 109:2, 109:6, 109:8, 110:12, 110:20, 111:11, 111:19, 111:21, 111:24, 112:6, 112:10, 112:13, 112:24, 113:5, 113:7, 113:14, 114:2, 114:9, 116:4, 116:12, 116:14, 116:24, 118:15, 119:2, 119:18, 120:14, 120:19, 120:25, 125:18, 126:22, 128:21, 133:16, 133:20, 134:2, 134:7, 134:12, 134:17, 134:18, 134:22, 134:23, 135:3, 135:13, 135:17, 135:19, 135:20, 136:5, 136:11
DR [2] - 2:4, 138:4
drag [3] - 59:1, 80:6, 80:15
drawing [10] - 5:23, 10:19, 10:24, 13:6, 18:12, 18:18, 18:21, 18:23, 44:15, 44:17
drawings [1] - 18:13
dredge [1] - 115:4
drop [6] - 10:11, 34:1, 34:9, 104:14, 117:19, 122:9
drops [1] - 41:3
drove [3] - 39:23, 40:14
drum [1] - 64:1
dry [4] - 12:6, 21:2, 71:15, 120:4
during [4] - 37:20, 70:12, 76:18, 77:20
dust [3] - 8:13, 83:17
DVD [8] - 23:16, 73:12, 75:7, 88:1, 97:6, 116:23, 126:8
DVD'd [2] - 71:21, 102:9
DVD's [1] - 14:14

E

eager [1] - 71:6
Ear [2] - 85:5, 85:6
ear [8] - 51:13, 55:7, 81:9, 83:24, 84:21, 85:12, 103:11, 103:13
early [3] - 9:2, 93:17, 117:3
ears [1] - 83:25
easier [5] - 9:5, 46:9, 81:3, 82:17, 87:23
easily [1] - 100:15
Eastern [1] - 95:11
easy [4] - 50:15, 52:9, 71:5, 71:7
economize [2] - 19:5, 24:1
education [1] - 50:21
effect [3] - 54:5, 54:9, 97:13
effective [2] - 36:7, 135:9
efficiency [1] - 5:8
effort [3] - 22:1, 91:4, 91:6
eight [3] - 65:16, 127:7, 127:22
either [12] - 5:23, 15:1, 29:18, 32:13, 56:13, 58:25, 59:6, 87:7, 113:6, 114:11, 131:13, 134:14
elaborate [2] - 108:17, 108:19
element [1] - 109:9
elements [5] - 4:22, 53:13, 54:21, 109:8
elevated [1] - 7:17
eligibility [1] - 113:13
eligible [1] - 68:21
eliminate [2] - 45:17, 54:16
eliminated [3] - 38:22, 39:10, 39:17
eliminating [1] - 40:6
elimination [2] - 41:10, 45:14
elongated [1] - 10:23
empirical [1] - 113:24
employee [40] - 20:15, 22:25, 24:19, 27:4, 28:4, 29:5, 34:18, 36:4, 36:12, 40:15, 41:2, 41:6, 48:20, 48:21, 69:20, 69:23, 70:14, 70:15, 71:13, 72:4, 73:20, 76:2, 77:1, 80:1, 91:2, 100:15, 100:16, 101:25, 102:2, 106:24, 113:13, 113:15,

113:17, 115:16, 115:25, 119:3, 121:17, 130:24, 131:16, 135:9
**Employee** [1] - 61:10
**employee's** [2] - 25:22, 26:6
**Employees** [1] - 114:9
**employees** [90] - 4:4, 7:17, 7:25, 8:8, 8:9, 9:23, 11:15, 11:16, 11:19, 11:23, 12:1, 12:8, 19:22, 20:6, 20:20, 21:18, 21:22, 22:4, 22:6, 23:6, 23:18, 23:20, 23:25, 24:6, 25:6, 26:8, 26:11, 26:14, 34:11, 34:14, 35:21, 39:11, 40:5, 40:9, 40:10, 40:20, 41:13, 45:1, 46:25, 47:3, 48:5, 48:6, 48:7, 48:8, 48:18, 48:19, 51:16, 52:20, 53:22, 58:20, 60:13, 61:8, 63:15, 66:21, 67:10, 67:19, 68:1, 68:8, 68:15, 68:21, 68:25, 69:6, 69:21, 69:24, 70:21, 71:6, 71:12, 73:13, 74:3, 77:21, 79:15, 80:4, 95:20, 97:15, 97:19, 115:23, 118:16, 118:23, 118:24, 119:22, 122:3, 122:20, 123:6, 124:17, 127:6, 129:15, 135:6, 135:7
**employees'** [4] - 4:1, 17:24
**employer** [8] - 52:6, 86:23, 87:2, 87:4, 101:1, 115:23, 132:19, 133:12
**empty** [1] - 92:16
**en** [1] - 122:2
**encountered** [1] - 123:22
**end** [23] - 9:17, 23:5, 33:7, 33:15, 39:10, 41:20, 41:21, 42:16, 42:19, 53:16, 71:19, 76:5, 76:11, 79:21, 80:7, 80:8, 89:16, 101:4, 118:25, 121:8, 123:15, 130:3, 134:6
**endemic** [1] - 20:21
**ends** [1] - 120:20
**engaged** [1] - 52:25
**engineer** [6] - 5:24, 35:14, 111:24, 112:11, 115:22, 118:8
**Engineering** [5] - 2:23, 3:3, 3:4, 3:6

**engineering** [4] - 28:12, 28:16, 29:2, 112:9
**engineers** [2] - 70:18, 70:24
**enjoyed** [1] - 136:14
**ensemble** [1] - 51:17
**enter** [12] - 9:3, 25:9, 25:13, 25:15, 27:8, 32:23, 37:12, 44:22, 84:25, 98:16, 122:20, 122:23
**entered** [7] - 30:22, 30:24, 32:17, 43:11, 43:12, 72:25, 128:3
**entering** [1] - 97:25
**enters** [1] - 93:24
**entire** [5] - 5:12, 26:19, 34:3, 102:9, 104:23
**environment** [2] - 52:19, 55:12
**environmental** [1] - 27:7
**envision** [1] - 22:3
**equal** [1] - 68:24
**equate** [2] - 48:3, 48:22
**equated** [1] - 34:17
**equates** [2] - 27:13, 94:14
**equations** [1] - 30:22
**equipment** [41] - 4:2, 9:21, 9:22, 13:10, 13:16, 21:21, 22:8, 38:3, 38:8, 39:16, 51:1, 51:4, 51:20, 51:21, 52:8, 52:20, 52:21, 55:9, 55:11, 55:16, 55:22, 56:16, 60:24, 62:3, 62:6, 66:23, 67:17, 71:13, 71:25, 76:10, 77:1, 78:3, 91:2, 101:1, 102:4, 108:2, 115:16, 115:24, 117:22, 119:23, 129:16
**equitable** [3] - 12:25, 24:25, 117:2
**ergometer** [1] - 19:15
**ergonomics** [4] - 3:5, 3:7, 112:9, 112:11
**error** [1] - 81:7
**escorted** [1] - 122:19
**especially** [2] - 20:17, 133:25
**Esquire** [4] - 1:17, 1:17, 1:19, 1:19
**essential** [1] - 53:10
**Essentially** [3] - 7:15, 50:9, 51:3
**essentially** [14] - 4:12, 4:22, 7:22, 8:7, 23:19, 30:16, 48:11, 51:8, 53:3, 66:18, 88:1, 102:2,

121:17, 134:23
**established** [7] - 17:19, 17:25, 19:18, 34:21, 36:6, 75:18, 75:21
**estimate** [5] - 24:19, 24:22, 72:4, 73:5, 126:25
**estimated** [1] - 110:20
**estimation** [3] - 11:18, 12:19, 92:18
**ET** [2] - 1:5, 1:7
**et** [2] - 139:4, 139:5
**evaluation** [1] - 52:7
**evening** [1] - 122:3
**event** [3] - 121:13, 124:21, 129:10
**events** [2] - 4:5, 50:25
**evidence** [2] - 64:20, 137:6
**Evis** [5] - 99:21, 100:19, 104:18, 124:12, 124:13
**evisceration** [2] - 10:14, 18:21
**Evisceration** [8] - 10:16, 10:17, 11:8, 11:11, 12:14, 18:24, 100:11
**evolution** [1] - 29:9
**exact** [9] - 12:1, 51:9, 59:9, 73:14, 91:2, 91:3, 108:11, 115:6, 122:22
**exactly** [7] - 15:6, 19:14, 21:13, 73:16, 75:9, 78:5, 94:1
**Exactly** [2] - 63:13, 64:9
**exacts** [1] - 121:12
**exaggeration** [1] - 57:21
**EXAMINATION** [4] - 2:12, 120:23, 138:5, 138:6
**examination** [1] - 120:21
**example** [8] - 10:15, 25:14, 30:25, 31:1, 61:14, 63:20, 83:23, 103:15
**Excel** [1] - 25:10
**Excellent** [1] - 136:19
**excellent** [1] - 79:8
**except** [3] - 15:6, 132:8, 135:25
**exception** [8] - 41:9, 47:4, 80:11, 94:9, 112:15, 131:16, 132:21, 132:25
**exceptions** [2] - 59:22, 120:3
**excessive** [1] - 95:3
**exclude** [5] - 58:7, 61:17, 112:7, 114:13,

135:24
**excluded** [1] - 114:10
**exclusively** [1] - 17:7
**excuse** [4] - 9:13, 20:2, 81:11, 83:8
**Excuse** [3] - 31:19, 44:3, 104:12
**excused** [1] - 62:14
**execution** [1] - 115:7
**Exhibit** [10] - 6:17, 7:5, 7:7, 14:6, 14:7, 14:8, 15:10, 16:14, 18:4, 25:12
**exhibit** [17] - 6:25, 7:3, 13:20, 14:7, 15:8, 16:11, 18:8, 22:14, 31:11, 31:12, 31:15, 32:22, 39:7, 82:11, 82:15, 134:25, 137:11
**exhibits** [5] - 10:10, 14:11, 14:16, 14:19, 137:8
**exists** [2] - 17:4, 17:21
**exit** [5] - 9:5, 9:7, 22:4, 23:9, 23:18
**expect** [5] - 68:16, 69:1, 69:5, 70:23, 74:23
**expectation** [2] - 70:24, 70:25
**expected** [4] - 68:8, 70:23, 97:5, 119:2
**expecting** [2] - 69:10, 87:6
**expedited** [1] - 122:9
**experience** [5] - 50:21, 55:4, 59:16, 66:23, 121:24
**experienced** [1] - 56:18
**experimental** [3] - 58:8, 81:18, 113:25
**experimenter** [1] - 59:1
**expert** [8] - 5:8, 13:14, 13:24, 25:7, 25:10, 74:16, 115:22, 120:15
**experts** [2] - 2:18, 115:8, 133:23
**explain** [12] - 7:7, 8:15, 50:22, 56:5, 60:19, 65:11, 66:7, 78:19, 78:22, 81:14, 82:6, 86:11
**explained** [1] - 86:16
**explains** [1] - 95:14
**explanation** [2] - 28:9, 33:9
**exposed** [1] - 51:24
**express** [1] - 32:3
**extract** [1] - 94:4
**extraordinarily** [1] - 78:25
**extremely** [2] - 32:9, 37:6

**extremists** [1] - 126:12
**eyeglasses** [1] - 105:23

**F**

**face** [2] - 84:25, 124:18
**faced** [1] - 133:11
**facetious** [1] - 100:17
**facilitate** [1] - 17:19
**Facilitated** [1] - 11:21
**facilities** [2] - 5:15, 13:9
**facility** [10] - 3:22, 3:25, 5:11, 5:13, 7:10, 22:20, 47:12, 49:10, 77:22
**fact** [12] - 9:2, 26:7, 28:20, 33:10, 34:20, 47:13, 57:13, 62:2, 62:11, 77:17, 97:14, 115:10
**factor** [10] - 24:3, 34:22, 35:11, 40:3, 50:24, 61:1, 77:17, 125:6, 125:7, 125:10
**Factor** [1] - 30:11
**factors** [3] - 112:9, 112:11, 130:2
**fair** [4] - 12:7, 111:25, 112:4, 134:1
**fairly** [12] - 7:13, 11:24, 47:10, 52:21, 53:16, 53:17, 71:5, 79:21, 102:13, 125:5, 126:25, 136:22
**Falcon** [1] - 2:20
**fall** [1] - 35:5
**falling** [1] - 35:1
**familiar** [3] - 5:7, 6:11, 121:21
**Familiarize** [1] - 5:22
**family** [1] - 54:2
**famous** [1] - 5:7
**far** [4] - 13:11, 70:22, 71:3, 90:20
**Farm** [3] - 52:20, 114:3, 129:15
**FARMS** [1] - 1:7
**Farms** [10] - 7:11, 34:25, 51:10, 67:25, 74:6, 86:23, 114:11, 119:10, 135:8, 139:5
**Farms'** [1] - 67:2
**fashion** [1] - 74:24
**fast** [7] - 30:14, 59:6, 69:17, 70:25, 71:7, 75:10, 80:7
**faster** [2] - 105:5, 105:6
**favorite** [1] - 63:25
**feathers** [1] - 8:13
**February** [1] - 96:13

**feed** [1] - 52:24
**feet** [16] - 25:5, 27:13, 27:16, 33:4, 33:18, 39:10, 41:10, 44:20, 45:15, 45:17, 46:17, 47:13, 47:19, 47:20, 47:22, 100:13
**fellow** [1] - 106:24
**felt** [1] - 125:6
**few** [4] - 56:9, 95:1, 126:21, 129:7
**field** [5] - 50:21, 53:6, 112:11, 116:15, 126:11
**fifteen** [1] - 65:5
**Figure** [1] - 135:12
**figure** [2] - 35:19, 119:11
**fill** [2] - 79:19, 124:7
**filling** [1] - 79:16
**films** [1] - 123:23
**final** [5] - 23:17, 51:22, 82:5, 105:19, 120:2
**finally** [2] - 51:22, 119:18
**fine** [4] - 17:18, 31:16, 70:3, 136:23
**Finish** [1] - 34:8
**finish** [5] - 8:4, 34:7, 98:12, 100:2, 123:5
**finished** [2] - 65:23, 108:1
**fire** [1] - 58:25
**first** [14] - 5:9, 5:11, 7:4, 7:6, 8:5, 79:10, 87:4, 100:22, 102:8, 118:18, 118:24, 121:2, 123:14, 129:9
**First** [2] - 5:13, 135:13
**fit** [2] - 6:2, 117:18
**five** [10] - 40:13, 51:13, 79:13, 80:9, 84:13, 84:16, 93:12, 97:22, 98:5, 128:16
**Flanagan** [1] - 1:17
**FLANAGAN** [4] - 14:15, 16:5, 16:16, 39:1
**Flanagan's** [1] - 16:11
**flavor** [1] - 52:2
**flexibility** [4] - 32:8, 40:21, 43:16, 50:16
**flexible** [2] - 32:9, 37:21
**flip** [2] - 121:11, 134:19
**floats** [1] - 56:23
**floor** [10] - 20:16, 20:24, 20:25, 21:8, 21:20, 23:24, 28:3, 34:24, 40:12, 47:9
**floors** [3] - 20:25, 21:1, 21:2
**fluids** [1] - 28:3

