1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                   NORTHERN DIVISION

3


4
     LUISA PEREZ, ET AL.
5
          v.                        CIVIL CASE NO.
6                                     AMD-06-121

     MOUNTAIRE FARMS, INC., ET AL.
7
          Defendants
8     _____/

9


10               (Bench Trial)
             Friday, March 27, 2009
11           Baltimore, Maryland

12
     Before:  Honorable Andre M. Davis, Judge
13


14


15   Appearances:

16        On Behalf of the Plaintiffs:
          C. Christopher Brown, Esquire
17        Jane R. Flanagan, Esquire

18        On Behalf of the Defendants:
          J. Larry Stine, Esquire
19        Paul Oliver, Esquire

20


21


22   Reported by:
     Mary M. Zajac, RPR
23   Room 5515, U.S. Courthouse
     101 West Lombard Street
24   Baltimore, Maryland 21201

25

1          (Proceedings at 10:10 a.m.)

2          THE COURT:  Mr. Brown, I'd be glad to hear from you.

3          MR. BROWN:  Your Honor, I would like to do my best to

4   weave together the facts and the law that's applicable to various

5   sub-components of our case.  And they, well, got one for each

6   little folder here.  But first I wanted to just get a technical

7   thing on the record.

8          Plaintiff's Exhibit Number Five is a part of the

9   defendant's answer in which they acknowledge that, quote:  "The

10  defendants do not challenge the assertion that as employers they

11  are subject to the FLSA."  I think we all agree to that.  But I

12  just want to get that clarified.

13          The big issue in this case, at least when it was filed

14  back in January of 2006, was whether the activities involved by

15  the workers in this case is a, quote, "integral and

16  indispensable" part of the principal activity of the overall

17  plant work.  And that was a big issue because it was less clear

18  at the time what this test is all about.

19          Significant change has taken place over the last few

20  years.  One consequence of that is that I think, I think you said

21  yesterday or the day before, under Alvarez, Alvarez almost

22  touches the home plate.  There's just very little you could add

23  to the facts of Alvarez to leave any doubt in anyone's minds that

24  this kind of donning and doffing, assuming we get over the

25  defenses, is compensable time.

1          And there are a number of cases, in essence, that said

2     that.  The Spoerle case from Wisconsin said because plaintiffs

3     need to put on equipment in order to perform the job safely,

4     their doing so is, quote, "an integral and indispensable part",

5     end quote, of a, quote, "principal activity", end quote.  So they

6     have found, in essence, that, and the facts in our situation have

7     met that test.

8          A case named Alvarez from the Ninth Circuit, which is,

9     I think you all have, also said that the test is whether both the

10    employer and the government are benefited by donning and doffing.

11    And they were in Alvarez.

12         The Spoerle case also said, after Alvarez there can be

13    little doubt that the donning and doffing protective gear at the

14    beginning and end of the work day are principal activities under

15    the Portal-to-Portal Act.

16         There have been a significant number of other cases

17    that have come since and in essence said the same thing.  Judge

18    Patel in the Lemmon, L-E-M-M-O-N, case, basically found the

19    standard to have been met.

20         The DOL, Department of Labor, Advisory Memorandum,

21    which is, you could probably take judicial notice of it, but is

22    Number Nine, Plaintiff's Number Nine.  I could just read it to

23    you.  Alvarez thus clearly stands for the proposition that where

24    the aggregate time spent donning, walking, waiting and doffing

25    exceeds the de minimis standard, it is compensable.  Any other

1    conclusion would be inconsistent with the continuous work day

2    rule.

3           So the DOL is saying Alvarez means the kind of activity

4    as donning a covered.

5           One of the things that is somewhat relevant to what we

6    talk about today are what's the law in the Fourth Circuit and

7    Third Circuit.  The Third Circuit is the circuit in which the

8    defendants have their, two of their plants.  They have another

9    plant in North Carolina which, obviously, is in the Fourth

10   Circuit.

11          The Third Circuit, in September of '07, said, Although

12   we recognize, of course, that whether donning and doffing is work

13   was not directly at issue in Alvarez, the Court could not have

14   concluded that walking and waiting time are compensable under the

15   Portal-to-Portal Act if they were not work themselves.

16          And the Court of Appeals of North Carolina said in

17   Alvarez, the Court held that the time spent by employees donning,

18   putting on, and doffing, removing, protective gear and clothing,

19   as well as time spent walking to and from the protective gear

20   changing area was compensable and, therefore, not excluded under

21   FLSA.

22          So the case law, especially since Alvarez came down,

23   has been very clear and what was, I think, a big issue to be

24   talked about today is no longer.

25          Exhibit 26 of the record is a 30(b)(6) deposition

1    transcript parts by a Mr. Z-L-O-T-O-R-Z-Y-N-S-K-I.  And he, I

2    don't think we need to go through them, but he goes through each

3    of the PPE, tells what its purpose is, tells why it's there,

4    tells is it required or not required.  And it goes into the

5    details, which I think we've all been exposed to quite a few

6    times over the last couple days.

7           Now, let us please start addressing some of these

8    defenses.  The first one on my list here is the de minimis

9    defense.  And there is a case called Lindow, which I think you

10   cited in your most recent opinion.  And Lindow suggests that ten

11   minutes, anything under ten minutes is de minimis and needn't

12   bother the employer by paying, but anything over ten minutes is

13   covered.

14          Dr. Davis is telling us that by his measure we've lost

15   about 10.2, I think it was, minutes of compensation.  Dr. Radwin

16   says, no, it's 20.0, I think is how it rounds off.  So we

17   probably don't even need to talk about the ten minute rule.

18          But I do want to point out that I don't think this ten

19   minute rule means an employer can have somebody work for nine

20   minutes and then say, tough luck, I'm not going to pay you.

21   Taken literally, that's what it would allow.

22          Let's assume for a moment that there's a question as to

23   how many minutes are involved.  The test has three parts.  It has

24   to test the practical administrative difficulty of counting time.

25   It has to talk about the aggregate claim.  Are we talking about a

1    big amount or a small amount?  And finally, it asks whether the

2    employees performed work on a regular basis.  And I think it's

3    now clear, it wasn't before, that we, plaintiffs have met each of

4    these three criteria.

5            With respect to the practical administrative

6    difficulty, well, the proof is in the pudding.  Dr. Davis did the

7    study.  So it can be done.

8            And Dr. Davis, on Pages 45 and 46 of Exhibit Number

9    4-B, explains why his study was a very good study, a study to be

10   relied upon and, therefore, a study that overcame any difficulty

11   of measuring time.

12           Secondly, this is not a small case but it's a big case.

13   We're not sure how much is at stake, is involved in terms of

14   judgment money because we haven't gotten there yet, under the

15   explanation that we're waiting for you to make a decision to get

16   into the details of damages.  But if there are 250 plaintiffs and

17   they are losing 15 minutes a day, say, that's over $300,000

18   annually that they would have lost.

19           One of the things that's very unfortunate here is,

20   these kinds of cases you opt in as opposed to have to opt out.

21   And as a consequence, there are 1800 employees.  Maybe in this

22   plant, I think, 900, roughly speaking.  But one of the

23   unfortunate aspects of the legal system is that the people who

24   didn't opt in are not, their statute of limitations is running on

25   them.  They're not getting paid.  By the opt-in rule, in essence,

1   Mountaire is benefitted by not having to worry about all those

2   who didn't opt in. And it's now been three years since we filed

3   suit.  So the legal process has aided Mountaire a great deal.

4          And finally, the third requirement is that the

5   employees perform work on a regular basis.  Well, that's what we

6   saw.  Everybody, every day do the same thing, roughly speaking.

7          So in 6 to 4 or 10 and 12 different ways, I think we

8   take care of the de minimis argument without too much trouble.

9          I would like to go through now, if I could, the

10  take-home defense, facts and law.  That is, the more I think

11  about it, the core of this case, and for various different

12  reasons.

13         First of all, the take-home defense, basically, the

14  take-home defense says, if Mountaire would have it, if we can

15  take home all of our PPE, personal protective equipment, and

16  change at home, you then don't get credit for having done that at

17  the plant.  That's a way of eliminating the right of these people

18  to get paid for the 20 minutes that they work each day and

19  haven't gotten paid for yet.

20         There are two parts.  There's the law before July of

21  2006, or the facts, I guess, before July of 2006, before they

22  allowed the smock to go home, and then after July of 2006, when

23  the smock was allowed to be taken home.

24         I don't know if the defendants are making their

25  argument about the time before July of 2006, but the facts

1   clearly show that if you weren't allowed to take your smock home,

2   it was totally impractical to come dressed to work, then get to

3   work, you'd have to take your smock off, you'd have to take your

4   sleeves off.  You would have to, in essence, strip down to the

5   smock because the smock is, generally speaking, according to all

6   the witnesses, the first thing one puts on.

7        So before July of 2006, it just made no sense to say

8   that people can change, don and doff at home, because the

9   practicalities didn't work.  That's why, I guess, come July of

10  2006, the defendants decided to create this illusory right and

11  give the plaintiff employees the ability to, the option to doff

12  and don at home.

13       The various thing -- the plaintiffs contend that this

14  is a false right, this is no right at all.  Basically, what this

15  is, the employer's telling the employee, We're going to give you

16  something real nice, a right to take your PPE all home and change

17  at home.  They know, at the same time, that the employees don't

18  want to do that.  They've created a locker room that makes it

19  convenient to change at the plant.  They've put the lab coats,

20  smocks, on that rack that we saw.  They have somebody, some of

21  the videos we've seen somebody sort of handing them out to

22  people, I guess knowing what the size might be.

23       They've done everything they can to make it efficient

24  and sensible for people not to don and doff at home, but to do it

25  in the comfort of the facilities at the plant.

1          As a consequence, one, not only do they realize that

2     people don't use this option, but the exchange price that the

3     employees get for getting this option is, forfeiting all their

4     doffing and donning time, or at least that's the way Mountaire

5     would have it.

6          The record shows that either no one doffs at home, or

7     if anyone does, very few do so.  And here's the factual record on

8     that.  This, in essence, is the factual underpinning for our

9     argument that this, indeed, is an illusory right that nobody

10    actually subscribes to.

11         First of all, the plaintiffs testified that they didn't

12    and, don't and didn't change at home and that no others did,

13    likewise.  Some of them talked about contamination problems as

14    being the reason.  One I remember talked about hearing you could

15    take it home, but then hearing that the policy was retracted.  We

16    don't know what evolved in that respect, but we do know that the

17    final result, which is that few, if anybody, implemented this

18    "right", quote-unquote.

19         Dr. Davis testified, Plaintiff's Exhibit Number 4-F, at

20    Pages 77, 78, that he saw no one take a smock out of the plant.

21    Quote:  "I was not aware specifically that I could recall right

22    now of anybody even taking a smock out of the building."

23    Remember, also, that he was in the building, in the plant for, I

24    think, two weeks and had a good opportunity to see what was going

25    on.

1      Plaintiff's Exhibit 4-D, Page 67, Dr. Davis, the

2  question to Dr. Davis was:  Did you observe any workers wearing a

3  smock into the plant from the outside?  Davis responded, quote:

4  "No, not that I can recall, no."  End quote.

5      So the workers are saying they know of nobody even

6  doing it.  Dr. Davis is saying he saw nobody even doing it.

7      Now, the agents, the officials of Mountaire have a

8  slightly different view.  Mr. Z, we'll call his, the long name

9  that I mentioned a few minutes ago, he says on Plaintiff's

10 Exhibit 26-C, Page 25, 26-C, Page 25, most workers pick up the

11 smock in the morning at the plant.  So he says most workers don't

12 take the smock home, in essence.

13     The same gentleman, a 30(b)(6) witness, said that it's

14 impractical to wear the smock home.  Question to him:  Would it

15 be practical for employees to wear the lab coat home if it's

16 dirty and soiled from being used all day long?"  Answer:  I've

17 seen it happen, yes, sir, but it's not practical.

18     I think common sense tells us that if the rule is

19 you've got to don and doff at home, as you leave the plant you

20 have to keep your dirty apron on and your smock on, and I guess

21 your gloves on, too, because, otherwise, you would be doffing

22 them.

23     THE COURT:  How would that work?  If an employee is

24 determined to don and doff at home, what would happen?  He or she

25 would presumably leave the dirty apron, leave the, if not dirty,

11

1   the used smock, and pick up a fresh smock and perhaps an apron

2   and take it home with him?

3           MR. BROWN:  Well, the problem with that --

4           THE COURT:  And put it away.  And then put it on in the

5   morning the next day and come to the plant?

6           MR. BROWN:  I guess so.  Yeah.

7           THE COURT:  It's kind of difficult to conceptualize it,

8   having seen how they work.

9           MR. BROWN:  And that's probably the reason why nobody's

10  doing it.  It has no rational basis.

11          THE COURT:  You wouldn't, even if you wore an apron,

12  and I guess most everybody does if they're working in those

13  departments, you really wouldn't want to wear the smock home,

14  would you?

15          MR. BROWN:  Especially on a hot summer day.  And I

16  don't know if I'd want to put my, in the winter, do I put my coat

17  over?

18          THE COURT:  Exactly.  Would you really put your coat

19  over a smock with chicken, chicken juice on it?

20          MR. BROWN:  Right.  Yeah.  It is an illusory

21  opportunity, I think.

22          THE COURT:  Is it contemplated that workers will

23  launder their smocks, sort of treat it like an item of their own

24  clothing?

25          MR. BROWN:  Yeah.  I've heard the answer to that

1   question and I can't remember.

2          THE COURT:  Okay.  I mean, I suppose if you had like

3   four or five of them at home at one time, you could sort of

4   launder them every few days and always wear a clean one to the

5   plant in the morning.

6          MR. BROWN:  Another inconsistency is the plant, as we

7   saw, it's really set up to keep and secure dirty stuff out of the

8   important production areas.  And this would allow you to take

9   your smock home.  And who knows what's going to happen to it at

10  home?  Your kid gets her hand on it and starts playing with it.

11  Or you put it on a closet shelf that is dirty already.

12          Anyway --

13          THE COURT:  We didn't see walk anybody in with the

14  smock on.

15          MR. BROWN:  No.

16          THE COURT:  Of course, I only saw a couple of videos.

17          MR. BROWN:  Right.  Defendants said they went through

18  some of those clips and didn't, they didn't say anything about --

19  I haven't heard, I guess another important issue, factual

20  inference, at least, is if people are wearing them home, where

21  are the witnesses that can tell us they're wearing them home?

22  Where are the -- well, okay.

23          And I mentioned that one of the things that Mountaire

24  does is encourage people to don at the plant by, one, having a

25  locker.  And site on that is Plaintiffs' 26-K.  And the smock

1    rack accessibility and cleaning routine is explained on

2    Plaintiffs' Exhibit 4-D.  So that's counter-intuitive, that you

3    would make it easy for people to don at work if, indeed, they had

4    the right to don.  If they had a meaningful right to don off the

5    project.

6         I think this Exhibit 15, well, the next thing that I

7    maybe should do is look at policy reasons.  Why, why is it that

8    this take-home rule is articulated in July of '06?

9         We asked, during depositions, that of Mr. Z, the

10   gentleman we just talk about, and he was a 30(b)(6) witness.  And

11   he said no idea how it benefits the employees or how it benefits

12   the employer.

13        We then later, in discovery, obtained Exhibit 15.  And

14   that, I think, clearly tells us the purpose behind the change of

15   rules in July of '06.  And that's the exhibit which says, guys,

16   and this is from Mike Tirrell, who we talked to here, who's a

17   very nice gentleman, but this is business.  And he tells the

18   guys, A few weeks ago we decided to give the employees the option

19   of taking the lab coat home with them and, therefore, making it

20   possible for the employee to put the lab coat on at their

21   discretion.  This should have effectively eliminated the donning

22   and doffing issue.

23        So it's a ploy to get around Alvarez, FLSA by setting

24   up a false construct, I'd say.

25        THE COURT:  Mr. Brown, I know you to be a very careful

1    lawyer and you haven't made an issue about those blackouts.  But

2    they're there.  And I have to ask.  Do you have anything to say

3    about that, in the hard copies of the e-mails?

4              MR. BROWN:  Well, the whole story's not told.  But I

5    don't know --

6              THE COURT:  I mean, you didn't pursue it?

7              MR. BROWN:  That wasn't pursued, the language.  The

8    case unfolded.

9              THE COURT:  And it's not just a stray mark, is it?  I

10   mean, it is intended to obliterate something from that e-mail.

11             MR. BROWN:  Oh, yeah.  Trying to look for my copy.

12   Yeah.  No.  It's page, Page Three of Plaintiffs' Exhibit 15.

13   It's a different rendering of, in essence, what we just said.

14   But at this point we have talked with each employee and they are

15   signing their names, saying that they understand they have the

16   option to take the coat or not take the coat.

17             Now, we haven't run into any plaintiffs who filled out

18   a form or signed a form, but maybe they did.  I don't know.  But

19   then, most importantly, this says, the first page of Exhibit 15,

20   most are not taking the coat and don't want it the night before.

21   However, as with their other equipment, they have the option.  So

22   they clearly know that they're promulgating a rule that is

23   meaningless to the worker other, than the fact that it's geared

24   toward stripping the worker of compensation for work time.

25             We can talk about, that same issue comes up again in

1    the next packet, which is the issue of good faith defense and

2    willfulness.

3            Your Honor, the first word about the sort of standard

4    Fourth Circuit law on good faith and willfulness.  I'm quoting

5    from the case called Williams, 485 F. Supp. 2d by Judge Fred

6    Motz.  And he sets out -- I don't know if you've set out these

7    standards in some of the previous opinions in this case or not.

8    But the burden is on the defendant to show that he did not act in

9    bad faith when implementing the rules.

10           The norm is, according to the Fourth Circuit, that

11   liquidated damages will be given even if the judge finds good

12   faith on the defendant's part.  The judge still has the right to

13   give liquidated damages.  As we said a few days ago, that means

14   if you worked a hundred overtime hours and didn't get paid time

15   and a half for them, under the liquidated damages provision you

16   get your half time and then that times two equals full-time.

17   You'd, in essence, get the amount of money as if you were working

18   full-time.

19           The employer has the plain and substantial burden of

20   persuading by proof that his failure to obey the statute is both

21   in good faith and predicated upon such reasonable grounds that it

22   would be unfair to impose upon him more then a compensatory

23   verdict.  So that's a fairly easy standard for plaintiffs to

24   overcome.

25           Willfulness, plaintiffs have the burden of proof on.

1          The statute under FLSA is normally two years, says the

2     Fourth Circuit in a case called Martin at 985 F.2d, at 135.

3          If a plaintiff can demonstrate the defendant's

4     violation was willful, however, the plaintiff may recover for the

5     preceding three years.  So willfulness triggers a third year back

6     on the Statute of Limitations.

7          And one can be, the Supreme Court has held that

8     violations are willful if the employer either knew or showed

9     reckless disregard for the matter of whether its conduct was

10    prohibited by the statute.

11         And I just, we contend two things.  One, especially

12    after Alvarez, they knew the game was up in terms of donning and

13    doffing time.

14         THE COURT:  So just so that I understand the

15    plaintiffs' contention in that regard.  If I understand

16    plaintiffs' position, Alvarez, the Ninth Circuit, and the Supreme

17    Court's affirmance on the admittedly limit piece of Alvarez that

18    the Supreme Court considered, provides such a compellingly clear

19    indication of the Supreme Court's view of these issues that an

20    employer who acts to skirt or to avoid Alvarez, plaintiffs'

21    contention is that that's a indicium of bad faith.

22         MR. BROWN:  Yes.

23         THE COURT:  And a compelling one?

24         MR. BROWN:  Yes.  And let me go back to sort of the

25    beginning of the chronology, which starts around the year 2000,

1    plus or minus.

2              The Department of Labor started doing surveys of

3    poultry plants.  One plant surveyed was the North Carolina

4    Mountaire plant.  The government found, Department of Labor found

5    in either 2000 or 2001 that plants were not honoring the donning

6    and doffing pay rules that DOL believed in, both for start and

7    beginning time, and lunch as well.  And they notified the poultry

8    industry of their position.  And their position was reiterated

9    over periods of time.  You can put the chronology together, I

10   guess, at least in part, from the exhibits we submitted,

11   plaintiffs' exhibits.

12             About 2003, 2004, something like that, the defense,

13   defendants sort of nationwide say that we have, we're following

14   some Southern courts that say Alvarez, when Alvarez comes, is not

15   applicable, you don't have to pay.  And our contention there is,

16   if you look at some of the legal memoranda from the, either their

17   lawyers or the lawyers for the industry, they really are overly

18   enthusiastic about their opportunities and chances.  It's a very,

19   very, for the most part, overly rosy picture, and we contend one

20   that's not rooted in neutrality.  I think their lawyers got a

21   little bit ahead of the law on that score.

22             One of the things that the defendants said, Mr. Tirrell

23   said on deposition, for example, and may have said it on the

24   stand, I don't know -- well, I just.

25             THE COURT:  Lost the thought?

1          MR. BROWN:  I just lost the thought.

2          THE COURT:  I've been there.

3          MR. BROWN:  My wife's not here to remind me.

4          THE COURT:  You were talking about Mr. Tirrell's

5     deposition.

6          MR. BROWN:  Exactly.  Well, I've completely lost my

7     thought.

8          Let me go on to something else and I'll come back to

9     this.  Something's not firing right.  Oh, it's come back to me.

10    Mr. Tirrell said in deposition, at least, that the reason why the

11    defendants were not willfully violating the law was that they did

12    have some courts that were going their way, the Cagles case is

13    one of them.  Some of these cases went their way on the 203(o)

14    issue, which is a different kind of precedent.

15         But in no case did they attempt to find that Mountaire,

16    with plants in Delaware and North Carolina, either attempt to

17    find out, realize that there was no law to be relied upon there

18    or later, when the law did come from there, the Third Circuit

19    case I just mentioned and the North Carolina Court of Appeals

20    case, that didn't wake them up to the reality of their

21    obligations under FLSA.

22         I just think, we just think, plaintiffs just think that

23    it is a, it's a clear-cut case of willful ignoring of the legal

24    rights of the plaintiffs by realizing that you're changing,

25    trying to change the rules on them, the take-home rule right in

1    the middle of the game, and giving them nothing.  I mean, it's

2    like telling me I can go swim in the Atlantic Ocean right now.

3    Well, thank you, that's nice, but no one's inclined to do so.

4              So we, we think that's the proof that supports the

5    willfulness claim.

6              Let me talk now a little bit about damages, or Dr.

7    Davis and Dr. Radwin.

8              THE COURT:  Is that before the Court at this point?

9              MR. BROWN:  Well, no.  What the Court has to do, I

10   think, and Mr. Stine might correct me if I'm wrong, we think that

11   you should pick the number 20 as the number of minutes, following

12   Dr. Radwin's testimony, and then allow us to plug in that and do

13   a computer system.