**focus** [2] - 3:5, 3:7
**folks** [38] - 4:16, 5:23, 8:10, 9:3, 10:10, 11:20, 32:20, 35:8, 38:5, 38:7, 40:13, 41:12, 47:4, 47:6, 51:8, 51:22, 54:24, 55:19, 55:21, 55:25, 56:17, 58:20, 59:2, 59:8, 62:12, 68:4, 68:16, 75:5, 89:2, 100:2, 113:22, 114:1, 122:3, 122:6, 131:17, 131:18
**follow** [8] - 17:7, 19:17, 20:3, 21:22, 21:24, 48:8, 96:10, 97:6
**followed** [1] - 105:24
**following** [3] - 21:15, 50:9, 133:12
**food** [1] - 106:13
**Foods** [4] - 113:14, 114:8, 118:15, 118:21
**foot** [10] - 23:18, 40:6, 42:23, 44:4, 44:6, 44:16, 44:21, 45:2, 47:15, 100:9
**footnote** [1] - 135:15
**FOR** [1] - 1:2
**force** [2] - 89:1, 127:10
**foregoing** [1] - 139:7
**forewarning** [1] - 97:20
**fork** [2] - 53:23, 96:2
**form** [1] - 91:14
**formally** [1] - 28:14
**format** [1] - 40:18
**forth** [3] - 40:7, 121:3, 129:17
**fortunate** [1] - 47:17
**forty** [3] - 90:6, 90:7, 90:8
**forward** [7] - 30:14, 65:3, 80:7, 124:20, 124:21, 136:19, 137:3
**foundation** [1] - 53:8
**four** [8] - 25:24, 29:3, 41:20, 97:22, 98:6, 109:7, 110:2, 113:12
**Four** [3] - 40:13, 97:8, 104:13
**frankly** [2] - 64:5, 137:7
**freezer** [8] - 35:6, 61:14, 61:15, 61:16, 78:11, 78:13, 105:22, 107:5
**friend** [1] - 95:8
**friends** [1] - 54:2
**fro** [1] - 17:8
**front** [21] - 18:4, 18:5, 18:12, 22:17, 22:23, 23:8, 25:20, 32:18, 32:22, 33:7, 41:11, 46:12, 54:2, 80:13, 81:5, 92:10, 93:24, 101:17,

122:15, 122:22
**full** [9] - 35:9, 76:4, 76:9, 76:21, 76:23, 77:13, 77:14, 119:7, 123:2
**fully** [1] - 111:7
**function** [2] - 29:6, 29:10
**fundamental** [1] - 11:4
**fundamentally** [1] - 44:1
**future** [2] - 22:21, 50:18

## G

**games** [1] - 64:14
**gate** [4] - 10:4, 78:4, 78:8, 80:13
**gender** [1] - 66:23
**general** [5] - 35:9, 51:16, 59:4, 77:6, 101:11
**generalities** [1] - 5:13
**generate** [1] - 5:25
**gentleman** [8] - 88:2, 90:4, 91:9, 94:3, 94:13, 94:15, 94:19, 97:5, 105:21, 105:24, 105:25, 106:19, 108:22, 109:13
**gentlemen** [2] - 70:3, 136:20
**geographic** [2] - 13:8, 13:17
**geographically** [3] - 12:6, 30:15, 47:8
**geography** [1] - 34:3
**geometric** [2] - 23:21, 25:21
**GERARD** [3] - 2:4, 2:10, 138:4
**Gerard** [1] - 2:10
**germane** [2] - 23:13, 114:1
**Gerry** [2] - 2:3, 120:14
**giant** [1] - 116:23
**Gilbraiths** [1] - 5:6
**Ginn** [1] - 2:23
**given** [5] - 77:13, 80:14, 81:12, 97:20
**gizzard** [1] - 63:25
**gladly** [1] - 62:9
**glasses** [2] - 83:11, 99:1
**glove** [15] - 55:8, 83:3, 83:4, 83:5, 83:7, 85:21, 85:24, 92:12, 100:24, 107:4, 107:5, 108:7, 127:7, 127:8
**gloves** [34] - 43:9, 43:11, 44:25, 45:1,

51:18, 52:2, 55:9, 75:3, 80:8, 80:9, 80:12, 85:13, 85:16, 85:17, 87:10, 87:11, 98:1, 98:4, 99:6, 99:16, 99:25, 100:20, 100:22, 100:23, 106:25, 107:1, 107:3, 107:8, 115:17, 115:18, 119:25, 120:11
**glue** [1] - 81:23
**goal** [2] - 6:8, 118:7
**Grab** [1] - 135:4
**grab** [5] - 6:21, 18:18, 67:7, 102:23, 123:2
**grabbed** [4] - 88:12, 106:6, 106:9, 107:16
**Grandpop** [1] - 92:6
**grasp** [5] - 88:2, 98:23, 99:1, 99:5, 99:15, 102:19
**grasping** [1] - 92:11
**grasps** [1] - 98:18
**Great** [1] - 42:9
**great** [4] - 50:14, 58:15, 71:17, 117:1
**greater** [1] - 21:6
**green** [3] - 10:20, 38:20, 95:16
**ground** [3] - 45:13, 78:15, 122:16
**group** [6] - 8:8, 47:6, 51:22, 54:2, 66:19, 66:20
**groups** [6] - 8:8, 27:11, 51:6, 55:23, 66:18, 67:16
**grown** [1] - 117:15
**guard** [4] - 52:3, 69:25, 81:21, 83:10
**guards** [2] - 55:11, 79:11
**guess** [14] - 21:4, 32:2, 38:15, 57:8, 62:16, 75:4, 79:20, 87:1, 87:9, 114:18, 128:2, 132:13, 132:15, 134:7
**guessing** [1] - 65:14
**guestimate** [1] - 65:13
**guidance** [2] - 129:12, 133:12
**gum** [1] - 77:8
**guy** [6] - 88:18, 95:4, 105:23, 110:7, 110:10

## H

**hair** [23] - 44:22, 51:12, 55:7, 61:5, 61:7, 62:7, 78:8, 79:11, 79:24, 83:8, 83:24, 84:21, 85:2, 85:11, 88:3, 88:4, 98:19, 98:20, 102:15, 105:22,

106:12, 115:19, 133:8
**half** [4] - 12:10, 29:3, 64:15, 118:11
**hall** [2] - 18:4, 18:5, 33:11, 89:20, 89:21
**hallway** [1] - 89:24
**hand** [9] - 7:24, 8:20, 12:3, 12:5, 57:4, 66:25, 95:24, 118:8, 119:25
**handed** [1] - 15:2
**handling** [1] - 99:25
**hands** [4] - 100:3, 101:11, 120:4, 120:6
**Hang** [1] - 124:14
**hang** [7] - 8:18, 8:19, 9:25, 33:16, 123:4, 123:17, 135:17
**hang/receiving/back** [1] - 32:24
**hanger** [1] - 102:19
**hanging** [1] - 117:2
**happy** [2] - 61:3, 137:9
**hard** [4] - 13:6, 15:6, 52:13, 125:21
**hat** [1] - 101:17
**Hawthorne** [2] - 54:5, 97:13
**hazard** [1] - 21:7
**hazardous** [2] - 53:21, 53:22
**hazards** [3] - 51:24, 51:25, 52:1
**head** [4] - 28:18, 49:13, 94:10, 133:7
**hear** [3] - 32:15, 75:7, 134:1
**heard** [5] - 7:16, 77:4, 111:17, 111:19, 116:24
**hearing** [1] - 137:3
**heart** [1] - 95:9
**heavier** [1] - 107:4
**helmet** [1] - 105:22
**help** [1] - 31:10
**helped** [1] - 134:15
**helper** [1] - 101:15
**helpful** [1] - 64:5
**hence** [2] - 82:4, 133:3
**hereby** [1] - 139:3
**hereunto** [1] - 139:10
**Hi** [1] - 128:21
**high** [7] - 11:19, 11:20, 12:18, 78:25, 116:12, 116:14, 116:17
**higher** [1] - 81:15
**highly** [2] - 11:25, 12:9
**highway** [3] - 121:18, 122:21, 123:7
**himself** [2] - 94:20, 94:24
**hip** [1] - 89:4

**historically** [2] - 49:15, 74:7
**history** [1] - 34:25
**hit** [1] - 117:7
**hold** [1] - 106:19
**holding** [2] - 16:8, 106:16
**hole** [1] - 29:9
**holistic** [1] - 112:6
**home** [3] - 2:14, 2:17, 136:17
**honest** [1] - 59:14
**Honestly** [1] - 58:23
**honestly** [2] - 59:23, 112:10
**Honor** [72] - 2:3, 13:22, 14:6, 14:21, 15:5, 15:12, 15:16, 15:18, 16:17, 16:19, 16:22, 17:9, 18:5, 18:10, 27:9, 29:17, 31:14, 31:18, 31:19, 33:24, 35:7, 39:6, 40:17, 42:2, 42:5, 42:25, 43:8, 44:15, 46:11, 47:6, 48:13, 58:17, 61:2, 61:3, 70:12, 70:15, 73:3, 77:25, 79:20, 84:4, 84:12, 84:13, 87:1, 87:22, 90:24, 91:12, 91:18, 92:3, 93:15, 94:8, 95:11, 97:21, 99:24, 101:9, 102:6, 103:19, 103:23, 107:16, 109:16, 111:6, 111:16, 115:20, 120:14, 120:18, 120:21, 128:25, 129:14, 131:19, 134:4, 136:9, 136:10, 137:13
**Honorable** [1] - 1:13
**honored** [1] - 22:10
**hopefully** [2] - 24:24, 115:7
**hostile** [1] - 57:6
**hour** [8] - 24:12, 27:14, 27:19, 28:10, 28:11, 28:19, 36:23, 136:21
**hourly** [1] - 134:10
**HR** [1] - 68:4
**Human** [1] - 55:17, 62:13, 62:24, 67:13, 67:21
**human** [8] - 29:20, 62:12, 67:9, 75:11, 106:18, 112:9, 112:11
**humans** [1] - 77:7
**hundred** [4] - 47:21, 59:9, 79:5, 79:22
**hundreds** [2] - 55:7, 59:17
**hypothetically** [2] -
62:5, 115:19

## I

**ice** [1] - 35:6
**idea** [8] - 57:16, 57:17, 58:12, 62:4, 93:20, 96:9, 101:10, 115:10
**ideas** [2] - 50:19, 50:21
**identical** [5] - 36:20, 74:10, 91:1, 102:2
**identically** [1] - 80:11
**identified** [5] - 10:9, 17:4, 19:8, 114:4, 114:9
**identify** [5] - 91:7, 95:20, 113:17, 114:13, 115:8
**identity** [1] - 113:13
**idle** [1] - 99:11
**illustrate** [1] - 39:5
**imagine** [1] - 91:16
**immediately** [1] - 66:15
**immensely** [1] - 137:5
**impact** [6] - 19:21, 21:3, 39:20, 46:24, 48:4, 69:12
**impacted** [2] - 34:14, 40:3
**impacts** [1] - 40:20
**impeaching** [2] - 91:8, 91:17
**impediment** [2] - 20:14, 28:1
**implementation** [1] - 54:21
**important** [5] - 12:16, 23:22, 103:9, 113:11, 130:3
**IN** [1] - 1:1
**Inc** [1] - 139:5
**INC** [1] - 1:7
**include** [11] - 26:16, 61:22, 89:2, 111:24, 113:20, 113:25, 117:6, 119:12, 129:10, 135:20, 135:24
**included** [13] - 33:6, 38:1, 89:21, 115:17, 115:18, 115:19, 119:14, 132:19, 134:9, 135:6, 135:10, 135:16, 135:22
**includes** [3] - 40:5, 41:7, 41:9
**including** [1] - 28:20
**Incorporated** [1] - 113:15
**incredibly** [3] - 35:23, 59:6
**indeed** [6] - 36:18, 61:18, 104:5, 124:1,
125:8, 134:14
**independently** [4] - 22:3, 32:4, 37:6, 58:8
**INDEX** [1] - 138:1
**indicated** [7] - 32:22, 37:20, 52:8, 70:12, 111:17, 113:7, 133:15
**indicating)** [1] - 126:2
**individual** [14] - 4:22, 8:6, 27:1, 27:11, 54:18, 65:6, 66:17, 69:25, 74:4, 75:15, 79:23, 98:12, 98:14, 102:8
**individual's** [1] - 107:19
**individually** [4] - 54:3, 71:15, 71:16, 82:21
**individuals** [4] - 102:9, 114:25, 117:16, 127:3
**industrial** [7] - 28:12, 28:15, 29:2, 29:21, 70:18, 111:23, 115:22
**Industrial** [3] - 2:22, 3:4, 3:6
**industry** [1] - 59:3
**infer** [2] - 97:19, 115:13
**information** [8] - 29:25, 52:5, 56:12, 73:22, 78:1, 80:10, 81:5, 133:14
**initial** [4] - 5:20, 25:23, 96:19, 118:17
**inquire** [1] - 60:4
**insatiably** [1] - 28:23
**insert** [1] - 29:8
**inside** [4] - 7:13, 98:5, 99:12, 99:19
**insignificance** [1] - 70:10
**inspection** [2] - 68:7, 101:16
**inspector** [3] - 101:15, 101:16, 104:19
**instance** [7] - 21:23, 46:15, 62:4, 69:24, 112:18, 113:22, 124:13
**instances** [4] - 30:19, 35:10, 46:23, 126:4
**instead** [3] - 17:4, 43:4, 76:12
**Instead** [1] - 131:7
**instructions** [2] - 71:18, 108:3
**intend** [2] - 63:7, 63:11
**intentionally** [2] - 69:17, 69:18
**interacted** [1] - 128:8
**interactive** [1] - 15:21
**interest** [7] - 19:17, 22:19, 23:17, 35:14, 67:16, 102:10, 116:3
**interested** [9] - 24:24,
36:7, 52:11, 56:14, 56:15, 67:3, 67:10, 75:11
**interesting** [2] - 64:5, 116:21
**intermediate** [1] - 66:20
**interpret** [2] - 4:15, 118:3
**interpretation** [1] - 13:1
**interrupt** [6] - 2:16, 17:6, 61:2, 70:2, 127:15, 131:3
**interrupting** [1] - 20:3
**introduce** [1] - 82:15
**introduced** [2] - 16:3, 28:14, 62:9
**introducing** [1] - 43:18
**introduction** [1] - 64:22
**invalid** [1] - 63:17
**investigator** [2] - 54:3, 104:15
**involved** [14] - 4:17, 6:5, 6:15, 67:22, 68:2, 68:4, 74:15, 83:20, 83:24, 91:20, 94:4, 95:25, 115:11
**iron** [1] - 58:25
**isolate** [1] - 94:23
**isolation** [2] - 97:3, 124:6, 126:7
**issue** [3] - 17:8, 89:1, 133:4
**issued** [2] - 103:17, 103:21
**issues** [6] - 30:13, 64:24, 86:11, 113:12, 115:13, 133:21
**item** [15] - 23:4, 66:17, 72:7, 75:16, 78:2, 80:17, 81:20, 81:22, 81:24, 83:1, 127:11, 128:4, 128:11, 132:25, 133:1
**items** [44] - 4:2, 7:19, 13:11, 13:16, 22:13, 39:16, 43:9, 51:2, 51:10, 51:12, 51:13, 52:12, 52:15, 52:16, 53:2, 56:7, 62:7, 65:6, 66:13, 71:20, 71:22, 76:4, 76:16, 77:21, 78:3, 79:14, 80:23, 80:25, 81:6, 81:23, 83:20, 85:11, 110:14, 115:4, 115:25, 119:19, 121:25, 123:3, 123:18, 128:16, 129:15, 131:7, 132:18, 133:3
**itself** [2] - 94:22, 124:5

## J

**Jane** [1] - 1:17
**January** [1] - 96:13
**job** [45] - 4:5, 6:7, 6:12, 6:13, 13:15, 17:23, 19:1, 19:2, 19:7, 19:19, 20:7, 24:20, 25:15, 25:22, 26:2, 26:6, 27:5, 27:24, 32:3, 33:1, 33:7, 33:8, 33:13, 33:15, 33:23, 33:25, 37:17, 40:10, 40:13, 40:14, 40:19, 51:5, 51:14, 52:7, 58:21, 77:2, 93:25, 98:8, 102:11, 107:10, 108:4, 113:17, 115:8
**jobs** [13] - 6:5, 7:22, 17:1, 17:24, 19:4, 20:15, 21:17, 27:12, 32:8, 36:10, 37:16, 57:21, 135:16
**join** [1] - 123:18
**journey** [1] - 5:15
**Judge** [11] - 1:13, 51:7, 69:9, 88:25, 112:10, 116:10, 128:20, 130:10, 133:22, 136:1, 136:13
**judge** [1] - 4:18
**July** [1] - 78:25
**jump** [2] - 49:6, 71:11
**justifies** [1] - 28:19
**justify** [1] - 134:23