14             THE COURT:  Okay.  So when you used the term "damages"

15   just now, you are actually talking about the quantification of --

16             MR. BROWN:  Preliminary -- which will then allow a

17   calculation of damages.  Excuse me for implicitly saying

18   otherwise.

19             THE COURT:  That's all right.

20             MR. BROWN:  Let me just say something.  There's a duty

21   under FLSA to keep records.  It's quite clear that Mountaire did

22   not keep records of the time we're talking about in this case.

23   Because that typically often happens in FLSA litigation, all the

24   plaintiffs have to do is present a, quote, "just and reasonable",

25   quote, inference as to what the lost time is.  It's not the

1    normal standard, it's a reduced standard, because the logic is

2    plaintiffs are in a position to know the inside workings of a

3    plant.

4            The Fourth Circuit therefore says that where an

5    employer's records are inadequate, approximate calculations of

6    damages will suffice.  And that is the Martin case and Justice

7    Powell, I guess, was sitting by designation and wrote that

8    opinion.

9            So arriving at the bench for you is actually which of

10   these two is more credible than the other in terms of the logic

11   of their experimentation, and what is the number that should be

12   plugged into the computer program?

13           First of all, Dr. Davis is at or around the de minimis

14   line, anyway.  This discussion is not whether there's a number,

15   but how much the number might be.

16           On the film, we saw Dr. Davis talking about how he

17   measures putting on doffing and donning protective equipment.  We

18   had a couple women doing it on the screen.  It's very much of an

19   artificial construct that he uses.  As we saw time and time again

20   on the film, people come in, they go to the locker room.  Then

21   they go to the, where you get your supplies.  Then they might go

22   to get the smock off the, off the rack.  They may walk with some

23   things on and put things on while they walk.

24           Donning at Mountaire is not a staying in one place,

25   have somebody give you all things you have to wear and then you

1    can put them on.  It's just seems very basic, basically

2    nonsensical in that respect.

3          There also was no accounting -- one of the things I at

4    least saw in the film was that there were many times when people

5    were, there were pedestrian jams, back-ups.  Typically in looked

6    like around the washing facilities.  And that was not taken into

7    account by Dr. Davis.

8          He specifically was not asked to time washing and

9    sanitizing, so he didn't do that.  That's another element that

10   Dr. Radwin did include.  And as you found, and I've overlooked

11   it, I had overlooked it, he didn't count, put into his count

12   boots and how much time would be required to add that piece of

13   the puzzle.

14         I think, also, he didn't really take into account the

15   continuous day rule, which says you start and you stop.  If you

16   put on a non-required item, you put on a sweater from home or

17   something like that, let's say, that gets counted.  The employer,

18   if he wants, can have the rules about no sweaters from home can

19   be worn.  But the idea is to start, stop everything in the

20   middle, even if it's not required, even if it's a white cotton

21   glove that might not be required but comes in handy, apparently.

22         So there were a lot of things missing from Dr. Davis.

23   And all the things missing would have bumped his time up above

24   ten to whatever it might be.

25         Now, in terms of Dr. Radwin.  First of all, he

1    testified that there were several ways in which he undercounted.

2    And we're able to see some of them.  If someone doffed or donned

3    in the bathroom or in the cafeteria, where he didn't capture it.

4    Secondly, we could tell that he was often stopping a little bit

5    before the line actually began, so there was a little lost time

6    at that point as well.

7        What has happened, what the defense did yesterday was

8    basically go through the film and they found the longest time.

9    And I agree, that guy was not a typical, the guy you called the

10   grandfather or something, he was not a typical worker.

11       THE COURT:  It was a term of endearment, by the way.

12       MR. BROWN:  So that, yeah, one thing was a little

13   strange.  Probably, on the other hand, there were things that

14   were too short.  When you do a random study of almost 200

15   different people, there are going to be minor flaws in the

16   system.

17       One of the flaws was that Dr. Radwin took out, he

18   included in his time capsule, his charts, some people who were

19   not production line hourly employees.  These people were called

20   the Delaware support, I think it is.  And he testified that he

21   took that out and that helped the plaintiffs more than it helped

22   the defendants.  So that really was a non-issue.

23       There's also another issue that was raised yesterday.

24   Dr. Davis, you might recall Dr. Davis criticized Dr. Radwin for

25   using somebody who worked in this more remote area.  And perhaps

1   they had to walk, I forget, 800 feet more than you normally have

2   to, or something like that.  I thought I asked Dr. Davis about

3   that in cross yesterday.  We went back and looked at the film

4   clip.  It's Clip Number CAMAD-20080318-T052842.  And we see, we

5   see why that guy was included in the study.  He picked up a smock

6   early on, put it over his arm, and then made his walk.

7          And the Department of Labor's the one that says

8   obtaining the smock is what triggers the work day.  So that's,

9   this was not a fluke of some sort.  This is another thing that he

10  just observed.

11         I think the big difference between Davis and Radwin's

12  studies is Radwin timed the real world with all its flaws.  And

13  Dr. Davis tried to construct a test that really didn't seem to

14  have that much to do with the way in which the plant, in fact,

15  operated.

16         I have no more to say on that.  I think Ms. Flanagan

17  has a few things to say to you about lunch time.

18         THE COURT:  All right.  Thank you, Mr. Brown.

19         MR. BROWN:  Thank you.

20         MS. FLANAGAN:  Just a couple odds and ends, Your Honor

21  because we've heard some, there's been some discussion about this

22  lunch time issue throughout this week.  And I just want to try to

23  clarify that for a second.

24         There are essentially two ways of looking at the lunch

25  issue in the donning and doffing cases.  One way is to look at

1    the whole meal period and to analyze, is it a bona fide meal

2    period or isn't it?  And actually, the Department of Labor in

3    that same poultry initiative, that 2001 poultry initiative, in

4    Plaintiffs' Exhibit 12, on the second page you can see the

5    Department of Labor says, they find that gear had to be removed

6    and cleaned at the start of meal periods and that, prior to

7    returning to work on the line, after meal periods workers had to

8    again put on, sanitize, and often wait and then walk to their

9    individual line positions.  Time spent in these work activities

10   during meal periods resulted in employees not receiving a bona

11   fide and, therefore, non-compensable meal period.

12        So there is some authority out there to say the whole

13   period is not compensable.  But that's actually, we're not even

14   going that far.  As we said in our response to motion for summary

15   judgment, we're actually just saying that if you find that

16   donning and doffing and sanitizing, if you find these activities

17   are part of principal activities, if you find that they're

18   compensable, then they're compensable at the beginning of the

19   shift and before you go to lunch.

20        You know, once they're compensable, the clock turns on,

21   the continuous day rule starts, and you don't just artificially

22   turn it off because the defendants say lunch is at 12.

23        And there are a number of cases that follow this

24   analysis, essentially.  The Ninth Circuit Alvarez decision looks

25   at time spent donning and doffing in order to comply with meal

1    break and rest break requirements, lumps it in.  There was also a

2    separate state law claim that they analyzed separately.  But it

3    was lumped into this analysis as well.

4           And this Cargo Meat Solutions wage and hour litigation

5    I mentioned other day, Middle District of Pennsylvania case

6    coming out last year, denying the defendant's motion for summary

7    judgment basically on the grounds of Alvarez and the De Asencio

8    Third Circuit case that Mr. Brown mentioned earlier.

9           And their logic is exactly the same as ours.  Once you

10   find that it's compensable, any activity between commencement and

11   completion is compensable.

12          Fox v. Tyson Foods similarly analyzes all the lunch

13   issues, the lunch issues the same way that they analyzed the

14   pre-shift and post-shift donning and doffing.

15          Now, it seems, and I'm hoping Mr. Stine will clarify

16   this, I'm sure he will, that he's saying it's all or nothing at

17   lunch.  You don't get to say you get a few minutes because you

18   still --

19          THE COURT:  I think that's the defense position.

20          MS. FLANAGAN:  And I guess what we would say is, you

21   know, the cases he refers to, the support for that proposition

22   are what people are seeking compensation for a whole lunch break

23   because they're on call, because they're ambulance drivers,

24   because they get a call in the middle of that lunch period.  That

25   seems entirely distinct to us from a situation where every single

1    day you actually just don't start your lunch until a few minutes

2    later than what your employer says you start your lunch.  I mean,

3    it just doesn't start.  And every single day you just go back a

4    few minutes earlier than, or you start performing compensable

5    activities a few minutes earlier, I should say.

6        And actually, he's right.  I didn't, I mean, I don't

7    think there are any decisions that are exactly on point on this,

8    although Alvarez does, at 913, 339 F.3d at 913, does, in

9    discussing the Washington State mill break law, say that that

10   does not permit truncation but suggests that FLSA flight would

11   indeed allow it.

12       And then one other tiny issue.  Defendants last week, I

13   believe, had filed a Motion to Dismiss certain opt-in plaintiffs.

14       THE COURT:  Yes.

15       MS. FLANAGAN:  We've look into that.  We've talked to

16   some people.  But our investigation is still ongoing.  Some of

17   those people actually have to do the Selbyville plant.  They're

18   not even included in it.  But we'd really love a little bit more

19   time to get our ducks in a row.

20       THE COURT:  Of course.  I don't think anybody thought

21   it was urgent, something that needed to be addressed right away.

22       MS. FLANAGAN:  Okay.

23       THE COURT:  By the way, remind me what's going on in

24   Selbyville.

25       MS. FLANAGAN:  Not much, Your Honor.  But I'll let Mr.

1    Brown tell you.

2             MR. BROWN:  You ruled in the workers' favor on 203(o)

3    issue.

4             THE COURT:  Right.

5             MR. BROWN:  As it's often called.  In another case

6    involving another plant, Allen, another company, Judge Garbis

7    ruled for the management.  That case is now in the Fourth

8    Circuit.  All the briefing is done.  So we're waiting assignment

9    of an argument date, if that's what they do.  And I trust you'll

10   be excluded from that case.

11            THE COURT:  So what is --

12            MR. BROWN:  So we're, so we're hoping to hold, we don't

13   see any sense in proceeding with Selbyville until the Fourth

14   Circuit.  Because if the Fourth Circuit agrees with Judge Garbis,

15   neither of us wants to do what we're doing right now.

16            THE COURT:  And remind me of the difference between

17   Millsboro and Selbyville.

18            MR. BROWN:  Selbyville's unionized.

19            THE COURT:  It's unionized.

20            MR. BROWN:  Millsboro, this case, these are non-union

21   people.

22            THE COURT:  Right.  And what is the significance of

23   that?  I need to be reminded on a regular basis.

24            MR. BROWN:  The 203(o) statute only applies in

25   unionized situations, not in non-union situation.

1          THE COURT:  Okay.  Because it talks about the history

2     of bargaining or lack thereof?

3          MR. BROWN:  Right.

4          THE COURT:  Over that issue.

5          MR. BROWN:  So that, the Selbyville case, we talked

6     about this yesterday, Mr. Stine and I, it makes most sense to sit

7     on it, because the Fourth Circuit -- Judge Garbis says he ruled

8     the way he did so we can get it there.

9          THE COURT:  So the Fourth Circuit could rule, sure.

10         MR. BROWN:  Yeah.  Exactly.  So that's where we are.

11         THE COURT:  Okay.  Thank you.  Thank you, Ms. Flanagan.

12    Mr. Stine.

13         MR. STINE:  Thank, Your Honor.  Is it okay to speak

14    from here?

15         THE COURT:  Absolutely.

16         MR. STINE:  Our first disagreement from the plaintiffs,

17    I think the plaintiffs are overoptimistic in their reading of the

18    Supreme Court decision in Alvarez, and I think our best proof of

19    their overoptimistic reading is that the courts of appeals have

20    addressed donning and doffing issues since Alvarez and are

21    continuing to find for the employer.

22         The Second Circuit, Gorman v. Consolidated, 488 F.3d

23    586, was a 2007 case.  And the Second Circuit found these items

24    to be postliminary, preliminary, not integral and indispensable.

25         THE COURT:  Now, Gorman is the nuclear power plant.

1        MR. STINE:  That's correct.

2        THE COURT:  And I wondered, I mean, I certainly agree.

3   I think Gorman has both some language and perhaps some reasoning,

4   and certainly the holding, that you quite justifiably rely on.

5   But I'm just wondering how much application Gorman actually has.

6        This is some, like, super secure facility with people

7   lining up at the security gate.

8        MR. STINE:  Which is a much longer wait.

9        THE COURT:  Picking up radiation detectors and all

10  that.  How do you apply that here?

11       MR. STINE:  Well, for example, in Gorman, one of the

12  items was a hard hat.  We got an item somewhat less than a hard

13  hat -- a bump cap.  It's not as hard or as strong, but it's still

14  a very similar item.  Boots were another one in the Gorman case.

15  Same particular item we have in this particular case.  So there

16  are applications.

17       THE COURT:  But in Gorman, wasn't all that before they

18  went through security?

19       MR. STINE:  Not necessarily.

20       THE COURT:  No?

21       MR. STINE:  No.

22       THE COURT:  Okay.

23       MR. STINE:  It wasn't just before security.  They were,

24  they were seeking for donning and doffing of certain items.

25       THE COURT:  But I thought it was before they went

1    through security.

2           MR. STINE:  It may well have been before security.  But

3    the problem is if you use the continuous work day, and donning

4    and doffing is integral and indispensable if you use Alvarez, the

5    day starts and, therefore, the time going through security now

6    would become half of the start of the day.  I don't see how going

7    through security, if the donning and doffing was integral and

8    indispensable, going through security wouldn't change it.  In

9    fact, under Alvarez, it would become compensable, and it wasn't.

10          THE COURT:  Is the difference, and certainly it is in

11   part, and of course we as lawyers and judges, this is our stock

12   and trade -- is the difference, does it come down to, to put it

13   in a hackneyed kind of way, perhaps, there are courts who listen

14   to what the Supreme Court says in its holding, its dicta, and the

15   thrust of the opinion.  And then there are courts that take, I

16   guess, to a certain extent the way that we were taught first year

17   of law school, and limit their consideration strictly and

18   narrowly to the Supreme Court's holding.

19          And so once you say, I mean, once you say, which I

20   think is correct, not you, Mr. Stine, but once one says the

21   holding of Alvarez is that walking after the commencement of the

22   work day is compensable.  I mean, do you agree with me that that

23   is, in fact, the narrowest holding that you can identify?

24          MR. STINE:  Alvarez had two holdings.  Standing in

25   line, pick up supplies --

1          THE COURT:  Is not.

2          MR. STINE:  -- postliminary and preliminary.

3          THE COURT:  And walking is.

4          MR. STINE:  Well, and the continuous work day rule,

5    whatever that may be.  I think the critical thing about reading

6    inferences in Alvarez is you have to go back to the writ of cert,

7    because I think this is absolutely critical if you want to look

8    at the analysis.  Because there were two issues applied for in

9    writ of certiorari.  One was the continuous work day.  The other

10   issue that was asked for in the writ of cert was the donning and

11   doffing issue.  And I went back and looked at it.

12          When they granted the writ, they crossed through the

13   second one, saying, We're not going to answer this question.  And

14   in part, I think it's because the Supreme Court likes to have,

15   shall we say, mature issues, issues for which there's been some

16   discussions in the courts of appeals so that they can look at

17   them.  And it wasn't there.

18          As a matter of fact, in the Anderson v. Cagle case, the

19   plaintiffs in that case, another donning and doffing case, filed

20   a writ of cert with the Supreme Court again.

21          THE COURT:  Yeah, after Alvarez.

22          MR. STINE:  After Alvarez denied the writ.  And I think

23   in part because when you look at the Court of Appeals, Your

24   Honor, part of it is, it is a little, it is, I won't call it

25   split in the circuit.  What I call it is splintered because no

1    circuit yet has kind of pulled the same rule.

2           When you look at the Ninth Circuit, it went up on

3    appeal.  Do remember that, basically, the five kind of items

4    we're talking about, the bump cap, hair net, the ear plugs, the

5    smock and the boots, they're finding non-compensable.  They're

6    finding it under a de minimis theory, which I think you're

7    struggling with and I have struggled with because I can't figure

8    out quite how that works in structures.

9           I think the other courts have used the, the decision to

10   say it's either unique or non-unique or generic or non-generic to

11   make the decision between postliminary and preliminary and

12   integral and indispensable, have a better, practical analysis

13   than just calling this stuff de minimis because I can't figure

14   out how to work it.  But do understand it was affirmed and it's

15   an impractical rule as far as I'm concerned.  And I think you're

16   having the same struggle I'm having with it.  But they still say

17   it's not compensable.

18           In addition to the Second Circuit, the Seventh Circuit

19   now has come out.  It came up in an odd context, I must admit.

20   It came up under a Family Medical Leave Act case.  FMLA adopts

21   the definition of hours worked out of FLSA.  And they found

22   donning and doffing was postliminary and preliminary that

23   particular case, also.  And of course Spoerle, from the Seventh

24   Circuit.

25           There's some doubt as to the validity of the Spoerle

1    ruling at this time.  I guess the Seventh Circuit will eventually

2    get Spoerle and see how they balance it.

3         So they are courts of appeals that have taken these

4    issues after IBP.  And to say that this has been decided by IBP,

5    I think, is an overly optimistic plaintiff's reading of the

6    decision that the Court of Appeals had rejected and district

7    courts have.

8         THE COURT:  On the other hand, none of us will be

9    surprised if, when the court finally grants cert, we see a line

10   in the opinion along, to the effect, This issue is controlled by

11   Alvarez.

12        MR. STINE:  Actually --

13        THE COURT:  I mean, the Court does have a way of, those

14   of us bottom feeders, I'm talking about, I'm talking about

15   lawyers and district judges, who --

16        MR. STINE:  Your Honor, I think we're the bottom

17   feeders.  You're at least one level up.

18        THE COURT:  No.  No.  No.  When it comes to this stuff,

19   we're all in the same boat.  District judges and lawyers who

20   appear before us trying to figure this stuff out, you know, we're

21   all in the same boat.  And the Court will have a way sometimes of

22   saying to us in so many words, Don't you get it?  We've already

23   decided this.  And we all go, Yeah, okay.

24        MR. STINE:  The Supreme Court said that in IBP v.

25   Alvarez, though.  They said, we've already decided this in

1    Steiner v. Mitchell.

2            THE COURT:  Good point.

3            MR. STINE:  That's what it says.  In our opinion, the

4    case to look at for these issues is not Alvarez.  It's Steiner.

5    That's the case you got to go back to.  That's the Supreme Court

6    decision on donning and doffing.  And if you go back and look at

7    Steiner --

8            THE COURT:  How does Steiner help you?

9            MR. STINE:  Oh, in a lot of ways.  The first thing is

10   it talks about changing clothes and showering under normal

11   circumstances is normally not compensable.  The government says,

12   ordinarily, clothes changing and showering is not compensable.

13   Then they go on to say this is a, this situation of working in a

14   lead-infested environment is not ordinary.  And that's when it

15   creates the integral and indispensable kind of distinction.

16            So now you've got to go back, Your Honor, to the

17   Portal-to-Portal Act.  And you've got to go all the way back to

18   Anderson v. Mt. Clemens Pottery.  As you recall from reading

19   these cases, the Portal-to-Portal Act was enacted in response to

20   some Supreme Court decisions, including Anderson v. Mt. Clemens

21   Pottery.  And I think in the Supreme Court, in Anderson v. Mt.

22   Clemens Pottery, in a lot of ways took the same position that

23   plaintiffs' counsel has been taking in this case.  Look, they're

24   here, they're doing work for you.  They're putting, they wouldn't

25   be putting on the smock and wouldn't be putting on the apron if

1    they didn't have to come to work.

2            And what the Supreme Court said was, We find

3    compensable certain preliminary activities after arriving at the

4    place of work, such as putting on aprons.  Aprons.  Aprons.  Same

5    thing.  They found it to be compensable.  And you understand why

6    they did because it meets their definition of work.  I'm not

7    putting on an apron to go, as you pointed out, to go walk on the

8    seashores at the Eastern Shore.  I'm not going to do it.  I'm

9    putting it on because I got to go to work.

10           Not only that, they said, and overall, removing shirts,

11   painting up and your greasing arms, and get this, putting on

12   finger cots.  What are finger cots?  If you work in a pottery

13   plant, it's a protective device for your hands.  For all intents

14   and purposes, rubber gloves.

15           So the Supreme Court, when they had that issue come up

16   for the first time before the Supreme Court, they say, You've got

17   to pay for these preliminary activities.  That is the definition

18   they gave to these preliminary activities -- putting on an apron,

19   putting on finger cots, the gloves.

20           So there we are right there.  That's the things that

21   when we talk about preliminary activities, that's what they were

22   reacting to.  So let's look at the items we're talking about,

23   because I think looking at this as a unit sometimes does us a

24   disservice because it's not necessarily all or none.

25           In other words, you could say putting on the boots is

1    is postliminary/preliminary and putting on something else is

2    integral and indispensable.  It does not require an absolute

3    everything is or nothing is.  There is a middle ground for the

4    Court.

5           So if you look at the boots -- I think you had an aha

6    moment yesterday when you were watching the videos, and all of a

7    sudden we're looking and you start looking at the feet.  And

8    they're not just all wearing those steel toe boot galoshes that

9    we provide.  They were wearing a lot of other different types of

10   shoes.  As we told you, they're required to have steel toe boots,

11   leather, and that's it.

12          So they wear them from home a lot of the time, just

13   like you would.  I don't think I want to wear the galoshes all

14   the time, but the other types of shoes, they're not too

15   uncomfortable.  I have to wear them myself.

16          So the boots are really just kind of a, you know, wear

17   jeans.  You know, wear heavy corduroys, wear some type of pants.

18   That's all the requirement we have.

19          In addition, Dr. Davis asked them, how many people wear

20   their boots from home.  77% do.  And in fact, one of the

21   plaintiffs testified that she wore her boots in on Monday.  She

22   didn't wear them on Tuesday, Wednesday, Thursday or Friday.  But

23   she said she wore boots in, brought her sneakers, and changed and

24   went back and forth.

25          So the boots are not even really in a sense of these

1   type of boots required.  Even under the most generous definition,

2   which I don't believe is a valid one, boots are not integral and

3   indispensable.

4          Let's kind of look at the next unit of stuff.  We're

5   talking about the hair nets, the bump cap, the ear plugs, and the

6   smock.  First thing is, is it's clear that that is required of

7   anyone who just enters the production area.  You don't have to be

8   an employee to put it on.  Dr. Davis testified that when he went

9   in, he had put these things on.  If I go in, I've got to put them

10  on.  It's not a requirement for your job.  It's just a

11  requirement to get into the production area, regardless of who

12  goes in there.

13         So it's not integral and indispensable to the job.

14  It's a much more generalized requirement just to go into the

15  production area.  And it also has the effect of protecting the

16  employee more than it does anyone else.

17         So then you look at Alvarez.  What did it say about

18  these items, the hard hat, the hair nets, the ear plugs, the

19  smock?  It's de minimis as a matter of law.  It's not

20  compensable.  Gorman talks about generic/non-generic.