## K

**keep** [1] - 48:20
**kept** [1] - 95:1
**Kevlar** [3] - 52:2, 55:9, 83:7
**key** [1] - 107:9
**kick** [1] - 95:3
**kill** [3] - 8:12, 8:19, 8:22
**killers** [1] - 40:12
**kind** [26] - 4:10, 5:19, 6:18, 8:13, 17:19, 21:3, 21:7, 21:8, 24:23, 26:13, 28:3, 37:9, 52:5, 71:7, 71:10, 72:10, 79:13, 80:5, 84:19, 86:14, 90:2, 91:15, 104:6, 112:1, 122:19
**kinds** [2] - 43:19, 62:20
**knobs** [1] - 19:23
**knock** [1] - 7:2
**knowing** [3] - 52:4, 66:21, 114:4
**knowledge** [1] - 67:23

**knowledgeable** [1] - 6:9

**known** [3] - 91:20, 96:25, 129:1

**knows** [3] - 101:7, 114:6, 119:13

## L

**lab** - 106:13
**label** [2] - 47:7, 131:17
**Labor** [1] - 133:12
**ladies** [1] - 136:20
**lady** [3] - 23:16, 102:3, 102:15, 103:8, 105:3
**landmarks** [1] - 18:14
**Large** [1] - 55:19
**large** [3] - 9:5, 18:12, 26:8
**larger** [2] - 7:13, 74:5
**Larry** [1] - 1:19
**last** [10] - 2:9, 13:5, 20:23, 42:3, 75:1, 80:8, 119:1, 129:10, 132:7, 134:4
**late** - 93:13
**law** [2] - 118:3, 118:8
**LAW** [5] - 13:25, 14:17, 15:20, 15:23, 15:25
**law's** [1] - 117:25
**lawn** [1] - 123:2
**laws** [1] - 133:13
**lay** [1] - 55:16
**layout** [11] - 5:21, 5:25, 6:8, 6:9, 7:10, 12:20, 18:12, 21:19, 23:11, 25:5
**layout's** [1] - 7:7
**layouts** [2] - 15:18, 18:3
**leads** [1] - 79:17
**learned** [1] - 133:23
**least** [5] - 28:17, 57:13, 81:14, 95:6, 95:20
**leave** [3] - 10:3, 76:14, 123:15
**leaving** [2] - 22:25, 43:14
**left** [8] - 8:20, 10:23, 12:11, 12:15, 21:24, 38:22, 40:11, 60:14
**left-hand** [1] - 8:20
**leg** [1] - 120:2
**Leg** [6] - 11:3, 11:5, 11:7, 11:8, 11:11, 124:16
**legal** [3] - 117:8, 129:12, 133:4
**lends** [1] - 124:5
**length** [1] - 104:24
**lengths** [1] - 71:17
**less** [5] - 64:17, 73:24,

79:22, 81:13
**level** [6] - 12:18, 12:22, 35:2, 35:5, 111:4, 122:16
**levels** [1] - 132:12
**life** [4] - 73:21, 95:8, 119:11
**likely** [1] - 21:11
**limit** [1] - 61:13
**limited** [1] - 124:8
**line** [20] - 45:23, 55:21, 67:7, 67:19, 93:12, 93:17, 113:18, 113:20, 114:17, 115:1, 124:4, 124:7, 124:15, 124:20, 126:5, 134:9, 135:20, 136:6
**liner** [1] - 108:6
**liners** [1] - 107:2
**lines** [9] - 10:20, 11:4, 11:10, 11:19, 12:14, 20:17, 20:18, 21:23, 44:13
**list** [9] - 62:13, 62:24, 67:22, 67:24, 81:6, 82:12, 82:15, 101:1, 135:5
**listed** [3] - 17:23, 27:5, 82:16
**listing** [1] - 13:15
**lists** [1] - 13:17
**litany** [1] - 39:12
**literature** [7] - 4:20, 28:18, 30:3, 35:16, 50:11, 50:15, 53:16, 112:21, 112:22
**litigant** [1] - 56:3
**litigants** [2] - 59:25, 62:4
**litigation** [2] - 59:3, 91:21
**live** [11] - 8:18, 8:19, 9:25, 32:23, 33:16, 55:5, 95:5, 95:9, 123:4, 123:17, 135:17
**lives** [1] - 8:21
**locate** [1] - 6:12
**located** [4] - 11:14, 11:16, 12:3, 22:13
**location** [4] - 19:2, 24:21, 49:16, 95:22
**locations** [2] - 6:13, 20:7
**locker** [34] - 7:25, 8:2, 9:9, 22:13, 22:24, 25:18, 25:19, 33:3, 33:10, 39:15, 39:17, 45:22, 53:24, 88:2, 88:11, 92:14, 98:16, 98:17, 98:22, 98:25, 99:1, 99:4, 102:20, 103:7, 106:1,

106:10, 117:20, 123:4, 123:17, 130:8, 130:13, 130:22, 131:8
**lockers** [4] - 32:24, 33:17, 123:9, 123:10
**locomoting** [1] - 21:11
**logical** [1] - 17:15
**logs** [2] - 35:2, 35:9
**Lombard** [1] - 1:24
**longest** [3] - 65:14, 90:21, 126:8
**Look** [2] - 60:3, 116:24
**look** [52] - 4:19, 4:20, 6:5, 11:25, 12:18, 13:6, 13:13, 13:22, 18:20, 20:25, 26:19, 30:3, 33:24, 36:25, 37:2, 37:22, 37:24, 38:21, 40:22, 41:15, 41:18, 41:23, 43:16, 46:15, 46:16, 48:12, 51:4, 51:14, 59:9, 61:9, 62:3, 74:3, 74:21, 76:6, 76:8, 85:11, 86:7, 86:10, 88:10, 95:17, 105:9, 113:9, 119:21, 124:17, 126:6, 126:9, 126:10, 131:14, 136:19, 137:3, 137:8, 137:9
**looked** [5] - 11:5, 22:12, 128:18, 128:19, 137:8
**looking** [29] - 5:13, 7:4, 12:18, 12:20, 15:1, 30:18, 31:11, 31:23, 39:1, 39:14, 44:15, 46:11, 47:18, 52:4, 60:23, 60:24, 65:3, 66:20, 66:23, 66:24, 79:10, 82:8, 102:7, 121:4, 125:19, 126:8, 126:14, 134:21
**looks** [5] - 64:10, 78:6, 106:3, 126:14
**Looks** [1] - 88:3
**lop** [1] - 60:14
**lose** [1] - 57:20
**lost** [2] - 29:6, 121:4
**lower** [1] - 7:24
**LUISA** [1] - 1:5
**lumped** [1] - 90:1
**lumps** [1] - 109:6
**lunch** [27] - 9:13, 9:14, 10:11, 26:2, 26:4, 33:8, 33:14, 41:8, 41:21, 42:16, 42:19, 43:13, 45:17, 45:18, 45:19, 45:20, 47:11, 57:9, 64:23, 66:4, 76:6, 76:12, 76:18, 102:17, 117:20, 120:9

**Luncheon** [1] - 66:1

## M

**main** [8] - 5:25, 7:18, 9:3, 23:5, 32:21, 121:20, 122:23
**maintain** [2] - 50:18, 74:5
**maintaining** [1] - 80:4
**maintenance** [2] - 113:22, 135:16
**Maintenance** [1] - 113:22
**majority** [2] - 55:19, 70:22
**man** [4] - 93:24, 96:8, 105:24
**management** [4] - 22:1, 68:3, 95:19, 97:15
**Manager** [1] - 55:18
**manager** [6] - 6:10, 18:25, 36:11, 55:4, 68:3, 114:18
**managers** [2] - 55:4, 67:18, 68:1
**manner** [2] - 120:10, 139:9
**manufacturing** [1] - 124:23
**map** [7] - 8:16, 8:21, 10:14, 10:15, 11:5, 11:6, 12:3
**maps** [1] - 121:4
**March** [6] - 1:11, 78:14, 87:16, 96:15, 96:16, 139:6
**margin** [1] - 81:7
**mark** [1] - 19:2
**Mark** [1] - 6:13
**marked** [3] - 7:24, 8:16, 16:10
**markers** [1] - 23:23
**marks** [1] - 28:12
**marshalling** [1] - 137:6
**Mary** [3] - 1:23, 139:3, 139:15
**MARYLAND** [1] - 1:2
**Maryland** [2] - 1:11, 1:24
**mask** [2] - 83:17
**masse** [1] - 122:2
**master** [5] - 114:10, 114:12, 114:16, 115:12
**Master** [1] - 114:17
**Masters** [1] - 3:4
**match** [1] - 102:12
**matching** [1] - 72:16
**material** [2] - 112:15,

121:11
**Matrix** [7] - 13:14, 16:3, 27:5, 34:2, 52:5, 55:2, 66:20
**matrix** [7] - 16:4, 16:7, 16:25, 19:8, 87:2, 95:18, 132:19
**matter** [21] - 4:17, 6:6, 6:13, 9:10, 10:8, 23:14, 26:18, 29:9, 33:10, 56:4, 59:3, 68:5, 74:15, 84:5, 113:21, 114:1, 114:3, 125:25, 126:8, 139:4, 139:9
**Maynard** [2] - 30:4, 82:1
**mean** [49] - 9:11, 9:24, 15:15, 27:23, 38:25, 41:2, 44:8, 48:24, 54:1, 57:6, 57:21, 59:14, 60:15, 62:17, 63:2, 63:6, 63:16, 64:6, 64:7, 67:16, 73:6, 73:7, 75:20, 75:21, 77:5, 79:2, 79:22, 80:13, 80:17, 80:23, 81:9, 84:20, 85:10, 85:18, 85:19, 87:13, 91:14, 93:12, 93:13, 96:10, 97:10, 101:20, 124:19, 130:20, 132:25, 133:6
**Meaning** [1] - 50:3, 72:14, 125:14
**meaning** [29] - 7:13, 9:21, 22:7, 12:22, 24:10, 30:9, 32:18, 36:16, 40:6, 53:11, 53:14, 55:6, 56:13, 66:16, 67:4, 67:16, 68:3, 72:13, 73:19, 88:4, 91:2, 94:21, 97:4, 105:5, 112:3, 113:21, 124:5, 124:18, 126:12
**means** [12] - 48:20, 57:4, 57:7, 68:25, 75:22, 75:23, 75:24, 75:25, 76:9, 77:6, 77:13, 126:10
**meant** [4] - 56:1, 70:13, 73:8, 117:9
**measurable** [1] - 53:19
**measure** [17] - 4:23, 22:23, 23:1, 36:24, 37:1, 37:14, 52:10, 56:6, 61:22, 61:23, 63:11, 110:8, 127:6, 129:9, 133:8
**measured** [2] - 23:3, 23:6, 37:5, 39:12, 47:14, 64:4, 64:6, 80:18, 130:16, 130:19, 132:3, 133:1
**measurement** [14] - 3:5,

3:7, 18:16, 23:12, 23:14, 26:4, 26:5, 26:20, 53:11, 70:18, 111:23, 112:8, 112:14, 115:22
**measurements** [4] - 18:15, 19:13, 24:1, 45:14
**measures** [2] - 19:11, 19:12
**measuring** [6] - 12:23, 22:19, 25:22, 31:2, 80:8, 133:6
**Mechanical** [1] - 3:2
**mechanism** [3] - 10:1, 17:19, 73:5
**median** [5] - 75:18, 75:20, 75:21, 75:22
**medical** [1] - 54:11
**member** [1] - 91:11
**members** [1] - 54:2
**mention** [1] - 56:25
**mentioned** [8] - 24:5, 56:22, 66:13, 66:18, 79:4, 126:19, 135:21, 136:7
**mesh** [1] - 85:21
**metal** [2] - 29:8, 85:21
**method** [1] - 68:16
**methodology** [9] - 4:13, 53:9, 54:20, 61:11, 96:21, 117:23, 118:1, 118:7, 119:19
**methods** [1] - 5:2
**metric** [2] - 27:16, 28:14
**micro** [1] - 111:4
**middle** [5] - 10:19, 11:14, 53:21, 129:10, 132:22
**midstream** [1] - 128:4
**might** [26] - 5:1, 5:6, 5:19, 19:17, 20:21, 21:7, 22:22, 35:23, 51:21, 51:25, 53:15, 59:24, 62:5, 62:6, 68:17, 76:3, 77:11, 80:8, 80:9, 89:16, 94:19, 102:8, 113:23, 122:19, 123:22, 126:13
**mike** [1] - 7:6
**mile** [2] - 23:23, 27:13, 28:11, 32:13
**miles** [6] - 24:12, 27:18, 28:10, 28:19, 36:23
**Millsboro** [3] - 3:17, 3:19, 7:11
**mind** [9] - 31:6, 31:13, 86:14, 87:20, 87:22, 113:9, 130:5, 133:18, 134:3
**miniature** [2] - 6:24, 6:25
**minus** [2] - 48:7, 48:8

**minuses** [2] - 115:7, 115:9
**minute** [14] - 29:4, 64:15, 84:13, 90:8, 95:10, 98:20, 98:21, 98:22, 98:23, 109:15, 110:2
**minutes** [74] - 27:13, 30:23, 31:7, 34:12, 34:15, 34:18, 36:5, 39:24, 40:16, 41:1, 41:4, 41:6, 47:22, 47:23, 47:25, 48:3, 48:11, 48:14, 48:17, 48:18, 48:21, 48:22, 65:5, 65:15, 65:16, 65:19, 65:20, 76:3, 76:23, 76:24, 84:16, 90:6, 90:7, 90:10, 92:23, 92:25, 93:4, 93:9, 93:12, 93:23, 94:2, 94:14, 97:22, 98:5, 98:23, 98:25, 99:1, 99:3, 99:5, 99:7, 99:9, 104:24, 104:25, 105:2, 105:13, 108:12, 108:13, 108:14, 109:2, 109:16, 109:19, 109:25, 110:2, 110:17, 126:21, 128:14, 128:15
**minutiae** [1] - 12:22
**missing** [1] - 81:23
**misspoke** [1] - 14:23
**misunderstood** [1] - 108:25
**model** [53] - 24:17, 24:24, 25:9, 25:11, 27:8, 32:17, 33:2, 33:6, 33:12, 33:22, 34:6, 35:25, 36:1, 36:7, 36:18, 36:23, 37:12, 37:13, 37:14, 37:17, 37:19, 37:21, 38:21, 38:22, 38:24, 48:12, 48:13, 72:3, 73:3, 73:14, 73:16, 73:18, 74:1, 76:1, 76:9, 77:12, 77:15, 77:16, 81:17, 82:23, 95:1, 105:7, 110:7, 110:9, 110:11, 125:5, 125:6, 131:24, 132:6, 132:15
**model's** [1] - 73:5
**models** [2] - 11:25, 76:13
**modification** [1] - 40:6
**modified** [1] - 39:2
**modify** [1] - 50:16
**modular** [2] - 24:10, 112:23
**moment** [6] - 57:1, 68:6, 68:14, 90:3, 103:12, 128:3

**momentarily** [1] - 125:24
**moments** [2] - 125:25, 129:7
**Monday** [1] - 97:17
**money** [3] - 64:8, 64:11, 80:1
**morning** [10] - 15:2, 78:4, 78:8, 97:17, 102:8, 119:23, 120:5, 121:22, 122:10, 136:20
**MOSH** [1] - 82:1
**MOST** [3] - 30:5, 30:9
**most** [16] - 6:11, 11:16, 13:2, 21:19, 21:20, 43:10, 45:1, 51:23, 64:20, 71:3, 119:24, 120:3, 120:4, 124:3, 130:3
**mostly** [1] - 12:7
**motion** [4] - 5:5, 5:8, 30:3, 81:25
**motivated** [1] - 92:20
**motivation** [1] - 129:12
**motor** [2] - 29:6
**MOUNTAIRE** [1] - 1:7
**Mountaire** [19] - 3:18, 6:12, 7:11, 17:21, 34:25, 51:10, 52:19, 67:2, 67:25, 72:16, 74:5, 74:7, 86:23, 114:3, 114:11, 119:10, 129:15, 135:8, 139:5
**move** [6] - 49:5, 70:25, 87:23, 88:12, 88:24, 124:20
**moved** [1] - 88:23
**movement** [1] - 29:21
**moves** [2] - 88:18, 95:8
**moving** [1] - 37:9
**MR** [127] - 2:3, 2:13, 3:14, 3:16, 13:22, 14:6, 14:9, 14:12, 14:14, 14:16, 14:21, 14:23, 15:12, 15:14, 15:16, 15:18, 15:21, 15:24, 16:1, 16:3, 16:6, 16:9, 16:13, 16:17, 16:19, 16:22, 16:24, 17:9, 17:14, 17:17, 22:18, 25:3, 26:23, 29:17, 29:23, 31:19, 31:22, 31:24, 31:25, 32:11, 38:23, 39:5, 39:19, 42:2, 42:5, 42:7, 43:2, 43:3, 43:4, 43:7, 43:18, 43:21, 43:22, 43:23, 43:24, 44:1, 44:3, 44:4, 44:6, 44:10, 44:14, 44:19, 44:24, 45:4, 45:6, 45:7,