21         Some of the other courts dealt directly with donning

22  and doffing recently, such as the Harrison case and the Claxton

23  case, do the same kind of analysis and say, look, this stuff is

24  there because it's this generic, non-unique.  It's

25  postliminary/preliminary.  It is not integral and indispensable.

1          Integral and indispensable has to have some meaning

2     beyond required.  I think I pointed this out.  Work is a task

3     assigned by the employee, primarily for the benefit of the

4     employer.  The Supreme Court in Anderson says putting on an apron

5     is work.  So you got to have something more than work because the

6     Supreme Court says that type of work you don't have to pay for.

7     The portal-to-portal.

8          And the Supreme Court acknowledges that ordinarily

9     clothes changing and showering would not be compensable.  And

10    remember, they're still doing this in context of Anderson.  This

11    time, you know, 1955, 1948, this is relatively recent law to

12    them.

13         The other thing is just kind of interesting to go back

14    and look at the case law.  After Steiner, donning and doffing

15    cases pretty much drop off.  You don't see a lot of donning and

16    doffing cases.

17         The reason you don't is because Wage and Hour changed

18    their position during the poultry initiatives.  You heard Mr.

19    Tirrell talk about the two different surveys.  That, in fact, is

20    exactly what happened.  In 1998 they went out.  50% of the

21    poultry plants were found to be in compliance.

22         Two years later they do another survey and say 100% of

23    the poultry plants are not in compliance.  50% of these plants

24    didn't change their practices after that survey.  What happened

25    was Wage and Hour changed the way they look at donning and

1     doffing.

2            And that's the point with which you start looking at

3     the lawsuits that start coming down the pike.  It's that date.

4     It's the date the Wage Hour starts saying, We're going to take

5     this position now.  And then you see the first couple lawsuits

6     getting filed.  Sanderson's Farm.  And you get to see Pilgrim's

7     Pride.  Both cases which were poultry processing plants, same

8     practices as this one.  Both courts find for the defendants.  The

9     plaintiffs appeal both of them.  The Fifth Circuit affirms both

10    of them.

11           And there the law, the cases stop for a while.  The

12    next one up was Anderson v. Cagles, which also found for the

13    defendant, and it was affirmed by the Eleventh Circuit.  So we

14    have all of those issues coming out on this particular issue.

15    Now, the last --

16           THE COURT:  Can you remind me which of those were

17    summary judgment and which --

18           MR. STINE:  Sanderson Farms was summary judgment.

19    Pilgrim's Pride was a bench trial.  Anderson v. Cagles was

20    summary judgment.  Harrison, summary judgment.  Claxton, summary

21    judgment.  There's a White v. Tip Top that I haven't referenced

22    so much because it was a very minor set of facts.  I think this

23    Court would have, probably find for the defendant with the set of

24    facts in White.  But there's another decision out from Judge

25    Murphy in the Northern District of Georgia.

1          So I think I've handled the boots and I think in the

2     video you see it.

3          The hard hats and the hair nets, and you've seen it in

4     the video, there were a number of people, not everybody, but

5     there was a reasonable sample of people walking in the door,

6     wearing those items.  So they can wear them.  And the courts for

7     the most part have found those type of items to be postliminary

8     and preliminary.

9          And I've pointed out in the apron and the rubber

10    gloves, that was, in fact, the very items in which the Supreme

11    Court found compensable as principal activities and Congress

12    reacted to in the portal-to-portal.

13         That leads us down to pretty much the last little bits,

14    which are the metal mesh gloves and cut gloves, and the few

15    people wear arms, very, very few wear those.

16         Now, we don't, we think that the primary purpose of

17    that is, and once again, benefits, there are always benefits to

18    both sides.  But from a safety point of view, our proposition is

19    it's a far greater benefit to an employee not to cut their hand

20    than it is to the employer for them not to cut their hand.  It's

21    just, they can be careful with the gloves.  It's safety and

22    primarily to keep them safe.  Not that -- we care about it, and

23    we do.

24         But even if you look at that and said, Okay, I'm making

25    the decision that the metal mesh gloves are integral and

1    indispensable.  There's a couple things about that.  First is if

2    you've watched in the video, you see where they put the metal

3    mesh gloves on.  It's at the very end of the process.  They have

4    dipped their gloves and sanitized them, and then they put the

5    metal mesh gloves on.  They're putting the metal mesh gloves on

6    pretty much either immediately before the line or right on the

7    line.

8           Now, you have, the only evidence you've got about how

9    long this type of process takes after the sanitizing is Dr.

10   Davis's study.  And that's one reason why Dr. Davis's study, in

11   our opinion, is far more helpful because it breaks it down into

12   individual units that this Court can use.

13          The problem with Dr. Radwin's decision is not the

14   study, but what he was told to be the trigger points.  Because

15   once the trigger points are gone, he doesn't give you the tools

16   to go down and subtract.  So if he's wrong, he's wrong, and it

17   pretty much becomes a useless thing.

18          If find that grasping an item is not integral and

19   indispensable, and we'll get to that in a second, then his timing

20   doesn't mean much, because that's what he uses.

21          So the time to put on the Kevlar gloves is 3.9 seconds.

22   The time to take them off is 3.1 seconds.  The chain metal glove,

23   7.4 seconds.  Doff 3.1 seconds.

24          Mere seconds.  Literally mere seconds.  And even when

25   you watch it, you'll see that it's mere seconds, not minutes.

1    This was clearly, if that was the only item, it would be easily

2    falling within the concept of de minimis.

3          Now, as a corollary to plaintiffs' case, they are

4    trying to argue that not only are donning and doffing integral

5    and indispensable items or integral, when you touch them it's

6    integral and indispensable.

7          The problem is what's wrong with that concept is the

8    language is, there's a bunch of things wrong.  The first thing

9    we'll start off with is they're grasping items that are not

10   integral and indispensable to start.  Boots, smocks, hair nets,

11   ear plugs.

12         Also, the analysis.  The analysis that they have to use

13   is, well, grasping this eye at the point, assuming it was, it's a

14   postliminary/preliminary activity is now integral and

15   indispensable.  Now we're going to say, okay, now grasping it is

16   integral and indispensable.  It requires a separate analysis.

17   Well, if that's true, and that analysis, because it's related to

18   it, then standing in line to get it has that same logic.  But we

19   know the Supreme Court said, No, standing in line is not

20   compensable.  That's clearly, they said, that's clearly

21   postliminary and preliminary.

22         So grasping, you can't, I can't see how you get past

23   the Supreme Court looking at standing in line and then go to this

24   next one and say, Just because it's related it's integral and

25   indispensable.

1          THE COURT:  Is one answer that there's got to be a rule

2     that people understand and can apply?

3          MR. STINE:  That would be very nice, Your Honor.  The

4     reason I say that is part of our problem in the industry is

5     compliance.  And I don't mean compliance in the sense of the way

6     we think compliance is.  I'm talking about whether it's

7     compliance on the other side of the table because I can't figure

8     it out.

9          THE COURT:  Well, but really, I don't mean to cut you

10    off, but how is the grasping rule any different from the take

11    home rule?  Isn't, at least at some level of analysis, each

12    provides a rule, a concept that is easily understood and fairly

13    easy to apply in an area that involves a lot of struggle.

14          So I think your argument is, if I get it right, the

15    option to take the stuff home ends the analysis.

16          MR. STINE:  As long as they have the option and the

17    ability.

18          THE COURT:  Yeah.  Option and ability, that ends the

19    analysis.  The plaintiffs say grasping or obtaining ends the

20    analysis.  That marks the commencement of the continuous work

21    day.

22          MR. STINE:  Right.

23          THE COURT:  Okay.

24          MR. STINE:  Two points.

25          THE COURT:  All right.

1          MR. STINE:  First thing is the take home defense, as

2     we'll call it, is you read in the Wage Advisory Memorandum,

3     which, by the way, was issued by the Department of Labor while

4     it's a litigant, a plaintiff in these donning and doffing cases.

5     So this is not a regulation.  It's not an interpretation.  It's a

6     position taken by the Department of Labor.  It notes on Page

7     Three, and this is the quote about, from where we're getting

8     this:  However, donning and doffing of required gear is within

9     the continuous work day only when the employer or the nature of

10     the job mandates that it take place on the employer's premises.

11     It is our long-standing position that if employees have the

12     option and ability to change in the required gear at home,

13     changing of that gear is not compensable activity even when it

14     takes place at the plant.

15          So what they're saying in this memorandum is, look,

16     we've been taking this position for a long time.  The problem

17     with the grasping is it's not a long term position.  It is, if

18     you look at it, it is them trying to read the tea leaves of IBP

19     v. Alvarez.

20          And the other problem we have with this is, even if you

21     took this as a given it doesn't apply in this situation because

22     it clearly states that, sets like donning and doffing, obtain the

23     gears, as opposed to waiting to obtain the gears, always

24     essential for the workers to do his job, the compensable day

25     starts once the employee has acquired the gear -- and here's the

1    critical phrase that's been left out by the plaintiffs --

2    required to be stored on the premises by taking an item out of a

3    bin, a locker, or another designated storage area.

4            I think the evidence has come out pretty clearly.

5    They're not required to store it.  We have a memorandum we gave

6    to them saying, You can take this stuff home.  As a matter of

7    fact, the plaintiffs admit on Friday, we make them take the stuff

8    home.  The only really mandate that we have about the lockers is

9    on Friday you've got to clear them out, you've got to take this

10   stuff home.

11           So it's pretty clear that there's no evidence that we

12   have mandated that they bring the stuff home.

13           THE COURT:  Can you walk me through how a worker would,

14   on a regular basis, take home a smock?

15           MR. STINE:  Yes, Your Honor.  What they did, and it's

16   in the evidence, what they started to do after they took this

17   policy about letting them take the smocks, they put the racks

18   back out in the afternoon.  So what you could do is very easy.

19           If you saw, remember, there was a bin where you could

20   throw your soiled smock if you don't want to wash it at home?  I

21   think I would normally throw it in there.  You can wash it if you

22   want.  Remember, there are aprons, so it's not as bad as it gets

23   to be pictured, because the aprons take the bulk of the chicken

24   fat and stuff.

25           You toss it in.  You walk over, you grab a smock, you

1    put it over your arm, you walk out.  You have the smock on your

2    arm, a clean one, ready to go for the next day if you want to put

3    it on.

4              THE COURT:  And nobody checks to see if the smock is

5    clean?  I mean, the company doesn't care if the smock is actually

6    clean?  I mean, in other words, theoretically, the person could

7    wear the same smock without laundering it?

8              MR. STINE:  If they came in and it was visibly stained

9    and dirty --

10             THE COURT:  Somebody might say something.

11             MR. STINE:  -- they might say something, give them

12   another smock to change.

13             THE COURT:  And then I guess your answer is, if the

14   person forgets the smock, leaves it at home or --

15             MR. STINE:  There's a smock rack.

16             THE COURT:  A smock rack.

17             MR. STINE:  If you remember from Mr. Tirrell, the

18   reason they hadn't done it before is because the smocks cost a

19   lot of money and people lose them and forget them.  And we,

20   basically, by letting them take them home --

21             THE COURT:  You decided it's cheaper to let them lose

22   some smocks than to pay the --

23             MR. STINE:  Right.  The problem about this is, is from

24   our point of view, from Mr. Tirrell's point of view, we were in

25   compliance.  We complied with, we got case law that says we're in

1   compliance.  Wage Hour comes out with this wham, Your Honor, on

2   May 31st, 2006.  Okay?  So Mr. Tirrell gets this wham sometime

3   around June of 2006 and reads and goes, Holy cow, look at this,

4   this is what Wage and Hour says.

5          By the way, they did argue it.  I knew about it because

6   they argued it in the amicus brief in IBP v. Alvarez.  You go

7   back and look at Wage Hour's amicus brief, you'll see they're

8   arguing, This is our long-standing position.

9          So here we are in June of 2006.  We look at it and go,

10  we can do that.  That will give us another level of compliance in

11  addition to us just taking the position we think we're right,

12  we'll do what Wage and Hour says.

13         You know, to take that e-mail and say that's evil

14  intent because he's writing an e-mail in which he uses casual

15  language could be put to the language and this will give us

16  complete compliance with the FLSA.  They would probably be

17  arguing, Well, see, he knew he wasn't in complete compliance with

18  the FLSA when he wrote the e-mail in 2006.

19         It was just an additional step that we could to

20  provide, as he's pointed out, an additional step in being

21  compliant with the law.  It's not designed to strip the plaintiff

22  of these rights.  From our point of view, they never had them.

23  We weren't stripping anything from them.

24         THE COURT:  Do you want to say anything about the

25  black-outs on the e-mail?

1          MR. STINE:  Black-outs are attorney/client privilege.

2     They were referencing statements made by counsel at that time.

3     And when we produced them, we noted they were attorney/client

4     privilege.

5          THE COURT:  Okay.  Thank you.

6          MR. STINE:  And they have nothing to add to it other

7     than, the attorneys know about it and, you know, my blessings.

8     That's it.  All the blackouts are attorney's names and their

9     comments.  That's the black-outs.

10         Now, we got into the taking of the home defense.

11    You've heard that we allow them.  As a matter of fact, it's

12    interesting that Mr. Brown cites the statements that said "most

13    people."  Most people don't do this.  Most people don't do this.

14    Well, that's their choice.  But what's implicit in that, also, is

15    a few do.

16         The comment that he made about wearing a smock home

17    dirty.  What did we say?  Well, some do.  We don't want them to

18    because we give them the choice.  They do.

19         I don't think, I don't think it's practical but it's,

20    they're doing it.  It's not illusory.  Folks are doing it.

21         You know, this type of policy, I don't think you looked

22    at the percentage of the people actually doing it.  You look at

23    to see, do they have the option and the ability?  And that's what

24    it says.

25         And people are coming in the door wearing gear and

1    occasionally a smock, not often.  But it doesn't make it

2    illusory.  You know, this week, I would have been wearing a smock

3    in this building if I could have had a smock to wear because I

4    didn't bring a coat worth a darn.  But it's my choice.  And it's

5    their choice.  And that's what Wage Hour was trying to get

6    across, is if you allow them to make the choices, we'll hold it

7    to be postliminary and preliminary under our definition.

8          And the policy was clearly communicated.  You heard our

9    witness testify that he put it out on the bulletin board, put it

10   up on closed screen TV, put it into the orientation.  And one of

11   the plaintiffs, she didn't want to, as a matter of fact she

12   denied it on the stand, but she agrees to it when she was

13   reminded about the deposition.  And that just as easily could

14   have been a passage of time because the memo was 2006 and here we

15   are standing in 2009.  But she acknowledges she got the policy.

16         And contrary to what Mr. Brown says, there's no

17   testimony in this courtroom, there's nothing in the transcript

18   that some supervisor told them to the contrary.  It didn't come

19   out in their testimony in here.  It may have been in an affidavit

20   in summary judgment, but that's not in the record before the

21   Court at this time.

22         And the video shows people come in wearing gear.  And

23   our people have observed people in and out in the community

24   wearing various, sundry portions of the gear.  So they can wear

25   it and do wear this stuff out, particularly the boots, the hair

1    net, bump cap, and the ear plugs.

2              And if you look at the language, it talks about that

3    gear.  So the Court could make a determination whether they can

4    take that gear home and not others.

5              And prior to 2006, the only thing that we did not allow

6    to go out, as you've heard, was the smock.  That was the only

7    item we wouldn't let to go out, and you heard why we didn't

8    typically have it go out.

9              And the memorandum just, so you can, it's Defendant's

10   Exhibit One, the memorandum we sent out to the employees.

11             So we've got an issue there of the, I think that kind

12   of covers our position on the integral and indispensable and the

13   grasping and the take home, Your Honor.  And as to the lunch

14   break, I think the most critical place that we need to go is the

15   Fourth Circuit's decisions because, of course, those are

16   controlling on us here.  And, you know, that's true right now

17   even when this memo, by the way, went out to take home.  Once he

18   filed this lawsuit in Baltimore, these plants are under the

19   jurisdiction of this Court and the Fourth Circuit, and not any

20   other circuit.  So we need to look at the Fourth Circuit case

21   law.

22             As to the lunch, here's what the Fourth Circuit said in

23   Roy v. City of Lexington, 141 F.3d 533.  And I don't have the

24   correct page cite.  It's in Keynote Paragraph 14.  And here's

25   what the Court says:

1          We believe the most appropriate standard for

2     compensability, for compensability is a flexible, realistic one

3     where we determine whether, on balance, employees use meal time

4     for their own or for their employer's benefit.

5          Your Honor, the interesting thing about that is, if all

6     the time is used for the employee's benefits, you really don't

7     even go to the test.  This is a test that you look at when there

8     is some amount of work being performed because, otherwise, why

9     would you be looking at it on balance?  They're dealing with

10    cases in which the employees are claiming we're doing some type

11    of work.  And they're looking at it and saying, Okay, the rule

12    for compensability is this particular rule.

13         And as the plaintiffs have acknowledged, they're not

14    looking to break the whole period.  They're only trying to look

15    at the time around the edges.  I want to talk about that

16    particular issue, also.

17         Now, we'd like to talk about time.  The time and de

18    minimis standard is kind of alike because I couldn't figure out a

19    way to present one without cleanly, and cleanly present another

20    one.

21         Let's start with Dr. Radwin's study.  Now, the reason I

22    want to point to Dr. Radwin's study is because when plaintiffs

23    testified, they did not testify to any time whatsoever.  So in

24    the plaintiffs' case, the only testimony you have before you is

25    Dr. Radwin's study.  And from our point of view, it becomes

1    useless because it was a totally inclusive plan.  And this is not

2    a criticism of Dr. Radwin because Dr. Radwin was told, Here's

3    what I want you to start from and here's where I want you to end.

4           Those are really more legal determinations as opposed

5    to a study.

6           But the problem with the study is if you don't agree

7    with the start points and the stop points, there's nothing in

8    that study to let you bring it down, you know.  Dr. Davis's

9    report broke them down into units so you could add and look at

10   it.  We've kind of empowered you to look at the times and the

11   walks so that you could use those in an additive sort of way.

12   Dr. Radwin's kind of a, an either take it or leave it type

13   approach, really.

14          So let's start with what he did in his trigger points.

15   Sometimes he started with putting on boots.  Well, they didn't

16   have to put their boots on there at the plant.  They can put them

17   on at home.  They didn't have to wear the steel toe galoshes, the

18   kind of ones we were looking at.

19          He starts with, almost all of them, with grasping,

20   although the evidence, I think, is abundantly clear, that they're

21   not required to store these things at the facility.  We make it

22   easy for them and they can.  But they're not required.  And it's

23   a mandated thing.  As you heard that language, it would be

24   mandated language.

25          He also starts with grasping of some gear that is not

1   integral and indispensable.  The hard hats.  The hair nets.  You

2   saw on some of the videos, the starting point.  If you remember

3   the slow guy that took so long, started by touching his hair net.

4   And then he really didn't put that smock on until a whole lot

5   longer, like 15 minutes into this process.  So how do you take

6   that out?

7          Then he uses items that are not required.  Boots,

8   again, cotton gloves.

9          And further, at lunch he uses travel time.  It's

10  unmistakable, I think the evidence is undisputable, that what

11  happens at the start of lunch is lunch time starts, employees

12  come down, and they can either rinse, if they have to wash off,

13  start at the end, take the apron, then hang it up, take the

14  gloves.  Then they're free.

15         What Dr. Radwin did was continue to count the traveling

16  time after they've doffed and donned and released the item, which

17  is the standard that they were arguing for the start of the shift

18  and the end of the shift.  But for lunch, they continue to count

19  the travel time.

20         Same thing is true, he said, at the end of the lunch.

21  They counted travel time from the time they left that cafeteria

22  until they got to grasping the apron.  He counted that as travel

23  time, if you recall.

24         Now, if you want to look at travel time in this

25  Portal-to-Portal, postliminary/preliminary, integral and

1    indispensable type analysis which, as you know, the defendants

2    think is not the appropriate analysis, but the plaintiffs are

3    arguing it, then let's look at how the Portal-to-Portal Act would

4    treat the travel time.

5              29 USC 254(a)(1) excludes from compensable time, and I

6    quote, "walking, riding, or traveling to and from the actual

7    place of performance of the principal activity or activities

8    which the employee is employed to perform."  In other words, even

9    if you assume the apron was integral and indispensable, once I

10   did that, that's where I did my principal activity, and then I'm

11   traveling.  And the Portal-to-Portal Act says that's not

12   compensable time, and it is included in his study over and over

13   again.

14             And the same thing is true from coming back from the

15   cafeteria.  The place of principal activity, being touching the

16   apron.

17             THE COURT:  Is it your position that the Court cannot,

18   as would a jury under proper instructions, determine an

19   appropriate discount from plaintiffs' expert's calculations?

20             MR. STINE:  I don't think he gave you anything upon

21   which to make those determinations.

22             THE COURT:  But I watched the video and I heard his

23   testimony.  I mean, I saw, I saw the grandfather and I saw the

24   first, the woman.  And I've got his calculations as to the means.

25             MR. STINE:  I understand that.  And the question

1    becomes, for example, let's start about the triggering event

2    under Alvarez.  What is the event that triggers?  You've got to

3    make that determination.  This Court today in its decision has

4    got to say, Okay, I am finding this activity to be the triggering

5    event.  Whatever that event may be.  They're asking for it to be

6    grasping.  You may determine it is the apron.

7         Well, the problem with Dr. Radwin's study is you don't

8    know, I don't know, I guess you could look at all 197 tapes and

9    sit there and figure it out and go from there, as to how much

10   time was between those points.

11        So the answer is, I think you can do it but I think

12   it's going to take a lot of work.  He doesn't have any units or

13   standardized for you to use.

14        THE COURT:  But I have all these charts.  I've seen the

15   videos.  I have the PPE.  And I have a pretty good idea how long

16   it takes to get from Evisceration to the lunch room.  I have a

17   pretty good idea how long it would take to doff the apron and the

18   gloves and wash up, or vice versa, and then start for the lunch

19   room.  I mean, think I have a pretty good idea of that.

20        MR. STINE:  Yes, Your Honor.  And that one, if that was

21   the only one, you could say takes X number of minutes to travel

22   there and back and dock it.  But what about the other issues?

23   What about the trigger points for the start of the day and the

24   end of the day?

25        You know, if it's different from what they say, then

1   you're going to have to make that determination.  You can make

2   your determination --

3               THE COURT:  He used as his trigger obtaining the first

4   PPE.

5               MR. STINE:  He uses grasping the first PPE, whether

6   it's touching a hard hat in a locker or putting the boots on.

7               THE COURT:  And he has nearly 200 people in his study.

8               MR. STINE:  Yes, Your Honor.

9               THE COURT:  And he's come up with the mean using that

10  as one of the criteria.

11              MR. STINE:  As a matter of fact, it's the only criteria

12  he uses for the start.