45:9, 45:10, 49:21, 50:1, 50:6, 65:4, 65:9, 65:14, 65:18, 66:3, 73:8, 75:13, 80:16, 82:11, 82:14, 82:24, 84:12, 84:13, 84:18, 87:19, 89:10, 90:24, 91:12, 91:18, 92:2, 92:8, 92:21, 92:25, 93:2, 93:6, 93:15, 95:11, 95:14, 96:15, 97:24, 100:20, 100:24, 101:2, 101:19, 101:23, 103:19, 103:23, 104:4, 105:8, 111:5, 111:8, 111:10, 119:17, 120:17, 120:20, 120:24, 127:25, 129:6, 131:4, 136:10, 136:18, 136:23, 137:1, 137:13, 138:5, 138:6
**MS** [4] - 14:15, 16:5, 16:16, 39:1
**multiple** [2] - 6:2, 59:19
**multiply** [3] - 47:22, 48:10, 69:4
**must** [1] - 14:2

## N

**name** [4] - 2:8, 2:9, 2:10, 113:17
**named** [1] - 74:16
**namely** [1] - 134:10
**narration** [1] - 86:15
**natural** [4] - 13:8, 17:2, 17:20, 21:21
**nature** [3] - 80:21, 124:4, 125:17
**nearly** [1] - 74:10
**necessary** [2] - 63:24, 70:3, 125:11
**need** [9] - 9:21, 18:13, 22:12, 22:21, 23:12, 25:9, 42:1, 48:23, 54:18, 57:9, 60:19, 61:10, 66:13, 70:3, 70:9, 79:22, 79:24, 80:22, 96:1, 122:7, 128:2, 133:23
**needed** [7] - 50:4, 50:5, 55:19, 62:6, 67:20, 127:6, 127:7
**needs** [1] - 38:15
**negligible** [1] - 134:14
**neighborhood** [1] - 105:4
**net** [19] - 44:22, 51:12, 76:24, 79:24, 83:8, 83:13, 83:24, 84:21, 85:2, 85:12, 88:3, 88:4, 98:19, 98:20, 102:16,

105:22, 105:23, 106:12, 133:8
**nets** [8] - 55:7, 61:5, 61:7, 62:7, 78:9, 79:11, 115:19
**Never** [1] - 31:13
**never** [4] - 58:6, 91:20, 112:13, 131:6
**new** [1] - 40:24
**next** [11] - 18:18, 25:7, 25:8, 30:13, 37:11, 81:24, 88:11, 90:4, 91:1, 106:10, 120:8
**nice** [3] - 47:12, 102:12, 134:1
**nil** [1] - 107:7
**nine** [3] - 74:16, 90:10
**ninety** [1] - 59:9
**NO** [1] - 1:6
**nobody** [1] - 95:22
**non** [9] - 57:16, 64:7, 64:16, 64:18, 111:25, 117:2, 120:8, 134:9, 134:10
**non-compensated** [1] - 120:8
**non-hourly** [1] - 134:10
**non-plaintiff** [2] - 64:7, 64:16
**non-plaintiffs** [2] - 57:16, 64:18
**non-production** [1] - 134:9
**non-value** [2] - 111:25, 117:2
**none** [5] - 60:17, 66:25, 70:2, 79:12, 137:1
**normal** [2] - 70:23, 117:21
**normalize** [1] - 29:20
**normally** [3] - 44:25, 56:7, 75:6
**NORTHERN** [1] - 1:2
**note** [5] - 19:21, 19:22, 20:13, 20:24, 22:6
**noted** [2] - 26:12, 27:7
**nothing** [1] - 112:24
**notice** [5] - 26:16, 34:19, 103:10, 107:2, 108:1, 124:1
**notified** [2] - 3:9, 97:15
**novice** [1] - 56:17
**nowhere** [2] - 132:8, 132:9
**number** [36] - 5:1, 6:7, 11:19, 13:6, 13:20, 16:5, 24:13, 24:14, 25:5, 26:8, 26:10, 37:4, 40:20, 41:1, 41:4, 48:6, 48:10, 50:17, 52:25, 55:4, 61:6, 63:20,

66:22, 69:8, 74:4, 78:5, 81:6, 82:5, 103:2, 103:4, 114:10, 126:2, 134:25, 135:6, 135:7
**Number** [1] - 58:6
**Number(s** [1] - 139:5
**numbers** [21] - 13:2, 26:18, 37:3, 39:25, 43:16, 59:10, 61:11, 68:9, 69:13, 71:8, 71:9, 71:10, 72:11, 72:13, 72:15, 72:19, 74:6, 76:19, 79:11, 135:17, 136:6

# O

**object** [1] - 64:12
**objection** [2] - 120:16, 120:17
**obscured** [1] - 108:8
**observation** [1] - 124:10
**observations** [8] - 8:7, 30:24, 61:12, 104:5, 120:4, 124:3, 125:19, 133:17
**observe** [2] - 26:9, 96:21
**observed** [3] - 81:16, 98:11, 119:24
**observer** [1] - 54:8
**obstacle** [2] - 46:17, 47:14
**obstacles** [2] - 23:24, 24:5
**obtain** [1] - 19:13
**obtained** [1] - 9:18
**obtaining** [2] - 19:10, 71:19
**obvious** [1] - 94:18
**Obviously** [2] - 62:20, 64:20
**obviously** [6] - 56:23, 57:21, 57:23, 57:25, 67:14, 91:4, 93:19, 104:15
**occupied** [1] - 21:20
**occur** [2] - 92:19, 96:9
**occurred** [2] - 35:5, 103:16
**odd** [1] - 112:18
**OF** [1] - 1:2
**office** [10] - 2:14, 2:19, 18:7, 18:12, 22:17, 25:20, 32:22, 44:15, 121:19
**official** [1] - 139:8
**Official** [1] - 139:16

**often** [2] - 77:10, 131:6
**old** [2] - 88:18, 115:4
**Oliver** [2] - 1:19, 14:19
**OLIVER** [2] - 14:9, 14:23
**Once** [1] - 71:9
**once** [17] - 5:9, 5:10, 6:4, 17:18, 19:13, 31:6, 34:6, 43:11, 48:1, 48:2, 54:15, 79:20, 90:15, 122:1, 129:24, 130:11
**one** [105] - 3:24, 5:21, 6:3, 7:2, 9:5, 13:22, 14:20, 14:22, 15:12, 17:6, 20:14, 21:1, 22:17, 23:19, 25:6, 25:25, 28:11, 28:18, 29:3, 31:25, 32:3, 32:4, 34:1, 35:4, 35:16, 35:20, 37:24, 40:2, 40:17, 40:19, 43:6, 46:4, 46:7, 46:14, 46:17, 46:24, 47:14, 48:12, 49:15, 53:14, 55:3, 57:17, 58:6, 65:17, 69:22, 70:17, 74:2, 77:7, 81:4, 81:10, 81:13, 81:14, 81:25, 82:20, 82:21, 83:1, 83:2, 83:3, 83:10, 83:24, 84:8, 84:20, 85:21, 86:10, 87:9, 87:21, 90:20, 91:1, 91:9, 94:9, 96:1, 96:7, 96:23, 102:8, 105:9, 105:10, 105:11, 105:16, 106:23, 108:1, 109:7, 109:18, 112:15, 112:18, 113:18, 114:7, 114:8, 114:23, 116:22, 118:8, 118:11, 118:13, 121:10, 122:3, 123:22, 124:24, 128:4, 134:8
**One** [20] - 8:8, 11:2, 61:2, 61:10, 71:24, 78:3, 85:24, 86:4, 86:18, 97:10, 102:7, 122:6, 127:1, 131:5, 134:4, 134:22, 135:7, 135:12
**one's** [1] - 65:14
**one-half** [2] - 29:3, 118:11
**ones** [1] - 122:1
**open** [8] - 19:24, 61:10, 88:2, 88:11, 98:16, 106:16, 106:20, 123:13
**opening** [1] - 51:8
**operate** [1] - 58:19
**operating** [1] - 70:22
**Operational** [2] - 30:4, 82:2
**operations** [4] - 68:3,

77:5, 77:6, 103:15
**opinion** [6] - 52:18, 116:12, 116:14, 116:17, 124:3, 124:21
**opportunity** [5] - 3:17, 57:8, 57:10, 117:17, 124:17
**opposed** [1] - 127:8
**opposite** [2] - 111:22, 116:6
**opt** [4] - 57:2, 67:24, 68:7, 68:15
**opt-in** [3] - 57:2, 67:24, 68:15
**opt-ins** [1] - 68:7
**opted** [1] - 60:13
**option** [2] - 79:2, 85:17, 96:1
**optional** [3] - 115:16, 122:1, 133:3
**options** [4] - 4:15, 26:11, 26:12, 101:12
**orally** [1] - 137:4
**orange** [1] - 95:16
**order** [1] - 52:15
**organization** [1] - 13:7
**orient** [1] - 29:8
**original** [1] - 48:13
**originally** [1] - 5:4
**OSH** [1] - 52:6
**OSHA** [1] - 35:2
**outlier** [2] - 69:19, 94:20
**outliers** [2] - 94:25, 95:2
**outside** [2] - 9:7, 123:16
**over-predicted** [1] - 73:18
**over-sample** [1] - 67:6
**overall** [7] - 7:9, 7:10, 39:25, 48:4, 73:23, 73:25, 78:11
**overestimated** [2] - 37:18, 110:20
**overestimates** [1] - 125:7
**overestimating** [1] - 74:1
**overlap** [1] - 96:17
**overly** [1] - 71:6
**overview** [5] - 4:10, 8:5, 8:21, 10:5, 10:15
**own** [9] - 9:8, 17:5, 19:3, 28:19, 47:7, 58:7, 63:6, 125:19

# P

**p.m** [1] - 137:15

**pace** [10] - 27:14, 59:21, 70:13, 70:16, 70:21, 70:23, 94:16, 95:8, 105:7
**Pack** [1] - 11:24
**packing** [1] - 106:22
**PAGE** [1] - 138:3
**Page** [7] - 15:12, 30:14, 30:17, 31:19, 40:1, 134:22, 135:2
**page** [7] - 7:4, 7:6, 31:11, 34:11, 38:25, 67:14, 136:6
**Pages** [1] - 15:14
**pages** [4] - 15:15, 31:14, 31:15, 139:7
**paid** [10] - 107:19, 107:22, 113:20, 115:1, 115:12, 118:23, 118:25, 134:10, 135:20
**Paid** [3] - 107:20, 107:21, 114:17
**pair** [3] - 75:3, 83:11, 102:12
**pairs** [2] - 115:17, 115:18
**pallets** [1] - 135:16
**parallel** [1] - 117:14
**park** [2] - 7:17, 121:17
**parking** [1] - 121:18
**Part** [2] - 43:7, 106:23
**part** [16] - 8:12, 11:16, 12:24, 50:5, 57:2, 81:24, 96:21, 119:25, 120:3, 120:4, 121:8, 123:14, 124:3, 128:1, 129:19, 132:13
**partial** [2] - 76:21, 76:24
**partially** [1] - 76:18
**particular** [26] - 4:20, 6:6, 11:13, 13:18, 18:15, 18:20, 20:6, 20:7, 23:13, 26:16, 33:4, 36:12, 38:10, 38:12, 39:9, 64:11, 66:5, 66:16, 77:9, 89:23, 97:1, 97:4, 98:12, 110:5, 112:18, 119:21
**particularly** [1] - 2:18
**parts** [1] - 28:1
**pass** [2] - 19:22, 27:21
**passed** [1] - 32:19
**past** [7] - 7:18, 100:16, 121:19, 123:8, 123:9, 123:12, 124:15
**path** [4] - 19:18, 22:2, 32:23, 48:9
**paths** [2] - 4:4, 24:21
**patience** [1] - 136:14
**Paul** [1] - 1:19
**Pause** [1] - 16:2
**pay** [1] - 115:24

**payroll** [2] - 135:8, 135:9
**pedestrian** [2] - 123:22, 125:2
**peel** [1] - 124:6
**peer** [2] - 4:19, 112:21
**peer-reviewed** [1] - 4:19
**peg** [2] - 29:4, 29:8
**People** [3] - 54:4, 59:4, 126:13
**people** [65] - 9:19, 11:19, 11:23, 19:16, 27:11, 28:20, 30:20, 35:1, 35:17, 47:17, 51:24, 53:12, 54:1, 56:10, 58:7, 58:21, 59:21, 59:23, 60:17, 60:23, 60:24, 61:4, 61:15, 61:18, 61:19, 62:22, 62:25, 63:7, 66:8, 67:4, 67:7, 67:22, 68:4, 70:6, 75:6, 77:10, 78:12, 79:6, 80:9, 96:9, 97:3, 97:11, 97:16, 101:10, 101:12, 103:18, 113:20, 115:1, 115:21, 117:5, 117:14, 121:8, 123:23, 124:5, 126:4, 126:11, 127:14, 128:13, 131:17, 132:7, 133:7, 134:10, 134:13, 135:20
**people's** [2] - 10:10, 54:4
**per** [24] - 24:12, 27:14, 27:18, 28:10, 28:11, 28:19, 30:23, 34:15, 34:22, 36:5, 36:23, 39:24, 40:16, 41:6, 47:22, 48:3, 48:14, 48:18, 48:21, 48:22, 76:25
**perceive** [1] - 22:9
**percent** [1] - 35:16
**percentage** [2] - 59:5, 60:1
**percentages** [1] - 41:4
**PEREZ** [1] - 1:5
**Perez** [1] - 139:4
**perform** [3] - 35:17, 54:6, 101:8
**performance** [3] - 29:20, 75:12, 126:13
**performing** [1] - 51:11, 66:5, 71:3
**performs** [1] - 24:24
**perhaps** [5] - 64:16, 91:9, 93:11, 95:24, 108:17
**Perhaps** [4] - 6:24,

19:15, 28:8, 44:10
**period** [1] - 33:8
**periods** [2] - 3:20, 125:13
**Peripheral** [1] - 11:23
**permit** [1] - 57:23
**Persgrave** - 28:13
**person** [19] - 6:9, 21:5, 21:11, 27:11, 27:18, 28:13, 30:23, 32:16, 56:2, 62:13, 62:24, 67:3, 79:10, 80:9, 114:13, 114:16, 116:25
**personal** [7] - 4:2, 9:22, 13:10, 28:19, 51:1, 76:25, 129:16
**personally** [5] - 31:8, 73:1, 78:3, 117:22, 132:24
**persons** [1] - 134:10
**perspective** [23] - 9:1, 9:11, 12:21, 13:1, 26:1, 32:7, 53:20, 57:25, 59:21, 61:9, 69:21, 79:25, 94:16, 102:12, 111:22, 112:25, 113:19, 113:25, 115:4, 117:24, 118:11, 120:9, 126:15
**pertain** [1] - 10:8
**pertaining** [1] - 112:17
**Ph.D** [1] - 3:6
**phonetic** - 28:13
**physical** [2] - 22:11, 127:5
**physically** [2] - 80:13, 108:3
**pick** [9] - 23:21, 29:7, 55:21, 71:5, 71:7, 74:22, 121:23, 127:12, 132:3
**picking** [3] - 19:7, 23:22, 40:12
**picks** [2] - 9:20, 10:4
**picture** [2] - 21:1, 89:11
**piece** [3] - 71:12, 73:1, 117:21
**pieces** [2] - 32:8, 70:1
**piles** [1] - 29:3
**pinning** [7] - 8:10, 8:22, 40:5, 40:9, 40:10, 40:15, 123:4
**Pinning** [3] - 40:13, 40:25, 41:13
**pinochle** [2] - 29:12, 29:14
**place** [9] - 10:12, 39:21, 55:15, 61:17, 99:16, 108:10, 121:13, 121:14, 121:23
**placebo** [1] - 54:11
**placed** [2] - 98:1, 98:3