13              THE COURT:  Well, okay.  For the start.  But I mean, in

14  other words, he did a holistic study of the entire continuous

15  work day.  And he's come up with a mean of 20 minutes --

16              MR. STINE:  Yes, Your Honor --

17              THE COURT:  -- give or take.

18              MR. STINE:  -- if you assume that grasping any gear is

19  the integral and indispensable trigger point, then it's a useful

20  study.

21              THE COURT:  Of course.  I'm saying it wouldn't be an

22  assumption, it would be a finding.

23              MR. STINE:  Yes, Your Honor.  A finding.

24              THE COURT:  But you see my point.  My point is, and Mr.

25  Brown said something that was suggestive of this and I didn't ask

1    him about it, but I don't think he really meant to say, that I

2    have to choose either 20 minute or 10 minutes.

3              MR. STINE:  No, you do not.

4              THE COURT:  Of course.  Of course.  I could choose less

5    than ten.  I could choose -- I suppose I couldn't possibly choose

6    more than 20.

7              MR. STINE:  I would probably object.

8              THE COURT:  That would certainly be clear erroneous.

9    But certainly, any, any number that the Court could say with

10   confidence it was reasonably certain, that had been proven

11   reasonably certain to be the number.

12             MR. STINE:  Just and reasonable.

13             THE COURT:  Yeah.

14             MR. STINE:  It is.  I would want to point out that Dr.

15   Davis's study, also, because it was additive, we put in items

16   that we don't, we're not arguing were compensable so that we

17   could deconstruct it down because it worked better that way.  So

18   for example, as we pointed out yesterday, he included all that

19   travel from the time clock back to the back dock.  But when he

20   took it out, the travel time dropped.  And when we moved, took

21   out the, from the production door to the break room and back, his

22   numbers dropped again.

23             You're closer to eight minutes with those assumptions,

24   I mean, you're closer to four point, I believe he said 4.4

25   minutes.  And the donning/doffing time, all the items.  And once

1    again, we made it so that if you could decide, Well, I'm going to

2    find this item, not this item, there's a different way of

3    handling it so that it's additive again.

4              So we gave you some tools.  And we did that

5    deliberately, Your Honor, so that you could do those types of

6    things with Dr. Davis's study.  But --

7              THE COURT:  No.  I understand that.  You know, to a

8    certain extent, this case, I mean, to a certain extent, I have

9    two records in front of me.  I appreciate that.  It's almost, in

10   fact, not just two records, but I have two bodies of law.

11             MR. STINE:  You might actually have more than two, the

12   way I look at it.

13             THE COURT:  You're right.  It's scattered.  But

14   essentially, the plaintiff can lose any number of different ways

15   and the defendant can lose any number of different ways.  That's

16   part of what makes this case so fascinating.

17             If I choose plaintiffs' law, though, I don't know how

18   to apply plaintiffs' law to your facts.

19             MR. STINE:  I know --

20             THE COURT:  If I choose your law, I don't know how to

21   apply plaintiff s' facts to your law.  It's really fascinating.

22             MR. STINE:  Yes, Your Honor.  And that was kind of the

23   thing I was arguing.

24             THE COURT:  Sure.

25             MR. STINE:  Because the way he did it is based upon the

1   legal theories of Mr. Brown, which is a perfectly legitimate way

2   to do it.  I'm not disagreeing of it.  It doesn't give you any

3   subtractive abilities, is what I'm getting across.

4           THE COURT:  Okay.  I guess I'm just disagreeing with

5   that.  Subtractive abilities, again, not to repeat, but I saw the

6   plant, I saw what people do in the plant.  Dr. Davis didn't take

7   account of pedestrian traffic jams.  He didn't take account of

8   boots.  He didn't take account of washing and sanitizing.  Dr.

9   Radwin, you know, used certain benchmarks and made certain

10  decisions.  So they both made certain decisions that the Court is

11  entitled to consider but it's not, not bound to, to embrace.

12          MR. STINE:  I don't disagree.  You got the whole record

13  in front of you.  You could take combinations.

14          But we do believe when you look at Dr. Davis's studies

15  you're going to find the times are relatively small.  And

16  depending on where you draw the trigger point, while we don't

17  think, we think everything is postliminary and preliminary, but

18  if you choose to say the metal mesh gloves are integral and

19  indispensable, you're going to, when you look at this record,

20  you'll probably come out with about three minutes of the whole

21  day, which we believe is de minimis.

22          So to some degree, the de minimis depends upon your

23  findings of fact.  And those depend upon what you find, what you

24  find to be integral and indispensable that triggers the

25  continuous work day.

1          I really don't know if there's much more I can say

2     about de minimis other than that's what it is.

3          And let's go to the, I know you have a sentencing

4     hearing at noon.  I think I'm going to finish up in time.  I

5     don't think you'll have --

6          Willfulness and in good faith.  And Mr. Brown got it

7     right.  It's a bizarre little thing to me in the law, and that is

8     willful is the burden of the plaintiff and good faith is the

9     burden of the defendants, and it's just an odd little quirk of

10    the Fair Labor Standards Act.  But he has stated it correctly.

11         But from our point of view, what is it for good faith?

12    And as I pointed out, and I continue to do this, we don't get to

13    good faith until you said, you guessed wrong.  If you say we

14    guessed right, we don't have to get to it.  So the courts only

15    deal with willfulness and good faith in cases in which they have

16    found the Court, the defendant to be guilty.

17         So what you've got to look at is were they being a

18    reasonable person under the circumstances, not that they're

19    right, but were they being reasonable?

20         THE COURT:  And you've got good lawyers interpreting

21    Alvarez within, within the range of reasonable interpretations.

22    And your client acting in accordance with that advice.

23         MR. STINE:  Correct.

24         THE COURT:  I didn't mean to interrupt.

25         MR. STINE:  You summed it up better than I could.  And

1   the Court, the District Courts and the Court of Appeals are

2   rendering decisions in favor of this position.  So we, we

3   understand it's a disputed issue.  We understand that the Wage

4   Hour's taken the litigation position over here.  But for example,

5   they took the litigation position.  What happens?

6           The first two cases that come out, industry wins.

7   Alvarez comes out.  Second Circuit says, still

8   postliminary/preliminary.  Seventh Circuit says, it's still

9   postliminary and preliminary.  And the Eleventh Circuit says

10  postliminary and preliminary.

11          The Fourth Circuit hasn't spoken.  If the Court had

12  spoken one way or the other and we're in the Fourth Circuit, that

13  would be the end of it.  At that point if they spoke, we had to

14  change.

15          But I think it's extraordinarily difficult for this

16  Court to sit here and say, You guessed wrong, you relied on

17  Gorman.  You relied on Sanderson Farms, you relied on Pilgrim's

18  Pride.  Because you guess wrong, it's willful and I'm going to

19  find the three year, I'm going to find the liquidated damages.

20          You know, we got decisions still coming out.  I'm one

21  of the lawyers giving advice.  I know we're prevailing.  As you

22  know, we've sent you the Claxton case.  We sent you the Harris

23  case.  These are cases coming out on decisions right now,

24  2008/2009.

25          So I think it's extraordinarily difficult for the

1    Court.  You know, I find it difficult to imagine why our position

2    would be found to be in bad faith and willful when district court

3    judges and Court of Appeals are finding our position to be

4    legitimate.  If you find for us, I think that's no liquidated

5    damages.  And no third year.

6         And Mr. Brown does properly state the law on liquidated

7    damages in the sense that it triggers your discretion.  But I

8    will tell you, I don't recall virtually any case in which the

9    courts have found the defendants have proven they've acted in

10   good faith and then imposed liquidated damages nevertheless.  For

11   that purpose, you know, the interest that would have to be

12   assessed on it would take that into account, compensate them for

13   that loss of wages during that period of time.

14        Finally, May 31, 2006, Wage Hour puts up its wham

15   saying, This is our position.  We go, Hmm, okay, we'll try that.

16   We can do that, we'll do that.  So there's an additional step.

17        I understand he thinks it's an illumination.  From our

18   point of view, well, it's an additional thing that Wage Hour says

19   is compliance with the law.

20        THE COURT:  It's like if IRS says you can claim this,

21   nothing wrong with claiming this, right?

22        MR. STINE:  Precisely.  Precisely.  I mean, you know, I

23   don't, I just think that e-mail was just basically a person

24   writing very quickly.  And you know, in hindsight I wish he

25   wouldn't, and this will provide additional protection to show

1  that we're in compliance with the law, if I had written it

2  knowing this.  But that's, that's just people writing e-mails.

3  And I think to take anything from that language --

4          THE COURT:  Without showing them to their lawyers

5  first.

6          MR. STINE:  Right.  Right.  And that pretty much

7  concludes our closing argument.

8          THE COURT:  Thank you, Mr. Stine.

9          MR. STINE:  Thank you.

10          THE COURT:  Brief rebuttal, Mr. Brown?

11          MR. BROWN:  Well, You Were, the only thing I would like

12  to point out, I guess, you had questions about your ability to

13  pick a number other than 10 or 20.  And when the defendant, when

14  the employer fails to keep records, all we have to do is present

15  a just and reasonable quantification.  And so the normal, these

16  are not harsh rules.  It would seem to me you clearly have the

17  flexibility.  That's it.

18          THE COURT:  Well, counsel, I must tell you, this has

19  been really quite a pleasant experience.  First of all, I've just

20  learned so much law and, and commercial practice.  It's really

21  been a pleasure.

22          I said to my law clerk, you know, I haven't had a civil

23  trial in so long. I mean, really.  It's just, in this district,

24  I'd kind of strange.  Civil trials are far less frequent than

25  would you imagine.  A lot of cases settle.  A lot of summary

1   judgments.  And so it was a pleasure to have you appear before

2   the Court.

3           It's a fascinating case with fascinating factual and

4   legal issues.  In some respects, it's almost a case of first

5   impression.  Not exactly.  But certainly in this circuit there's

6   a paucity, well, there's a total absence of controlling precedent

7   and there's a paucity of persuasive precedent within the circuit.

8           I really want to give this my full and mature

9   consideration, which is exactly what you and your clients are

10  entitled to.

11          So I'm going to issue an opinion, I promise you sooner

12  rather than later.  It's quite a record.  And it's, it's

13  beguiling is what it is.  It's absolutely beguiling.

14          MR. STINE:  It is a fascinating area.  And Your Honor,

15  we would like, all of us here, to thank you.  This is, you made

16  the trial a delightful process.  It has been wonderful to appear

17  before you and answer the questions.  I wish every courtroom was

18  run the way you run yours.

19          THE COURT:  That's very kind, Mr. Stine.  Thank you.

20  It's been an absolute pleasure to have you.

21          MR. STINE:  Thank you.

22          MR. BROWN:  Your Honor, I would like to echo what Mr.

23  Stine says, and add that the opinion that you wrote three weeks

24  ago, I think it's been now, was --

25          THE COURT:  On the summary judgment?

1          MR. BROWN:  -- on summary judgment, it was a wonderful

2     opinion.

3          THE COURT:  Thank you.  That's quite a surprise to

4     hear.

5          MR. BROWN:  Well, I've talked to people around the

6     country and told them about.  It was very well done.

7          THE COURT:  Well, thank you very much.

8          Thank you all very much.  Have a safe trip home.

9          MR. STINE:  Thank you, Your Honor.

10         THE COURT:  I look forward to further contact with you.

11    We'll stand in recess.

12               (Conclusion of Proceedings at 11:55 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3        I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of Perez, et al.,

5   v. Mountaire Farms, Inc., et al., Case Number(s) AMD-06-121, on

6   March 27, 2009.

7        I further certify that the foregoing pages constitute

8   the official transcript of proceedings as transcribed by me to

9   the within matter in a complete and accurate manner.

10        In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                           _____

                             Mary M. Zajac,
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

**$300,000** [1] - 6:17

**'**

**'06** [2] - 13:8, 13:15
**'07** [1] - 4:11

**1**

**10** [3] - 7:7, 57:2, 63:13
**10.2** [1] - 5:15
**100%** [1] - 38:22
**101** [1] - 1:23
**10:10** [1] - 2:1
**11:55** [1] - 65:12
**12** [1] - 7:7, 24:4, 24:22
**135** [1] - 16:2
**14** [1] - 50:24
**141** [1] - 50:23
**15** [6] - 6:17, 13:6, 13:13, 14:12, 14:19, 53:5
**1800** [1] - 6:21
**1948** [1] - 38:11
**1955** [1] - 38:11
**197** [1] - 55:8
**1998** [1] - 38:20

**2**

**20** [6] - 7:18, 19:11, 56:15, 57:2, 57:6, 63:13
**20.0** [1] - 5:16
**200** [2] - 22:14, 56:7
**2000** [2] - 16:25, 17:5
**2001** [2] - 17:5, 24:3
**2003** [1] - 17:12
**2004** [1] - 17:12
**2006** [14] - 2:14, 7:21, 7:22, 7:25, 8:7, 8:10, 47:2, 47:3, 47:9, 47:18, 49:14, 50:5, 62:14
**2007** [1] - 28:23
**2008/2009** [1] - 61:24
**2009** [4] - 1:10, 49:15, 66:6, 66:11
**203(o** [3] - 18:13, 27:2, 27:24
**21201** [1] - 1:24
**25** [2] - 10:10
**250** [1] - 6:16
**254(a)(1** [1] - 54:5
**26** [1] - 4:25
**26-C** [2] - 10:10
**26-K** [1] - 12:25
**27** [2] - 1:10, 66:6

**29** [1] - 54:5
**2d** [1] - 15:5

**3**

**3.1** [2] - 41:22, 41:23
**3.9** [1] - 41:21
**30(b)(6** [3] - 4:25, 10:13, 13:10
**31** [1] - 62:14
**31st** [1] - 47:2
**339** [1] - 26:8

**4**

**4** [1] - 7:7
**4-B** [1] - 6:9
**4-D** [2] - 10:1, 13:2
**4-F** [1] - 9:19
**4.4** [1] - 57:24
**45** [1] - 6:8
**46** [1] - 6:8
**485** [1] - 15:5
**488** [1] - 28:22

**5**

**50%** [2] - 38:20, 38:23
**533** [1] - 50:23
**5515** [1] - 1:23
**586** [1] - 28:23

**6**

**6** [1] - 7:7
**67** [1] - 10:1

**7**

**7.4** [1] - 41:23
**77** [1] - 9:20
**77%** [1] - 36:20
**78** [1] - 9:20

**8**

**800** [1] - 23:1

**9**

**900** [1] - 6:22
**913** [2] - 26:8
**985** [1] - 16:2

**A**

**a.m** [2] - 2:1, 65:12
**abilities** [1] - 59:3, 59:5
**ability** [6] - 8:11, 43:17, 43:18, 44:12, 48:23, 63:12
**able** [1] - 22:2
**absence** [1] - 64:6
**absolute** [1] - 36:2, 64:20
**absolutely** [2] - 31:7, 64:13
**Absolutely** [1] - 28:15
**abundantly** [1] - 52:20
**accessibility** [1] - 13:1
**accordance** [1] - 60:22
**according** [2] - 8:5, 15:10
**account** [6] - 21:7, 21:14, 59:7, 59:8, 62:12
**accounting** [1] - 21:3
**accurate** [1] - 66:9
**acknowledge** [1] - 2:9
**acknowledged** [1] - 51:13
**acknowledges** [2] - 38:8, 49:15
**acquired** [1] - 44:25
**act** [1] - 15:8
**Act** [8] - 3:15, 4:15, 32:20, 34:17, 34:19, 54:3, 54:11, 60:10
**acted** [1] - 62:9
**acting** [1] - 60:22
**activities** [12] - 2:14, 3:14, 24:9, 24:16, 24:17, 26:5, 35:3, 35:17, 35:18, 35:21, 40:11, 54:7
**activity** [9] - 2:16, 3:5, 4:3, 25:10, 42:14, 44:13, 54:7, 54:10, 54:15, 55:4
**acts** [1] - 16:20
**actual** [1] - 54:6
**add** [5] - 2:22, 21:12, 48:6, 52:9, 64:23
**addition** [3] - 32:18, 36:19, 47:11
**additional** [5] - 47:19, 47:20, 62:16, 62:18, 62:25
**additive** [3] - 52:11, 57:15, 58:3
**addressed** [2] - 26:21, 28:20
**addressing** [1] - 5:7
**administrative** [2] - 5:24, 6:5
**admit** [2] - 32:19, 45:7

**admittedly** [1] - 16:17
**adopts** [1] - 32:20
**advice** [2] - 60:22, 61:21
**Advisory** [3] - 3:20, 44:2
**affidavit** [1] - 49:19
**affirmance** [1] - 16:17
**affirmed** [2] - 32:14, 39:13
**affirms** [1] - 39:9
**affixed** [1] - 66:10
**afternoon** [1] - 45:18
**agents** [1] - 10:7
**aggregate** [3] - 3:24, 5:25
**ago** [4] - 10:9, 13:18, 15:13, 64:24
**agree** [5] - 2:11, 22:9, 29:2, 30:22, 52:6
**agrees** [2] - 27:14, 49:12
**aha** [1] - 36:5
**ahead** [1] - 17:21
**aided** [1] - 7:3
**AL** [2] - 1:4, 1:6
**al** [2] - 66:4, 66:5
**alike** [1] - 51:18
**Allen** [1] - 27:6
**allow** [8] - 5:21, 12:8, 19:12, 19:16, 26:11, 48:11, 49:6, 50:5
**allowed** [3] - 7:22, 7:23, 8:1
**almost** [5] - 2:21, 22:14, 52:19, 58:9, 64:4
**Alvarez** [39] - 2:21, 2:23, 3:8, 3:11, 3:12, 3:23, 4:3, 4:13, 4:17, 4:22, 13:23, 16:12, 16:16, 16:17, 16:20, 17:14, 24:24, 25:7, 26:8, 28:18, 28:20, 30:4, 30:9, 30:21, 30:24, 31:6, 31:21, 31:22, 33:11, 33:25, 34:4, 37:17, 44:19, 47:6, 55:2, 60:21, 61:7
**ambulance** [1] - 25:23
**AMD-06-121** [2] - 1:6, 66:5
**amicus** [2] - 47:6, 47:7
**amount** [4] - 6:1, 15:17, 51:8
**analysis** [15] - 24:24, 25:3, 31:8, 32:12, 37:23, 42:12, 42:16, 42:17, 43:11, 43:15, 43:19, 43:20, 54:1, 54:2
**analyze** [1] - 24:1

**analyzed** [2] - 25:2, 25:13
**analyzes** [1] - 25:12
**Anderson** [2] - 31:18, 34:18, 34:20, 34:21, 38:4, 38:10, 39:12, 39:19
**Andre** [1] - 1:12
**annually** [1] - 6:18
**Answer** [1] - 10:16
**answer** [7] - 2:9, 11:25, 31:13, 43:1, 46:13, 55:11, 64:17
**Anyway** [1] - 12:12
**anyway** [1] - 20:14
**appeal** [2] - 32:3, 39:9
**appeals** [3] - 28:19, 31:16, 33:3
**Appeals** [6] - 4:16, 18:19, 31:23, 33:6, 61:1, 62:3
**appear** [3] - 33:20, 64:1, 64:16
**Appearances** [1] - 1:15
**applicable** [2] - 2:4, 17:15
**application** [1] - 29:5
**applications** [1] - 29:16
**applied** [1] - 31:8
**applies** [1] - 27:24
**apply** [6] - 29:10, 43:2, 43:13, 44:21, 58:18, 58:21
**appreciate** [1] - 58:9
**approach** [1] - 52:13
**appropriate** [3] - 51:1, 54:2, 54:19
**approximate** [1] - 20:5
**apron** [15] - 10:20, 10:25, 11:1, 11:11, 34:25, 35:7, 35:18, 38:4, 40:9, 53:13, 53:22, 54:9, 54:16, 55:6, 55:17
**aprons** [3] - 35:4, 45:22, 45:23
**Aprons** [1] - 35:4
**area** [8] - 4:20, 22:25, 37:7, 37:11, 37:15, 43:13, 45:3, 64:14
**areas** [1] - 12:8
**argue** [2] - 42:4, 47:5
**argued** [1] - 47:6
**arguing** [6] - 47:8, 47:17, 53:17, 54:3, 57:16, 58:23
**argument** [6] - 7:8, 7:25, 9:9, 27:9, 43:14, 63:7
**arm** [3] - 23:6, 46:1, 46:2
**arms** [2] - 35:11, 40:15

**arriving** [2] - 20:9, 35:3
**articulated** [1] - 13:8
**artificial** [1] - 20:19
**artificially** [1] - 24:21
**Asencio** [1] - 25:7
**aspects** [1] - 6:23
**assertion** [1] - 2:10
**assessed** [1] - 62:12
**assigned** [1] - 38:3
**assignment** [1] - 27:8
**assume** [3] - 5:22, 54:9, 56:18
**assuming** [2] - 2:24, 42:13
**assumption** [1] - 56:22
**assumptions** [1] - 57:23
**Atlantic** [1] - 19:2
**attempt** [2] - 18:15, 18:16
**attorney's** [1] - 48:8
**attorney/client** [2] - 48:1, 48:3
**attorneys** [1] - 48:7
**authority** [1] - 24:12
**avoid** [1] - 16:20
**aware** [1] - 9:21

**B**

**back-ups** [1] - 21:5
**bad** [4] - 15:9, 16:21, 45:22, 62:2
**balance** [3] - 33:2, 51:3, 51:9
**Baltimore** [3] - 1:11, 1:24, 50:18
**bargaining** [1] - 28:2
**based** [1] - 58:25
**basic** [1] - 21:1
**basis** [5] - 6:2, 7:5, 11:10, 27:23, 45:14
**bathroom** [1] - 22:3
**become** [2] - 30:6, 30:9
**becomes** [3] - 41:17, 51:25, 55:1
**began** [1] - 22:5
**beginning** [4] - 3:14, 16:25, 17:7, 24:18
**beguiling** [2] - 64:13
**Behalf** [2] - 1:16, 1:18
**behind** [1] - 13:14
**bench** [2] - 20:9, 39:19
**Bench** [1] - 1:10
**benchmarks** [1] - 59:9
**benefit** [3] - 38:3, 40:19, 51:4
**benefited** [1] - 3:10
**benefits** [5] - 13:11,