**places** [1] - 103:6
**plaintiff** [5] - 64:6, 64:7, 64:16, 81:15, 136:25
**plaintiff's** [3] - 16:11, 90:19, 134:15
**Plaintiff's** [3] - 16:16, 16:17, 16:20
**Plaintiffs** [1] - 1:16
**plaintiffs** [17] - 16:4, 57:6, 57:15, 57:16, 57:18, 57:19, 60:17, 62:24, 63:1, 64:14, 64:17, 64:18, 67:24, 68:15, 109:17, 110:3
**plaintiffs'** [3] - 57:14, 91:7, 91:8
**plane** [3] - 65:24, 84:11, 129:4
**planned** [1] - 50:8
**planning** [1] - 50:7
**plant** [64] - 3:18, 6:5, 6:10, 7:11, 7:12, 7:14, 8:12, 9:8, 10:8, 11:17, 12:7, 13:11, 13:15, 18:17, 20:10, 21:17, 22:5, 22:12, 24:16, 25:19, 25:22, 26:2, 26:3, 26:5, 26:6, 28:1, 30:15, 32:18, 32:23, 33:24, 35:8, 36:13, 37:17, 43:25, 47:9, 50:2, 51:9, 51:11, 51:19, 53:21, 55:1, 55:12, 55:20, 56:15, 60:12, 63:15, 68:3, 85:8, 96:24, 97:11, 98:16, 102:9, 113:16, 121:9, 121:20, 122:23, 124:4, 124:12, 124:22, 124:23, 125:21, 130:13
**plants** [7] - 7:12, 13:7, 20:22, 74:4, 74:11, 74:13, 86:20
**plastic** [1] - 52:3
**plate** [1] - 84:25
**platform** [2] - 27:23, 27:24
**play** [1] - 59:15
**playing** [3] - 29:3, 64:14, 86:14
**plot** [1] - 135:11
**plugs** [10] - 51:13, 55:7, 81:9, 83:24, 84:21, 85:5, 85:6, 85:12, 103:11, 103:13
**plus** [1] - 125:20
**plusses** [2] - 115:7, 115:9
**pocket** [2] - 13:19, 98:4
**pockets** [3] - 98:1, 99:17, 103:7

**point** [51] - 6:4, 17:2, 19:9, 19:16, 19:17, 20:5, 20:9, 22:11, 23:17, 25:4, 25:7, 25:21, 26:3, 27:2, 36:14, 43:13, 44:11, 45:15, 46:18, 62:9, 63:13, 64:19, 67:12, 70:7, 72:19, 79:12, 79:20, 81:11, 82:21, 88:6, 91:8, 93:16, 96:8, 96:22, 98:2, 101:3, 107:18, 108:11, 109:18, 114:23, 116:25, 118:9, 119:12, 123:13, 123:16, 124:19, 124:25, 128:18, 137:12
**Point** [3] - 21:11, 21:12, 95:13
**pointing** [1] - 18:11
**points** [10] - 23:23, 25:6, 32:13, 44:16, 50:3, 53:16, 124:2, 124:8, 124:9, 133:21
**poker** [1] - 29:11
**policy** [1] - 116:2
**Pop** [2] - 92:7
**pop** [1] - 51:6
**Pop-Pop** [1] - 92:7
**populated** [2] - 11:25, 12:9
**population** [4] - 24:13, 68:20, 68:21, 135:10
**portion** [2] - 125:16, 128:5
**position** [2] - 2:21, 4:14, 101:25
**positions** [1] - 27:1
**possibility** [1] - 69:22
**possible** [5] - 24:1, 66:24, 67:11, 118:4, 131:1
**possibly** [1] - 109:12
**post** [1] - 21:7
**posts** [1] - 32:13
**poultry** [3] - 74:11, 74:13, 74:17
**Poultry** [1] - 74:14
**PPE** [34] - 13:14, 13:16, 16:3, 19:8, 27:5, 34:2, 34:4, 39:16, 51:3, 52:5, 52:7, 55:2, 55:6, 66:11, 66:17, 66:20, 72:3, 77:16, 87:2, 89:4, 95:18, 99:6, 99:8, 99:25, 102:11, 103:6, 117:21, 121:23, 121:25, 122:25, 123:2, 123:18, 132:1, 132:19
**practice** [2] - 52:23, 54:12

**practices** [1] - 50:10
**pre** [1] - 131:7
**pre-selected** [1] - 131:7
**precedes** [1] - 53:14
**preceding** [1] - 96:19
**precise** [1] - 118:16
**predetermined** [9] - 5:5, 10:13, 20:9, 30:3, 30:9, 30:10, 47:19, 81:17, 81:25
**predictability** [1] - 118:4
**predicted** [3] - 73:14, 73:16, 73:18
**predictions** [1] - 36:2
**predicts** [2] - 37:13, 37:14
**Prematurely** - 101:19
**premise** [1] - 58:20
**prepared** [2] - 46:5, 77:2
**prescreen** [1] - 63:6
**presence** [3] - 19:21, 20:13, 24:5
**present** [1] - 17:15
**presented** [2] - 132:8, 132:9
**Presently** [1] - 3:9
**pretty** [11] - 24:20, 52:13, 65:9, 89:1, 92:18, 94:18, 96:24, 101:10, 113:11, 115:13, 118:19
**previous** [6] - 35:4, 38:22, 112:13, 113:5, 119:14, 135:22
**previously** [1] - 10:9, 40:1, 48:14, 74:13, 84:24, 113:7, 116:7, 135:24
**price** [2] - 47:7, 131:17
**Primarily** [1] - 50:14
**primarily** [1] - 9:14
**primary** [4] - 8:8, 11:2, 18:11, 71:24
**principal** [2] - 118:18, 118:24
**principle** [2] - 54:5, 54:12
**principles** [2] - 4:24, 50:9
**private** [1] - 55:14
**probability** [3] - 68:19, 69:10
**problem** [1] - 52:13
**proceed** [5] - 2:2, 32:25, 45:11, 48:25, 111:8
**proceeding** [2] - 106:21, 106:22

**Proceedings** [2] - 2:1, 137:15
**proceedings** [3] - 16:2, 139:4, 139:8
**process** [12] - 7:21, 10:13, 11:21, 57:15, 60:18, 62:1, 62:15, 68:9, 80:3, 118:17, 120:11, 123:19
**Processing** [3] - 135:13, 135:14
**processing** [5] - 23:19, 25:20, 37:9, 74:13, 123:14
**produce** [2] - 13:2, 72:3
**producing** [1] - 73:6
**product** [9] - 10:13, 20:17, 21:20, 37:9, 58:22, 93:25, 101:3, 101:17, 124:22
**production** [24] - 41:19, 41:25, 42:6, 42:13, 42:14, 42:17, 42:20, 42:23, 43:6, 43:11, 43:12, 43:14, 44:4, 44:8, 44:9, 44:19, 45:16, 45:23, 46:18, 61:2, 100:6, 100:11, 106:15, 134:9
**Production** [2] - 44:3, 135:14
**professor** [1] - 3:8
**Professor** [2] - 2:22, 3:10
**promise** [1] - 65:25
**prompted** [1] - 88:17
**properly** [2] - 70:16, 74:24
**proportion** [3] - 12:1, 134:24, 135:11
**proposing** [1] - 135:18
**protect** [1] - 115:23
**protection** [2] - 52:1, 77:1
**protective** [5] - 4:2, 9:22, 13:10, 51:1, 129:16
**protocol** [1] - 80:11
**provide** [4] - 54:13, 56:2, 115:24, 133:14
**provided** [14] - 9:15, 17:21, 35:2, 36:17, 38:23, 39:15, 47:11, 52:21, 71:14, 75:8, 111:13, 122:1, 135:6, 135:12
**provides** [1] - 9:23
**proximate** [1] - 33:9
**prudent** [2] - 24:13, 52:18
**pseudo** [2] - 24:23, 72:2

**pull** [4] - 5:24, 19:24, 55:15, 79:15
**pulled** [1] - 92:17
**pullers** [1] - 63:25
**pulling** [1] - 73:25
**pulls** [1] - 13:10
**punch** [3] - 9:4, 10:11, 23:8
**punched** [2] - 118:23, 118:25
**Purdue** [1] - 29:4
**purpose** [3] - 6:4, 21:4, 72:5
**purposes** [5] - 19:3, 78:2, 82:14, 82:16, 86:18
**push** [3] - 19:24, 19:25
**put** [42] - 13:19, 14:21, 14:22, 16:13, 16:14, 16:15, 22:9, 22:13, 23:16, 31:15, 38:16, 42:8, 43:11, 45:1, 52:16, 54:24, 56:7, 58:25, 59:20, 75:2, 76:10, 81:21, 96:5, 100:18, 102:17, 103:13, 106:10, 106:12, 115:17, 115:19, 115:21, 115:25, 116:1, 120:5, 120:10, 122:8, 122:25, 128:21, 132:3, 133:7
**Put** [1] - 108:6
**puts** [1] - 88:4
**putting** [8] - 83:24, 83:25, 106:4, 106:25, 107:1, 107:3, 108:2, 126:12, 128:4
**puzzled** [1] - 127:1

## Q

**quantifiable** [1] - 117:6
**quantification** [2] - 30:2, 30:8
**quantify** [3] - 87:3, 130:3, 133:8
**quarter** [1] - 37:17
**questioning** [1] - 96:22
**questions** [15] - 5:1, 22:22, 31:3, 40:19, 49:1, 49:4, 50:17, 52:25, 60:7, 62:20, 79:6, 133:13, 134:20, 136:9, 136:10
**queue** [1] - 79:19
**quick** [5] - 71:11, 71:12, 82:9, 84:8, 118:13, 123:5
**quickly** [3] - 60:20, 84:20, 96:24
**quite** [4] - 7:1, 93:17, 128:8

**quote** [2] - 24:4, 118:22
**quote-unquote** [1] - 24:4
**quotes** [2] - 136:5, 136:8

## R

**rack** [1] - 92:16, 102:18, 131:9, 132:8, 132:9
**radio** [1] - 67:15
**Radwin** [44] - 25:24, 43:15, 86:7, 94:1, 96:12, 97:15, 102:1, 102:23, 104:25, 105:25, 106:8, 106:9, 107:15, 107:24, 108:4, 108:10, 108:12, 108:14, 109:2, 109:6, 109:8, 110:20, 111:21, 111:24, 112:6, 112:10, 112:24, 113:5, 113:7, 114:2, 114:9, 116:4, 116:12, 116:14, 116:24, 118:15, 119:3, 134:7, 134:12, 134:17, 134:23, 135:13, 135:18, 135:21
**Radwin's** [22] - 88:1, 88:6, 89:21, 90:15, 93:23, 96:9, 102:9, 108:23, 110:12, 111:11, 111:19, 112:13, 113:14, 125:19, 126:22, 133:16, 133:20, 134:2, 134:18, 134:22, 135:19, 136:6
**raised** [1] - 62:21
**random** [10] - 55:25, 59:25, 60:8, 60:10, 60:15, 60:16, 63:14, 63:15, 134:5
**Random** [1] - 60:10
**randomized** [4] - 57:15, 60:18, 114:24
**randomly** [6] - 33:25, 36:9, 55:21, 55:24, 67:18, 69:6
**range** [1] - 71:4
**rate** [1] - 59:21
**rated** [2] - 70:16, 70:21
**rather** [2] - 124:23, 127:22
**rating** [1] - 105:7
**rationalize** [2] - 13:1, 29:20
**Re** [1] - 124:14
**Re-Hang** [1] - 124:14
**reach** [1] - 29:7, 81:19, 127:21
**reached** [1] - 102:23
**read** [3] - 30:18, 116:22,

135:5
**reading** [2] - 81:15, 82:17
**readjust** [1] - 42:22
**ready** [7] - 2:2, 7:6, 10:13, 57:18, 66:2, 86:10, 98:11
**real** [8] - 37:8, 52:20, 71:11, 73:21, 84:7, 123:5
**reality** [1] - 132:6
**realize** [1] - 82:19
**really** [8] - 2:17, 64:12, 70:3, 108:16, 134:16, 136:2, 136:3, 137:8
**reapply** [1] - 48:21
**reason** [13] - 10:1, 23:22, 24:15, 32:6, 34:22, 36:21, 47:2, 47:8, 50:14, 71:24, 72:24, 111:6, 125:4
**reasonable** [1] - 21:11
**reassurance** [1] - 35:7
**rebuttal** [1] - 136:24
**recalculate** [1] - 45:13
**recalculated** [1] - 134:13
**receive** [1] - 38:2
**received** [1] - 8:21
**Receiving** [10] - 23:7, 30:20, 30:21, 30:25, 32:12, 37:24, 38:8, 38:21, 40:14, 41:13
**receiving** [8] - 8:10, 8:19, 9:25, 31:8, 34:10, 121:8, 123:4, 123:17
**receiving/break** [1] - 23:11
**recently** [1] - 3:9
**recess** [4] - 65:1, 65:25, 66:1, 84:16
**Recess** [1] - 84:17
**reciprocal** [1] - 33:18
**recognize** [2] - 104:19, 104:20
**recollection** [2] - 96:14, 130:6
**recommend** [1] - 53:6
**record** [17] - 2:9, 2:15, 8:15, 19:19, 19:20, 36:24, 36:25, 43:8, 52:23, 70:4, 71:23, 71:25, 72:25, 86:20, 98:11, 103:2, 116:11
**recordable** [2] - 35:5, 35:9
**recorded** [1] - 139:3
**rectangular** [1] - 10:23
**red** [1] - 7:24
**reduced** [1] - 76:15
**refer** [2] - 13:8, 95:18

**reference** [2] - 70:16, 72:1
**referenced** [1] - 112:14
**referred** [2] - 17:5, 54:8
**referring** [9] - 5:22, 8:20, 16:7, 24:18, 25:11, 25:15, 25:18, 31:22, 122:25
**refresh** [1] - 130:6
**regards** [1] - 8:12
**regular** [2] - 107:8, 121:16
**rehab** [1] - 29:5
**reiterate** [1] - 45:12
**rejected** [1] - 69:9
**release** [1] - 81:22
**reliability** [1] - 57:24
**reliable** [1] - 50:16
**relief** [1] - 40:12
**rely** [1] - 133:11
**remained** [1] - 68:13
**remaining** [2] - 50:5, 61:7
**remember** [2] - 25:24, 134:8
**remind** [1] - 44:8
**reminder** [1] - 48:15
**remote** [3] - 47:8, 55:13
**remove** [2] - 46:16, 76:12
**removes** [2] - 88:3, 98:19
**repeat** [3] - 9:16, 36:20, 38:4
**repeatability** [1] - 53:11
**repeatable** [1] - 53:19
**repeated** [1] - 7:16
**replace** [1] - 40:23
**replacement** [1] - 123:3
**replicate** [1] - 81:18
**report** [31] - 13:14, 13:23, 13:24, 17:10, 25:1, 25:11, 28:17, 31:20, 48:24, 49:5, 49:22, 67:20, 76:1, 76:20, 77:21, 110:20, 111:14, 111:15, 116:22, 119:3, 127:2, 127:9, 127:14, 131:13, 131:23, 131:24, 131:25, 133:16, 134:18, 134:22
**reported** [23] - 34:5, 61:18, 69:9, 69:11, 69:15, 78:7, 78:8, 78:9, 78:12, 79:2, 87:14, 94:1, 95:2, 98:5, 104:25, 108:13, 109:2, 110:19, 113:6, 131:18, 135:25
**Reported** [1] - 1:22
**Reporter** [1] - 139:16