40:17, 51:6
**benefitted** [1] - 7:1
**best** [2] - 2:3, 28:18
**better** [3] - 32:12, 57:17, 60:25
**between** [5] - 23:11, 25:10, 27:16, 32:11, 55:10
**beyond** [1] - 38:2
**big** [6] - 2:13, 2:17, 4:23, 6:1, 6:12, 23:11
**bin** [4] - 45:3, 45:19
**bit** [4] - 17:21, 19:6, 22:4, 26:18
**bits** [1] - 40:13
**bizarre** [1] - 60:7
**black** [2] - 47:25, 48:9
**Black** [1] - 48:1
**black-outs** [2] - 47:25, 48:9
**Black-outs** [1] - 48:1
**blackouts** [1] - 14:1, 48:8
**blessings** [1] - 48:7
**board** [1] - 49:9
**boat** [2] - 33:19, 33:21
**bodies** [1] - 58:10
**bona** [2] - 24:1, 24:10
**boot** [1] - 36:8
**Boots** [3] - 29:14, 42:10, 53:7
**boots** [18] - 21:12, 32:5, 35:25, 36:5, 36:10, 36:16, 36:20, 36:21, 36:23, 36:25, 37:1, 37:2, 40:1, 49:25, 52:15, 52:16, 56:6, 59:8
**bother** [1] - 5:12
**bottom** [2] - 33:14, 33:16
**bound** [1] - 59:11
**break** [7] - 25:1, 25:22, 26:9, 50:14, 51:14, 57:21
**breaks** [1] - 41:11
**Brief** [1] - 63:10
**brief** [2] - 47:6, 47:7
**briefing** [1] - 27:8
**bring** [3] - 45:12, 49:4, 52:8
**broke** [1] - 52:9
**brought** [1] - 36:23
**BROWN** [36] - 2:3, 11:3, 11:6, 11:9, 11:15, 11:20, 11:25, 12:6, 12:15, 12:17, 14:4, 14:7, 14:11, 16:22, 16:24, 18:1, 18:3, 18:6, 19:9, 19:16, 19:20, 22:12, 23:19, 27:2, 27:5, 27:12, 27:18, 27:20, 27:24, 28:3, 28:5, 28:10,

63:11, 64:22, 65:1, 65:5
**Brown** [13] - 1:16, 2:2, 13:25, 23:18, 25:8, 27:1, 48:12, 49:16, 56:25, 59:1, 60:6, 62:6, 63:10
**building** [3] - 9:22, 9:23, 49:3
**bulk** [1] - 45:23
**bulletin** [1] - 49:9
**bump** [4] - 29:13, 32:4, 37:5, 50:1
**bumped** [1] - 21:23
**bunch** [1] - 42:8
**burden** [5] - 15:8, 15:19, 15:25, 60:8, 60:9
**business** [1] - 13:17

**C**

**cafeteria** [3] - 22:3, 53:21, 54:15
**Cagle** [1] - 31:18
**Cagles** [3] - 18:12, 39:12, 39:19
**calculation** [1] - 19:17
**calculations** [2] - 20:5, 54:19, 54:24
**CAMAD-20080318-T 052842** [1] - 23:4
**cannot** [1] - 54:17
**cap** [4] - 29:13, 32:4, 37:5, 50:1
**capsule** [1] - 22:18
**capture** [1] - 22:3
**care** [3] - 7:8, 40:22, 46:5
**careful** [2] - 13:25, 40:21
**Cargo** [1] - 25:4
**Carolina** [4] - 4:9, 4:16, 17:3, 18:16, 18:19
**case** [55] - 2:5, 2:13, 2:15, 3:2, 3:8, 3:12, 3:18, 4:22, 5:9, 6:12, 7:11, 14:8, 15:5, 15:7, 16:2, 18:12, 18:15, 18:19, 18:20, 18:23, 19:22, 20:6, 25:5, 25:8, 27:5, 27:7, 27:10, 27:20, 28:5, 28:23, 29:14, 29:15, 31:18, 31:19, 32:20, 32:23, 34:4, 34:5, 34:23, 37:22, 37:23, 38:14, 42:3, 46:25, 50:20, 51:24, 58:8, 58:16, 61:22, 61:23, 62:8, 64:3, 64:4
**Case** [1] - 66:5
**CASE** [1] - 1:5

**cases** [18] - 3:1, 3:16, 6:20, 18:13, 23:25, 24:23, 25:21, 34:19, 38:15, 38:16, 39:7, 39:11, 44:4, 51:10, 60:15, 61:6, 61:23, 63:25
**casual** [1] - 47:14
**cert** [4] - 31:6, 31:10, 31:20, 33:9
**certain** [11] - 26:13, 29:24, 30:16, 35:3, 57:10, 57:11, 58:8, 59:9, 59:10
**certainly** [6] - 29:2, 29:4, 30:10, 57:8, 57:9, 64:5
**CERTIFICATE** [1] - 66:1
**certify** [2] - 66:3, 66:7
**certiorari** [1] - 31:9
**chain** [1] - 41:22
**challenge** [1] - 2:10
**chances** [1] - 17:18
**change** [13] - 2:19, 7:16, 8:8, 8:16, 8:19, 9:12, 13:14, 18:25, 30:8, 38:24, 44:12, 46:12, 61:14
**changed** [1] - 36:23, 38:17, 38:25
**changing** [6] - 4:20, 18:24, 34:10, 34:12, 38:9, 44:13
**charts** [2] - 22:18, 55:14
**cheaper** [1] - 46:21
**checks** [1] - 46:4
**chicken** [1] - 11:19, 45:23
**choice** [4] - 48:14, 48:18, 49:4, 49:5
**choices** [1] - 49:6
**choose** [7] - 57:2, 57:4, 57:5, 58:17, 58:20, 59:18
**Christopher** [1] - 1:16
**chronology** [2] - 16:25, 17:9
**circuit** [6] - 4:7, 31:25, 32:1, 50:20, 64:5, 64:7
**Circuit** [36] - 3:8, 4:6, 4:7, 4:10, 4:11, 15:4, 15:10, 16:2, 16:16, 18:18, 20:4, 24:24, 25:8, 27:8, 27:14, 28:7, 28:9, 28:22, 28:23, 32:2, 32:18, 32:24, 33:1, 39:9, 39:13, 50:19, 50:20, 50:22, 61:7, 61:8, 61:9, 61:11, 61:12
**Circuit's** [1] - 50:15
**circumstances** [2] - 34:11, 60:18

**cite** [1] - 50:24
**cited** [1] - 5:10
**cites** [1] - 48:12
**City** [1] - 50:23
**civil** [1] - 63:22
**CIVIL** [1] - 1:5
**Civil** [1] - 63:24
**claim** [4] - 5:25, 19:5, 25:2, 62:20
**claiming** [2] - 51:10, 62:21
**clarified** [1] - 2:12
**clarify** [2] - 23:23, 25:15
**Claxton** [3] - 37:22, 39:20, 61:22
**clean** [4] - 12:4, 46:2, 46:5, 46:6
**cleaned** [1] - 24:6
**cleaning** [1] - 13:1
**cleanly** [2] - 51:19
**clear** [11] - 2:17, 4:23, 6:3, 16:18, 18:23, 19:21, 37:6, 45:9, 45:11, 52:20, 57:8
**clear-cut** [1] - 18:23
**clearly** [11] - 3:23, 8:1, 13:14, 14:22, 42:1, 42:20, 44:22, 45:4, 49:8, 63:16
**Clemens** [3] - 34:18, 34:20, 34:22
**clerk** [1] - 63:22
**client** [1] - 60:22
**clients** [1] - 64:9
**clip** [1] - 23:4
**Clip** [1] - 23:4
**clips** [1] - 12:18
**clock** [2] - 24:20, 57:19
**closed** [1] - 49:10
**closer** [2] - 57:23, 57:24
**closet** [1] - 12:11
**closing** [1] - 63:7
**clothes** [3] - 34:10, 34:12, 38:9
**clothing** [2] - 4:18, 11:24
**coat** [6] - 10:15, 11:16, 11:18, 13:19, 13:20, 14:16, 14:20, 49:4
**coats** [1] - 8:19
**combinations** [1] - 59:13
**comfort** [1] - 8:25
**coming** [7] - 25:6, 39:3, 39:14, 48:25, 54:14, 61:20, 61:23
**commencement** [3] - 25:10, 30:21, 43:20
**comment** [1] - 48:16

**comments** [1] - 48:9
**commercial** [1] - 63:20
**common** [1] - 10:18
**communicated** [1] - 49:8
**community** [1] - 49:23
**company** [2] - 27:6, 46:5
**compelling** [1] - 16:23
**compellingly** [1] - 16:18
**compensability** [3] - 51:2, 51:12
**compensable** [29] - 2:25, 3:25, 4:14, 4:20, 24:11, 24:13, 24:18, 24:20, 25:10, 25:11, 26:4, 30:9, 30:22, 32:5, 32:17, 34:11, 34:12, 35:3, 35:5, 37:20, 38:9, 40:11, 42:20, 44:13, 44:24, 54:5, 54:12, 57:16
**compensate** [1] - 62:12
**compensation** [3] - 5:15, 14:24, 25:22
**compensatory** [1] - 15:22
**complete** [2] - 47:16, 47:17, 66:9
**completely** [1] - 18:6
**completion** [1] - 25:11
**compliance** [13] - 38:21, 38:23, 43:5, 43:6, 43:7, 46:25, 47:1, 47:10, 47:16, 47:17, 62:19, 63:1
**compliant** [1] - 47:21
**complied** [1] - 46:25
**comply** [1] - 24:25
**components** [1] - 2:5
**computer** [2] - 19:13, 20:12
**concept** [3] - 42:2, 42:7, 43:12
**conceptualize** [1] - 11:7
**concerned** [1] - 32:15
**concluded** [1] - 4:14
**concludes** [1] - 63:7
**conclusion** [1] - 4:1
**Conclusion** [1] - 65:12
**conduct** [1] - 16:9
**confidence** [1] - 57:10
**Congress** [1] - 40:11
**consequence** [3] - 2:20, 6:21, 9:1
**consider** [1] - 59:11
**consideration** [2] - 30:17, 64:9
**considered** [1] - 16:18
**Consolidated** [1] - 28:22

**constitute** [1] - 66:7
**construct** [3] - 13:24, 20:19, 23:13
**contact** [1] - 65:10
**contamination** [1] - 9:13
**contemplated** [1] - 11:22
**contend** [3] - 8:13, 16:11, 17:19
**contention** [3] - 16:15, 16:21, 17:15
**context** [2] - 32:19, 38:10
**continue** [3] - 53:15, 53:18, 60:12
**continuing** [1] - 28:21
**continuous** [10] - 4:1, 21:15, 24:21, 30:3, 31:4, 31:9, 43:20, 44:9, 56:14, 59:25
**contrary** [2] - 49:16, 49:18
**controlled** [1] - 33:10
**controlling** [2] - 50:16, 64:6
**convenient** [1] - 8:19
**copies** [1] - 14:3
**copy** [1] - 14:11
**corduroys** [1] - 36:17
**core** [1] - 7:11
**corollary** [1] - 42:3
**correct** [4] - 19:10, 29:1, 30:20, 50:24
**Correct** [1] - 60:23
**correctly** [1] - 60:10
**cost** [1] - 46:18
**cots** [3] - 35:12, 35:19
**cotton** [2] - 21:20, 25:8
**counsel** [3] - 34:23, 48:2, 63:18
**count** [4] - 21:11, 53:15, 53:18
**counted** [3] - 21:17, 53:21, 53:22
**counter** [1] - 13:2
**counter-intuitive** [1] - 13:2
**counting** [1] - 5:24
**country** [1] - 65:6
**couple** [6] - 5:6, 12:16, 20:18, 23:20, 39:5, 41:1
**course** [9] - 4:12, 12:16, 26:20, 30:11, 32:23, 50:15, 56:21, 57:4
**court** [2] - 33:9, 62:2
**COURT** [98] - 1:1, 2:2, 10:23, 11:4, 11:7, 11:11, 11:18, 11:22, 12:2, 12:13, 12:16, 13:25,

14:6, 14:9, 16:14, 16:23, 17:25, 18:2, 18:4, 19:8, 19:14, 19:19, 22:11, 23:18, 25:19, 26:14, 26:20, 26:23, 27:4, 27:11, 27:16, 27:19, 27:22, 28:1, 28:4, 28:9, 28:11, 28:15, 28:25, 29:2, 29:9, 29:17, 29:20, 29:22, 29:25, 30:10, 31:1, 31:3, 31:21, 33:8, 33:13, 33:18, 34:2, 34:8, 39:16, 43:1, 43:9, 43:18, 43:23, 43:25, 45:13, 46:4, 46:10, 46:13, 46:16, 46:21, 47:24, 48:5, 54:17, 54:22, 55:14, 56:3, 56:7, 56:9, 56:13, 56:17, 56:21, 56:24, 57:4, 57:8, 57:13, 58:7, 58:13, 58:20, 58:24, 59:4, 60:20, 60:24, 62:20, 63:4, 63:8, 63:10, 63:18, 64:19, 64:25, 65:3, 65:7, 65:10
**Court** [49] - 4:13, 4:16, 4:17, 16:7, 16:18, 18:19, 19:8, 19:9, 28:18, 30:14, 31:14, 31:20, 31:23, 33:6, 33:13, 33:21, 33:24, 34:5, 34:20, 34:21, 35:2, 35:15, 35:16, 36:4, 38:4, 38:6, 38:8, 39:23, 40:11, 41:12, 42:19, 42:23, 49:21, 50:3, 50:19, 50:25, 54:17, 55:3, 57:9, 59:10, 60:16, 61:1, 61:11, 61:16, 62:1, 62:3, 64:2, 66:16
**Court's** [3] - 16:17, 16:19, 30:18
**Courthouse** [1] - 1:23
**courtroom** [2] - 49:17, 64:17
**courts** [14] - 17:14, 18:12, 28:19, 30:13, 30:15, 31:16, 32:9, 33:3, 33:7, 37:21, 39:8, 40:6, 60:14, 62:9
**Courts** [1] - 61:1
**covered** [2] - 4:4, 5:13
**covers** [1] - 50:12
**cow** [1] - 47:3
**create** [1] - 8:10
**created** [1] - 8:18
**creates** [1] - 34:15
**credible** [1] - 20:10
**credit** [1] - 7:16
**criteria** [3] - 6:4, 56:10,

56:11
**critical** [4] - 31:5, 31:7, 45:1, 50:14
**criticism** [1] - 52:2
**criticized** [1] - 22:24
**cross** [1] - 23:3
**crossed** [1] - 31:12
**cut** [5] - 18:23, 40:14, 40:19, 40:20, 43:9

# D

**damages** [12] - 6:16, 15:11, 15:13, 15:15, 19:6, 19:14, 19:17, 20:6, 61:19, 62:5, 62:7, 62:10
**darn** [1] - 49:4
**date** [3] - 27:9, 39:3, 39:4
**Davis** [22] - 1:12, 5:14, 6:6, 6:8, 9:19, 10:1, 10:2, 10:3, 10:6, 19:7, 20:13, 20:16, 21:7, 21:22, 22:24, 23:2, 23:11, 23:13, 36:19, 37:8, 59:6
**Davis's** [6] - 41:10, 52:8, 57:15, 58:6, 59:14
**days** [3] - 5:6, 12:4, 15:13
**De** [1] - 25:7
**de** [3] - 3:25, 5:8, 5:11, 7:8, 20:13, 32:6, 32:13, 37:19, 42:2, 51:17, 59:21, 59:22, 60:2
**deal** [2] - 7:3, 60:15
**dealing** [1] - 51:9
**dealt** [1] - 37:21
**decide** [1] - 58:1
**decided** [6] - 8:10, 13:18, 33:4, 33:23, 33:25, 46:21
**decision** [11] - 6:15, 24:24, 28:18, 32:9, 32:11, 33:6, 34:6, 39:24, 40:25, 41:13, 55:3
**decisions** [8] - 26:7, 34:20, 50:15, 59:10, 61:2, 61:20, 61:23
**deconstruct** [1] - 57:17
**defendant** [6] - 15:8, 39:13, 39:23, 58:15, 60:16, 63:13
**defendant's** [4] - 2:9, 15:12, 16:3, 25:6
**Defendant's** [1] - 50:9
**Defendants** [4] - 1:7, 1:18, 12:17, 26:12
**defendants** [13] - 2:10,

4:8, 7:24, 8:10, 17:13, 17:22, 18:11, 22:22, 24:22, 39:8, 54:1, 60:9, 62:9
**defense** [10] - 5:9, 7:10, 7:13, 7:14, 15:1, 17:12, 22:7, 25:19, 44:1, 48:10
**defenses** [2] - 2:25, 5:8
**definition** [5] - 32:21, 35:6, 35:17, 37:1, 49:7
**degree** [1] - 59:22
**Delaware** [2] - 18:16, 22:20
**deliberately** [1] - 58:5
**delightful** [1] - 64:16
**demonstrate** [1] - 16:3
**denied** [2] - 31:22, 49:12
**denying** [1] - 25:6
**Department** [8] - 3:20, 17:2, 17:4, 23:7, 24:2, 24:5, 44:3, 44:6
**departments** [1] - 11:13
**deposition** [5] - 4:25, 17:23, 18:5, 18:10, 49:13
**depositions** [1] - 13:9
**designated** [1] - 45:3
**designation** [1] - 20:7
**designed** [1] - 47:21
**details** [2] - 5:5, 6:16
**detectors** [1] - 29:9
**determination** [4] - 50:3, 55:3, 56:1, 56:2
**determinations** [2] - 52:4, 54:21
**determine** [3] - 51:3, 54:18, 55:6
**determined** [1] - 10:24
**device** [1] - 35:13
**dicta** [1] - 30:14
**difference** [4] - 23:11, 27:16, 30:10, 30:12
**different** [12] - 7:7, 7:11, 10:8, 14:13, 18:14, 22:15, 36:9, 38:19, 43:10, 55:25, 58:2, 58:14, 58:15
**difficult** [4] - 11:7, 61:15, 61:25, 62:1
**difficulty** [3] - 5:24, 6:6, 6:10
**dipped** [1] - 41:4
**directly** [2] - 4:13, 37:21
**dirty** [8] - 10:16, 10:20, 10:25, 12:7, 12:11, 46:9, 48:17
**disagree** [1] - 59:12
**disagreeing** [2] - 59:2, 59:4
**disagreement** [1] -

28:16
**discount** [1] - 54:19
**discovery** [1] - 13:13
**discretion** [2] - 13:21, 62:7
**discussing** [1] - 26:9
**discussion** [2] - 20:14, 23:21
**discussions** [1] - 31:16
**Dismiss** [1] - 26:13
**disputed** [1] - 61:3
**disregard** [1] - 16:9
**disservice** [1] - 35:24
**distinct** [1] - 25:25
**distinction** [1] - 34:15
**District** [4] - 25:5, 33:19, 39:25, 61:1
**district** [4] - 33:6, 33:15, 62:2, 63:23
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**dock** [2] - 55:22, 57:19
**doff** [6] - 8:8, 8:11, 8:24, 10:19, 10:24, 55:17
**Doff** [1] - 41:23
**doffed** [2] - 22:2, 53:16
**doffing** [32] - 2:24, 3:10, 3:13, 3:24, 4:12, 4:18, 9:4, 10:21, 13:22, 16:13, 17:6, 20:17, 23:25, 24:16, 24:25, 25:14, 28:20, 29:24, 30:4, 30:7, 31:11, 31:19, 32:22, 34:6, 37:22, 38:14, 38:16, 39:1, 42:4, 44:4, 44:8, 44:22
**doffs** [1] - 9:6
**DOL** [3] - 3:20, 4:3, 17:6
**don** [9] - 8:8, 8:12, 8:24, 10:19, 10:24, 12:24, 13:3, 13:4
**done** [6] - 6:7, 7:16, 8:23, 27:8, 46:18, 65:6
**donned** [2] - 22:2, 53:16
**Donning** [1] - 20:24
**donning** [32] - 2:24, 3:10, 3:13, 3:24, 4:4, 4:12, 4:17, 9:4, 13:21, 16:12, 17:5, 20:17, 23:25, 24:16, 24:25, 25:14, 28:20, 29:24, 30:3, 30:7, 31:10, 31:19, 32:22, 34:6, 37:21, 38:14, 38:15, 38:25, 42:4, 44:4, 44:8, 44:22
**donning/doffing** [1] - 57:25
**door** [3] - 40:5, 48:25, 57:21

**doubt** [3] - 2:23, 3:13, 32:25
**down** [11] - 4:22, 8:4, 30:12, 39:3, 40:13, 41:11, 41:16, 52:8, 52:9, 53:12, 57:17
**Dr** [42] - 5:14, 5:15, 6:6, 6:8, 9:19, 10:1, 10:2, 10:6, 19:6, 19:7, 19:12, 20:13, 20:16, 21:7, 21:10, 21:22, 21:25, 22:17, 22:24, 23:2, 23:13, 36:19, 37:8, 41:9, 41:10, 41:13, 51:21, 51:22, 51:25, 52:2, 52:8, 52:12, 53:15, 55:7, 57:14, 58:6, 59:6, 59:8, 59:14
**draw** [1] - 59:19
**dressed** [1] - 8:2
**drivers** [1] - 25:23
**drop** [1] - 38:15
**dropped** [2] - 57:20, 57:22
**ducks** [1] - 26:19
**during** [4] - 13:9, 24:10, 38:18, 62:13
**duty** [1] - 19:20

## E

**e-mail** [6] - 14:10, 47:13, 47:14, 47:18, 47:25, 62:23
**e-mails** [1] - 14:3, 63:2
**ear** [5] - 32:4, 37:5, 37:18, 42:11, 50:1
**early** [1] - 23:6
**easily** [3] - 42:1, 43:12, 49:13
**Eastern** [1] - 35:8
**easy** [5] - 13:3, 15:23, 43:13, 45:18, 52:22
**echo** [1] - 64:22
**edges** [1] - 51:15
**effect** [2] - 33:10, 37:15
**effectively** [1] - 13:21
**efficient** [1] - 8:23
**eight** [1] - 57:23
**either** [10] - 9:6, 16:8, 17:5, 17:16, 18:16, 32:10, 41:6, 52:12, 53:12, 57:2
**element** [1] - 21:9
**Eleventh** [2] - 39:13, 61:9
**eliminated** [1] - 13:21
**eliminating** [1] - 7:17
**embrace** [1] - 59:11

**employed** [1] - 54:8
**employee** [10] - 8:15, 10:23, 13:20, 14:14, 37:8, 37:16, 38:3, 40:19, 44:25, 54:8
**employee's** [1] - 51:6
**employees** [17] - 4:17, 6:2, 6:21, 7:5, 8:11, 8:17, 9:3, 10:15, 13:11, 13:18, 22:19, 24:10, 44:11, 50:10, 51:3, 51:10, 53:11
**employer** [4] - 3:10, 5:12, 5:19, 13:12, 15:19, 16:8, 16:20, 21:17, 26:2, 28:21, 38:4, 40:20, 44:9, 63:14
**employer's** [4] - 8:15, 20:5, 44:10, 51:4
**employers** [1] - 2:10
**empowered** [1] - 52:10
**enacted** [1] - 34:19
**encourage** [1] - 12:24
**End** [1] - 10:4
**end** [10] - 3:5, 3:14, 41:3, 52:3, 53:13, 53:18, 53:20, 55:24, 61:13
**endearment** [1] - 22:11
**ends** [4] - 23:20, 43:15, 43:18, 43:19
**enters** [1] - 37:7
**enthusiastic** [1] - 17:18
**entire** [1] - 56:14
**entirely** [1] - 25:25
**entitled** [2] - 59:11, 64:10
**environment** [1] - 34:14
**equals** [1] - 15:16
**equipment** [4] - 3:3, 7:15, 14:21, 20:17
**erroneous** [1] - 57:8
**Especially** [1] - 11:15
**especially** [2] - 4:22, 16:11
**Esquire** [4] - 1:16, 1:17, 1:18, 1:19
**essence** [9] - 3:1, 3:6, 3:17, 6:25, 8:4, 9:8, 10:12, 14:13, 15:17
**essential** [1] - 44:24
**essentially** [2] - 23:24, 24:24, 58:14
**ET** [2] - 1:4, 1:6
**et** [2] - 66:4, 66:5
**event** [4] - 55:1, 55:2, 55:5
**eventually** [1] - 33:1
**evidence** [6] - 41:8, 45:4, 45:11, 45:16, 52:20, 53:10