**REPORTER'S** [1] - 139:1

**reporting** [1] - 127:14
**reports** [5] - 17:10, 119:6, 131:23, 133:24, 135:18
**representation** [3] - 54:13, 79:18, 113:21
**Representative** [2] - 67:13, 67:21
**representative** [9] - 13:2, 55:17, 55:23, 59:14, 66:22, 67:2, 67:9, 89:2, 113:16
**represented** [3] - 55:21, 67:1, 135:11
**reputation** [1] - 112:12
**request** [2] - 5:21, 17:22
**requested** [2] - 35:2, 41:23, 71:19
**require** [2] - 2:17, 129:9
**required** [30] - 4:2, 7:19, 13:10, 51:10, 52:8, 53:1, 55:9, 61:8, 71:13, 76:4, 76:17, 76:25, 87:10, 87:12, 101:1, 103:23, 110:14, 112:4, 115:17, 115:25, 121:25, 127:3, 129:15, 132:16, 132:18, 132:25, 133:1, 133:3
**requirements** [1] - 32:8
**requires** [2] - 13:16, 129:9
**reservations** [1] - 133:16
**resident** [1] - 5:24
**resist** [1] - 60:6
**Resources** [6] - 55:17, 55:18, 62:13, 62:24, 67:13, 67:21
**resources** [1] - 67:9
**respect** [5] - 60:10, 88:19, 88:22, 117:16, 127:5
**respected** [1] - 112:10
**respectfully** [2] - 94:15, 117:14
**respondents** [2] - 78:6, 79:5
**response** [3] - 29:10, 119:20, 119:21
**responsibility** [1] - 115:23
**responsive** [1] - 131:21
**rest** [3] - 76:14, 93:10, 125:9
**restroom** [1] - 116:25
**restroom/wash** [1] -

23:15
**restroom/wash-up** [1] - 23:15
**rests** [1] - 136:18
**result** [2] - 48:18, 85:25
**resulting** [1] - 76:24
**results** [4] - 25:1, 41:5, 73:25, 134:23
**resume** [3] - 26:21, 26:24, 108:18
**retrieve** [2] - 4:25, 7:19
**return** [2] - 48:2, 89:15
**returning** [1] - 81:24
**returns** [1] - 82:22
**reverse** [1] - 64:16
**review** [2] - 111:11, 126:22
**reviewed** [3] - 4:19, 112:21, 126:20
**reviewing** [1] - 113:5
**right-hand** [3] - 7:24, 12:3, 12:5
**rigid** [1] - 54:21
**rigor** [1] - 81:18
**rigorously** [1] - 74:25
**ripple** [1] - 124:22
**risk** [1] - 22:9
**Roasters** [1] - 11:24
**robber** [1] - 83:3
**roll** [1] - 99:22
**rolling** [1] - 100:17
**Room** [2] - 1:23, 10:2
**room** [55] - 4:5, 8:19, 8:22, 9:9, 9:15, 10:1, 22:13, 22:24, 23:1, 23:2, 23:11, 25:17, 25:18, 25:19, 26:3, 26:5, 32:24, 33:3, 33:10, 33:13, 33:16, 38:1, 38:2, 39:15, 39:17, 45:15, 45:22, 45:23, 47:7, 47:11, 53:24, 53:25, 55:6, 61:4, 62:23, 67:20, 89:19, 99:13, 103:7, 117:20, 122:4, 122:6, 123:4, 123:13, 123:17, 127:4, 127:17, 130:8, 130:13, 130:22
**room's** [1] - 8:2
**room/cafeteria** [1] - 46:18
**rooms** [2] - 7:25, 8:22
**roughly** [6] - 3:22, 69:3, 78:7, 94:13, 105:4, 110:1
**round** [1] - 48:11
**route** [3] - 22:10, 47:3
**routes** [4] - 5:19, 21:18, 36:9, 129:17
**routine** [3] - 10:12, 101:7, 117:21

**RPR** [1] - 1:23
**rubbed** [1] - 21:7
**rubber** [11] - 55:7, 83:3, 85:12, 85:16, 85:17, 92:12, 99:6, 99:16, 100:22, 103:25, 107:4
**rubbers** [1] - 98:4
**rule** [4] - 119:5, 129:8, 129:21, 132:22
**rules** [3] - 36:5, 129:11, 133:13
**ruling** [1] - 137:4
**run** [5] - 24:25, 53:23, 76:9, 95:7, 110:9
**running** [2] - 86:15, 97:12
**runs** [1] - 124:24

## S

**safe** [2] - 136:16, 136:22
**safety** [2] - 83:11, 99:1
**sake** [1] - 61:6
**sample** [10] - 37:16, 55:23, 59:25, 63:25, 66:22, 67:6, 68:20, 69:7, 135:10, 135:12
**sampled** [4] - 34:1, 36:10, 37:3, 69:4
**samples** [1] - 81:7
**sampling** [3] - 63:14, 63:15, 134:24
**Samuel** [1] - 2:23
**sanitation** [12] - 4:2, 9:21, 13:10, 13:16, 39:16, 51:2, 51:3, 76:25, 113:23, 117:22, 121:25, 129:16
**sanitize** [5] - 26:8, 100:1, 100:3, 104:11, 109:12
**sanitizing** [9] - 23:18, 101:10, 104:12, 110:4, 120:1, 125:13, 125:17, 125:21, 126:5
**sarcastic** [1] - 133:10
**saves** [1] - 22:8
**saw** [13] - 21:1, 23:15, 62:7, 92:19, 109:13, 116:23, 123:22, 123:23, 125:18, 126:21, 132:7
**scenario** [1] - 46:16
**schematic** [4] - 6:14, 11:13, 12:15, 19:2
**science** [1] - 4:19
**Science** [2] - 3:2, 3:4
**scientific** [6] - 50:14, 52:17, 112:5, 112:15,

112:25, 118:7
**scientist** [1] - 60:9
**scientists** [1] - 118:7
**screen** [2] - 38:16, 38:20
**screened** [2] - 56:3, 57:2
**screw** [1] - 57:20
**searching** [1] - 119:15
**seated** [1] - 2:6
**Second** [1] - 135:13
**second** [32] - 4:3, 6:9, 7:23, 8:4, 14:2, 14:10, 16:12, 17:7, 18:4, 20:16, 24:18, 30:10, 34:1, 35:11, 40:2, 47:6, 47:9, 50:4, 51:16, 72:1, 81:13, 81:14, 82:1, 82:20, 82:22, 84:8, 86:22, 98:25, 99:5, 108:1, 108:7, 110:18
**seconds** [52] - 64:17, 81:10, 81:11, 83:2, 83:3, 83:4, 83:5, 83:6, 83:7, 83:8, 83:11, 83:13, 83:14, 83:15, 83:16, 83:18, 85:19, 90:7, 90:8, 90:10, 93:23, 94:13, 94:14, 97:23, 98:6, 98:18, 98:20, 98:21, 98:22, 98:23, 99:3, 99:5, 99:7, 104:12, 104:13, 104:24, 105:1, 108:12, 108:23, 109:1, 109:15, 109:16, 109:22, 110:17, 110:19, 110:21
**section** [1] - 24:16
**Security** [2] - 32:19, 123:8
**security** [9] - 7:18, 10:4, 78:8, 121:19, 122:9, 122:11, 122:12, 122:17, 122:22
**see** [64] - 7:11, 11:10, 11:18, 12:1, 18:10, 20:19, 30:16, 30:23, 34:13, 35:12, 37:7, 37:13, 38:17, 38:18, 40:11, 40:18, 40:23, 41:18, 44:25, 47:18, 48:12, 51:5, 51:16, 52:1, 57:24, 59:16, 59:22, 61:5, 62:23, 65:7, 67:21, 68:17, 72:18, 73:5, 74:6, 77:10, 79:11, 79:24, 82:22, 87:23, 89:4, 92:16, 93:18, 94:12, 96:22, 100:15, 104:8, 104:9, 104:17, 105:21, 106:4, 108:8, 111:2,

112:19, 114:20, 116:4, 117:1, 117:18, 120:12, 124:4, 124:20, 128:18, 133:10
**seeing** [2] - 36:7, 136:19
**sees** [2] - 101:14, 111:21
**segment** [1] - 104:24
**segregate** [2] - 17:24, 133:5
**segregated** [1] - 69:19
**select** [2] - 55:24, 67:19, 85:1
**selected** [8] - 3:10, 57:4, 60:1, 62:22, 68:17, 68:20, 69:6, 131:7
**selecting** [1] - 55:25
**selection** [7] - 62:1, 62:14, 66:6, 66:8, 66:9, 114:24
**self** [4] - 78:9, 79:2, 127:9, 127:14
**self-report** [1] - 127:9
**self-reported** [2] - 78:9, 79:2
**senior** [2] - 68:2, 68:4
**sense** [5] - 21:5, 25:25, 78:15, 117:22, 119:7
**sent** [2] - 62:23, 63:10
**separate** [4] - 9:9, 15:13, 17:9, 17:11
**separately** [1] - 16:10
**Sequence** [2] - 30:4, 82:2
**sequence** [1] - 60:5
**serial** [1] - 124:4
**series** [1] - 12:5
**set** [9] - 36:5, 50:22, 51:16, 52:18, 52:22, 53:3, 55:12, 61:21, 76:4
**sets** [1] - 107:1
**Seven** [1] - 134:22
**several** [1] - 126:20
**shack** [1] - 122:9
**Shall** [1] - 65:1
**shape** [1] - 91:14
**shed** [2] - 122:9, 122:11
**shift** [22] - 9:17, 22:16, 30:23, 34:15, 36:5, 39:10, 39:11, 39:24, 40:16, 41:6, 41:20, 41:21, 42:12, 48:22, 76:5, 76:18, 89:16, 93:21, 102:11, 109:8, 118:17, 119:8
**shifting** [2] - 110:4, 127:1
**shoes** [1] - 35:18, 98:24, 102:16

112:19, 114:20, 116:4, 117:1, 117:18, 120:12, 124:4, 124:20, 128:18, 133:10
**shooting** [1] - 116:22
**Shore** [1] - 95:11
**short** [3] - 22:6, 102:13, 125:17
**shorter** [1] - 102:5
**shortest** [2] - 65:16, 126:8
**shot** [2] - 90:12, 128:14
**shoulders** [1] - 104:16
**show** [15] - 6:18, 9:6, 32:5, 46:9, 46:24, 46:25, 84:7, 84:9, 90:18, 91:9, 97:16, 102:13, 105:16, 123:8, 127:10
**Show** [2] - 105:18, 105:20
**showed** [1] - 111:1
**showing** [2] - 34:10, 87:20
**shown** [3] - 43:15, 64:14, 104:6
**shows** [2] - 48:13, 63:6
**shuffling** [1] - 121:3
**side** [6] - 7:24, 8:20, 54:11, 122:18, 134:15, 136:21
**sides** [1] - 116:6
**sign** [1] - 122:18
**signature** [1] - 139:10
**significance** [3] - 70:10, 121:14
**significant** [9] - 6:6, 26:15, 34:15, 56:24, 59:16, 89:1, 125:6, 125:7, 129:9
**significantly** [3] - 73:24, 94:16, 102:5
**similar** [7] - 5:16, 51:1, 52:25, 74:24, 112:21, 120:9, 120:10
**SIMO** [5] - 77:17, 77:18, 103:10, 103:15
**simply** [8] - 19:24, 24:18, 40:22, 54:6, 56:6, 63:13, 76:13, 84:25
**simultaneous** [2] - 77:5, 103:15
**Simultaneous** [1] - 77:6
**simultaneously** [1] - 77:11
**single** [2] - 6:12, 19:1
**sit** [3] - 111:5, 117:20, 129:20
**site** [2] - 20:7, 91:3
**sitting** [1] - 128:19
**situation** [2] - 4:12, 21:8
**situations** [1] - 29:21
**six** [8] - 28:18, 90:6, 92:23, 93:4, 104:24,

127:8, 127:22
**Six** [6] - 16:16, 16:17, 16:20, 90:7, 90:8, 92:25
**size** [3] - 18:11, 55:7, 127:3, 127:5, 127:7, 127:8, 127:11, 127:22
**sizes** [2] - 107:6, 122:7
**sizing** [1] - 107:9
**skew** [1] - 59:7
**sleeve** [2] - 83:2
**sleevelets** [1] - 55:10
**sleeves** [3] - 51:18, 99:22, 100:18
**slighter** [1] - 107:4
**slip** [1] - 35:5
**slippery** [1] - 35:23
**slipping** [1] - 35:1
**slow** [5] - 59:6, 69:18, 71:6, 75:10, 94:16
**small** [11] - 6:1, 12:23, 24:21, 53:16, 53:17, 59:5, 59:22, 59:25, 71:8, 74:21, 128:16
**Small** [1] - 11:20
**smaller** [1] - 18:13
**smock** [34] - 23:16, 44:21, 51:12, 83:14, 83:25, 84:21, 85:7, 85:8, 85:9, 85:12, 89:13, 92:16, 92:24, 93:5, 93:7, 93:8, 96:5, 97:23, 97:25, 98:1, 98:3, 98:4, 99:14, 99:15, 99:16, 99:22, 102:18, 102:19, 102:20, 102:24, 103:1, 103:6, 132:9
**smocks** [9] - 55:10, 89:14, 89:15, 92:17, 93:13, 93:16, 96:4, 131:9
**snow** [1] - 78:15
**snowy** [1] - 87:16
**soap** [2] - 21:1, 34:24
**sole** [1] - 103:25
**solicit** [1] - 63:21
**solved** [1] - 111:18
**someone** [2] - 52:9, 132:15
**something's** [1] - 72:1
**Sometimes** [2] - 6:1, 125:24
**sometimes** [3] - 59:2, 59:5, 127:13
**somewhat** [1] - 76:7
**soon** [1] - 122:16
**sorry** [12] - 2:16, 14:24, 17:6, 28:23, 31:10, 31:16, 31:18, 70:2, 74:9, 114:15, 114:21, 127:15
**Sorry** [2] - 17:16, 131:2
**sort** [4] - 63:17, 63:19,

103:20, 121:3
**sound** [1] - 4:23
**source** [4] - 25:8, 25:13, 30:21, 104:9
**sources** [2] - 28:18, 72:16
**South** [1] - 3:3
**space** [2] - 21:20, 55:14
**special** [2] - 53:17, 114:19
**specific** [17] - 9:6, 19:18, 20:24, 24:15, 25:22, 26:10, 35:22, 37:3, 37:12, 40:19, 56:16, 60:24, 67:10, 77:2, 113:3, 125:4, 133:24
**specifically** [15] - 7:16, 23:6, 24:8, 26:15, 35:6, 50:11, 57:4, 96:20, 113:3, 121:7, 125:11, 129:23, 134:7, 135:21, 136:7
**specifications** [1] - 51:4
**speed** [3] - 24:12, 90:11, 124:7
**spelling** [1] - 2:9
**spend** [2] - 3:22, 70:9
**spending** [1] - 136:14
**spent** [1] - 49:14
**spread** [2] - 6:7, 79:17
**spreadsheet** [11] - 15:20, 15:21, 25:9, 30:22, 39:1, 39:2, 39:3, 39:14, 46:22, 73:1
**spreadsheets** [1] - 25:14
**stability** [1] - 118:4
**staff** [1] - 55:20
**stairs** [5] - 20:15, 27:7, 30:10, 122:17, 123:8
**stand** [6] - 26:21, 26:24, 65:1, 84:15, 101:16, 108:18
**standard** [15] - 4:21, 5:5, 24:9, 27:10, 32:7, 34:21, 40:21, 50:10, 52:24, 66:14, 80:21, 84:23, 103:21, 112:23
**standing** [3] - 92:24, 106:24, 127:18
**star** [2] - 97:1, 109:8
**start** [31] - 4:7, 9:2, 12:23, 18:3, 19:10, 19:16, 41:20, 42:12, 42:19, 45:21, 47:13, 53:15, 61:12, 76:17, 79:10, 79:15, 81:20, 84:21, 87:21, 90:22,