**evil** [1] - 47:13
**Evisceration** [1] - 55:16
**evolved** [1] - 9:16
**exactly** [5] - 25:9, 26:7, 38:20, 64:5, 64:9
**Exactly** [3] - 11:18, 18:6, 28:10
**example** [5] - 17:23, 29:11, 55:1, 57:18, 61:4
**exceeds** [1] - 3:25
**exchange** [1] - 9:2
**excluded** [2] - 4:20, 27:10
**excludes** [1] - 54:5
**Excuse** [1] - 19:17
**exhibit** [1] - 13:15
**Exhibit** [13] - 2:8, 4:25, 6:8, 9:19, 10:1, 10:10, 13:2, 13:6, 13:13, 14:12, 14:19, 24:4, 50:10
**exhibits** [2] - 17:10, 17:11
**experience** [1] - 63:19
**experimentation** [1] - 20:11
**expert's** [1] - 54:19
**explained** [1] - 13:1
**explains** [1] - 6:9
**explanation** [1] - 6:15
**exposed** [1] - 5:5
**extent** [2] - 30:16, 58:8
**extraordinarily** [2] - 61:15, 61:25
**eye** [1] - 42:13

## F

**F.2d** [1] - 16:2
**F.3d** [3] - 26:8, 28:22, 50:23
**facilities** [2] - 8:25, 21:6
**facility** [2] - 29:6, 52:21
**fact** [14] - 14:23, 23:14, 30:9, 30:23, 31:18, 36:20, 38:19, 40:10, 45:7, 48:11, 49:11, 56:11, 58:10, 59:23
**facts** [10] - 2:4, 2:23, 3:6, 7:10, 7:21, 7:25, 39:22, 39:24, 58:18, 58:21
**factual** [4] - 9:7, 9:8, 12:19, 64:3
**fails** [1] - 63:14
**failure** [1] - 15:20
**Fair** [1] - 60:10
**fairly** [2] - 15:23, 43:12
**faith** [3] - 15:1, 15:4, 15:9, 15:12, 15:21,

16:21, 60:6, 60:8, 60:11, 60:13, 60:15, 62:2, 62:10
**falling** [1] - 42:2
**false** [2] - 8:14, 13:24
**Family** [1] - 32:20
**far** [5] - 24:14, 32:15, 40:19, 41:11, 63:24
**Farm** [1] - 39:6
**FARMS** [1] - 1:6
**Farms** [2] - 39:18, 61:17, 66:5
**fascinating** [1] - 58:16, 58:21, 64:3, 64:14
**fat** [1] - 45:24
**favor** [2] - 27:2, 61:2
**feeders** [2] - 33:14, 33:17
**feet** [2] - 23:1, 36:7
**few** [18] - 2:19, 5:5, 9:7, 9:17, 10:9, 12:4, 13:18, 15:13, 23:17, 25:17, 26:1, 26:4, 26:5, 40:14, 40:15, 48:15
**fide** [2] - 24:1, 24:11
**Fifth** [1] - 39:9
**figure** [5] - 32:7, 32:13, 33:20, 43:7, 51:18, 55:9
**filed** [6] - 2:13, 7:2, 26:13, 31:19, 39:6, 50:18
**filled** [1] - 14:17
**film** [5] - 20:16, 20:20, 21:4, 22:8, 23:3
**final** [1] - 9:17
**Finally** [1] - 62:14
**finally** [3] - 6:1, 7:4, 33:9
**findings** [1] - 59:23
**finger** [3] - 35:12, 35:19
**finish** [1] - 60:4
**firing** [1] - 18:9
**first** [17] - 2:6, 5:8, 8:6, 14:19, 15:3, 28:16, 30:16, 34:9, 35:16, 39:5, 42:8, 54:24, 56:3, 56:5, 61:6, 63:5, 64:4
**First** [8] - 7:13, 9:11, 20:13, 21:25, 37:6, 41:1, 44:1, 63:19
**five** [2] - 12:3, 32:3
**Five** [1] - 2:8
**Flanagan** [3] - 1:17, 23:16, 28:11
**FLANAGAN** [5] - 23:20, 25:20, 26:15, 26:22, 26:25
**flaws** [3] - 22:15, 22:17, 23:12
**flexibility** [1] - 63:17
**flexible** [1] - 51:2
**flight** [1] - 26:10

**FLSA** [1] - 2:11, 4:21, 13:23, 16:1, 18:21, 19:21, 19:23, 26:10, 32:21, 47:16, 47:18
**fluke** [1] - 23:9
**FMLA** [1] - 32:20
**folder** [1] - 2:6
**Folks** [1] - 48:20
**follow** [1] - 24:23
**following** [2] - 17:13, 19:11
**Foods** [1] - 25:12
**FOR** [1] - 1:1
**foregoing** [1] - 66:7
**forfeiting** [1] - 9:3
**forget** [2] - 23:1, 46:19
**forgets** [1] - 46:14
**form** [2] - 14:18
**forth** [1] - 36:24
**forward** [1] - 65:10
**four** [2] - 12:3, 57:24
**Fourth** [17] - 4:6, 4:9, 15:4, 15:10, 16:2, 20:4, 27:7, 27:13, 27:14, 28:7, 28:9, 50:15, 50:19, 50:20, 50:22, 61:11, 61:12
**Fox** [1] - 25:12
**Fred** [1] - 11:5
**free** [1] - 53:14
**frequent** [1] - 63:24
**fresh** [1] - 11:1
**Friday** [4] - 1:10, 36:22, 45:7, 45:9
**front** [2] - 58:9, 59:13
**full** [3] - 15:16, 15:18, 64:8
**full-time** [2] - 15:16, 15:18

## G

**galoshes** [3] - 36:8, 36:13, 52:17
**game** [2] - 16:12, 19:1
**Garbis** [3] - 27:6, 27:14, 28:7
**gate** [1] - 29:7
**gear** [15] - 3:13, 4:18, 4:19, 24:5, 44:8, 44:12, 44:13, 44:25, 48:25, 49:22, 49:24, 50:3, 50:4, 52:25, 56:18
**geared** [1] - 14:23
**gears** [2] - 44:23
**generalized** [1] - 37:14
**generally** [1] - 8:5
**generic** [4] - 32:10, 37:20, 37:24

**generic/non** [1] - 37:20
**generic/non-generic** [1] - 37:20
**generous** [1] - 37:1
**gentleman** [3] - 10:13, 13:10, 13:17
**Georgia** [1] - 39:25
**given** [2] - 15:11, 44:21
**glad** [1] - 2:2
**glove** [2] - 21:21, 41:22
**gloves** [17] - 10:21, 35:14, 35:19, 40:10, 40:14, 40:21, 40:25, 41:3, 41:4, 41:5, 41:21, 53:8, 53:14, 55:18, 59:18
**Gorman** [9] - 28:22, 28:25, 29:3, 29:5, 29:11, 29:14, 29:17, 37:20, 61:17
**government** [3] - 3:10, 17:4, 34:11
**grab** [1] - 45:25
**grandfather** [2] - 22:10, 54:23
**granted** [1] - 31:12
**grants** [1] - 33:9
**grasping** [15] - 41:18, 42:9, 42:13, 42:15, 42:22, 43:10, 43:19, 44:17, 50:13, 52:19, 52:25, 53:22, 55:6, 56:5, 56:18
**greasing** [1] - 35:11
**great** [1] - 7:3
**greater** [1] - 40:19
**ground** [1] - 36:3
**grounds** [2] - 15:21, 25:7
**guess** [17] - 7:21, 8:9, 8:22, 10:20, 11:6, 11:12, 12:19, 17:10, 20:7, 25:20, 30:16, 33:1, 46:13, 55:8, 59:4, 61:18, 63:12
**guessed** [3] - 60:13, 60:14, 61:16
**guilty** [1] - 60:16
**guy** [4] - 22:9, 23:5, 53:3
**guys** [2] - 13:15, 13:18

## H

**hackneyed** [1] - 30:13
**hair** [8] - 32:4, 37:5, 37:18, 40:3, 42:10, 49:25, 53:1, 53:3
**half** [3] - 15:15, 15:16, 30:6

**hand** [5] - 12:10, 22:13, 33:8, 40:19, 40:20
**handing** [1] - 8:21
**handled** [1] - 40:1
**handling** [1] - 58:3
**hands** [1] - 35:13
**handy** [1] - 21:21
**hang** [1] - 53:13
**hard** [8] - 14:3, 29:12, 29:13, 37:18, 40:3, 53:1, 56:6
**Harris** [1] - 61:22
**Harrison** [2] - 37:22, 39:20
**harsh** [1] - 63:16
**hat** [4] - 29:12, 29:13, 37:18, 56:6
**hats** [2] - 40:3, 53:1
**hear** [2] - 2:2, 65:4
**heard** [10] - 11:25, 12:19, 23:21, 38:18, 48:11, 49:8, 50:6, 50:7, 52:23, 54:22
**hearing** [3] - 9:14, 9:15, 60:4
**heavy** [1] - 36:17
**held** [2] - 4:17, 16:7
**help** [1] - 34:8
**helped** [2] - 22:21
**helpful** [1] - 41:11
**hereby** [1] - 66:3
**hereunto** [1] - 66:10
**hindsight** [1] - 62:24
**history** [1] - 28:1
**Hmm** [1] - 62:15
**hold** [2] - 27:12, 49:6
**holding** [5] - 29:4, 30:14, 30:18, 30:21, 30:23
**holdings** [1] - 30:24
**holistic** [1] - 56:14
**Holy** [1] - 47:3
**home** [55] - 2:22, 7:10, 7:13, 7:14, 7:15, 7:16, 7:22, 7:23, 8:1, 8:8, 8:12, 8:16, 8:17, 8:24, 9:6, 9:12, 9:15, 10:12, 10:14, 10:15, 10:19, 10:24, 11:2, 11:13, 12:3, 12:9, 12:10, 12:20, 12:21, 13:8, 13:19, 18:25, 21:16, 21:18, 36:12, 36:20, 43:11, 43:15, 44:1, 44:12, 45:6, 45:8, 45:10, 45:12, 45:14, 45:20, 46:14, 46:20, 48:10, 48:16, 50:4, 50:13, 50:17, 52:17, 65:8
**Honor** [22] - 2:3, 15:3,

23:20, 26:25, 28:13, 31:24, 33:16, 34:16, 43:3, 45:15, 47:1, 50:13, 51:5, 55:20, 56:8, 56:16, 56:23, 58:5, 58:22, 64:14, 64:22, 65:9
**Honorable** [1] - 1:12
**honoring** [1] - 17:5
**hoping** [2] - 25:15, 27:12
**hot** [1] - 11:15
**hour** [1] - 25:4
**Hour** [9] - 38:17, 38:25, 39:4, 47:1, 47:4, 47:12, 49:5, 62:14, 62:18
**Hour's** [2] - 47:7, 61:4
**hourly** [1] - 22:19
**hours** [2] - 15:14, 32:21
**hundred** [1] - 15:14

## I

**IBP** [5] - 33:4, 33:24, 44:18, 47:6
**idea** [3] - 13:11, 21:19, 55:15, 55:17, 55:19
**identify** [1] - 30:23
**ignoring** [1] - 18:23
**illumination** [1] - 62:17
**illusory** [5] - 8:10, 9:9, 11:20, 48:20, 49:2
**imagine** [2] - 62:1, 63:25
**immediately** [1] - 41:6
**implemented** [1] - 9:17
**implementing** [1] - 15:9
**implicit** [1] - 48:14
**implicitly** [1] - 19:17
**important** [2] - 12:8, 12:19
**importantly** [1] - 14:19
**impose** [1] - 15:22
**imposed** [1] - 62:10
**impractical** [2] - 8:2, 10:14, 32:15
**impression** [1] - 64:5
**IN** [1] - 1:1
**inadequate** [1] - 20:5
**Inc** [1] - 66:5
**INC** [1] - 1:6
**inclined** [1] - 19:3
**include** [1] - 21:10
**included** [5] - 22:18, 23:5, 26:18, 54:12, 57:18
**including** [1] - 34:20
**inclusive** [1] - 52:1
**inconsistency** [1] - 12:6
**inconsistent** [1] - 4:1

**indeed** [3] - 9:9, 13:3, 26:11
**indication** [1] - 16:19
**indicium** [1] - 16:21
**indispensable** [27] - 2:16, 3:4, 28:24, 30:4, 30:8, 32:12, 34:15, 36:2, 37:3, 37:13, 37:25, 38:1, 41:1, 41:19, 42:5, 42:6, 42:10, 42:15, 42:16, 42:25, 50:12, 53:1, 54:1, 54:9, 56:19, 59:19, 59:24
**individual** [2] - 24:9, 41:12
**industry** [4] - 17:8, 17:17, 43:4, 61:6
**inference** [2] - 12:20, 19:25
**inferences** [1] - 31:6
**infested** [1] - 34:14
**initiative** [1] - 24:3
**initiatives** [1] - 38:18
**inside** [1] - 20:2
**instructions** [1] - 54:18
**Integral** [1] - 38:1
**integral** [27] - 2:15, 3:4, 28:24, 30:4, 30:7, 32:12, 34:15, 36:2, 37:2, 37:13, 37:25, 40:25, 41:18, 42:4, 42:5, 42:6, 42:10, 42:14, 42:16, 42:24, 50:12, 53:1, 53:25, 54:9, 56:19, 59:18, 59:24
**intended** [1] - 14:10
**intent** [1] - 47:14
**intents** [1] - 35:13
**interest** [1] - 62:11
**interesting** [3] - 38:13, 48:12, 51:5
**interpretation** [1] - 44:5
**interpretations** [1] - 60:21
**interpreting** [1] - 60:20
**interrupt** [1] - 60:24
**intuitive** [1] - 13:2
**investigation** [1] - 26:16
**involved** [3] - 2:14, 5:23, 6:13
**involves** [1] - 43:13
**involving** [1] - 27:6
**IRS** [1] - 62:20
**issue** [26] - 2:13, 2:17, 4:13, 4:23, 12:19, 13:22, 14:1, 14:25, 15:1, 18:14, 22:22, 22:23, 23:22, 23:25, 26:12, 27:3, 28:4, 31:10, 31:11, 33:10, 35:15, 39:14, 50:11, 51:16, 61:3, 64:11

issued [1] - 44:3
issues [12] - 16:19, 25:13, 28:20, 31:8, 31:15, 33:4, 34:4, 39:14, 55:22, 64:4
item [1] - 11:23, 21:16, 29:12, 29:14, 29:15, 41:18, 42:1, 45:2, 50:7, 53:16, 58:2
items [14] - 28:23, 29:12, 29:24, 32:3, 35:22, 37:18, 40:6, 40:7, 40:10, 42:5, 42:9, 53:7, 57:15, 57:25

**J**

jams [1] - 21:5, 59:7
Jane [1] - 1:17
January [1] - 2:14
jeans [1] - 36:17
job [5] - 3:3, 37:10, 37:13, 44:10, 44:24
judge [2] - 15:11, 15:12
Judge [7] - 1:12, 3:17, 15:5, 27:6, 27:14, 28:7, 39:24
judges [4] - 30:11, 33:15, 33:19, 62:3
judgment [11] - 6:14, 24:15, 25:7, 39:17, 39:18, 39:20, 39:21, 49:20, 64:25, 65:1
judgments [1] - 64:1
judicial [1] - 3:21
juice [1] - 11:19
July [8] - 7:20, 7:21, 7:22, 7:25, 8:7, 8:9, 13:8, 13:15
June [2] - 47:3, 47:9
jurisdiction [1] - 50:19
jury [1] - 54:18
Justice [1] - 20:6
justifiably [1] - 29:4

**K**

keep [6] - 10:20, 12:7, 19:21, 19:22, 40:22, 63:14
Kevlar [1] - 41:21
Keynote [1] - 50:24
kid [1] - 12:10
kind [20] - 2:24, 4:3, 11:7, 18:14, 30:13, 32:1, 32:3, 34:15, 36:16, 37:4, 37:23, 38:13, 50:11, 51:18, 52:10, 52:12, 52:18, 58:22, 63:24,

64:19
kinds [1] - 6:20
knowing [2] - 8:22, 63:2
knows [1] - 12:9

**L**

lab [4] - 8:19, 10:15, 13:19, 13:20
Labor [8] - 3:20, 17:2, 17:4, 24:2, 24:5, 44:3, 44:6, 60:10
Labor's [1] - 23:7
lack [1] - 28:2
language [9] - 14:7, 29:3, 42:8, 47:15, 50:2, 52:23, 52:24, 63:3
Larry [1] - 1:18
last [6] - 2:19, 5:6, 25:6, 26:12, 39:15, 40:13
launder [2] - 11:23, 12:4
laundering [1] - 46:7
law [31] - 2:4, 4:6, 4:22, 7:10, 7:20, 15:4, 17:21, 18:11, 18:17, 18:18, 25:2, 26:9, 30:17, 37:19, 38:11, 38:14, 39:11, 46:25, 47:21, 50:21, 58:10, 58:17, 58:18, 58:20, 58:21, 60:7, 62:6, 62:19, 63:1, 63:20, 63:22
lawsuit [1] - 50:18
lawsuits [2] - 39:3, 39:5
lawyer [1] - 14:1
lawyers [9] - 17:17, 17:20, 30:11, 33:15, 33:19, 60:20, 61:21, 63:4
lead [1] - 34:14
lead-infested [1] - 34:14
leads [1] - 40:13
learned [8] - 2:13, 9:4, 12:20, 17:10, 18:10, 21:4, 33:17, 43:11
leather [1] - 36:11
leave [5] - 2:23, 10:19, 10:25, 52:12
Leave [1] - 32:20
leaves [1] - 44:18, 46:14
left [2] - 45:1, 53:21
legal [7] - 6:23, 7:3, 17:16, 18:23, 52:4, 59:1, 64:4
legitimate [2] - 59:1, 62:4
Lemmon [1] - 3:18

LEMMON [1] - 3:18
less [4] - 2:17, 29:12, 57:4, 63:24
letting [2] - 45:17, 46:20
level [3] - 33:17, 43:11, 47:10
Lexington [1] - 50:23
likewise [1] - 9:13
limit [1] - 16:17, 30:17
limitations [1] - 6:24
Limitations [1] - 16:6
Lindow [2] - 5:9, 5:10
line [12] - 20:14, 22:5, 22:19, 24:7, 24:9, 30:25, 33:9, 41:6, 41:7, 42:18, 42:19, 42:23
lining [1] - 29:7
liquidated [7] - 15:11, 15:13, 15:15, 61:19, 62:4, 62:6, 62:10
list [1] - 5:8
listen [1] - 30:13
literally [1] - 5:21
Literally [1] - 41:24
litigant [1] - 44:4
litigation [4] - 19:23, 25:4, 61:4, 61:5
locker [5] - 8:18, 12:25, 20:20, 45:3, 56:6
lockers [1] - 45:8
logic [4] - 20:1, 20:10, 25:9, 42:18
Lombard [1] - 1:23
long-standing [2] - 44:11, 47:8
longest [1] - 22:8
Look [1] - 34:23
look [39] - 13:7, 14:11, 17:16, 23:25, 26:15, 31:7, 31:16, 31:23, 32:2, 34:4, 34:6, 35:22, 36:5, 37:4, 37:17, 37:23, 38:14, 38:25, 40:24, 44:15, 44:18, 47:3, 47:7, 47:9, 48:22, 50:2, 50:20, 51:7, 51:14, 52:9, 52:10, 53:24, 54:3, 55:8, 58:12, 59:14, 59:19, 60:17, 65:10
looked [4] - 21:5, 23:3, 31:11, 48:21
looking [10] - 23:24, 35:23, 36:7, 39:2, 42:23, 51:9, 51:11, 51:14, 52:18
looks [1] - 24:24
lose [4] - 46:19, 46:21, 58:14, 58:15
losing [1] - 6:17
loss [1] - 62:13
Lost [1] - 17:25

lost [6] - 5:14, 6:18, 18:1, 18:6, 19:25, 22:5
love [1] - 26:18
luck [1] - 5:20
LUISA [1] - 1:4
lumped [2] - 25:3
lumps [1] - 25:1
lunch [22] - 17:7, 23:17, 23:22, 23:24, 24:19, 24:22, 25:12, 25:13, 25:17, 25:22, 25:24, 26:1, 26:2, 50:13, 50:22, 53:9, 53:11, 53:18, 53:20, 55:16, 55:18

**M**

mail [6] - 14:10, 47:13, 47:14, 47:18, 47:25, 62:23
mails [2] - 14:3, 63:2
management [1] - 27:7
mandate [1] - 45:8
mandated [3] - 45:12, 52:23, 52:24
mandates [1] - 44:10
manner [1] - 66:9
March [2] - 1:10, 66:6
mark [1] - 14:9
marks [1] - 43:20
Martin [2] - 16:2, 20:6
Mary [3] - 1:22, 66:3, 66:15
MARYLAND [1] - 1:1
Maryland [2] - 1:11, 1:24
matter [9] - 16:9, 31:18, 37:19, 45:6, 48:11, 49:11, 56:11, 66:4, 66:9
mature [2] - 31:15, 64:8
meal [8] - 24:1, 24:6, 24:7, 24:10, 24:11, 24:25, 51:3
mean [25] - 12:2, 14:6, 14:10, 19:1, 26:2, 26:6, 29:2, 30:19, 30:22, 33:13, 41:20, 43:5, 43:9, 46:5, 46:6, 54:23, 55:19, 56:9, 56:13, 56:15, 57:24, 58:8, 60:24, 62:22, 63:23
meaning [1] - 38:1
meaningful [1] - 13:4
meaningless [1] - 14:23
means [4] - 4:3, 5:19, 15:13, 54:24
meant [1] - 57:1
measure [1] - 5:14
measures [1] - 20:17

measuring [1] - 6:11
Meat [1] - 25:4
Medical [1] - 32:20
meets [1] - 35:6
memo [2] - 49:14, 50:17
memoranda [1] - 17:16
Memorandum [2] - 3:20, 44:2
memorandum [4] - 44:15, 45:5, 50:9, 50:10
mentioned [2] - 10:9, 12:23, 18:19, 25:5, 25:8
Mere [1] - 41:24
mere [2] - 41:24, 41:25
mesh [2] - 40:14, 40:25, 41:3, 41:5, 59:18
met [3] - 3:7, 3:19, 6:3
metal [7] - 40:14, 40:25, 41:2, 41:5, 41:22, 59:18
Middle [1] - 25:5
middle [5] - 19:1, 21:20, 25:24, 36:3
might [10] - 8:22, 19:10, 20:15, 20:21, 21:21, 21:24, 22:24, 46:10, 46:11, 58:11
Mike [1] - 13:16
mill [1] - 26:9
Millsboro [2] - 27:17, 27:20
minds [1] - 2:23
minimis [3] - 3:25, 5:8, 5:11, 7:8, 20:13, 32:6, 32:13, 37:19, 42:2, 51:18, 59:21, 59:22, 60:2
minor [2] - 22:15, 39:22
minus [1] - 17:1
minute [3] - 5:17, 5:19, 57:2
minutes [22] - 5:11, 5:12, 5:15, 5:20, 5:23, 6:17, 7:18, 10:9, 19:11, 25:17, 26:1, 26:4, 26:5, 41:25, 53:5, 55:21, 56:15, 57:2, 57:23, 57:25, 59:20
missing [2] - 21:22, 21:23
Mitchell [1] - 34:1
moment [2] - 5:22, 36:6
Monday [1] - 36:21
money [3] - 6:14, 15:17, 46:19
morning [3] - 10:11, 11:5, 12:5
most [5] - 5:10, 10:10, 10:11, 11:12, 14:19, 14:20, 17:19, 28:6, 37:1, 40:7, 48:12, 50:14, 51:1
Most [2] - 48:13