99:8, 98:12, 107:20, 112:3, 112:7, 113:20, 118:23, 121:13, 123:6, 127:23
**started** [12] - 88:7, 102:23, 106:8, 106:11, 107:14, 107:15, 107:21, 118:17, 119:3, 130:6, 130:7, 130:21
**starting** [7] - 33:2, 42:14, 43:19, 62:3, 76:12, 79:22, 93:17
**starts** [8] - 43:5, 93:12, 93:21, 107:19, 114:19, 117:23, 119:5, 119:8
**state** [2] - 2:14, 54:22
**STATES** [1] - 1:1
**stating** [1] - 2:8
**station** [6] - 100:4, 101:5, 101:21, 103:9, 104:14, 104:19
**statistical** [11] - 4:24, 54:22, 69:19, 70:10, 79:11, 79:25, 94:20, 126:10, 126:15, 129:25, 134:16
**statistically** [1] - 24:11
**statistician** [1] - 63:1
**statutes** [1] - 118:3
**stay** [1] - 9:14
**stayed** [1] - 96:20
**steel** [2] - 103:18, 103:24
**stenographically** [1] - 139:4
**step** [11] - 5:9, 5:11, 25:7, 25:8, 27:22, 27:23, 27:24, 27:25, 28:4, 47:25, 96:1
**stepping** [2] - 27:23, 56:21
**steps** [5] - 27:6, 33:5, 39:18, 40:7, 41:12
**stick** [2] - 64:1, 101:11
**still** [12] - 41:1, 41:7, 50:18, 68:8, 70:6, 80:3, 80:4, 91:10, 101:3, 108:5, 133:22
**STINE** [90] - 2:3, 2:13, 3:16, 13:22, 14:6, 14:12, 14:14, 14:16, 14:21, 15:12, 15:14, 15:16, 15:18, 15:21, 15:24, 16:1, 16:3, 16:6, 16:9, 16:13, 16:17, 16:19, 16:22, 16:24, 17:9, 17:14, 17:17, 25:3, 26:23, 29:17, 29:23, 31:22, 31:25, 32:11, 39:5, 39:19, 42:5, 42:7,

43:3, 43:7, 43:21, 43:23, 44:1, 44:4, 44:10, 44:14, 44:19, 44:24, 45:4, 45:7, 45:10, 50:6, 65:4, 65:9, 65:14, 65:18, 66:3, 73:8, 75:13, 80:16, 82:11, 82:14, 82:24, 84:12, 84:18, 87:19, 89:10, 90:24, 91:12, 91:18, 92:2, 92:25, 93:6, 93:15, 97:24, 101:2, 101:23, 103:19, 103:23, 104:4, 105:8, 111:5, 111:8, 111:10, 119:17, 120:20, 136:10, 136:18, 137:13, 138:5
**Stine** [23] - 1:19, 25:2, 28:11, 29:22, 34:7, 35:20, 37:23, 39:3, 46:12, 48:2, 49:9, 57:11, 58:6, 64:21, 65:2, 69:5, 72:24, 91:23, 92:1, 93:3, 93:19, 131:15, 136:17
**Stine's** [1] - 60:6
**stipulate** [2] - 93:2, 93:4
**stop** [13] - 6:12, 7:23, 19:1, 19:19, 42:16, 56:9, 70:14, 79:23, 81:22, 99:11, 125:24, 133:6, 133:11
**stopped** [4] - 36:13, 93:24, 107:24, 108:10
**stopping** [4] - 43:19, 71:20, 71:22, 128:6
**stops** [6] - 14:2, 14:7, 14:8, 43:5, 71:12, 114:19
**store** [1] - 131:8
**story** [1] - 118:11
**stow** [1] - 98:24
**stowage** [1] - 88:12
**strange** [1] - 93:11
**strata** [1] - 69:6
**stratification** [1] - 66:15
**Stratification** [1] - 66:16
**Street** [1] - 1:24
**street** [2] - 7:17, 35:18
**stride** [3] - 28:4, 47:16, 125:22
**strikes** [1] - 78:24
**striving** [1] - 58:23
**strongly** [1] - 133:22
**struck** [1] - 112:18
**structures** [1] - 28:2
**struggle** [1] - 61:15
**student** [1] - 72:22
**students** [2] - 96:13, 96:19
**studied** [1] - 36:21, 59:4, 59:8, 66:9, 68:22,

69:17, 70:21, 74:13, 74:14, 74:16, 113:13
**studies** [20] - 3:20, 3:23, 3:25, 5:3, 17:14, 34:3, 49:24, 57:13, 59:18, 59:19, 74:17, 74:23, 113:7, 113:8, 114:12, 115:5, 115:10, 119:10, 119:14, 135:22
**study** [86] - 4:1, 4:3, 4:8, 4:11, 5:10, 12:24, 24:25, 25:7, 28:19, 34:4, 35:15, 36:8, 43:19, 49:7, 49:15, 49:16, 50:7, 50:8, 50:13, 50:20, 50:22, 52:10, 52:17, 52:23, 53:3, 53:9, 53:18, 57:14, 57:16, 57:23, 59:7, 59:18, 63:16, 66:5, 70:15, 70:19, 75:14, 77:6, 77:20, 78:1, 78:17, 82:3, 86:22, 86:24, 87:5, 87:11, 88:6, 89:21, 90:15, 94:7, 94:11, 96:20, 102:9, 107:25, 111:11, 111:23, 112:8, 112:14, 113:4, 113:14, 113:19, 114:9, 114:14, 115:6, 116:18, 117:6, 118:21, 120:15, 121:2, 125:15, 125:16, 128:5, 129:11, 129:13, 129:19, 129:22, 129:23, 130:6, 132:12, 132:13, 132:17, 134:5, 134:13, 135:6
**studying** [4] - 36:20, 60:12, 67:3, 68:12
**stuff** [9] - 51:23, 54:24, 73:25, 87:10, 96:24, 119:6, 122:8, 127:18, 128:22
**sub** [1] - 108:4
**sub-tasks** [1] - 108:4
**subcontracted** [1] - 113:23
**subject** [4] - 57:17, 124:7, 134:6
**subjects** [10] - 54:6, 54:7, 57:1, 57:4, 66:24, 79:15, 91:7, 106:17, 106:18
**submit** [1] - 120:14
**submitted** [3] - 3:20, 13:14, 102:2
**substantial** [1] - 47:10
**subtotal** [1] - 34:12
**subtract** [4] - 38:12, 48:16, 76:13, 117:1
**subtracting** [1] - 31:3
**sufficient** [1] - 63:24

**suggest** [1] - 61:19
**suggesting** [1] - 70:5
**suggests** [1] - 66:15
**suit** [4] - 67:22, 68:2, 78:12, 105:22
**suits** [4] - 61:14, 61:15, 61:16, 78:13
**summarize** [2] - 125:1, 129:8
**summary** [3] - 30:16, 34:11, 134:21
**summing** [1] - 34:14
**supervisor** [10] - 9:20, 10:4, 18:25, 22:2, 36:11, 60:16, 114:18, 122:2, 123:1
**supervisors** [6] - 6:11, 62:23, 67:18, 67:23, 68:1, 95:19
**supervisors/ managers** [1] - 67:15
**supplied** [1] - 103:24
**supplies** [4] - 9:19, 9:20, 9:21, 39:21
**supply** [12] - 23:2, 25:17, 45:22, 45:23, 55:6, 89:19, 99:13, 122:4, 122:6, 123:13, 131:20
**Supply** [1] - 10:2
**Support** [4] - 134:11, 135:14, 135:15, 135:16
**support** [3] - 111:25, 112:24, 134:12
**supports** [1] - 112:22
**supposed** [2] - 133:6, 133:8
**surface** [2] - 21:6, 34:22
**surfaces** [2] - 28:21, 50:25
**surveys** [2] - 74:10
**suspect** [5] - 60:3, 60:6, 93:19, 96:23, 97:10
**sweaty** [1] - 120:6
**swing** [1] - 19:24
**swipe** [4] - 32:20, 99:9, 103:8, 123:11
**swiped** [2] - 105:25, 119:8
**swipes** [3] - 89:4, 89:5, 114:18
**swiping** [1] - 131:19
**swooshed** [1] - 119:25
**SWORN** [1] - 2:4
**system** [16] - 4:21, 4:22, 5:25, 24:9, 24:10, 30:11, 32:7, 47:19, 50:10, 52:24, 80:21, 81:17, 83:19, 84:24, 107:16, 112:23

**systematic** [1] - 62:8
**systematically** [2] - 18:17, 19:6
**systems** [1] - 30:4
**Systems** [3] - 2:22, 3:4, 3:6

### T

**table** [9] - 30:16, 30:18, 87:23, 127:18, 128:19, 131:6, 131:25, 132:1, 134:21
**Table** [1] - 134:22, 135:6
**tactile** [1] - 29:10
**tag** [1] - 15:8
**tails** [1] - 126:13
**tape** [4] - 73:13, 86:14, 93:23, 110:12
**tapes** [1] - 59:15, 73:12, 75:7, 125:20, 126:20, 126:22
**taping** [1] - 93:25
**targets** [1] - 124:17
**tasks** [1] - 108:4
**technique** [1] - 52:23
**Technique** [2] - 30:4, 82:2
**temporary** [1] - 88:12
**ten** [3] - 65:5, 128:14, 137:3
**Ten** [1] - 128:15
**tend** [3] - 78:22, 112:2, 124:17
**tends** [1] - 59:7
**tension** [1] - 118:6
**tenure** [1] - 3:11
**tenured** [1] - 3:8
**term** [2] - 56:17, 126:1
**terminate** [1] - 101:18
**terminology** [2] - 122:24, 126:23
**terms** [1] - 35:9
**test** [7] - 29:4, 29:5, 33:21, 36:3, 66:8, 123:20
**tested** [1] - 69:11
**testified** [1] - 134:7
**testimony** [1] - 10:10, 37:20, 37:25, 38:6, 39:5, 60:5, 63:6, 64:11, 70:12, 93:19, 111:17, 111:19, 133:20, 134:2, 135:18
**tests** [1] - 53:7
**textbooks** [1] - 4:20
**texts** [1] - 112:20
**THE** [386] - 1:1, 1:2, 2:2, 2:5, 2:6, 2:7, 2:8, 2:10, 2:16, 3:15, 6:22, 6:24,

13:20, 13:25, 14:1, 14:3, 14:4, 14:7, 14:10, 14:13, 14:17, 14:18, 14:25, 15:4, 15:5, 15:8, 15:10, 15:13, 15:15, 15:17, 15:19, 15:20, 15:23, 15:25, 16:7, 16:10, 16:18, 16:20, 16:23, 17:6, 17:13, 17:16, 18:7, 18:22, 20:2, 20:4, 20:5, 20:8, 20:9, 20:11, 20:12, 20:13, 21:4, 21:9, 21:10, 21:13, 21:15, 21:16, 22:15, 22:16, 22:19, 24:3, 24:7, 26:21, 28:23, 29:1, 29:11, 29:13, 29:14, 29:16, 29:19, 29:22, 31:10, 31:13, 31:16, 31:18, 31:21, 32:2, 38:24, 39:2, 39:9, 42:4, 42:6, 42:9, 43:1, 44:7, 44:11, 44:18, 44:23, 45:3, 49:24, 50:2, 54:8, 54:10, 56:19, 56:20, 56:21, 58:1, 58:2, 58:3, 58:5, 58:6, 58:9, 58:11, 58:13, 58:14, 58:16, 58:17, 58:18, 58:19, 59:11, 59:12, 60:3, 60:10, 60:12, 60:19, 60:22, 60:23, 60:25, 61:1, 61:22, 61:23, 61:24, 61:25, 62:16, 62:19, 62:20, 63:4, 63:5, 63:9, 63:10, 63:11, 63:13, 63:18, 63:19, 63:22, 63:23, 64:9, 64:10, 65:8, 65:12, 65:16, 65:20, 65:22, 66:2, 70:2, 70:9, 72:13, 72:18, 72:21, 72:22, 72:23, 73:7, 73:10, 73:11, 74:9, 74:12, 74:18, 74:20, 75:2, 75:4, 78:16, 78:17, 78:19, 78:21, 78:22, 78:23, 78:24, 79:1, 79:4, 79:7, 82:10, 82:13, 82:18, 82:19, 84:5, 84:7, 84:9, 84:15, 86:16, 86:18, 86:25, 87:1, 87:8, 87:9, 87:12, 87:13, 87:16, 87:17, 87:18, 87:25, 88:14, 88:15, 88:17, 88:19, 88:20, 88:22, 88:23, 88:25, 89:8, 89:9, 90:18, 90:20, 90:22, 90:25, 91:1, 91:4, 91:13, 91:19, 91:20, 91:22, 91:24, 91:25, 92:6, 92:9, 92:13, 92:15, 92:22,

93:1, 93:3, 93:8, 93:11, 93:18, 93:22, 94:18, 94:19, 95:4, 95:6, 95:7, 95:13, 95:15, 95:17, 95:22, 95:24, 96:4, 96:5, 96:6, 96:8, 96:12, 96:16, 96:17, 96:18, 96:22, 97:2, 97:7, 97:9, 97:10, 97:13, 97:14, 97:18, 97:19, 97:21, 100:21, 100:25, 101:20, 103:16, 103:20, 104:3, 104:5, 104:8, 104:11, 104:15, 104:17, 104:22, 104:23, 108:16, 108:19, 108:21, 108:24, 108:25, 109:1, 109:3, 109:4, 109:5, 109:6, 109:10, 109:11, 109:14, 109:16, 109:17, 109:19, 109:20, 109:21, 109:22, 109:23, 109:24, 110:1, 110:2, 110:5, 110:7, 110:9, 110:11, 110:12, 110:15, 110:16, 110:18, 110:19, 110:22, 110:23, 110:24, 110:25, 111:2, 111:3, 111:7, 111:9, 113:10, 114:15, 114:17, 114:20, 114:21, 114:22, 115:3, 116:6, 116:8, 116:9, 116:10, 116:13, 116:14, 116:16, 116:17, 116:19, 116:20, 117:11, 117:13, 117:25, 118:2, 118:3, 118:5, 118:6, 118:10, 118:12, 118:13, 118:14, 118:15, 119:16, 120:16, 120:18, 120:19, 120:22, 122:5, 127:15, 127:19, 127:20, 127:23, 127:24, 128:1, 128:2, 128:7, 128:10, 128:11, 128:12, 128:13, 128:15, 128:18, 128:20, 128:21, 128:23, 128:24, 128:25, 129:1, 129:2, 129:3, 129:5, 130:5, 130:9, 130:11, 130:13, 130:15, 130:16, 130:17, 130:19, 130:21, 130:23, 130:25, 131:1, 131:2, 131:21, 134:25, 135:3, 136:11, 136:13, 136:16, 136:19, 136:24, 137:2, 137:14
**themselves** [3] - 69:19, 69:23, 69:24
**Therefore** [1] - 112:1
**therefore** [2] - 66:15, 115:15, 115:24
**they've** [2] - 32:19,

119:25
**thick** [1] - 31:23
**Thigh** [2] - 11:3, 124:16
**thigh** [2] - 11:7, 64:1
**thinking** [2] - 42:4, 136:20
**third** [4] - 12:10, 29:4, 49:15, 73:24
**thirds** [1] - 49:17
**thorough** [1] - 5:12
**thousand** [1] - 31:15
**thousands** [2] - 31:14, 59:17
**three** [31] - 8:8, 11:2, 11:4, 15:5, 15:6, 15:12, 15:13, 28:12, 35:4, 55:23, 59:23, 61:20, 62:11, 62:12, 63:7, 65:18, 66:18, 67:10, 69:9, 69:11, 70:11, 70:17, 74:13, 90:18, 104:12, 104:24, 110:25, 113:12, 125:18, 125:20, 126:21
**Three** [2] - 65:17, 81:11
**threshold** [4] - 23:1, 46:19, 89:7, 90:15
**thresholds** [2] - 29:25, 30:2
**throughout** [3] - 6:7, 12:7, 39:12
**Thursday** [1] - 1:11
**tie** [1] - 83:15
**time's** [1] - 83:20
**time-study** [1] - 52:23
**timed** [1] - 59:18, 71:15, 71:16, 71:21, 72:20, 73:12, 94:19, 107:6, 128:9, 128:10
**tiny** [1] - 12:23
**title** [3] - 13:15, 17:23, 113:17
**titles** [12] - 6:7, 27:5, 32:3, 33:25, 40:10, 40:13, 40:14, 51:5, 51:14, 52:7, 52:9, 77:2
**today** [4] - 5:1, 5:21, 70:18, 123:24
**toe** [1] - 103:24
**toes** [1] - 56:22
**together** [2] - 81:23, 108:15
**tomorrow** [5] - 57:12, 136:20, 137:3, 137:4, 137:10
**tonight** [1] - 137:7
**took** [14] - 5:10, 25:21, 64:15, 64:22, 73:20, 76:16, 92:13, 93:4, 104:23, 123:21, 132:3,