Motion [1] - 26:13
motion [2] - 24:14, 25:6
Motz [1] - 15:6
MOUNTAIRE [1] - 1:6
Mountaire [11] - 7:1,
7:3, 7:14, 9:4, 10:7,
12:23, 17:4, 18:15,
19:21, 20:24, 66:5
moved [1] - 57:20
MR [94] - 2:3, 11:3,
11:6, 11:9, 11:15, 11:20,
11:25, 12:6, 12:15,
12:17, 14:4, 14:7, 14:11,
16:22, 16:24, 18:1, 18:3,
18:6, 19:9, 19:16, 19:20,
22:12, 23:19, 27:2, 27:5,
27:12, 27:18, 27:20,
27:24, 28:3, 28:5, 28:10,
28:13, 28:16, 29:1, 29:8,
29:11, 29:19, 29:21,
29:23, 30:2, 30:24, 31:2,
31:4, 31:22, 33:12,
33:16, 33:24, 34:3, 34:9,
39:18, 43:3, 43:16,
43:22, 43:24, 44:1,
45:15, 46:8, 46:11,
46:15, 46:17, 46:23,
48:1, 48:6, 54:20, 54:25,
55:20, 56:5, 56:8, 56:11,
56:16, 56:18, 56:23,
57:3, 57:7, 57:12, 57:14,
58:11, 58:19, 58:22,
58:25, 59:12, 60:23,
60:25, 62:22, 63:6, 63:9,
63:11, 64:14, 64:21,
64:22, 65:1, 65:5, 65:9
MS [5] - 23:20, 25:20,
26:15, 26:22, 26:25
Mt [3] - 34:18, 34:20,
34:21
Murphy [1] - 39:25
must [2] - 32:19, 63:18

## N

name [1] - 10:8
named [1] - 3:8
names [2] - 14:15, 48:8
narrowest [1] - 30:23
narrowly [1] - 30:18
nationwide [1] - 17:13
nature [1] - 44:9
nearly [1] - 56:7
necessarily [2] - 29:19,
35:24
need [6] - 3:3, 5:2, 5:17,
27:23, 50:14, 50:20
needed [1] - 26:21
needn't [1] - 5:11

net [3] - 32:4, 50:1, 53:3
nets [5] - 37:5, 37:18,
40:3, 42:10, 53:1
neutrality [1] - 17:20
never [1] - 47:22
nevertheless [1] -
62:10
next [7] - 11:5, 13:6,
15:1, 37:4, 39:12, 42:24,
46:2
nice [4] - 8:16, 13:17,
19:3, 43:3
night [1] - 14:20
nine [1] - 5:19
Nine [1] - 3:22
Ninth [4] - 3:8, 16:16,
24:24, 32:2
NO [1] - 1:5
nobody [4] - 9:9, 10:5,
10:6, 46:4
nobody's [1] - 11:9
non [9] - 21:16, 22:22,
24:11, 27:20, 27:25,
32:5, 32:10, 37:24
non-compensable [2] -
24:11, 32:5
non-generic [1] - 32:10
non-issue [1] - 22:22
non-required [1] -
21:16
non-union [2] - 27:20,
27:25
non-unique [2] - 32:10,
37:24
none [2] - 33:8, 35:24
nonsensical [1] - 21:2
noon [1] - 60:4
norm [1] - 15:10
normal [2] - 20:1,
34:10, 63:15
normally [4] - 16:1,
23:1, 34:11, 45:21
North [5] - 4:9, 4:16,
17:3, 18:16, 18:19
NORTHERN [1] - 1:2
Northern [1] - 39:25
noted [1] - 48:3
notes [1] - 44:6
nothing [7] - 19:1,
25:16, 36:3, 48:6, 49:17,
52:7, 62:21
notice [1] - 3:21
notified [1] - 17:7
nuclear [1] - 28:25
Number [6] - 2:8, 3:22,
6:8, 9:19, 23:4
number [15] - 3:1, 3:16,
19:11, 20:11, 20:14,
20:15, 24:23, 40:4,
55:21, 57:9, 57:11,

58:14, 58:15, 63:13
Number(s [1] - 66:5
numbers [1] - 57:22

## O

obey [1] - 15:20
object [1] - 57:7
obligations [1] - 18:21
obliterate [1] - 14:10
observe [1] - 10:2
observed [2] - 23:10,
49:23
obtain [2] - 44:22, 44:23
obtained [1] - 13:13
obtaining [3] - 23:8,
43:19, 56:3
obviously [1] - 4:9
occasionally [1] - 49:1
Ocean [1] - 19:2
odd [2] - 32:19, 60:9
odds [1] - 23:20
OF [1] - 1:1
official [1] - 66:8
Official [1] - 66:16
officials [1] - 10:7
often [6] - 19:23, 22:4,
24:8, 27:5, 49:1
Oliver [1] - 1:19
Once [2] - 25:9, 50:17
once [9] - 24:20, 30:19,
30:20, 40:17, 41:15,
44:25, 54:9, 57:25
one [42] - 2:5, 5:8, 6:22,
8:6, 9:1, 9:6, 9:20, 12:3,
12:4, 12:23, 12:24, 16:7,
16:23, 17:19, 18:13,
20:24, 21:3, 22:12, 23:7,
26:12, 29:11, 29:14,
30:20, 31:13, 33:17,
36:20, 37:2, 39:8, 39:12,
41:10, 42:24, 43:1, 46:2,
49:10, 51:2, 51:19,
51:20, 55:20, 55:21,
56:10, 61:12, 61:20
One [11] - 2:20, 4:5,
6:19, 9:14, 16:11, 17:3,
17:22, 22:17, 23:25,
31:9, 50:10
one's [1] - 19:3
ones [1] - 52:18
ongoing [1] - 26:16
operated [2] - 23:15
opinion [9] - 5:10, 20:8,
30:15, 33:10, 34:3,
41:11, 64:11, 64:23, 65:2
opinions [1] - 15:7
opportunities [1] -
17:18

opportunity [2] - 9:24,
11:21
opposed [2] - 6:20,
44:23, 52:4
opt [6] - 6:20, 6:24,
6:25, 7:2, 26:13
opt-in [2] - 6:25, 26:13
optimistic [1] - 33:5
Option [1] - 43:18
option [10] - 8:11, 9:2,
9:3, 13:18, 14:16, 14:21,
43:15, 43:16, 44:12,
48:23
order [2] - 3:3, 24:25
ordinarily [2] - 34:12,
38:8
ordinary [1] - 34:14
orientation [1] - 49:10
otherwise [5] - 10:21,
19:18, 51:8
outs [3] - 47:25, 48:1,
48:9
outside [1] - 10:3
overall [2] - 2:16, 35:10
overcame [1] - 6:10
overcome [1] - 15:24
overlooked [2] - 21:10,
21:11
overly [1] - 17:17,
17:19, 33:5
overoptimistic [2] -
28:17, 28:19
overtime [1] - 15:14
own [2] - 11:23, 51:4

## P

packet [1] - 15:1
Page [5] - 10:1, 10:10,
14:12, 44:6
page [4] - 14:12, 14:19,
24:4, 50:24
Pages [2] - 6:8, 9:20
pages [1] - 66:7
paid [4] - 6:25, 7:18,
7:19, 15:14
painting [1] - 35:11
pants [1] - 36:17
Paragraph [1] - 50:24
part [14] - 2:8, 2:16, 3:4,
15:12, 17:10, 17:19,
24:17, 30:11, 31:14,
31:23, 31:24, 40:7, 43:4,
58:16
particular [6] - 29:15,
32:23, 39:14, 51:12,
51:16
particularly [1] - 49:25
parts [3] - 5:1, 5:23,

7:20
passage [1] - 49:14
past [1] - 42:22
Patel [1] - 3:18
paucity [2] - 64:6, 64:7
Paul [1] - 1:19
pay [5] - 5:20, 17:6,
17:15, 35:17, 38:6, 46:22
paying [1] - 5:12
pedestrian [2] - 21:5,
59:7
Pennsylvania [1] - 25:5
people [37] - 6:23, 7:17,
8:8, 8:22, 8:24, 9:2,
12:20, 12:24, 13:3,
20:20, 21:4, 22:15,
22:18, 22:19, 25:22,
26:16, 26:17, 27:21,
29:6, 36:19, 40:4, 40:5,
40:15, 43:2, 46:19,
48:13, 48:22, 48:25,
49:22, 49:23, 56:7, 59:6,
63:2, 65:5
percentage [1] - 48:22
Perez [1] - 66:4
PEREZ [1] - 1:4
perfectly [1] - 59:1
perform [3] - 3:3, 7:5,
54:8
performance [1] - 54:7
performed [2] - 6:2,
51:8
performing [1] - 26:4
perhaps [4] - 11:1,
22:25, 29:3, 30:13
period [7] - 24:1, 24:2,
24:11, 24:13, 25:24,
51:14, 62:13
periods [4] - 17:9, 24:6,
24:7, 24:10
permit [1] - 26:10
person [4] - 46:6,
46:14, 60:18, 62:23
personal [1] - 7:15
persuading [1] - 15:20
persuasive [1] - 64:7
phrase [1] - 45:1
pick [5] - 10:10, 11:1,
19:11, 30:25, 63:13
picked [1] - 23:5
Picking [1] - 29:9
picture [1] - 17:19
pictured [1] - 45:23
piece [2] - 16:17, 21:12
pike [1] - 39:3
Pilgrim's [3] - 39:6,
39:19, 61:17
place [8] - 2:19, 20:24,
35:4, 44:10, 44:14,
50:14, 54:7, 54:15

**plain** [1] - 15:19
**plaintiff** [8] - 8:11, 16:3, 16:4, 44:4, 47:21, 58:14, 58:21, 60:8
**plaintiff's** [1] - 33:5
**Plaintiff's** [5] - 2:8, 3:22, 9:19, 10:1, 10:9
**plaintiffs** [26] - 3:2, 6:3, 6:16, 8:13, 9:11, 14:17, 15:23, 15:25, 18:22, 18:24, 19:24, 20:2, 22:21, 26:13, 28:16, 28:17, 31:19, 36:21, 39:9, 43:19, 45:1, 45:7, 49:11, 51:13, 51:22, 54:2
**Plaintiffs** [1] - 1:16
**Plaintiffs'** [4] - 12:25, 13:2, 14:12, 24:4
**plaintiffs'** [10] - 16:15, 16:16, 16:20, 17:11, 34:23, 42:3, 51:24, 54:19, 58:17, 58:18
**plan** [1] - 52:1
**plant** [27] - 2:17, 4:9, 6:22, 7:17, 8:19, 8:25, 9:20, 9:23, 10:3, 10:11, 10:19, 11:5, 12:5, 12:6, 12:24, 17:3, 17:4, 20:3, 23:14, 26:17, 27:6, 28:25, 35:13, 44:14, 52:16, 59:6
**plants** [4] - 4:8, 17:3, 17:5, 18:16, 38:21, 38:23, 39:7, 50:18
**plate** [1] - 2:22
**playing** [1] - 12:10
**pleasant** [1] - 63:19
**pleasure** [3] - 63:21, 64:1, 64:20
**ploy** [1] - 13:23
**plug** [1] - 19:12
**plugged** [1] - 20:12
**plugs** [5] - 32:4, 37:5, 37:18, 42:11, 50:1
**plus** [1] - 17:1
**point** [25] - 5:18, 14:14, 19:8, 22:6, 26:7, 34:2, 39:2, 40:18, 42:13, 46:24, 47:22, 51:22, 51:25, 53:2, 56:19, 56:24, 57:14, 57:24, 59:16, 60:11, 61:13, 62:18, 63:12
**pointed** [6] - 35:7, 38:2, 40:9, 47:20, 57:18, 60:12
**points** [8] - 41:14, 41:15, 43:24, 52:7, 52:14, 55:10, 55:23
**policy** [9] - 9:15, 13:7, 45:17, 48:21, 49:8, 49:15

**portal** [4] - 38:7, 40:12
**Portal** [14] - 3:15, 4:15, 34:17, 34:19, 53:25, 54:3, 54:11
**portal-to-portal** [2] - 38:7, 40:12
**Portal-to-Portal** [7] - 3:15, 4:15, 34:17, 34:19, 53:25, 54:3, 54:11
**portions** [1] - 49:24
**position** [22] - 16:16, 17:8, 20:2, 25:19, 34:22, 38:18, 39:5, 44:6, 44:11, 44:16, 44:17, 47:8, 47:11, 50:12, 54:17, 61:2, 61:4, 61:5, 62:1, 62:3, 62:15
**positions** [1] - 24:9
**possible** [1] - 13:20
**possibly** [1] - 57:5
**post** [1] - 25:14
**post-shift** [1] - 25:14
**postliminary** [10] - 28:24, 31:2, 32:11, 32:22, 40:7, 42:21, 49:7, 59:17, 61:9, 61:10
**postliminary/ preliminary** [5] - 36:1, 37:25, 42:14, 53:25, 61:8
**Pottery** [3] - 34:18, 34:21, 34:22
**pottery** [1] - 35:12
**poultry** [8] - 17:3, 17:7, 24:3, 38:18, 38:21, 38:23, 39:7
**Powell** [1] - 20:7
**power** [1] - 28:25
**PPE** [6] - 5:3, 7:15, 8:16, 55:15, 56:4, 56:5
**practical** [6] - 5:24, 6:5, 10:15, 10:17, 32:12, 48:19
**practicalities** [1] - 8:9
**practice** [1] - 63:20
**practices** [2] - 38:24, 39:8
**pre** [1] - 25:14
**pre-shift** [1] - 25:14
**precedent** [3] - 18:14, 64:6, 64:7
**preceding** [1] - 16:5
**Precisely** [1] - 62:22
**predicated** [1] - 15:21
**preliminary** [14] - 28:24, 31:2, 32:11, 32:22, 35:3, 35:17, 35:18, 35:21, 40:8, 42:21, 49:7, 59:17, 61:9, 61:10
**Preliminary** [1] - 19:16
**premises** [2] - 44:10,

45:2
**present** [4] - 19:24, 51:19, 63:14
**presumably** [1] - 10:25
**pretty** [10] - 38:15, 40:13, 41:6, 41:17, 45:4, 45:11, 55:15, 55:17, 55:19, 63:6
**prevailing** [1] - 61:21
**previous** [1] - 15:7
**price** [1] - 9:2
**Pride** [3] - 39:7, 39:19, 61:18
**primarily** [2] - 38:3, 40:22
**primary** [1] - 40:16
**principal** [8] - 2:16, 3:5, 3:14, 24:17, 40:11, 54:7, 54:10, 54:15
**privilege** [2] - 48:1, 48:4
**problem** [11] - 11:3, 30:3, 41:13, 42:7, 43:4, 44:16, 44:20, 46:23, 52:6, 55:7
**problems** [1] - 9:13
**proceeding** [1] - 27:13
**Proceedings** [2] - 2:1, 65:12
**proceedings** [2] - 66:4, 66:8
**process** [5] - 7:3, 41:3, 41:9, 53:5, 64:16
**processing** [1] - 39:7
**produced** [1] - 48:3
**production** [6] - 12:8, 22:19, 37:7, 37:11, 37:15, 57:21
**program** [1] - 20:12
**prohibited** [1] - 16:10
**project** [1] - 13:5
**promise** [1] - 64:11
**promulgating** [1] - 14:22
**proof** [5] - 6:6, 15:20, 15:25, 19:4, 28:18
**proper** [1] - 54:18
**properly** [1] - 62:6
**proposition** [3] - 3:23, 25:21, 40:18
**protecting** [1] - 37:15
**protection** [1] - 62:25
**protective** [6] - 3:13, 4:18, 4:19, 7:15, 20:17, 35:13
**proven** [2] - 57:10, 62:9
**provide** [2] - 36:9, 47:20, 62:25
**provides** [2] - 16:18, 43:12
**provision** [1] - 15:15

**pudding** [1] - 6:6
**pulled** [1] - 32:1
**purpose** [4] - 5:3, 13:14, 40:16, 62:11
**purposes** [1] - 35:14
**pursue** [1] - 14:6
**pursued** [1] - 14:7
**put** [35] - 3:3, 8:19, 11:4, 11:16, 11:18, 12:11, 13:20, 17:9, 20:23, 21:1, 21:11, 21:16, 23:6, 24:8, 30:12, 37:8, 37:9, 41:2, 41:4, 41:21, 45:17, 46:1, 46:2, 47:15, 49:9, 49:10, 52:16, 53:4, 57:15
**puts** [2] - 8:6, 62:14
**putting** [17] - 4:18, 20:17, 34:24, 34:25, 35:4, 35:7, 35:9, 35:11, 35:18, 35:19, 35:25, 36:1, 38:4, 41:5, 52:15, 56:6
**puzzle** [1] - 21:13

**Q**

**quantification** [2] - 19:15, 63:15
**questions** [2] - 63:12, 64:17
**quickly** [1] - 62:24
**quirk** [1] - 60:9
**quite** [7] - 5:5, 19:21, 29:4, 32:8, 63:19, 64:12, 65:3
**quote** [13] - 2:9, 2:15, 3:4, 3:5, 9:18, 10:3, 10:4, 19:24, 19:25, 44:7, 54:6
**Quote** [1] - 9:21
**quote-unquote** [1] - 9:18
**quoting** [1] - 15:4

**R**

**rack** [5] - 8:20, 13:1, 20:22, 46:15, 46:16
**racks** [1] - 45:17
**radiation** [1] - 29:9
**Radwin** [5] - 5:15, 19:7, 21:10, 21:25, 22:17, 22:24, 23:12, 52:2, 53:15, 59:12
**Radwin's** [8] - 19:12, 23:11, 41:13, 51:21, 51:22, 51:25, 52:12, 55:7
**raised** [1] - 22:23

**random** [1] - 22:14
**range** [1] - 60:21
**rather** [1] - 64:12
**rational** [1] - 11:10
**reacted** [1] - 40:12
**reacting** [1] - 35:22
**read** [3] - 3:22, 44:2, 44:18
**reading** [5] - 28:17, 28:19, 31:5, 33:5, 34:18
**reads** [1] - 47:3
**ready** [1] - 46:2
**real** [2] - 8:16, 23:12
**realistic** [1] - 51:2
**reality** [1] - 18:20
**realize** [2] - 9:1, 18:17
**realizing** [1] - 18:24
**really** [23] - 11:13, 11:18, 12:17, 17:17, 21:14, 22:22, 23:13, 26:18, 36:16, 36:25, 43:9, 45:8, 51:6, 52:4, 52:13, 53:4, 57:1, 58:21, 60:1, 63:19, 63:20, 63:23, 64:8
**reason** [8] - 9:14, 11:9, 18:10, 38:17, 41:10, 43:4, 46:18, 51:21
**reasonable** [8] - 15:21, 19:24, 40:5, 57:12, 60:18, 60:19, 60:21, 63:15
**reasonably** [2] - 57:10, 57:11
**reasoning** [1] - 29:3
**reasons** [2] - 7:12, 13:7
**rebuttal** [1] - 63:10
**receiving** [1] - 24:10
**recent** [2] - 5:10, 38:11
**recently** [1] - 37:22
**recess** [1] - 65:11
**reckless** [1] - 16:9
**recognize** [1] - 4:12
**record** [8] - 2:7, 4:25, 9:6, 9:7, 49:20, 59:12, 59:19, 64:12
**recorded** [1] - 66:3
**records** [6] - 19:21, 19:22, 20:5, 58:9, 58:10, 63:14
**recover** [1] - 16:4
**reduced** [1] - 20:1
**referenced** [1] - 39:21
**referencing** [1] - 42:14
**refers** [1] - 25:21
**regard** [1] - 16:15
**regardless** [1] - 37:11
**regular** [4] - 6:2, 7:5, 27:23, 45:14
**regulation** [1] - 44:5

reiterated [1] - 17:8
rejected [1] - 33:6
related [2] - 42:17, 42:24
relatively [2] - 38:11, 59:15
released [1] - 53:16
relevant [1] - 4:5
relied [5] - 6:10, 18:17, 61:16, 61:17
rely [1] - 29:4
remember [7] - 9:14, 12:1, 32:3, 38:10, 45:19, 46:17, 53:2
Remember [2] - 9:23, 45:22
remind [4] - 18:3, 26:23, 27:16, 39:16
reminded [2] - 27:23, 49:13
remote [1] - 22:25
removed [1] - 24:5
removing [2] - 4:18, 35:10
rendering [2] - 14:13, 61:2
repeat [1] - 59:5
report [1] - 52:9
Reported [1] - 1:22
Reporter [2] - 66:16
REPORTER'S [1] - 66:1
require [1] - 36:2
required [17] - 5:4, 21:12, 21:16, 21:20, 21:21, 36:10, 37:1, 37:6, 38:2, 44:8, 44:12, 45:2, 45:5, 52:21, 52:22, 53:7
requirement [5] - 7:4, 36:18, 37:10, 37:11, 37:14
requirements [1] - 25:1
requires [1] - 42:16
respect [3] - 6:5, 9:16, 21:2
respects [1] - 64:4
responded [1] - 10:3
response [2] - 24:14, 34:19
rest [1] - 25:1
result [1] - 9:17
resulted [1] - 24:10
retracted [1] - 9:15
returning [1] - 24:7
riding [1] - 54:6
rights [2] - 18:24, 47:22
rinse [1] - 53:12
Room [1] - 1:23
room [5] - 8:18, 20:20, 55:16, 55:19, 57:21

rooted [1] - 17:20
rosy [1] - 17:19
roughly [2] - 6:22, 7:6
rounds [1] - 5:16
routine [1] - 13:1
row [1] - 26:19
Roy [1] - 50:23
RPR [1] - 1:22
rubber [2] - 35:14, 40:9
rule [20] - 4:2, 5:17, 5:19, 6:25, 10:18, 13:8, 14:22, 18:25, 21:15, 14:21, 28:9, 31:4, 32:1, 32:15, 43:1, 43:10, 43:11, 43:12, 51:11, 51:12
ruled [3] - 27:2, 27:7, 28:7
rules [6] - 13:15, 15:9, 17:6, 18:25, 21:18, 63:16
ruling [1] - 33:1
run [3] - 14:17, 64:18
running [1] - 6:24