134:8, 134:12, 134:14
**Top** [1] - 12:5
**top** [7] - 12:10, 28:18, 38:21, 49:12, 94:10, 100:23
**total** [15] - 34:13, 34:14, 41:1, 48:19, 48:20, 49:18, 49:25, 50:1, 65:12, 76:16, 85:10, 85:19, 104:23, 128:5, 135:9
**touch** [3] - 81:20, 117:21, 120:6
**touched** [1] - 119:4
**touching** [1] - 118:18
**tour** [2] - 5:12, 5:20
**towards** [1] - 98:8
**towed** [1] - 103:18
**trade** [1] - 89:16
**traditional** [2] - 28:24, 29:1
**traditionally** [1] - 86:19
**traffic** [7] - 95:25, 123:20, 123:21, 123:22, 124:5, 125:2
**trained** [3] - 30:6, 111:23, 112:20
**training** [3] - 70:19, 112:1, 117:8
**transcribed** [1] - 139:8
**transcript** [1] - 139:8
**translator** [3] - 55:18, 55:19, 66:25
**trash** [2] - 122:8, 123:2
**Tray** [1] - 11:24
**treat** [1] - 93:18
**treated** [1] - 32:3
**tremendous** [1] - 112:12
**tremendously** [1] - 9:2
**Trial** [1] - 1:10
**trials** [1] - 54:11
**trick** [3] - 29:15, 29:17, 59:1
**tried** [2] - 14:22, 80:3
**trigger** [2] - 116:24, 117:7
**triggers** [1] - 129:22
**trip** [3] - 25:23, 35:5, 136:16
**tripping** [1] - 35:1
**trouble** [2] - 100:17, 135:21
**truck** [2] - 53:23, 96:2
**true** [2] - 90:17, 92:11
**truly** [2] - 60:8
**trust** [1] - 56:21
**try** [11] - 7:2, 58:21, 59:1, 59:5, 59:6, 67:5, 80:6, 80:11, 80:14,

90:13, 127:12
**trying** [16] - 13:1, 17:2, 21:10, 21:13, 23:24, 43:7, 43:15, 54:13, 58:22, 59:20, 66:21, 67:1, 73:9, 84:10, 133:10, 134:23
**tunnel** [1] - 7:18
**turn** [3] - 19:23, 20:1, 62:12
**turned** [2] - 59:24, 62:25
**turning** [1] - 43:24
**twelve** [1] - 128:15
**Twenty** [1] - 65:16
**Twenty-eight** [1] - 65:16
**twice** [3] - 48:1, 89:5, 117:20
**two** [56] - 3:19, 3:20, 14:9, 14:20, 14:21, 15:12, 17:9, 17:14, 18:1, 21:23, 23:20, 28:24, 29:1, 33:4, 33:5, 35:21, 37:1, 39:17, 39:18, 40:22, 44:16, 49:17, 49:19, 49:21, 49:24, 50:3, 59:23, 59:24, 61:20, 64:11, 67:10, 69:1, 69:9, 71:11, 72:17, 78:2, 84:20, 85:16, 85:17, 86:18, 88:10, 96:17, 102:10, 107:1, 108:23, 115:17, 115:18, 115:19, 116:6, 118:13, 125:20, 130:9, 131:23, 134:4
**Two** [5] - 49:22, 49:25, 50:1, 61:4, 97:7
**two-thirds** [1] - 49:17
**twofold** [1] - 71:24
**type** [23] - 4:13, 5:8, 11:19, 11:23, 12:20, 13:12, 24:10, 29:10, 30:5, 43:16, 50:12, 50:25, 51:15, 52:1, 52:16, 55:11, 55:14, 68:4, 69:12, 73:4, 85:19, 94:9, 106:25
**types** [1] - 53:7
**typical** [2] - 20:17, 25:15
**typically** [1] - 71:2
**Tyson** [4] - 113:14, 114:8, 118:15, 118:21

---

## U

**U.S** [1] - 1:23

**unauthorized** [1] - 22:7
**under** [8] - 20:18, 22:7, 36:5, 37:8, 52:21, 55:17, 120:1, 133:7
**underlies** [1] - 75:15
**understood** [1] - 19:13
**undertook** [1] - 91:16
**unexpected** [1] - 87:7
**unintentionally** [1] - 69:18
**unique** [1] - 52:8
**UNITED** [1] - 1:1
**units** [2] - 34:4, 66:16
**Units** [1] - 30:11
**University** [4] - 2:24, 3:3, 3:5, 3:7
**unless** [5] - 7:16, 24:14, 47:16, 120:5
**unquote** [1] - 24:4
**untypical** [1] - 20:16
**up** [82] - 6:2, 6:8, 6:14, 8:3, 9:20, 10:4, 14:15, 15:2, 18:13, 19:7, 19:25, 20:15, 20:20, 21:25, 22:14, 23:3, 23:15, 26:9, 26:20, 27:17, 27:25, 33:8, 33:9, 33:13, 33:15, 33:16, 34:4, 34:8, 38:5, 38:21, 40:2, 40:11, 47:12, 50:3, 50:22, 52:18, 53:4, 55:12, 57:20, 60:20, 61:21, 63:10, 67:19, 71:7, 71:14, 75:14, 79:16, 80:17, 84:6, 85:8, 90:11, 97:17, 99:20, 99:22, 100:17, 101:15, 102:17, 104:19, 106:4, 106:22, 106:23, 108:8, 109:12, 110:16, 111:20, 112:2, 112:23, 115:4, 121:18, 121:23, 122:16, 123:18, 124:13, 124:14, 124:15, 127:12, 132:3, 133:21, 134:2, 134:6
**upper** [1] - 12:3
**ups** [3] - 5:25, 6:16, 8:5
**urge** [1] - 60:6
**USDA** [1] - 101:15
**users** [1] - 56:17
**uses** [1] - 27:12

---

## V

**validation** [2] - 24:23, 72:3
**validity** [1] - 50:18
**value** [7] - 28:20, 40:24, 61:7, 81:25, 82:3,

111:25, 117:2
**various** [16] - 4:4, 4:25, 5:18, 6:1, 6:7, 19:10, 51:4, 51:24, 55:22, 66:13, 95:18, 95:19, 101:12, 129:17, 132:1
**vast** [1] - 11:18
**vehicular** [1] - 95:25
**verbose** [1] - 133:25
**verification** [2] - 36:18, 72:2
**verified** [4] - 31:9, 55:3, 73:1
**verify** [2] - 24:23, 67:14
**verifying** [1] - 22:1
**version** [5] - 6:25, 7:1, 10:21, 107:4, 129:2
**Versus** [1] - 110:19
**versus** [4] - 8:11, 110:18, 113:14, 114:8
**vetted** [1] - 56:4
**via** [2] - 27:16, 55:20
**video** [19] - 44:25, 87:20, 87:24, 93:9, 101:4, 101:24, 102:1, 102:14, 103:2, 103:4, 105:9, 105:13, 108:4, 108:12, 108:14, 108:21, 110:3, 128:8, 128:14
**video's** [1] - 101:18
**videographer** [2] - 104:21, 106:16
**videographers** [1] - 113:16
**videos** [12] - 43:15, 65:3, 65:10, 65:12, 65:17, 65:18, 90:19, 91:7, 125:18, 125:19, 126:2, 131:5
**videotape** [2] - 86:11, 128:4
**videotaped** [4] - 96:11, 113:15, 113:17, 128:5
**videotapes** [1] - 86:7
**videotaping** [1] - 119:4
**virtually** [1] - 78:13
**visit** [1] - 3:17
**visited** [1] - 3:19
**visitor** [1] - 51:11
**volume** [3] - 14:10, 14:20, 14:22
**volumes** [2] - 14:9, 14:20
**volunteer** [1] - 87:10
**volunteers** [1] - 63:21

---

## W

**Wait** [3] - 14:18

**wait** [2] - 90:14, 125:24
**waiting** [10] - 89:20, 89:23, 90:1, 92:17, 92:21, 92:24, 93:6, 98:9, 99:14, 126:5
**walk** [70] - 4:4, 5:12, 9:7, 9:12, 9:16, 10:10, 19:1, 20:15, 21:19, 21:25, 23:25, 24:19, 27:6, 27:15, 32:19, 32:20, 36:12, 36:17, 36:19, 36:20, 37:12, 39:10, 40:7, 40:15, 41:1, 41:10, 41:24, 42:13, 42:16, 42:19, 44:21, 45:17, 47:3, 47:10, 47:16, 73:4, 77:8, 88:13, 89:6, 94:17, 98:5, 98:8, 98:16, 99:10, 99:13, 99:18, 99:20, 100:1, 100:4, 100:12, 102:17, 102:18, 103:7, 103:9, 103:11, 104:18, 109:11, 120:2, 122:13, 122:14, 122:15, 122:16, 122:21, 123:9, 123:12, 123:16, 124:15, 129:16, 130:9
**walk-in** [1] - 73:4
**walk-through** [1] - 5:12
**walked** [3] - 18:24, 48:18, 97:21
**walker** [1] - 36:22
**walking** [90] - 4:8, 5:19, 8:25, 9:1, 9:11, 12:17, 17:8, 17:10, 17:12, 18:16, 19:16, 19:18, 19:21, 20:14, 21:3, 21:6, 22:2, 22:20, 24:12, 25:11, 26:1, 27:8, 27:10, 27:13, 27:18, 28:7, 28:10, 28:11, 28:21, 30:23, 34:4, 34:11, 34:15, 34:16, 35:8, 36:5, 36:22, 37:5, 37:8, 37:18, 38:24, 38:25, 39:23, 41:2, 41:5, 41:7, 41:19, 42:22, 48:24, 49:14, 49:15, 49:22, 50:13, 50:23, 50:24, 50:25, 54:16, 77:10, 77:13, 77:15, 88:2, 89:3, 93:9, 94:6, 94:13, 96:20, 99:8, 101:21, 102:4, 103:12, 103:14, 104:13, 104:17, 105:1, 105:4, 106:13, 107:17, 109:5, 110:4, 110:14, 112:17, 121:2, 124:6, 131:11, 131:18, 131:23, 132:12, 132:13
**walks** [7] - 27:4, 31:2,

39:18, 41:19, 47:3, 127:20, 128:19
**walls** [1] - 5:14
**wandering** [1] - 89:20
**wants** [2] - 96:6, 116:1
**wash** [10] - 26:9, 33:8, 33:9, 33:15, 71:14, 109:12, 124:13, 124:14, 124:15
**Wash** [1] - 33:13
**washed** [1] - 26:7
**washing** [3] - 125:13, 125:14, 126:17
**waste** [1] - 64:8
**watch** [11] - 22:4, 36:16, 44:25, 56:9, 65:3, 70:14, 81:20, 81:22, 93:3, 100:2, 111:4
**watched** [3] - 26:8, 108:22, 109:14
**watching** [1] - 103:16
**water** [2] - 120:1, 135:4
**ways** [8] - 23:20, 63:20, 75:2, 101:13, 115:4, 130:9, 130:19, 131:1
**wear** [22] - 7:20, 51:15, 51:17, 51:23, 52:1, 52:15, 71:13, 76:3, 78:4, 78:13, 79:3, 86:19, 86:20, 103:24, 103:25, 104:1, 104:6, 116:2, 122:1, 128:16, 132:15
**wearing** [24] - 51:3, 51:8, 51:19, 52:14, 60:24, 61:16, 67:5, 67:11, 67:17, 77:21, 78:7, 78:8, 78:9, 78:20, 80:12, 80:13, 87:14, 102:15, 102:16, 102:21, 103:20, 105:21, 106:2, 106:3
**wears** [1] - 115:16
**week** [5] - 3:24, 50:3, 96:19, 126:3, 133:23
**weeks** [8] - 49:19, 49:21, 49:22, 49:25, 50:1, 64:11, 125:21
**weigh** [1] - 131:17
**weigh/price/label** - 48:8
**weight** [2] - 48:5, 64:20
**West** [1] - 1:24
**wet** [8] - 12:6, 21:2, 28:2, 28:21, 35:23, 106:23, 119:19, 120:7
**wetness** [1] - 34:24
**whatsoever** [1] - 117:8
**wheels** [1] - 19:16
**Whereof** [1] - 139:10
**whistle** [1] - 124:24

**white** [6] - 100:22, 100:24, 101:17, 107:2, 108:6
**whole** [4] - 6:4, 30:18, 79:20, 80:10
**wide** [1] - 61:10
**willing** [2] - 59:15, 90:13
**window** [8] - 23:2, 23:3, 25:17, 89:19, 122:18, 122:23, 131:20
**withdrawn** [2] - 133:17, 133:19
**WITNESS** [159] - 2:4, 2:5, 2:7, 2:10, 3:15, 14:3, 15:5, 20:4, 20:8, 20:11, 20:13, 21:9, 21:13, 21:16, 22:16, 22:19, 24:7, 29:1, 29:13, 29:16, 29:19, 31:18, 31:21, 32:2, 38:24, 39:2, 39:9, 49:24, 50:2, 54:10, 56:20, 58:1, 58:3, 58:6, 58:11, 58:14, 58:17, 58:19, 59:12, 60:10, 60:19, 60:23, 61:1, 61:23, 61:25, 62:19, 63:4, 63:9, 63:11, 63:18, 63:22, 64:9, 65:20, 72:21, 72:23, 73:11, 74:12, 74:20, 75:4, 78:17, 78:21, 78:23, 79:1, 79:7, 82:19, 84:7, 86:18, 87:1, 87:9, 87:13, 87:17, 88:15, 88:19, 88:22, 88:25, 89:9, 90:20, 91:1, 91:20, 91:24, 92:9, 92:15, 92:22, 93:1, 93:8, 93:22, 94:19, 95:6, 95:17, 95:24, 96:5, 96:8, 96:16, 96:18, 97:2, 97:9, 97:13, 97:18, 97:21, 100:21, 100:25, 101:20, 104:5, 104:11, 104:17, 104:23, 108:19, 108:24, 109:1, 109:4, 109:6, 109:11, 109:16, 109:19, 109:21, 109:23, 110:1, 110:5, 110:9, 110:12, 110:16, 110:19, 110:23, 110:25, 111:3, 114:17, 114:21, 115:3, 116:8, 116:10, 116:14, 116:17, 116:20, 117:13, 118:2, 118:5, 118:10, 118:13, 118:15, 120:18, 127:19, 127:23, 128:2, 128:10, 128:12, 128:15, 128:20, 128:23, 128:25, 129:2, 129:5,

130:9, 130:13, 130:16, 130:19, 130:23, 131:1, 136:13, 138:4
**witness** [4] - 26:21, 26:24, 108:18
**Witness** [1] - 139:10
**woman** [1] - 127:17
**wondering** [1] - 96:11
**word** [2] - 55:13, 96:23
**words** [6] - 24:4, 72:20, 91:8, 103:25, 128:7, 130:21
**wore** [3] - 71:25, 78:12, 78:13
**worker** [1] - 57:15
**workers** [3] - 131:6, 131:7
**works** [4] - 59:3, 122:4, 122:6, 122:7
**world** [1] - 37:8
**worn** [2] - 66:23, 87:14
**write** [1] - 106:4
**write-up** [1] - 106:4
**written** [1] - 92:10
**wrote** [1] - 75:15

## Y

**year** [1] - 78:17
**years** [1] - 35:4
**yellow** [2] - 10:20, 38:20
**yesterday** [6] - 15:11, 55:18, 117:15, 123:23, 134:7, 134:12
**young** [5] - 97:11, 102:2, 102:15, 103:8, 105:3
**yourself** [1] - 72:20

## Z

**Zajac** [3] - 1:23, 139:3, 139:15
**zero** [1] - 112:3
**zone** [1] - 122:17