## S

s' [1] - 58:21
safe [2] - 40:22, 65:8
safely [1] - 3:3
safety [2] - 40:18, 40:21
sample [1] - 40:5
Sanderson [2] - 39:18, 61:17
Sanderson's [1] - 39:6
sanitize [1] - 24:8
sanitized [1] - 41:4
sanitizing [1] - 21:9, 24:16, 41:9, 59:8
saw [16] - 7:6, 8:20, 9:20, 10:6, 12:7, 12:16, 20:16, 20:19, 21:4, 45:19, 53:2, 54:23, 59:5, 59:6
scattered [1] - 58:13
school [1] - 30:17
score [1] - 17:21
screen [2] - 20:18, 49:10
seashores [1] - 35:8
Second [4] - 28:22, 28:23, 32:18, 61:7
second [4] - 23:23, 24:4, 31:13, 41:19
Secondly [2] - 6:12, 22:4
seconds [7] - 41:21, 41:22, 41:23, 41:24, 41:25
secure [1] - 12:7, 29:6

security [8] - 29:7, 29:18, 29:23, 30:1, 30:2, 30:5, 30:7, 30:8
see [22] - 9:24, 12:13, 22:2, 23:4, 23:5, 24:4, 27:13, 30:6, 33:2, 33:9, 38:15, 39:5, 39:6, 40:2, 41:2, 41:25, 42:22, 46:4, 47:7, 47:17, 48:23, 56:24
seeking [2] - 25:22, 29:24
seem [2] - 23:13, 63:16
Selbyville [1] - 26:17, 26:24, 27:13, 27:17, 28:5
Selbyville's [1] - 27:18
sense [7] - 8:7, 10:18, 27:13, 28:6, 36:25, 43:5, 62:7
sensible [1] - 8:24
sent [3] - 50:10, 61:22
sentencing [1] - 60:3
separate [2] - 25:2, 42:16
separately [1] - 25:2
September [1] - 4:11
set [4] - 12:7, 15:6, 39:22, 39:23
sets [2] - 15:6, 44:22
setting [1] - 13:23
settle [1] - 63:25
Seventh [4] - 32:18, 32:23, 33:1, 61:8
several [1] - 22:1
shall [1] - 31:15
shelf [1] - 12:11
shift [5] - 24:19, 25:14, 53:17, 53:18
shirts [1] - 35:10
shoes [2] - 36:10, 36:14
Shore [1] - 35:8
short [1] - 22:14
show [3] - 8:1, 15:8, 62:25
showed [1] - 16:8
showering [3] - 34:10, 34:12, 38:9
showing [1] - 63:4
shows [2] - 9:6, 49:22
side [1] - 43:7
sides [1] - 40:18
signature [1] - 66:11
signed [1] - 14:18
significance [1] - 27:22
Significant [1] - 2:19
significant [1] - 3:16
signing [1] - 14:15
similar [1] - 29:14
similarly [1] - 25:12
single [2] - 25:25, 26:3

sit [3] - 28:6, 55:9, 61:16
site [1] - 12:25
sitting [1] - 20:7
situation [5] - 3:6, 25:25, 27:25, 34:13, 44:21
situations [1] - 27:25
size [1] - 8:22
skirt [1] - 16:20
sleeves [1] - 8:4
slightly [1] - 10:8
slow [1] - 53:3
small [3] - 6:1, 6:12, 59:15
smock [44] - 7:22, 7:23, 8:1, 8:3, 8:5, 9:20, 9:22, 10:3, 10:11, 10:12, 10:14, 10:20, 11:1, 11:13, 11:19, 12:9, 12:14, 12:25, 20:22, 23:5, 23:8, 32:5, 34:25, 37:6, 37:19, 45:14, 45:20, 45:25, 46:1, 46:4, 46:5, 46:7, 46:12, 46:14, 46:15, 46:16, 48:16, 49:1, 49:2, 49:3, 50:6, 53:4
smocks [6] - 8:20, 11:23, 42:10, 45:17, 46:18, 46:22
sneakers [1] - 36:23
soiled [2] - 10:16, 45:20
Solutions [1] - 25:4
someone [1] - 22:2
Something's [1] - 18:9
sometime [1] - 47:2
sometimes [2] - 33:21, 35:23
Sometimes [1] - 52:15
somewhat [2] - 4:5, 29:12
sooner [1] - 64:11
sort [8] - 8:21, 11:23, 12:3, 15:3, 16:24, 17:13, 23:9, 52:11
Southern [1] - 17:14
speaking [3] - 6:22, 7:6, 8:5
specifically [2] - 9:21, 21:8
spent [5] - 3:24, 4:17, 4:19, 24:9, 24:25
splintered [1] - 31:25
split [1] - 31:25
Spoerle [5] - 3:2, 3:12, 32:23, 32:25, 33:2
spoken [2] - 61:11, 61:12
stained [1] - 46:8

stake [1] - 6:13
stand [3] - 17:24, 49:12, 65:11
standard [9] - 3:19, 3:25, 15:3, 15:23, 20:1, 51:1, 51:18, 53:17
standardized [1] - 55:13
Standards [1] - 60:10
standards [1] - 15:7
standing [6] - 42:18, 42:19, 42:23, 44:11, 47:8, 49:15
Standing [1] - 30:24
stands [1] - 3:23
start [27] - 5:7, 17:6, 21:15, 21:19, 24:6, 26:1, 26:2, 26:3, 26:4, 30:6, 36:7, 39:2, 39:3, 42:9, 42:10, 51:21, 52:3, 52:7, 52:14, 53:11, 53:13, 53:17, 55:1, 55:18, 55:23, 56:12, 56:13
started [4] - 17:2, 45:16, 52:15, 53:3
starting [1] - 53:2
starts [9] - 12:10, 16:25, 24:21, 30:5, 39:4, 44:25, 52:19, 52:25, 53:11
State [1] - 26:9
state [2] - 25:2, 62:6
statements [4] - 48:2, 48:12
STATES [1] - 1:1
states [1] - 44:22
Statute [1] - 16:6
statute [5] - 6:24, 15:20, 16:1, 16:10, 27:24
staying [1] - 20:24
steel [3] - 36:8, 36:10, 52:17
Steiner [5] - 34:1, 34:4, 34:7, 34:8, 38:14
stenographically [1] - 66:4
step [3] - 47:19, 47:20, 62:16
still [9] - 15:12, 25:18, 26:16, 29:13, 32:16, 38:10, 61:7, 61:8, 61:20
STINE [58] - 28:13, 28:16, 29:1, 29:8, 29:11, 29:19, 29:21, 29:23, 30:2, 30:24, 31:2, 31:4, 31:22, 33:12, 33:16, 33:24, 34:3, 34:9, 39:18, 43:3, 43:16, 43:22, 43:24, 44:1, 45:15, 46:8, 46:11, 46:15, 46:17, 46:23, 48:1, 48:6, 54:20,

54:25, 55:20, 56:5, 56:8, 56:11, 56:16, 56:18, 56:23, 57:3, 57:7, 57:12, 57:14, 58:11, 58:19, 58:22, 58:25, 59:12, 60:23, 60:25, 62:22, 63:6, 63:9, 64:14, 64:21, 65:9

**Stine** [9] - 1:18, 19:10, 25:15, 28:6, 28:12, 30:20, 63:8, 64:19, 64:23

**stock** [1] - 30:11

**stop** [4] - 21:15, 21:19, 39:11, 52:7

**stopping** [1] - 22:4

**storage** [1] - 45:3

**store** [2] - 45:5, 52:21

**stored** [1] - 45:2

**story's** [1] - 14:4

**strange** [2] - 22:13, 63:24

**stray** [1] - 14:9

**Street** [1] - 1:23

**strictly** [1] - 30:17

**strip** [2] - 8:4, 47:21

**stripping** [2] - 14:24, 47:23

**strong** [1] - 29:13

**structures** [1] - 32:8

**struggle** [2] - 32:16, 43:13

**struggled** [1] - 32:7

**struggling** [1] - 32:7

**studies** [2] - 23:12, 59:14

**study** [23] - 6:7, 6:9, 6:10, 22:14, 23:5, 41:10, 41:14, 51:21, 51:22, 51:25, 52:5, 52:6, 52:8, 54:12, 55:7, 56:7, 56:14, 56:20, 57:15, 58:6

**stuff** [13] - 12:7, 32:13, 33:18, 33:20, 37:4, 37:23, 43:15, 45:6, 45:7, 45:10, 45:12, 45:24, 49:25

**sub** [1] - 2:5

**sub-components** [1] - 2:5

**subject** [1] - 2:11

**submitted** [1] - 17:10

**subscribes** [1] - 9:10

**substantial** [1] - 15:19

**subtract** [1] - 41:16

**subtractive** [1] - 59:3

**Subtractive** [1] - 59:5

**sudden** [1] - 36:7

**suffice** [1] - 20:6

**suggestive** [1] - 56:25

**suggests** [2] - 5:10,

26:10

**suit** [1] - 7:3

**summary** [11] - 24:14, 25:6, 39:17, 39:18, 39:20, 49:20, 63:25, 64:25, 65:1

**summed** [1] - 60:25

**summer** [1] - 11:15

**sundry** [1] - 49:24

**super** [1] - 29:6

**supervisor** [1] - 49:18

**Supp** [1] - 15:5

**supplies** [2] - 20:21, 30:25

**support** [2] - 22:20, 25:21

**supports** [1] - 19:4

**suppose** [2] - 12:2, 57:5

**Supreme** [2] - 16:7, 16:16, 16:18, 16:19, 28:18, 30:14, 30:18, 31:14, 31:20, 33:24, 34:5, 34:20, 34:21, 35:2, 35:15, 35:16, 38:4, 38:6, 38:8, 40:10, 42:19, 42:23

**surprise** [1] - 65:3

**surprised** [1] - 33:9

**survey** [2] - 38:22, 38:24

**surveyed** [1] - 17:3

**surveys** [2] - 17:2, 38:19

**sweater** [1] - 21:16

**sweaters** [1] - 21:18

**swim** [1] - 19:2

**system** [3] - 6:23, 19:13, 22:16

## T

**table** [1] - 43:7

**take-home** [5] - 7:10, 7:13, 7:14, 13:8, 18:25

**talks** [4] - 28:1, 34:10, 37:20, 50:2

**tapes** [1] - 55:8

**task** [1] - 38:2

**taught** [1] - 30:16

**tea** [1] - 44:18

**technical** [1] - 2:6

**ten** [7] - 5:10, 5:11, 5:12, 5:17, 5:18, 21:24, 57:5

**term** [3] - 19:14, 22:11, 44:17

**terms** [4] - 6:13, 16:12, 20:10, 21:25

**test** [8] - 2:18, 3:7, 3:9, 5:23, 5:24, 23:13, 51:7

**testified** [7] - 9:11, 9:19, 22:1, 22:20, 36:21, 37:8, 51:23

**testify** [2] - 49:9, 51:23

**testimony** [5] - 19:12, 49:17, 49:19, 51:24, 54:23

**THE** [99] - 1:1, 1:1, 2:2, 10:23, 11:4, 11:7, 11:11, 11:18, 11:22, 12:2, 12:13, 12:16, 13:25, 14:6, 14:9, 16:14, 16:23, 17:25, 18:2, 18:4, 19:8, 19:14, 19:19, 22:11, 23:18, 25:19, 26:14, 26:20, 26:23, 27:4, 27:11, 27:16, 27:19, 27:22, 28:1, 28:4, 28:9, 28:11, 28:15, 28:25, 29:2, 29:9, 29:17, 29:20, 29:22, 29:25, 30:10, 31:1, 31:3, 31:21, 33:8, 33:13, 33:18, 34:2, 34:8, 39:16, 43:1, 43:9, 43:18, 43:23, 43:25, 45:13, 46:4, 46:10, 46:13, 46:16, 46:21, 47:24, 48:5, 54:17, 54:22, 55:14, 56:3, 56:7, 56:9, 56:13, 56:17, 56:21, 56:24, 57:4, 57:8, 57:13, 58:7, 58:13, 58:20, 58:24, 59:4, 60:20, 60:24, 62:20, 63:4, 63:8, 63:10, 63:18, 64:19, 64:25, 65:3, 65:7, 65:10

**themselves** [1] - 4:15

**theoretically** [1] - 46:6

**theories** [1] - 59:1

**theory** [1] - 32:6

**therefore** [6] - 4:20, 6:10, 13:19, 20:4, 24:11, 30:5

**thereof** [1] - 28:2

**they've** [2] - 53:16, 62:9

**They've** [2] - 8:18, 8:19, 8:23

**thinks** [1] - 62:17

**Third** [5] - 4:7, 4:11, 18:18, 25:8

**third** [3] - 7:4, 16:5, 62:5

**Three** [2] - 14:12, 44:7

**three** [7] - 5:23, 6:4, 7:2, 16:5, 59:20, 61:19, 64:23

**throughout** [1] - 23:22

**throw** [2] - 45:20, 45:21

**thrust** [1] - 30:15

**Thursday** [1] - 36:22

**timed** [1] - 23:12

**timing** [1] - 41:19

**tiny** [1] - 26:12

**Tip** [1] - 39:21

**Tirrell** [2] - 13:16, 17:22, 18:10, 38:19, 46:17, 47:2

**Tirrell's** [2] - 18:4, 46:24

**today** [3] - 4:6, 4:24, 55:3

**toe** [2] - 36:8, 36:10, 52:17

**together** [2] - 2:4, 17:9

**took** [9] - 22:17, 22:21, 34:22, 44:21, 45:16, 53:3, 57:20, 61:5

**tools** [2] - 41:15, 58:4

**Top** [1] - 39:21

**toss** [1] - 45:25

**total** [1] - 64:6

**totally** [2] - 8:2, 52:1

**touch** [1] - 42:5

**touches** [1] - 2:22

**touching** [3] - 53:3, 54:15, 56:6

**tough** [1] - 5:20

**toward** [1] - 14:24

**trade** [1] - 30:12

**traffic** [1] - 59:7

**transcribed** [1] - 66:8

**transcript** [3] - 5:1, 49:17, 66:8

**travel** [9] - 53:9, 53:19, 53:21, 53:22, 53:24, 54:4, 55:21, 57:19, 57:20

**traveling** [3] - 53:15, 54:6, 54:11

**treat** [2] - 11:23, 54:4

**Trial** [1] - 1:10

**trial** [3] - 39:19, 63:23, 64:16

**trials** [1] - 63:24

**tried** [1] - 23:13

**trigger** [7] - 41:14, 41:15, 52:14, 55:23, 56:3, 56:19, 59:16

**triggering** [2] - 55:1, 55:4

**triggers** [5] - 16:5, 23:8, 55:2, 59:24, 62:7

**trip** [1] - 65:8

**trouble** [1] - 7:9

**true** [4] - 42:17, 50:16, 53:20, 54:14

**truncation** [1] - 26:10

**trust** [1] - 27:9

**try** [2] - 23:22, 62:15

**Trying** [1] - 14:11

**trying** [6] - 18:25, 33:20, 42:4, 44:18, 49:5,

51:14

**Tuesday** [1] - 36:22

**turn** [1] - 24:22

**turns** [1] - 24:20

**TV** [1] - 49:10

**Two** [2] - 38:22, 43:24

**two** [16] - 4:8, 7:20, 9:24, 15:16, 16:1, 16:11, 20:10, 23:24, 30:24, 31:8, 38:19, 58:9, 58:10, 58:11, 61:6

**type** [6] - 36:17, 37:1, 38:6, 40:7, 41:9, 48:21, 51:10, 52:12, 54:1

**types** [3] - 36:9, 36:14, 58:5

**typical** [2] - 22:9, 22:10

**typically** [2] - 19:23, 50:8

**Typically** [1] - 21:5

**Tyson** [1] - 25:12

## U

**U.S** [1] - 1:23

**uncomfortable** [1] - 36:15

**under** [20] - 2:21, 3:14, 4:14, 4:20, 5:11, 6:14, 15:15, 16:1, 18:21, 19:21, 30:9, 32:6, 32:20, 34:10, 37:1, 49:7, 50:18, 54:18, 55:2, 60:18

**undercounted** [1] - 22:1

**underpinning** [1] - 9:8

**understood** [1] - 43:12

**undisputable** [1] - 53:10

**unfair** [1] - 15:22

**unfolded** [1] - 14:8

**unfortunate** [2] - 6:19, 6:23

**union** [2] - 27:20, 27:25

**unionized** [2] - 27:18, 27:19, 27:25

**unique** [2] - 32:10, 37:24

**unit** [2] - 35:23, 37:4

**UNITED** [1] - 1:1

**units** [3] - 41:12, 52:9, 55:12

**unmistakable** [1] - 53:10

**unquote** [1] - 9:18

**up** [27] - 10:10, 11:1, 12:7, 13:24, 14:25, 16:12, 18:20, 21:23, 23:5, 29:7, 29:9, 30:25,

32:2, 32:19, 32:20, 33:17, 35:11, 35:15, 39:12, 49:10, 53:13, 55:18, 56:9, 56:15, 60:4, 60:25, 62:14
**ups** [1] - 21:5
**urgent** [1] - 26:21
**USC** [1] - 54:5
**useful** [1] - 56:19
**useless** [2] - 41:17, 52:1
**uses** [7] - 20:19, 41:20, 47:14, 53:7, 53:9, 56:5, 56:12

## V

**valid** [1] - 37:2
**validity** [1] - 32:25
**various** [4] - 2:4, 7:11, 8:13, 49:24
**verdict** [1] - 15:23
**versa** [1] - 55:18
**vice** [1] - 55:18
**video** [5] - 40:2, 40:4, 41:2, 49:22, 54:22
**videos** [5] - 8:21, 12:16, 36:6, 53:2, 55:15
**view** [9] - 10:8, 16:19, 40:18, 46:24, 47:22, 51:25, 60:11, 62:18
**violating** [1] - 18:11
**violation** [1] - 16:4
**violations** [1] - 16:8
**virtually** [1] - 62:8
**visibly** [1] - 46:8

## W

**Wage** [12] - 38:17, 38:25, 39:4, 44:2, 47:1, 47:4, 47:7, 47:12, 49:5, 61:3, 62:14, 62:18
**wage** [1] - 25:4
**wages** [1] - 62:13
**wait** [2] - 24:8, 29:8
**waiting** [5] - 3:24, 4:14, 6:15, 27:8, 44:23
**wake** [1] - 18:20
**walk** [10] - 12:13, 20:22, 20:23, 23:1, 23:6, 24:8, 35:7, 45:13, 45:25, 46:1
**walking** [7] - 3:24, 4:14, 4:19, 30:21, 31:3, 40:5, 54:6
**walks** [1] - 52:11
**wants** [2] - 21:18, 27:15
**wash** [4] - 45:20, 45:21,

53:12, 55:18
**washing** [3] - 21:6, 21:8, 59:8
**Washington** [1] - 26:9
**watch** [1] - 41:25
**watched** [2] - 41:2, 54:22
**watching** [1] - 36:6
**ways** [7] - 7:7, 22:1, 23:24, 34:9, 34:22, 58:14, 58:15
**wear** [21] - 10:14, 10:15, 11:13, 12:4, 20:25, 36:12, 36:13, 36:15, 36:16, 36:17, 36:19, 36:22, 40:6, 40:15, 46:7, 49:3, 49:24, 49:25, 52:17
**wearing** [11] - 10:2, 12:20, 12:21, 36:8, 36:9, 40:6, 48:16, 48:25, 49:2, 49:22, 49:24
**weave** [1] - 2:4
**Wednesday** [1] - 36:22
**week** [3] - 23:22, 26:12, 49:2
**weeks** [3] - 9:24, 13:18, 64:23
**West** [1] - 1:23
**wham** [3] - 47:1, 47:2, 62:14
**whatsoever** [1] - 51:23
**Whereof** [1] - 66:10
**White** [2] - 39:21, 39:24
**white** [1] - 21:20
**whole** [8] - 14:4, 24:1, 24:12, 25:22, 51:14, 53:4, 59:12, 59:20
**wife's** [1] - 18:3
**willful** [6] - 16:4, 16:8, 18:23, 60:8, 61:18, 62:2
**willfully** [1] - 18:11
**willfulness** [5] - 15:2, 15:4, 16:5, 19:5, 60:15
**Willfulness** [2] - 15:25, 60:6
**Williams** [1] - 15:5
**wins** [1] - 61:6
**winter** [1] - 11:16
**Wisconsin** [1] - 3:2
**wish** [2] - 62:24, 64:17
**witness** [3] - 10:13, 13:10, 49:9
**Witness** [1] - 66:10
**witnesses** [2] - 8:6, 12:21
**woman** [1] - 54:24
**women** [1] - 20:18
**wondered** [1] - 29:2
**wonderful** [2] - 64:16, 65:1

**wondering** [1] - 29:5
**word** [1] - 15:3
**words** [5] - 33:22, 35:25, 46:6, 54:8, 56:14
**wore** [3] - 11:11, 36:21, 36:23
**worker** [4] - 14:23, 14:24, 22:10, 45:13
**workers** [8] - 2:15, 10:2, 10:5, 10:10, 10:11, 11:22, 24:7, 44:24
**workers'** [1] - 27:2
**workings** [1] - 20:2
**works** [1] - 32:8
**world** [1] - 23:12
**worn** [1] - 21:19
**worry** [1] - 7:1
**worth** [1] - 49:4
**writ** [6] - 31:6, 31:9, 31:10, 31:12, 31:20, 31:22
**writing** [3] - 47:14, 62:24, 63:2
**written** [1] - 63:1
**wrote** [3] - 20:7, 47:18, 64:23

## Y

**year** [6] - 16:5, 16:25, 25:6, 30:16, 61:19, 62:5
**years** [5] - 2:20, 7:2, 16:1, 16:5, 38:22
**yesterday** [7] - 2:21, 22:7, 22:23, 23:3, 28:6, 36:6, 57:18

## Z

**Z-L-O-T-O-R-Z-Y-N-S-K-I** [1] - 5:1
**Zajac** [3] - 1:22, 66:3, 66:15